

RECEIVED

JUL 17 2026

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

# ATTACHMENT B

## SECOND CORRECTED PROPOSED SECOND AMENDED COMPLAINT

*Complete Redline Against ECF No. 26-1*

ALEXANDER C. GRAY,

 Plaintiff,

v.

Civil Action No. 3:25-cv-00742-RCY

**COMMONWEALTH SAVERS (f/k/a Virginia College Savings Plan),**

**MARY G. MORRIS,** in her individual and official capacities,

**CAROLYN BISHOP,** in her individual and official capacities, and

**DEBBIE ALLAN,** in her individual and official capacities,

 Defendants.

## SECOND CORRECTED PROPOSED SECOND AMENDED COMPLAINT

Plaintiff Alexander C. Gray alleges:

## I. INTRODUCTION

1. On June 23, 2025, Plaintiff emailed leadership documenting disability discrimination and requesting a meeting to discuss these concerns. On June 27 - the next business day - Defendants responded to his discrimination complaint by giving him an ultimatum: resign or be fired.

2. When Plaintiff did not resign, Defendants disabled his system access but texted at 5:09 p.m. that it would be "re-enabled Monday morning."

3. On June 30 at 8:46 a.m. ET, Plaintiff texted "I need to take PTO today for family medical reasons." At 12:13 p.m., Defendants terminated him citing "job abandonment."

1

4. Defendants reported to the Virginia Employment Commission that Plaintiff "failed to attend a scheduled meeting on 06/30/2025." No such meeting existed. Plaintiff seeks relief under the FMLA and § 1983.

## II. JURISDICTION, VENUE, AND PARTIES

5. Jurisdiction lies under 28 U.S.C. § 1331 and 29 U.S.C. § 2617(a)(2). Sovereign immunity is abrogated for family-care FMLA claims. *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721 (2003). Venue is proper under 28 U.S.C. § 1391(b).

6. Defendant Commonwealth Savers is a Virginia state agency. Plaintiff sues Defendants Morris, Bishop, and Allan in their individual capacities for damages under 42 U.S.C. § 1983, and in their official capacities only to the extent necessary to effectuate record-correction relief if ordered. Defendant Morris is Chief Executive Officer and, on information and belief, serves as Chair of the Board of Commonwealth Savers. All actions described herein were taken under color of state law. No § 1983 claim is asserted against the agency itself.

7. Plaintiff served as Director of Application Development from March 2020 until June 30, 2025, with total annual compensation of approximately $290,000.

8. As Director of Application Development, Plaintiff led two Agile teams with approximately ten (10) direct reports and multiple contractors. The teams were geographically distributed across the country with employees residing in Virginia, Pennsylvania, and Florida, collaborating daily with product owners and enterprise stakeholders. From 2020 through 2025, this work was performed on a remote-first cadence (Teams, Jira), with text messages accepted by leadership for day-of schedule notifications. Defendants repeatedly acknowledged and approved this remote cadence and the morning text notification method for PTO and availability.

2

## III. FACTUAL ALLEGATIONS

### A. Five Years of Successful Remote Performance

9. From March 2020 through February 2025, Plaintiff led application development teams across multiple states. For the first three years, Plaintiff worked entirely remotely. Beginning in 2023, he was required in office 1-4 days monthly. He consistently performed at a high level throughout this period, maintaining full productivity and meeting all deadlines.

10. On February 13, 2025, Plaintiff received a formal mid-year performance review written by CTO Mike Henry and approved by COO Carolyn Bishop. The review was predominantly rated "On Target~~" (highest rating),"~~ with no ~~performance~~disciplinary or attendance issues identified.

11. By February 2025, leadership knew Plaintiff's spouse had serious mental health conditions requiring family support available only in Utah.

### B. March 19 Escalation Following Disclosure

12. On March 19, 2025, Bishop increased Plaintiff's in-office requirement from 1-4 days monthly to three days weekly.

13. The March 19 memorandum cited anonymous complaints allegedly occurring in January 2025 and earlier. Most complaints predated the February 13 formal midyear review Bishop had approved a few weeks earlier.

### C. Successful Utah Remote Work Periods

14. On April 20, 2025, Henry approved two weeks of Utah remote work via text, stating he was "fine" with the arrangement (Ex. L).

