**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

ALEXANDER C. GRAY,

Plaintiff,

v.

Civil Action No. 3:25-cv-00742-RCY

COMMONWEALTH SAVERS PLAN (f/k/a Virginia College Savings Plan),
MARY G. MORRIS, in her individual and official capacities,
CAROLYN BISHOP, in her individual capacity, and
DEBBIE ALLAN, in her individual capacity,

Defendants.

## ATTACHMENT A — PROPOSED SECOND AMENDED COMPLAINT

Plaintiff Alexander C. Gray alleges as follows:

## I. NATURE OF THE ACTION

1. Alexander C. Gray challenges Commonwealth Savers Plan's (CSP's) use of his family-care absences to force his departure and its immediate discharge of him on June 30, 2025, within hours of his family-medical notice. He seeks relief for interference with and retaliation for protected family leave; the adoption and maintenance of a substantially false, stigmatizing abandonment charge without a meaningful opportunity to clear his name; and Carolyn Bishop's personal publication of that written charge to the identified recipients.

2. On June 27, after Gray's June 23 written complaint and discussion of his Tuesday–Thursday absences, CSP required him to choose a month of remote transition work or termination at the end of the meeting. Gray denied abandoning his position. Faced with those choices and denied the weekend to consider them, he selected the offered month of continuing work while reserving his rights. CSP then called for a resignation email, Bishop's acceptance, and Monday planning.

Gray sent no resignation email, and no contemplated written acceptance followed. No deadline for that email had been communicated to him.

3. At 5:09 p.m. Friday, Bishop acknowledged that CSP had not heard from Gray, said access would be disabled through the weekend, and promised Monday access and outreach. On Monday, a day ordinarily permitted for remote work from Utah, Gray needed time off for an acute, unforeseen episode of his wife's condition. At 8:46 a.m. Eastern Time, he texted Bishop: “I need to take PTO today for family medical reasons.” At 12:13 p.m., Bishop sent a letter terminating him “effective immediately due to job abandonment” and stating that his health-insurance benefits would continue through June 30. Gray challenges both the June 27 ultimatum and the immediate June 30 discharge.

## II. JURISDICTION, VENUE, AND PARTIES

4. This Court has jurisdiction over the federal claims under 28 U.S.C. § 1331. The FMLA action is authorized by 29 U.S.C. § 2617(a)(2). Venue is proper under 28 U.S.C. § 1391(b) because CSP's employment operations and substantial challenged decisions occurred in this District. The Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Count IV, which arises from the same discharge, written accusation, and resulting injury as the federal claims.

5. Gray worked for CSP as Director of Application Development from March 2020 until June 30, 2025. CSP's records also use the title Development Director. His assigned organizational worksite was the Arboretum office in North Chesterfield, Virginia. His regular salary immediately before discharge was $8,889.79 semimonthly, approximately $213,354.96 annually. (Ex. O.)

6. Virginia created CSP as “a body politic and corporate” and “an independent agency of the Commonwealth.” Its Board administers the Plan, exercises statutory contracting and investment powers, and employs the chief executive officer, who directs, manages, and administers the Plan and may employ needed staff. Plan employees are exempt from the Virginia Personnel Act. Virginia law dedicates Plan assets to the Plan's statutory purposes and prohibits their use for unrelated Commonwealth purposes. Savings-trust contributions are deposited in separate bank or

trust-company accounts. Other Plan money first enters a special nonreverting treasury fund and then separate accounts; prepaid benefits and operating expenses are paid from that Fund. Biennium-end balances do not revert to the general fund, and investment income earned on Fund money remains in the Fund. Any independent prepaid-benefit disbursement system and related procedures are subject to State Comptroller review and approval. CSP employed Gray and was a public-agency employer covered by the FMLA. Va. Code §§ 23.1-701(A)–(E), 23.1-703(A), 23.1-704(1), (3), (5), 23.1-706(B), and 2.2-2905(23).

7. CSP's Chief Financial Officer stated in the declaration Defendants filed in this action that, apart from a temporary Virginia Treasury loan for RetirePath Virginia, CSP is funded solely by revenues generated through administration of its programs. (ECF No. 15-1, ¶ 3.) For purposes of § 23.1-705, current obligations include contract benefits, other Plan obligations, maintenance, and current-biennium operating expenses. Virginia law provides that the Board acts and undertakings covered by § 23.1-705(B) do not constitute Commonwealth debt or a pledge of Commonwealth credit and are payable solely from the Plan. Notwithstanding subsection B, § 23.1-705(C) requires the Governor to propose a sum-sufficient appropriation for current obligations. Sums appropriated by the General Assembly are advances repayable without interest, subject to contract-holder rights, from operating revenue exceeding current obligations. Va. Code § 23.1-705(A)–(C).

8. Based on its corporate structure, statutory allocation of obligations, dedicated assets, and independent operating revenues, Gray alleges that CSP is legally separate from the Commonwealth rather than an arm of the State and asserts Count III against it on that basis. Gray asserts this entity claim in addition to the claims against the individuals in their personal capacities and the claim for prospective relief against Morris in her official capacity. If CSP is held to be an arm of the Commonwealth, Gray continues to assert those individual-capacity and prospective-relief claims.

9. The FMLA claims concern leave to care for Gray's spouse. To the extent CSP is an arm of the Commonwealth, those claims fall within Congress's valid abrogation of state immunity for

family-care leave. *Nevada Department of Human Resources v. Hibbs,* 538 U.S. 721, 725–26, 740 (2003). Count III seeks damages from CSP on the non-arm-of-the-State basis pleaded above, personal damages from the respective officials, and prospective process and record relief from Morris in her official capacity. Count IV seeks damages from Bishop personally.

10. Mary G. Morris is CSP's Chief Executive Officer. She participated in the June 27 meeting, defended the challenged work-location decision, and joined the discussion of the proposed transition and benefits. On June 5, Allan identified Morris as Gray's internal appeal and stated that the Board delegates staff decisions to her. Allan also explained that allegations of harassment or illegality should go to the Board. (Ex. G at 13:36–14:25, 31:52–32:27; Ex. H at 12:10–13:30, 26:22–26:25.) Gray sues Morris individually for her own constitutional conduct and officially for prospective relief within her present authority.