15. On May 18, 2025, Bishop stated "you are welcome to take PTO so you can focus on her." After Plaintiff explained he needed to work, not take unpaid leave, Bishop approved remote work. Bishop suggested Plaintiff contact HR regarding FMLA (Ex. M).

16. On May 29, 2025 at 7:06 a.m., Plaintiff texted Bishop and Henry: "good morning, I need to take PTO today." Bishop replied "Ok thank you." Henry replied "Thanks" (Ex. N). This demonstrates the normal PTO notification method was morning SMS.

17. During both April and May Utah remote periods, Plaintiff maintained full productivity, met all deadlines, and received no complaints.

**D. Telework Policy and Interactive Process Failure**

18. The Telework Policy states that telework arrangements are "based on manager approval" (Path 1) and "may be considered a reasonable accommodation under the ADAAA" (Path 2). The Policy also requires that "the employee, their manager, and the Chief Engagement Officer will discuss the feasibility" of a telework arrangement (Ex. A). Despite repeated requests, no such feasibility discussion ever occurred for Plaintiff. The policy further does not require residency in Virginia, and the decision to enforce an office presence three days a week was applied inconsistently, particularly given the lack of a written policy or any reasonable accommodation discussion.

19. On June 5, 2025, HR Director Allan ~~stated~~wrote in a ~~recorded conversation~~follow-up email: "There is no policy restricting Managers from working remotely or living out of state." ~~"Tuesday through Thursday is our recommendation ... it~~(Ex. A.) In a recorded conversation, Allan described Tuesday through Thursday as "our recommendation" and stated, "It's a practice, not a policy." When asked if any policy required Virginia residency, Allan replied, "Nope." She further stated that decisions about telework are made on a case-by-case basis. Despite repeated requests for a remote work arrangement due to Plaintiff's spouse's medical condition, no formal accommodation process or feasibility discussion was initiated. (Ex. G, Recording Tr. at ~~15:15-19, 14:47-15:07~~11:03-11:07, 14:47-15:21.)

20. When pressed to identify the specific policy requiring physical presence, Allan could identify none. The written Telework Policy contained no restriction on managers working remotely.

**E. June 2025 Protected Activity and Retaliation**

21. June 13, 2025: Bishop emailed Plaintiff to use PTO for Utah days and invited him to "restart the [FMLA] process" (Ex. B).

22. Bishop's June 13 email instructed Plaintiff to use PTO for Utah caregiving days going forward, ~~stating: "I need you to utilize PTO while in Utah."~~ (Ex. B.) Defendants later paid out the accrued PTO they told Plaintiff to use, confirming he was following instructions - not "abandoning" his job.

23. June 23, 2025 at 10:22 a.m.: Plaintiff sent a detailed email documenting: (1) the shifting justifications from performance to policy to preference; (2) HR's June 5 admission that no policy existed requiring physical presence in the office; (3) disparate treatment compared to Chad Bailey's Utah approval; (4) failure to conduct the feasibility discussion required by policy; and (5) the temporal correlation between the disclosure of his spouse's disability and the escalating restrictions. Plaintiff requested a meeting to discuss these discriminatory practices. This constituted protected opposition to disability discrimination. Bishop responded within hours defensively, adding HR to the thread and stating "the ADAAA does not require accommodations to be provided for caregivers." She scheduled a meeting for June 27 (Ex. C).

**F. June 27 Retaliation Meeting**

24. At the June 27 meeting - convened ostensibly to address Plaintiff's discrimination complaints - Morris, Bishop, and Allan instead gave Plaintiff an ultimatum: resign or be terminated. They stated they had "walked through all of this with counsel" - repeating this admission twice in the recorded meeting. They offered health coverage through August if Plaintiff resigned, which

would have allowed the employer to avoid the legal risks and liabilities associated with terminating Plaintiff, including potential wrongful termination and retaliation claims. They claimed "by the legal definition you have abandoned your job" even though no absence had occurred (Ex. H).