11. Carolyn Bishop was CSP's Chief Operations Officer. By May 2025, during CTO Mike Henry's retirement transition, Gray was fully reporting to Bishop. She made the June 13 and June 23 responses, demanded the June 27 choice, sent the Friday access message, received the June 30 family-medical text through her designated number, and issued the immediate discharge letter. Debbie Allan was Chief Engagement Officer and head of HR. She discussed Gray's care needs and leave options, participated in the June 27 decision, and personally asserted the abandonment rationale. Gray sues Bishop and Allan individually under Count III for their respective acts, and Bishop individually under Count IV for her written publication. The challenged constitutional conduct occurred under color of state law.

## III. FACTUAL ALLEGATIONS

### A. Gray's work, demonstrated performance, and the office requirement

12. Gray led two Agile development teams comprising approximately ten direct-report employees and approximately ten contractors. His workforce was geographically distributed; all of the contractors worked entirely remotely and were dispersed across the country. Gray's duties included supervising and mentoring employees, coordinating application delivery and priorities, working with business leaders and product owners, managing development practices, and

coordinating technology and security work. He used Microsoft Teams, Jira, email, telephone, and related systems to perform that work. His position was within CSP's technology function. He reported to the Chief Technology Officer, who reported to the Chief Operations Officer; by May 2025, Gray reported directly to Bishop as described in paragraph 11. (Ex. W, p. 4.)

13. The Application Development Director posting Gray applied to describes technology strategy, application-development leadership, stakeholder relationships, development standards, and delivery responsibilities. Its Work Environment section describes a typical office environment, movement about the office for meetings, computer work, frequent communication, and occasional travel. (Ex. S, physical pp. 1, 4, 7, 10.)

14. For nearly three years—from his hire in March 2020 until his transition to hybrid attendance in January 2023—Gray performed the director role 100% remotely. During that initial period, he did not work a single day in the office. He performed every responsibility remotely, including managing and meeting with his teams, coordinating delivery and stakeholder work, and conducting weekly or twice-monthly one-on-one coaching sessions.

15. When the hybrid agreement took effect in January 2023, Gray attended the office three days weekly for a brief initial period, which he recalls as approximately four to six weeks. His team worked remotely, and most people with whom he regularly interacted and most attendees in his meetings participated remotely. Gray requested an exception, and Henry approved it. The principal expectation became attendance for an approximately 9:00 a.m.–noon planning meeting every other Thursday with about six local team members; Henry also requested weekly Thursday attendance during one period. That flexible arrangement continued until the March 19, 2025 directive. During the June 5 discussion, Allan identified team members in Florida, Pennsylvania, and Virginia and the contractors, then stated, “So that's why we gave you an exception.” (Ex. G at 5:30–6:12.) Gray's broader June 5 statement that he had not previously worked a three-day schedule was mistaken as to the brief initial period described here. In that same discussion, Allan recalled an earlier three-day period followed by Henry's exception. The four-to-six-week estimate rests on Gray's recollection. (Ex. G at 8:32–9:10.)

16. Henry's February 13, 2025 review rated four of five goals "On Target" and one "Behind Schedule." It credited Gray with leadership of a large team and outside development group, substantial progress on application projects, and designing and fully implementing CI/CD pipelines that were working well and being used by IT Operations. It also requested improvements in camera use, engagement, metrics, documentation, and progress communications. (Ex. I, physical pp. 2–5.)

17. On March 19, 2025, CSP directed Gray to work in the office at least three days each week beginning April 1, obtain approval for changes, and improve availability and communications. That renewed requirement remained CSP's stated position through his discharge, with the approved Utah remote-work periods and directed office-day PTO described below. The memorandum cited outstanding planning work and reported concerns about engagement and accessibility. The same memorandum required team meetings at least every two weeks, his team's office attendance at least one full day every other week, and relevant stakeholder meetings at least quarterly. It directed Gray to make every effort to meet his supervisor in person every other week, with rescheduling if needed. Gray disputes management's characterization that he was unavailable or unable to lead remotely. (Ex. X, physical pp. 3–4; Exs. G, H, I.)

18. CSP's written telework policy permits authorization for all or part of a workweek and defines full-time, hybrid, and ad hoc telework. It provides for a feasibility discussion involving the employee, manager, and Chief Engagement Officer, addressing work habits, performance, responsibilities, equipment, and legal or fiscal implications. The policy makes telework approval dependent on managerial assessment of the work and business needs. (Ex. A; Ex. AA, source pp. 7–9, handbook pp. 23–25.)

19. Gray's telework agreement is dated December 28, 2022 and states an initial term of January 1, 2023 through January 1, 2024, with an agreed extension contemplated. It selects part-time/hybrid telework, identifies the Arboretum as the main location, and marks Monday and Friday as the preferred normal remote days. It permits CSP to end telework. Gray does not recall executing any extension or new telework agreement after January 1, 2024, and CSP's EEOC

production included only the December 28, 2022 agreement. CSP continued his reduced schedule. His actual individualized attendance arrangement is described above. (Ex. Y, source pp. 1–3.)

20. Allan's June 5 email stated that no policy restricted managers from remote work or out-of-state residence and that no policy authorized them to do so full time. It asserted a three-day practice for managers while recognizing managerial approval under the telework policy. In the recorded discussion, Allan described Tuesday through Thursday as the recommended choice of office days and said different days could be considered. She also distinguished the agency's attendance and residency practices from its written telework policy. CSP had exercised its discretion by allowing Gray's reduced office schedule and temporary Utah work. (Ex. A1, physical pp. 1–3; Ex. G at 11:03–11:31, 14:37–15:21; Exs. L, M.)