25. The sequence of events from Plaintiff's June 23 protected opposition to the June 27 ultimatum occurred within zero business days. Plaintiff requested a meeting to discuss discrimination. Defendants responded by consulting counsel, but no final decision was made on June 27. Instead, Defendants continued to delay the decision until June 30, when the termination letter was created after Plaintiff's protected notice. (Exs. F, P, Q, E.)

26. The June 27 meeting did not effectuate a termination or provide any name-clearing opportunity; it delivered an ultimatum only. Bishop's 5:09 p.m. text ("re-enable Monday") confirms the decision was not final on June 27, and the operative termination was created and transmitted on June 30 after Plaintiff's protected notice. (Exs. F, P, Q, E.)

27. Plaintiff did not resign by close of business June 27. Defendants did not terminate Plaintiff by close of business June 27.

28. At 5:09 p.m. June 27, Bishop texted: "we are disabling your access now through the weekend and we will reenable access on Monday morning and we will reach out then" (Ex. F).

**G. June 30 FMLA Notice and Termination**

29. On June 30, 2025 at 8:46 a.m., Plaintiff texted "I need to take PTO today for family medical reasons" (Ex. E).

30. Under 29 C.F.R. § 825.303(b), no "FMLA" magic words are required for unforeseeable same-day leave, and under § 825.305(b) an employer must afford 15 days to furnish medical certification after requesting it. Terminating Plaintiff within hours of his family-medical notice -

without requesting or allowing certification - denied the FMLA benefit and supports interference and retaliation.

31. Employer knowledge and duty to inquire. Defendants had actual knowledge that Plaintiff's absences were to care for his spouse's serious health condition. On June 13, COO Bishop expressly told Plaintiff the "original FMLA eligibility notice ... [had] expired" and invited him to "restart the process" "to be with your wife." (Ex. B.) Plaintiff had repeatedly used same-day PTO texts for this caregiving need with Defendants' knowledge (e.g., May 29 text approved by COO and CTO). Given this context, Plaintiff's June 30 "family medical" text triggered Defendants' duty under 29 C.F.R. § 825.303(b) to inquire further and to provide the written rights-and-obligations notice required by § 825.300(c)(1), which they failed to do.

32. Plaintiff's June 30 text satisfied the FMLA's notice standard. Under 29 C.F.R. § 825.303(a)-(b), an employee need not mention "FMLA"; he must provide enough information for the employer to reasonably determine the FMLA may apply. The message "I need to take PTO today for family medical reasons," coupled with Defendants' June 13 "restart FMLA" invitation and their contemporaneous knowledge of Plaintiff's spouse's serious condition and prior Utah remote work for that reason (Exs. B, L, M, N), did so. See *Hannah P. v. Coats*, 916 F.3d 327, 346 (4th Cir. 2019) (duty to inquire once employer is on notice); see also *Roberts v. Gestamp W. Va., LLC*, 45 F.4th 726, 735-37 (4th Cir. 2022) (employee satisfies § 825.303 by using the employer's "usual and customary" method, even informal electronic channels).

33. Plaintiff's June 30 text followed Bishop's June 13 instruction to ~~"utilize~~use PTO ~~while in Utah"~~ for Utah caregiving. (Ex. B.) Plaintiff was complying with the employer's directive, not abandoning his job.

34. The termination-letter PDF (file name ZGray_correspondence_6 30 2025.pdf) bears Author: Jessica Geis and Created 6/30/2025 11:50 AM; Modified 11:51 AM (Eastern), confirming the document was generated after Plaintiff's 8:46 a.m. family-medical notice. The letter was then emailed to Plaintiff and copied to ~~COO Bishop~~CEO Morris, HR (Geis), and General Counsel (McGee) the same day. (Exs. P, Q, E.)

35. Payroll ~~and HRIS~~ records confirm wages through June 30, 2025, and, on information and belief, Defendants' HRIS records reflect active employment status through ~~June 30, 2025, and~~that date. Defendants' termination letter states benefits would continue "through today, June 30, 2025." (Ex. O; Ex. E.) Together with Bishop's 5:09 p.m. June 27 text ("re-enable Monday"), the 11:50 a.m. June 30 document metadata, and the VEC notation ~~"terminated~~that Plaintiff was terminated the same day ~~6/30,",~~ June 30, these records show the separation was executed after Plaintiff's 8:46 a.m. family-medical notice.