21. In 2021, CSP approved an arrangement under which employee Chad Bailey could live and work remotely in Utah, as reflected in Gray's contemporaneous "Utah is a go" message and Bailey's response and exit account. Bailey was an individual contributor, and Allan later described the arrangement as a six-month trial. (Ex. D; Ex. G at 14:00–14:25.) Morris later gave a competing account: CSP had considered the arrangement but was moving toward denial, and Bailey left before a final decision. (Ex. H at 12:30–13:30.)

**B. CSP's knowledge of the medical circumstances and the distinction between work and leave**

22. Gray's wife had a chronic, serious mental-health condition, including bipolar disorder, received continuing treatment, and experienced recurring acute episodes that placed her safety at risk and required his care and psychological support. Gray needed to provide care and comfort during those episodes. The family support available to her was in Utah and formed part of her treatment and support arrangement. Being in Utah near his wife did not itself prevent Gray from working. When her condition required care that prevented work, he needed time away to provide it. (Ex. G at 2:56–3:52, 27:39–28:16; Exs. B, C, M.)

23. Gray discussed his wife's medical circumstances and possible need to be in Utah with Henry before the March change. Management later disputed when it learned that his earlier family difficulties involved medical needs. Henry received Gray's earlier communications; by the May and June communications described below, Bishop, Allan, and Morris each had information about the medical basis of his requests. (Ex. H at 10:50–12:10; Exs. B, C, G, M; Ex. AB; see paragraph 25.)

24. On April 20, Gray told Henry that his wife was not doing well and that they were going to southern Utah to find temporary housing near her family. He requested permission to work remotely or use PTO for two weeks. Henry approved remote work, asked him to remain engaged and use his camera when possible, and said that if things became hectic he could take PTO and "just send me a text when you need to take time." That instruction established a direct text channel for a need to stop working and take leave. (Ex. L.)

25. During the first part of May 2025, Gray met with Morris and read aloud prepared notes describing his wife's serious health circumstances, the need for family support in Utah, and his desire to continue working for CSP. He retained the script in a May 6 email to himself. It stated, "I want to be a part of CommonwealthSavers for the long haul," requested continued remote work as Director, offered regular travel to Richmond, and proposed discussion of a different title or compensation if necessary. (Ex. AB.) Morris referred to earlier relocation requests and said she would discuss the matter with Bishop and Allan. The email's date identifies the retained script, not the precise day of the meeting.

26. On May 18, following a difficult weekend for his wife, Gray requested remote work and offered to use PTO if remote work was unavailable. Bishop asked how long he expected to be away and replied: "Given the need to be with her, you are welcome to take pto so you can focus on her," again recommending that he speak with HR about FMLA. Gray explained that he did not need to focus on her all day and that being nearby was often sufficient, so he sought to keep working when able. The exchange ended with a meeting arrangement. (Ex. M.) Bishop approved remote work, and Gray actually worked remotely from Utah that week under her approval.

27. During both the approved April and May Utah remote-work periods, Gray maintained full productivity, met all deadlines, and received no complaints about his work during those periods.

28. On May 27, Bishop directed Gray to use PTO for required Tuesday–Thursday office days when he was unable to attend the Arboretum because he was in Utah. When Bishop imposed that arrangement in May, Gray expressly told her that he could not travel to Richmond every week and needed another workable arrangement. Her later June 13 email expressly identified the May 27 meeting and restated that future days on which he could not attend because of Utah travel would require PTO. Gray followed that direction. (Ex. B1, physical p. 1.)

29. Gray had previously used a same-day PTO text for this caregiving need with management's knowledge. On May 29, he needed PTO for that purpose and sent the morning message, "good morning, I need to take PTO today." Bishop replied, "Ok thank you," and Henry replied, "Thanks." (Ex. N.)

30. Gray was willing to travel to Richmond for approximately one week per month, with additional trips as needed for important meetings and the regular quarterly meetings. In the June 5 discussion, he proposed a recurring schedule of "once a month, a week a month, or a few days a month." He sought a workable continuing arrangement while explaining why traveling across the country every week was incompatible with the care circumstances he described. (Ex. G at 11:55–12:19.)

31. Gray had received FMLA-related information. During the June 5 discussion, Allan referred to previously provided paperwork and said she had not checked with Geis whether it had been returned. Gray responded, "I don't need leave. That's not really what I need," while explaining his wish to continue working and his concern that temporary unpaid leave would not solve the longer-term location problem. Later in the same discussion Allan explained that FMLA need not be taken as twelve continuous weeks, and Gray responded, "Like a day." (Ex. G at 16:07–16:41, 22:37–23:18.)

32. Gray also explained the practical problem with being across the country when acute episodes placed his wife's safety at risk and she needed his care. Allan responded, "those are the days I

would hope you would just take the PTO," followed by "I would hope you would apply for FML." (Ex. G at 27:39–28:16.)

33. On June 5, Allan confirmed that telework depended on manager approval. When Gray asked what would happen if he used his remaining PTO, she stated, "We're not terminating your employment," while discussing the existing office requirement and available schedule options. When Gray asked how to "claw back" the three-day requirement, Allan told him to demonstrate that he was reachable and discussed building a relationship with the incoming CTO. She emphasized, "Everything is manager's discretion," and later advised that if the arrangement was going well, "you can ask for a modification, but you have to prove it to us first." Gray understood the discussion to leave open continued employment and a manager-approved reduction in his office schedule. (Ex. G at 14:54–15:21, 18:28–18:45, 20:21–20:59, 24:45–25:20, 26:40–26:57, 30:34–30:41.)

34. In discussing a proposed schedule involving office attendance and weekly travel, subject to managerial approval, Allan said, "maybe the best case scenario is this holds you out till you can get a job in Utah." Gray also asked about a defined remote period of three, four, or six months. Allan discussed whether employment would end and said management had considered a three-month period followed by filling his position and resignation, but questioned the work that would be obtained during that period. No transition agreement or employment end date was set in this discussion. (Ex. G at 26:40–30:16.)