**H. False Statements to VEC**

36. Defendants reported Plaintiff "last worked 06/27/2025" and "failed to attend a scheduled meeting on 06/30/2025." The VEC employer submission was prepared and signed by HR Business Partner Jessica Geis. The VEC denied benefits based on these statements (Exs. J, K). On information and belief, the termination reason was also transmitted to third-party administrators to process COBRA/benefit separation and to the state plan/benefits systems as part of standard separation feeds. These communications disseminated the "job abandonment" rationale beyond internal HR.

37. ~~In Virginia's unemployment scheme, the label "misconduct" under~~Under Va. Code § 60.2-618, "misconduct" is a ~~formal adjudication used by employers and agencies to assess truthfulness, reliability, and fitness~~statutory basis for disqualification from unemployment

benefits. Being falsely branded as discharged for "misconduct" and "abandonment" thus carries an enduring stigma that forecloses comparable IT leadership roles.

38. The VEC Discharge Form (B-DFF-017), signed August 14, 2025, contains the following admissions:

- Question 15 (~~reason for separation~~delay between final incident and discharge): "Meeting to be held on 6/30... Terminated same day"

- Question 16 (~~decision-makers~~witnesses to the final incident): Morris, Bishop, Allan

- Question 18 (~~written~~whether a policy ~~violated~~related to the discharge reason): "No"

- Question 19 (prior warnings): Reference to June 23 email characterized as "warning"

These admissions confirm Defendants terminated Plaintiff on June 30 and~~, in their own words,~~ identified no policy related to the ~~Plaintiff did not violate any policies—either in-office or remotely. Clearly,~~stated reason for discharge. This supports Plaintiff's allegation that no policy was violated ~~by Plaintiff. The Defendants' own documents make this unequivocally clear~~ and underscores the falsity of the "job abandonment" accusation. (Ex. K.)

39. On August 27, 2025, Plaintiff sent a written request for a name-clearing hearing and record correction to the Board of the Commonwealth Savers Plan and to the Joint Legislative Audit and Review Commission (JLARC), the agency's legislative oversight body. No hearing was granted and no response was received. (Ex. R.)

**I. Comparator**

40. In 2021, the same leadership team - Bishop, Allan, and Morris - approved employee Chad Bailey for permanent Utah remote work for personal preference (Ex. D).

41. The same decision-makers - Morris, Bishop, and Allan - approved Chad Bailey's Utah remote arrangement in 2021 while categorically denying Plaintiff's materially similar Utah

9

request during his spouse's medical crisis. Any role differences do not defeat comparability at the pleading stage, particularly where the same officials selectively enforced remote-work "practice" against Plaintiff.

## J. Eligibility

42. Plaintiff worked more than 12 months and 1,250 hours. His spouse's bipolar disorder with suicide risk is a serious health condition under 29 U.S.C. § 2611(11).

43. The pattern of retaliation escalated with each protected disclosure: (1) disclosure of spouse's condition -> 5 weeks -> March 19 increase from 2-4 days monthly to 3 days weekly; (2) June 23 protected opposition requesting meeting to discuss discrimination -> 0 business days -> June 27 resign-or-be-fired ultimatum; (3) June 30 FMLA request -> 3 hours 27 minutes -> termination.

## IV. CLAIMS FOR RELIEF

### COUNT I - FMLA INTERFERENCE (29 U.S.C. § 2615(a)(1))
*(Against Commonwealth Savers)*

44. Plaintiff incorporates ¶¶ 1-43.

45. Plaintiff was eligible for FMLA leave.

46. Plaintiff's 8:46 a.m. text "I need to take PTO today for family medical reasons" provided adequate notice. Bishop knew of the spouse's condition. Bishop invited Plaintiff to "restart the [FMLA] process" on June 13. Henry approved text notice April 20. Both accepted identical morning notice May 29.

47. Defendants terminated Plaintiff 3 hours 27 minutes after notice.

48. Defendants acted willfully and in bad faith: after consulting counsel on June 27 they nonetheless terminated Plaintiff three days later without any FMLA inquiry.