35. On June 13, Gray requested remote work on June 17 and 18 because his wife's mental-health treatment required her to be in Utah with family support. If remote work was unavailable, he said he would need PTO "to address my family's medical situation." Bishop responded: "Your PTO is available for these situations, and I will approve your time off next week to be with your wife." Bishop declined the requested remote work for June 17–18 and directed Gray to use PTO for those days, reiterating her May 27 requirement while recognizing Monday and Friday remote work. (Ex. B1, physical pp. 1–2.)

36. Bishop also wrote that the original FMLA eligibility notice had "expired since you declined to return the paperwork," declared the absences "not FMLA-protected in nature," and invited Gray to "restart the process" through Geis or HR. Gray alleges that CSP applied that unprotected classification to his later qualifying care absences and relied on those absences to require his departure. (Ex. B1, physical p. 1.)

**C. The June 23 complaint, June 24–26 absences, and June 27 meeting**

37. On June 23, Gray sent Bishop a detailed email linking the escalating restrictions to disclosure of his wife's condition, questioning the changing explanations and motivation, and requesting a meeting. He reminded Bishop that his wife's mental-health treatment required their "permanent presence in Utah for essential family support," described the current Tuesday–Thursday PTO arrangement, and expressed concern that paid leave would run out in approximately four to five weeks. He explained that temporary unpaid FMLA leave did not resolve the longer-term relocation problem. He sought continued productive work rather than extended unpaid absence, while discussing a mutually acceptable resolution, transition arrangements, and an orderly handover. He criticized disability-linked unequal treatment as well as requesting flexibility. (Ex. C1, physical pp. 2–3.)

38. Bishop responded that the ADA did not require caregiver accommodations, repeated the restriction on people leaders working remotely from other states, copied HR, and agreed to meet. Gray's complaint concerned the reasons for CSP's changed treatment and its administration of existing discretion. (Ex. C1, physical p. 1.)

39. After responding to Gray's June 23 email describing the medical circumstances and existing PTO arrangement, Bishop texted that his out-of-office response indicated an absence she said he had not disclosed. Gray replied that he had clearly indicated his need to remain in Utah and inability to attend the office Tuesdays through Thursdays. The disputed absence covered June 24–26—the same Tuesday–Thursday office days for which Bishop had directed PTO—as CSP later confirmed in its EEOC statement. Bishop's text also scheduled the requested meeting for Friday. (Ex. Z, source p. 1; Ex. W, p. 9.)

40. Gray used PTO on June 24, 25, and 26 in accordance with Bishop's direction for the Tuesday–Thursday office days. He used that leave to remain with his wife in Utah and provide the care, comfort, and psychological support she needed during recurring acute episodes that placed her safety at risk. Weekly travel to Richmond, while maintaining Monday and Friday work, would require approximately a day of travel each way and absence from her for about a week. He could not provide that immediate care from across the country. He sought to work when able and to use leave when necessary care prevented required work.

41. Bishop's June 23 email response copied Geis. At the June 27 meeting, Allan explained that CSP had assembled the decisionmakers because of Gray's email and request for resolution. The written response and Allan's opening explanation place the work-arrangement dispute before HR and leadership before the choice described below. (Ex. C1, physical p. 1; Ex. H at 2:30–2:49.)

42. At the start of the June 27 meeting, Bishop asked whether Gray was refusing to work in the office. Gray answered that he was unable to come on those days and would love to work remotely. Bishop then said his inability to meet the requirement meant he could not continue and was "in essence" resigning. (Ex. H at 2:30–2:49, 4:12–5:35.)

43. Gray challenged the asserted restrictions, expressly raised associational discrimination and the timing of CSP's treatment, and disputed management's account of when it learned of the medical circumstances. Morris personally defended the work-location decision and distinguished Bailey's circumstances. These discussions followed, rather than preceded, Bishop's opening announcement that Gray could not continue. (Ex. H at 8:36–14:22.)

44. Allan explained that the proposed remote notice period would avoid continuing "this PTO thing Tuesday, Wednesday, Thursday." Management asserted office requirements, performance concerns, and relocation as its reasons. Gray alleges that CSP used his care-related absences under the directed PTO arrangement to require his departure instead of allowing him to continue working and taking leave. (Ex. H at 14:23–16:35.)

45. Allan described CSP's offer as "letting you work a remote notice period if you choose to resign." Gray sought a mutually beneficial resolution and discussed a transition package. Allan

then stated, “you have abandoned your job.” Gray answered, “I have not abandoned my job,” and said he was trying to work things out. Allan asserted abandonment “by the legal definition” and offered a month of work or an immediate departure. (Ex. H at 16:37–19:19, including 16:50–16:55.)

46. Gray then said he needed to consider external processes addressing the policy and discrimination implications. Allan immediately asked whether he was not resigning. Gray said he was not resigning at that moment and was trying to save his position. When he asked to think over the weekend, Bishop refused and stated that he must resign or be terminated at the end of the meeting. The renewed immediate ultimatum followed his express opposition. (Ex. H at 19:22–21:02.)

47. After Bishop refused the weekend and demanded resignation or termination at the end of the meeting, Gray responded: “Okay, so if you're telling me that those are my only two choices, I will continue with the one month, but I also want to reserve my rights under that agreement.” Management then specified communication, availability, deliverables, and possible early termination. Gray said, “I will accept those terms at this point in time. Yes.” Later, when management proposed August 1 to provide additional health coverage, he indicated that date worked for him. (Ex. H at 20:14–22:27, 25:35–26:28.)

48. After that exchange, Allan asked Gray to email a resignation in his own words with an end date, said Bishop would respond and accept it, and contemplated a Monday discussion of the work and communications plan. Bishop said she would await the resignation email and respond. The deliverables and transition details remained to be settled. No deadline for the email had been communicated to Gray in the meeting or otherwise. (Ex. H at 22:29–23:28, 25:35–26:17.) Gray's August 27 Board letter described the ultimatum as running “until end of day” and stated, “I refused to resign.” The letter misstated the deadline and omitted Gray’s later selection of the offered month of work under the ultimatum, with his rights expressly reserved. The recorded deadline concerned the choice due at the meeting's end, which he answered; it did not set a deadline for the later email, which he did not send. (Ex. R1, physical p. 5, printed p. 6.)