49. Defendants failed to provide the written rights and responsibilities notice required by 29 C.F.R. § 825.300(c)(1) and, if certification was required, the 15-day ~~certification window requiredresponse~~ response period provided by § 825.305(b) ~~after receiving Plaintiff's June 30 notice~~. Terminating him within hours, after stating on June 27 they had "walked through all of this with counsel," supports willfulness. (Ex. H.) See Mook v. City of Martinsville, No. 4:23-cv-00028, 2024 WL 2988285 (W.D. Va. June 14, 2024) (alleged deviations from the §§ 825.305-307 certification/clarification framework state an FMLA interference claim at Rule 12(b)(6)). Defendants' decision to terminate him for "abandonment" within hours of a PTO request they had instructed him to make further evidences willfulness and bad faith. (Ex. B; Ex. E.) Defendants failed to inquire under 29 C.F.R. § 825.~~305(b) and~~303(b), failed to provide the written notice required by § 825.300(c)(1), and terminated Plaintiff immediately without giving ~~the required written notice or certification period~~him an opportunity to submit certification.

50. Plaintiff lost wages, benefits, and other compensation.

Relief: Back pay; benefits; front pay or reinstatement; liquidated damages equal to back pay; COBRA reimbursement; prejudgment interest; costs under Fed. R. Civ. P. 54(d)(1) and 28 U.S.C. § 1920; and for Counts I-II, the costs of the action under 29 U.S.C. § 2617(a)(3).

### COUNT II - FMLA RETALIATION (29 U.S.C. § 2615(a)(2))
*(Against Commonwealth Savers)*

51. Plaintiff incorporates ¶¶ 1-50.

52. Plaintiff requested FMLA leave at 8:46 a.m. June 30.

53. Defendants terminated him at 12:13 p.m.

54. The June 27 text proves no final decision existed before the FMLA request. Defendants had invited Plaintiff on June 13 to "restart the [FMLA] process" "to be with your wife," confirming their contemporaneous knowledge of a potentially qualifying reason; the employer's duty to

inquire was therefore triggered, yet Defendants terminated him within hours of notice instead of initiating that process.

55. The temporal proximity establishes causation. The hours-level proximity between the 8:46 a.m. notice and 12:13 p.m. termination supports causation. See Strothers v. City of Laurel, 895 F.3d 317, 335-36 (4th Cir. 2018); cf. Roberts, 45 F.4th at 736-37 (~~a fact-bound dispute over~~conflicting evidence regarding the actual termination date ~~precludes dismissal~~created a genuine dispute of material fact). Plaintiff's June 30 text occurred hours after Defendants' prior notice (June 27 text). The temporal proximity, together with Defendants' failure to follow FMLA notice rules, makes a plausible retaliation claim.

Relief: Back pay; benefits; front pay or reinstatement; liquidated damages equal to back pay; COBRA reimbursement; prejudgment interest; costs under Fed. R. Civ. P. 54(d)(1) and 28 U.S.C. § 1920; and for Counts I-II, the costs of the action under 29 U.S.C. § 2617(a)(3).

**COUNT III - § 1983 PROCEDURAL DUE PROCESS**
*(Individual capacity damages; Official capacity injunctive relief)*

56. Plaintiff incorporates ¶¶ 1-55.

57. Defendants stated and recorded stigmatizing reasons for Plaintiff's separation, including that he "abandoned" his job and "failed to attend a scheduled meeting," and caused the Virginia Employment Commission to issue a decision labeling his separation as "misconduct." Those charges impugn honesty, reliability, and professional ethics and carry a badge of infamy in the IT leadership profession.

58. These statements are false. No June 30 meeting existed; Plaintiff gave 8:46 a.m. family-medical notice using the employer's established channel; Defendants told him on June 27 that access would be re-enabled Monday, and they created the termination letter at 11:50 a.m. on June 30 - after the notice. Defendants knew or recklessly disregarded these facts when publishing

the statements. The falsity is further emphasized by the fact that Plaintiff followed Defendants' own instructions to use PTO in these circumstances (Ex. B) and was paid out accrued PTO after termination (Ex. ~~E~~O) - making the "job abandonment" label impossible to justify.