49. Allan proposed August 1 to preserve an additional month of health coverage and said the arrangement would provide two months of coverage. Morris participated in that benefits discussion. Management contemplated working time, transition tasks, and possible PTO for the final days. Allan had already acknowledged on June 5 that Gray was trying to keep his job and health insurance while being with his wife. (Ex. G at 4:28–5:00; Ex. H at 17:31–18:42, 25:35–26:28.)

50. The abandonment accusation was presented as management's existing conclusion. Allan asserted documentation concerning the telework agreement and performance meeting, but no such supporting documents were presented for Gray to review during the recorded exchange. Gray disputed the accusation and reasons. Bishop required an immediate choice and refused weekend consideration; the discussion then turned to departure mechanics. The later invitation for questions came after Gray's response to the forced choice and management's request for a resignation email. Later in the meeting, Allan stated: “We understand why your family is taking you to Utah. Hopefully you understand why that means that you can't continue in this role.” (Ex. H at 19:06–24:49.)

**D. The requested resignation email, Friday text, and June 30 discharge**

51. Gray did not send the requested resignation email, Bishop did not issue the contemplated written acceptance, and Monday planning did not occur. Gray alleges that his response to the ultimatum was involuntary and resulted from the unlawful conduct alleged below.

52. At 5:09 p.m. Eastern Time on June 27, Bishop texted: “Zander, we did not hear from you as agreed and it's now past 5 pm for our business hours. While we navigate this, we are disabling your access now through the weekend and we will reenable access on Monday morning and we will reach out then. Jessica Geis is included on this text message. Should you have any questions, contact us.” This was her first invocation of 5:00 p.m. business hours in connection with the missing response. Gray had received no deadline for the resignation email. Bishop acknowledged nonreceipt and nevertheless promised Monday access and outreach. (Ex. F1.)

53. On June 30, Gray's wife experienced an acute episode requiring immediate, unforeseen care and attention from him. He needed the day away from work to provide that care. Monday was ordinarily a permitted remote-work day under the June 13 arrangement. (Ex. B1, physical p. 1.) This was therefore a need for time off on a day he could otherwise have worked from Utah.

54. At 8:46 a.m. Eastern Time, Gray texted Bishop: "I need to take PTO today for family medical reasons." He used the direct text method Henry had instructed and Bishop and Henry had accepted. The saved message shows delivery at 6:46 a.m. Mountain Time; it does not supply a precise read time. Gray alleges that Bishop knew the family-medical context from the preceding communications and received this notice before issuing the discharge. (Exs. E1, L, M, N.)

55. Between his 8:46 a.m. text and the 12:13 p.m. letter, Gray received no inquiry about the care needed, no request for clarification, no leave determination, and no request for certification.

56. The preserved termination-letter PDF identifies Jessica Geis in its author field and records creation at 11:50:17 a.m. and modification at 11:51:54 a.m. Eastern Time on June 30. Both recorded times follow Gray's 8:46 a.m. family-medical text. (Exs. P, Q.)

57. At 12:13 p.m., Bishop emailed Gray the termination letter, copying Morris, Geis, and General Counsel McGee. The letter itself also identifies those copies. Its opening states: "This letter serves as confirmation that your employment with Commonwealth Savers is terminated effective immediately due to job abandonment. As we have discussed to include most recently on Friday June 27th, your permanent move to Utah and resulting inability to work in-office as this role requires cannot be supported." The letter stated, "Your health insurance benefits will continue through today, June 30, 2025," and said that information about COBRA continuation rights would be mailed by the plan administrator. It set a final-paycheck date and provided for later payment of unused PTO. It did not state that CSP was accepting an August 1 resignation. (Exs. E2–E3.)

58. CSP did not communicate a particular June 30 meeting time or invitation to Gray before discharging him. The Friday communications contemplated Monday planning and outreach but identified no particular meeting he could knowingly fail to attend. (Exs. F, H at 22:29–24:23.)

59. Gray alleges that, at the June 27 meeting, CSP used his qualifying family-care absences to require his departure, then used his June 30 family-medical notice to impose immediate discharge and a cutoff of continued employment-related health benefits after June 30. Alternatively, the June 30 protected notice caused CSP to advance or materially worsen a contemplated departure.

**E. Later explanations, the official separation record, and requests for review**

60. CSP later told EEOC that Gray verbally accepted a resignation offer but was terminated June 30 when the requested written confirmation did not timely arrive. The statement described his “refusal or inability” to comply with the office requirement, acknowledged weeks of remote work from Utah with CSP's knowledge, and said the transition would have allowed remote work. It did not mention the June 30 family-medical text or use the word “abandonment.” Its missing-writing explanation differs from the contemporaneous letter's stated abandonment reason. Gray had received no deadline for that email, and Bishop promised Monday access and outreach after she knew it had not arrived. (Ex. W, pp. 2, 7–10; Exs. E–F.)

61. On information and belief, CSP retained its formally issued job-abandonment reason in Gray's personnel or separation record. The preserved file identifies HR Business Partner Jessica Geis in its author field; the COO issued it and copied the CEO, HR Business Partner, and General Counsel. In the context of Gray's senior technology responsibilities, falsely classifying his departure as abandonment imputes deliberate desertion of professional duties and serious unreliability. Gray had remained in communication, sought to preserve his employment, selected the offered period of continuing work, and given notice of the June 30 medical absence.

62. Gray seeks comparable technology-leadership employment and intends to pursue positions for which prospective employers are likely to ask CSP about his prior employment and reason for separation. The Virginia Department of Human Resource Management’s current public

employment-verification guidance directs a verifier to the human resources office of the agency identified as the person’s current or former employer. On information and belief, CSP maintains the abandonment classification as its official separation reason and is likely to communicate that reason in response to those employment inquiries. Gray bases this inference on CSP's formal adoption of the charge, its issuance to HR and the officials responsible for his employment, and its continued maintenance despite his request for review. The claim concerns disclosure of the separation reason through that inquiry channel. CSP controls its separation record and the practices used to answer such inquiries.