59. Publication. Defendants published or caused publication of the stigmatizing rationale as follows:

(a) Commission adjudication (confidential record of harm): Defendants caused their "misconduct/abandonment" rationale to be recorded in the Virginia Employment Commission's adjudicative file, which was used to deny benefits, causing documented economic harm (Exs. J, K). While VEC records are confidential under Va. Code § 60.2-623(B), publication is independently alleged through third-party benefits processors and dissemination from Plaintiff's personnel file. See *Bryant-Shannon v. Hampton Roads Cmty. Action Program, Inc.*, 299 Va. 579, 589-92, 856 S.E.2d 612, 617-20 (2021).

(b) Third-party benefits/COBRA processing (outside the agency): On information and belief, the separation reason was transmitted to third-party benefits/COBRA administrators and other external plan processors in the ordinary course of separation. Cf. Cox v. Red Hat, Inc., No. 1:23-cv-766, ~~2024 WL 945660~~ECF No. 31, at ~~*5-6~~14-16 (E.D. Va. Jan. 9, 2024) (recognizing a qualified privilege for employment-related communications absent malice; communications within the employment context are not automatically defamatory, but malice ~~suffices to~~may overcome the privilege). Defendants' knowing falsity and unnecessary transmission to external processors plausibly allege malice or abuse of any privilege.

(c) Alternative allegation - Board briefings: On information and belief, the separation reason was shared with Board members, including non-employee appointees, as part of executive/Board

13

briefings regarding the separation. Such briefings are a routine practice for senior separations at Commonwealth Savers, which gives this allegation a reasonable factual basis.

(d) Personnel-file likelihood of dissemination: The "job abandonment" rationale remains in Plaintiff's personnel file. On information and belief, and consistent with standard practice, HR discloses separation reasons to prospective employers when a release is signed during reference or verification checks. The false charge is therefore likely to be disseminated to prospective employers. On information and belief, all external reference/verification inquiries are routed to HR, and HR draws its answers from the personnel-file separation reason, thereby channeling prospective employers to the "job abandonment" notation. This makes dissemination likely. See Sciolino v. City of Newport News, 480 F.3d 642, 649-50 (4th Cir. 2007); Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 308-10 (4th Cir. 2006) ~~(finding stigma-plus where false charge likely to reach prospective employers)~~; see also Moschetti v. Office of the ~~Att'y~~ Inspector Gen., No. 3:22-cv-24, 2022 WL 3334926, at *3-4 (E.D. Va. Aug. 11, 2022) (only public, false charges implying dishonesty/immorality satisfy Sciolino).

60. Each individual defendant personally participated: Morris attended the June 27 meeting and approved termination; Bishop sent the Friday text, received the Monday FMLA notice, and sent the termination letter; Allan attended the June 27 meeting.

61. Defendants knew the "job abandonment" statement was false. They had received the 8:46 a.m. family-medical notice and had texted that system access would be restored Monday morning. Labeling that same day's protected leave request as abandonment constitutes deliberate falsification and stigmatization.

62. Denial of name-clearing opportunity. Plaintiff promptly contested the accusation during and after the June 27 and June 30 communications and in the ensuing separation correspondence.

14

Defendants did not offer any name-clearing hearing or process to rebut the charge before or after publication. On August 27, 2025, Plaintiff sent a written request seeking correction and relief to the governing Board and the JLARC oversight body; Defendants nonetheless refused to provide any hearing or correction and continue to maintain and disseminate the stigmatizing rationale.

63. As a result, Plaintiff suffered loss of employment and benefits, denial of $9,828 in UI benefits, and continuing reputational harm impeding employment. The maintained "job abandonment/misconduct" notation in his personnel file poses an ongoing likelihood of dissemination to prospective employers and professional networks.

64. Defendants' pre-publication legal review, their knowledge of the 8:46 a.m. family-medical notice, and their decision to label the same-day absence as "abandonment/misconduct" demonstrate deliberate indifference to Plaintiff's liberty interest.

65. Because supervisors and coworkers are instructed not to provide references and to direct all inquiries to HR, Plaintiff's professional references are effectively replaced by HR's personnel-file disclosure of the "job abandonment" code. This deprives him of neutral, context-based references, compounding reputational harm that impedes future employment and advancement in the IT industry.