63. The June 30 termination letter identified no grievance, appeal, or review procedure. (Exs. E2–E3.) On August 27, 2025, Gray sent CSP's Board and JLARC the letter reproduced in Exhibit R. He disputed the abandonment termination account and requested investigation of the employment practices, review of executive decisions, remedial action, and redress. The letter also proposed a monetary settlement. Allan had identified the Board as an appropriate channel for reported illegality. CSP's handbook likewise directed employees to report suspected discrimination or harassment to management, HR, or the Board, and called for prompt HR investigation. The certified-mail records establish delivery through the institutional channels shown, including a Board copy addressed care of Morris. Gray received no name-clearing opportunity, responsive charge-focused review, or correction. (Ex. R; Ex. G at 31:52–32:27; Ex. AA, source p. 3, handbook p. 4.)

64. Allan personally formulated and pressed the abandonment accusation during the June 27 decision meeting. Bishop adopted and issued it as CSP's formal discharge reason after the medical notice. Morris participated in the decision discussion and defended the work-location position; the June 30 instrument copied her. Based on her identified decisionmaking role and participation in that disposition, Gray alleges on information and belief that Morris approved adoption of abandonment as the official separation classification.

65. Allan explained that the Board hired Morris and “delegates all staff decisions to her,” identified Morris as Gray's final internal avenue for the work-location decision, and

distinguished allegations of harassment or illegality that should go to the Board. Allan's June 5 written follow-up likewise stated that Morris was part of the work-location decision and that schedules were delegated to the CEO under the Board Charter. It separately identified the Board as a channel for reported law violations. (Ex. A1, physical p. 2.) Morris personally participated in the June 27 disposition, defended CSP's position, and received the official June 30 abandonment classification. Based on that stated delegation and her actual participation, Gray alleges on information and belief that Morris held and exercised delegated final authority for CSP over the official separation classification and the process afforded to contest it. He challenges her adoption and implementation of that disposition as CSP's decision. (Ex. G at 13:36–14:25, 31:52–32:27; Exs. E, H.)

66. Morris remains CSP's Chief Executive Officer. In that capacity she directs the employment administration involved and, on information and belief based on the staff-decision delegation described above, has authority to convene review and direct correction or annotation of CSP-controlled separation records. Gray seeks prospective process and record relief from her under Count III concerning the maintained charge and its likely use in employment references.

**F. FMLA eligibility and injury**

67. At the relevant times Gray had worked for CSP for more than twelve months and at least 1,250 hours during the preceding twelve months. CSP was a public-agency employer covered by the FMLA. On information and belief, it employed at least fifty employees at or within seventy-five miles of Gray's assigned North Chesterfield worksite, including employees reporting to or receiving assignments from that worksite under the applicable worksite rule. Gray had available family-care leave entitlement. His wife's chronic condition and continuing treatment constituted a serious health condition, and he was needed to provide the care described above. 29 U.S.C. §§ 2611–2612; 29 C.F.R. §§ 825.110–111, 825.124.

68. The challenged actions ended Gray's employment on June 30 and, as stated in the letter, limited his employment-related health-insurance benefits to coverage through that date. He seeks the wages, employment benefits, and other recoverable losses caused by the violations proved,

including the consequences of losing the communicated transition and coverage period. The payroll records identify regular compensation and a separate $7,317.34 payment for accrued leave. That payment will be accounted for; it did not compensate all alleged lost future wages or continued health coverage. (Exs. E, H, O.)

69. Gray wanted to remain employed, perform his duties when able, and use available family-care leave when necessary care prevented work. He alleges that CSP's unlawful use of his qualifying family-care leave caused his forced departure and that, absent those violations, he would have remained employed. Alternatively, he seeks recovery for the additional compensation and benefit losses caused by the immediate June 30 discharge and cutoff of continued employment-related health benefits. The constitutional and defamation claims seek their separately caused injuries.

## IV. CLAIMS FOR RELIEF

### COUNT I — FMLA INTERFERENCE

**29 U.S.C. § 2615(a)(1) — Against CSP**

70. Gray incorporates the preceding common factual allegations, paragraphs 1–69.

71. Gray was an eligible employee, CSP was a covered employer, and Gray had available leave to care for his spouse's serious health condition when the described circumstances required his care. His qualifying care leave remained protected when paid through PTO. Paid leave could run concurrently with FMLA leave; the wrong alleged is CSP's denial and adverse use of otherwise available protection. 29 U.S.C. § 2612(a)(1)(C), (d)(2); 29 C.F.R. §§ 825.124(a)–(c), 825.207(a).

72. The June 30 acute episode required immediate, unforeseen care and a day away from work. Gray notified Bishop as soon as practicable through the accepted direct-text channel. His stated family-medical reason, the known condition, and the preceding care and leave communications supplied sufficient information that the FMLA might apply. CSP discharged him within hours without clarifying that notice with him or addressing the qualifying need, denying protection of that absence and the leave, restoration, and benefit rights otherwise available to him.

73. Gray also alleges interference through the June 27 forced exit. On June 24–26, he used PTO as Bishop had directed on May 27 and restated June 13, in the care circumstances described in paragraph 40. CSP knew the medical basis of that work/PTO arrangement through the identified communications. It treated those qualifying care absences and his continuing need for leave as grounds to require resignation or immediate termination. This claim concerns his use of leave for necessary care, not the hours he actually worked remotely.

74. CSP's treatment of the earlier qualifying care absences as unprotected attendance caused its June 27 decision to require Gray's departure. Its failure to clarify the June 30 notice and its adverse use of that qualifying absence denied available leave protection and caused the immediate discharge. These acts produced the respective compensation and benefit losses pleaded. 29 C.F.R. §§ 825.220(b), 825.301(a), 825.303(b).