66. The "job abandonment" rationale was completely baseless. The Defendants have admitted that Plaintiff violated no written policy - whether regarding remote work, office attendance, or any other requirements. The termination for abandonment was a false pretext used to cover up retaliatory animus based on Plaintiff's protected activity.

Relief (individual capacities): Compensatory damages for reputational, economic, and consequential harms; punitive damages against Morris, Bishop, and Allan for reckless or callous indifference to federally protected rights; costs.

Relief (official capacities): Name-clearing hearing; record correction; neutral reference;

injunction.

## V. PRAYER FOR RELIEF

A. FMLA: Back pay ($290,000 annually); benefits; liquidated damages; front pay; COBRA; interest; costs under Fed. R. Civ. P. 54(d)(1) and 28 U.S.C. § 1920; and for Counts I-II, the costs of the action under 29 U.S.C. § 2617(a)(3).

B. § 1983: Compensatory damages including $9,828 lost unemployment; punitive damages; name-clearing hearing; record correction; neutral reference; injunction; costs under Fed. R. Civ. P. 54(d)(1) and 28 U.S.C. § 1920.

C. Other relief deemed just.

## VI. JURY DEMAND

Plaintiff demands jury trial.

Respectfully submitted,

**Alexander C. Gray (pro se)**
150 N. Snow Canyon Dr., Unit 19
Ivins, UT 84738
(804) 335-7579
zandergray1@gmail.com
Dated: ~~June 15~~July 16, 2026

## CERTIFICATE OF SERVICE

I certify that on ~~June 15~~July 16, 2026, I served the foregoing Second Corrected Proposed Second

Amended Complaint by email on:

Maya M. Eckstein (meckstein@hunton.com)
C. Randolph Sullivan (rsullivan@hunton.com)

Reilly C. Moore (rmoore@hunton.com)
Hunton Andrews Kurth LLP
951 East Byrd Street
Richmond, VA 23219

Alexander C. Gray

**INDEX OF EXHIBITS**

**Exhibit A - June 5, 2025 HR Email Chain with Telework Policy**
• Description: Email chain discussing the telework policy and outlining discussions on manager approval and work arrangements.

**Exhibit B - June 13, 2025 Bishop Email**
• Description: Email from Bishop instructing Plaintiff to use PTO for Utah days and offering to "restart the FMLA process."

**Exhibit C - June 23, 2025 Email Chain**
• Description: Email correspondence where Plaintiff details his discrimination complaint and requests a meeting to address it.

**Exhibit D - Chad Bailey Approval**
• Description: Documentation showing Chad Bailey's approval for permanent Utah remote work arrangement in 2021 (comparator evidence).

**Exhibit E - June 30, 2025 Texts and Termination**
• Description: Text messages between Plaintiff and Defendants on June 30, 2025, regarding the termination and family-medical PTO request.

**Exhibit F - June 27, 2025 Text**
• Description: Text message from Bishop on June 27 stating Plaintiff's system access would be re-enabled on Monday.

**Exhibit G - June 5, 2025 Recording Transcript**
• Description: Transcript of recorded conversation with Debbie Allan discussing the telework policy, manager approvals, and residency requirements.

**Exhibit H - June 27, 2025 Meeting Recording Transcript**
• Description: Transcript of the June 27 meeting where Plaintiff was given the ultimatum to resign or be terminated.

**Exhibit I - February 13, 2025 Review**
• Description: Performance review from Mike Henry (CTO) and Carolyn Bishop (COO) showing Plaintiff's performance was predominantly rated "On Target," with no performancedisciplinary or attendance issues identified.

**Exhibit J - VEC Decision**
• Description: The Virginia Employment Commission decision denying Plaintiff's unemployment benefits based on job abandonmentmisconduct arising from the alleged failure to attend a scheduled meeting.

**Exhibit K - VEC Form B-DFF-017**
• Description: VEC Discharge Form (signed by Jessica Geis) showing the "job abandonment" rationale and the termination reason.

**Exhibit L - April 20, 2025 Texts**
• Description: Text messages between Plaintiff and Henry approving Utah remote work for two weeks.

**Exhibit M - May 18, 2025 Texts**