75. The June 13 classification informed CSP's later treatment of the care absences as grounds for separation. The June 27 ultimatum restrained Gray's continued use of qualifying family-care leave and caused the pleaded employment and benefit losses. Gray's earlier preference to continue working did not waive otherwise available FMLA rights for later qualifying absences. 29 C.F.R. § 825.220(b), (d).

76. As a result, Gray lost wages, benefits, and compensation and seeks the relief authorized by 29 U.S.C. § 2617(a), including appropriate equitable relief, interest, costs, and liquidated damages as provided by the statute.

**COUNT II — FMLA RETALIATION AND PROHIBITED USE OF LEAVE**

**29 U.S.C. § 2615(a)(1)–(2); 29 C.F.R. § 825.220(c) — Against CSP**

77. Gray incorporates the common factual allegations, paragraphs 1–69.

78. Gray exercised or attempted to exercise family-care leave rights through the qualifying PTO used June 24–26 and the continuing care need described in paragraph 40, and through the separate June 30 request. CSP knew the medical context and the relevant notices through the identified supervisors and HR communications.

79. CSP used qualifying family-care leave as a negative factor in the June 27 forced-exit decision. Gray had used PTO under Bishop's standing direction in the known medical context. Following Bishop's objection to that week's out-of-office notice, management required his departure and Allan explained that the offered arrangement would end "this PTO thing Tuesday, Wednesday, Thursday." The meeting included the abandonment accusation and the demand for resignation or immediate termination. Gray alleges that his qualifying care leave and continuing need to exercise those rights caused CSP to impose that forced exit when and as it did. (Ex. H at 14:23–15:12, 19:06–21:02.)

80. Gray further alleges that his June 30 family-medical notice caused the immediate discharge and the stated cutoff of continued employment-related health benefits after June 30. Bishop received that notice through the accepted channel; the preserved termination letter was created later that morning and issued at 12:13 p.m. She had already acknowledged nonreceipt of the requested resignation writing on Friday and nevertheless promised Monday access and outreach. Gray had received no deadline for that writing. This sequence and CSP's differing explanations for the immediate discharge support causation in addition to the short interval.

81. Alternatively, the June 30 protected notice caused CSP to advance or materially worsen a previously contemplated departure, replacing the communicated transition and Monday planning with immediate termination and health-insurance benefits continuing only through June 30.

82. CSP's actions were intentional. Its identified decisionmakers knew the family-medical circumstances and the administered work/PTO arrangement, yet used qualifying care as abandonment or as grounds for an adverse employment change. Gray alleges that CSP knew its conduct violated the FMLA or recklessly disregarded that possibility.

83. The retaliation caused loss of employment, wages, benefits, and other recoverable compensation. Gray seeks relief under 29 U.S.C. § 2617(a), coordinated with Count I to avoid duplicate recovery.

**COUNT III — PROCEDURAL DUE PROCESS: STIGMATIZING DISCHARGE**

**42 U.S.C. § 1983 — Against CSP; Morris, Bishop, and Allan individually; limited prospective relief against Morris officially**

84. Gray incorporates the common factual allegations, paragraphs 1–69.

85. Through their respective acts pleaded above, Morris, Bishop, and Allan caused CSP to adopt the substantially false abandonment charge in conjunction with Gray's discharge. In the professional context described, that charge imputed deliberate desertion of a senior IT director's responsibilities and a serious defect in professional integrity and reliability. Gray remained in communication, sought to preserve his employment, selected the offered period of continuing work under the threat of immediate termination, and gave the June 30 care notice. His location and disagreement with the office requirement did not make that imputation true.

86. On information and belief, the charge remains in CSP's personnel or separation record and is likely to reach prospective employers through the employment-inquiry channel alleged in paragraph 62. Gray seeks comparable employment, and prospective employers considering him for those positions are likely to request information about his prior employment and departure. The maintained charge and its alleged likely disclosure threaten his ability to obtain comparable professional work.

87. Gray did not receive a meaningful opportunity to clear the charge during the June 27 encounter or after his later written request for official review. Although he expressly denied abandonment, Allan immediately repeated the conclusion and limited the offered course to a notice period or immediate departure; Bishop then refused weekend consideration. Supporting documents were asserted but not presented for review during that exchange. The later invitation for questions followed Gray's selection of the offered work period and management's request for a resignation email. The encounter and subsequent failure to provide responsive review left the stigmatizing charge untested through a meaningful name-clearing process. (Ex. H at 19:06–23:28; Ex. R.)

88. Allan personally formulated and pressed the abandonment charge. Bishop formally adopted and issued it as the discharge reason. Morris participated in the disposition and, on information and belief based on her identified decisionmaking role and participation pleaded above, approved the official classification. Each caused the challenged record and process deprivation through her own conduct.

89. Gray also asserts Count III against CSP as a legally separate entity subject to 42 U.S.C. § 1983. The official classification and the process afforded to contest it resulted from Morris's exercise of the delegated final authority alleged in paragraph 65. Her adoption and implementation of that disposition caused the maintained stigmatizing classification, its alleged likelihood of disclosure through employment references, and the absence of meaningful name-clearing process. Gray seeks entity liability for that decision, in addition to the individuals' respective personal conduct.

90. Before the challenged conduct, the right to meaningful name-clearing process for false, constitutionally stigmatizing public-employment discharge information likely to reach prospective employers was clearly established. *Sciolino v. City of Newport News,* 480 F.3d 642, 646, 649–50 (4th Cir. 2007); *Cannon v. Village of Bald Head Island,* 891 F.3d 489, 501–06 (4th Cir. 2018).

91. The maintained classification and likely reference use threaten continuing professional harm. Gray seeks a constitutionally adequate name-clearing opportunity and appropriate correction or annotation of the identified CSP-controlled record, as warranted by that process and its findings, from Morris in her official capacity within her present implementing authority.

92. Gray seeks compensatory and, where appropriate, nominal damages from CSP under the entity theory pleaded above and from Morris, Bishop, and Allan individually for injuries caused by their respective constitutional violations. Those injuries include economic, reputational, professional, and emotional harm. He seeks punitive damages only against a liable individual upon the required showing.

## COUNT IV — VIRGINIA WRITTEN DEFAMATION

**Against Carolyn Bishop individually**

93. Gray incorporates paragraphs 1–59, 61, and 67–69 only to the extent relevant to the June 30 written publication, his professional duties, Bishop's knowledge, and injury caused by that publication. This count concerns Bishop's written statement quoted in paragraph 57, including its complete explanation of the office-location dispute.

94. Bishop published the June 30 statement about Gray to Morris, HR Business Partner Jessica Geis, and General Counsel McGee, in addition to sending it to Gray. Its official classification of his separation as job abandonment conveyed the substantially false factual implication that he deliberately deserted his position and professional responsibilities as a senior technology director. Allan had asserted abandonment "by the legal definition" in Bishop's presence three days earlier, and Bishop adopted it as the letter's official cause of termination. His duties required reliable supervision of two development teams, coordination of application delivery, and continuity of technology and security work. The charge of deserting those responsibilities imputed unfitness and lack of integrity in performing those duties. Gray's location and his disagreement with the office requirement did not make that imputation true; he denies the implication of deliberate professional desertion. (Ex. H at 19:06–19:19; Ex. E3.)

95. Gray remained in communication, expressly denied abandonment, sought to preserve his position, and selected the offered period of continuing work under the demanded immediate choice. Bishop was present for those statements. No deadline for the requested resignation email had been communicated to Gray. Bishop knew the writing had not arrived when she nevertheless promised Monday access and outreach. Monday ordinarily permitted remote work, and Gray's notice requested time away from work for family-medical care before she issued the letter. The letter omitted Bishop's directed office-day PTO arrangement, Gray's selection of the offered period of continuing work, her promise of Monday access and outreach despite the missing resignation email, and his June 30 family-medical notice. Those facts contradicted the implication that he had deliberately deserted his employment.

96. Bishop intended the letter to convey to its identified management recipients that Gray had deliberately deserted his continuing professional responsibilities, and used that implication to justify the immediate discharge. Read in the employment context pleaded above, the letter conveyed that factual implication to those recipients. Bishop published that false implication knowing it was false or with reckless disregard for its truth. Bishop knew the facts detailed in paragraph 95. Her own directions, promises, and knowledge of Gray's continued communications contradicted the implication of deliberate desertion. She nevertheless used that false classification to discredit Gray's professional conduct.

97. To the extent the publication occurred on a common-interest privileged occasion, Bishop abused that privilege through the knowing or reckless falsity alleged. The same facts show her bad-faith use of that classification to discredit Gray's professional conduct. The challenged publication communicated and implemented the operative employment disposition to its management recipients. This count concerns that written employment publication, not a judicial submission, VEC statement, hypothetical outside reference, or Allan's earlier negotiation statements.

98. The publication harmed Gray's professional reputation and caused reputational, professional, and emotional injury. He seeks compensatory damages, including general damages available for defamation per se upon satisfaction of the applicable fault requirements, and punitive damages upon the required showing and within applicable limits.

99. This count arises from the same false published abandonment reason and reputational harm already alleged against Bishop personally in the timely September 19, 2025 First Amended Complaint, including its paragraphs 27, 42, and 56–58. The timely First Amended Complaint also attached the actual June 30 letter, including its identified copies, as Exhibit E, ECF No. 6-5 at 3, PageID 59. This count supplies an additional legal theory for that occurrence. Gray invokes relation back under Federal Rule of Civil Procedure 15(c)(1)(B); he does not rely on an unidentified later republication or continuing internal retention to restart a limitation period.

## V. PRAYER FOR RELIEF

100. For Counts I and II, judgment against CSP for wages, benefits, and other compensation lost by reason of the violations; other actual monetary loss recoverable under the statute where applicable; interest; and liquidated damages equal to the statutory loss-and-interest amount unless CSP establishes the legally required basis for reduction. Gray also requests reinstatement or other appropriate equitable relief, including front pay where warranted, and recoverable costs. 29 U.S.C. § 2617(a).

101. For Count III, compensatory and, where appropriate, nominal damages against CSP under the entity theory pleaded above and against each liable individual for injuries caused by their respective constitutional violations; punitive damages only against a liable individual upon the required showing. Gray also requests a meaningful name-clearing opportunity and appropriate prospective correction or annotation of CSP-controlled records, as warranted by the process and its findings, from Morris in her official capacity.

102. For Count IV, compensatory damages against Bishop personally for the actionable publication, including general damages legally available for defamation per se upon the applicable showing; punitive damages upon the required proof and within the applicable state-law limit; and allowable interest and costs.

103. Recoverable benefit loss includes health coverage and replacement costs, retirement and employer contributions, and leave or other employment benefits recoverable under the applicable plan and statute. Wage loss and health-benefit loss will be measured from their respective actual starting dates; the claimed cutoff of continued employment-related health benefits begins July 1. The calculation will account for compensation already paid, the accrued-leave payout, any actual COBRA or replacement coverage and costs, legally applicable offsets, and overlapping losses among counts.

104. Gray requests allowable pre- and post-judgment interest, costs, attorney's fees if counsel is retained and the statutory requirements are met, and other appropriate relief. The recoverable period and amount of each loss depend on the violations and causation proved.

## VI. JURY DEMAND

105. Gray demands a jury trial on Counts I–IV and every issue so triable. Relief that is exclusively equitable is requested from the Court.

Respectfully submitted,

______________________________

Alexander C. Gray, Plaintiff pro se
150 N. Snow Canyon Dr., Unit 19
Ivins, UT 84738
(804) 335-7579
zandergray1@gmail.com
Date: September 21, 2026

**CERTIFICATION**

I declare under penalty of perjury that:

(1) No attorney has prepared, or assisted in the preparation of this document.

Alexander C. Gray

Name of Pro Se Party (Print or Type)

____________________________________

Signature of Pro Se Party

Executed on: September 21, 2026