UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION
ALEXANDER C. GRAY, Plaintiff,
v. Civil Action No. 3:25-cv-00742-RCY
COMMONWEALTH SAVERS PLAN (f/k/a Virginia College Savings Plan),
MARY G. MORRIS, in her individual and official capacities,
CAROLYN BISHOP, in her individual capacity, and
DEBRA ("DEBBIE") ALLAN, in her individual capacity, Defendants.

**PROPOSED THIRD AMENDED AND SUPPLEMENTAL COMPLAINT**

Plaintiff Alexander C. Gray alleges as follows:

## I. NATURE OF THE ACTION

1. Alexander C. Gray sought to keep working for Commonwealth Savers Plan (CSP) while providing needed care to his seriously ill wife. Management knew her condition. Bishop permitted Utah remote work on Mondays and Fridays but required PTO for Tuesday-Thursday office days. Gray followed that course. Four days after his June 23 written objection to disability-linked unequal treatment, management required his departure. It offered temporary remote transition work on the same weekdays it had required him to cover with PTO. Gray alleges that CSP and the responsible officials used his qualifying care absences to force that June 27 exit, and that CSP and Bishop discharged him immediately on June 30 after a separate family-medical request. He asserts interference with and retaliation for protected family leave, retaliation for opposing disability-linked unequal treatment, and discrimination because of his association with his disabled wife. Management accused him of abandoning the professional responsibilities he was trying to preserve. He challenges Bishop's written publication of that false, stigmatizing charge and the denial of a meaningful opportunity to clear his name.

2. On June 27, four days after Gray's June 23 written complaint and following his Tuesday-Thursday care absences, CSP convened the meeting requested in that complaint. Gray had sought a resolution of the disability-linked treatment he challenged. Management instead required his departure: a month of remote transition work or termination at the end of the

meeting. Gray denied abandoning his position and asked for the weekend to consider the ultimatum. Bishop refused. To avoid immediate discharge and preserve income and health coverage for his family, Gray responded that he would continue for the month, expressly reserving his rights. CSP then called for a resignation email, Bishop's acceptance, and Monday planning. Gray sent no resignation email, and the contemplated written acceptance did not follow. No deadline for that email had been communicated to him. His primary ADA retaliation claim challenges the June 27 forced exit itself as retaliation for his June 23 opposition.

3. At 5:09 p.m. that Friday, Bishop acknowledged that the requested response had not arrived and stated that it was past 5:00 p.m. business hours. She nevertheless promised Monday access and outreach, while stating that access would be disabled through the weekend. On Monday, ordinarily a permitted remote-work day, Gray needed time off for an acute, unforeseen episode of his wife's condition. At 8:46 a.m. Eastern Time, he texted Bishop: "I need to take PTO today for family medical reasons." At 12:13 p.m., three hours and twenty-seven minutes later, Bishop sent a letter terminating him "effective immediately due to job abandonment" and stating that his health-insurance benefits would continue only through that same day, June 30. Gray challenges that immediate discharge as well as the earlier forced exit.

**II. JURISDICTION, VENUE, AND PARTIES**

4. This Court has jurisdiction over the federal claims under 28 U.S.C. § 1331. The FMLA action is authorized by 29 U.S.C. § 2617(a)(2). Venue is proper under 28 U.S.C. § 1391(b) because CSP's employment operations and substantial challenged decisions occurred in this District. The Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Count IV, which arises from the same discharge, written accusation, and resulting injury as the federal claims. The ADA employment claims arise under 42 U.S.C. §§ 12112(b)(4) and 12203(a), with enforcement and remedies under §§ 12117(a) and 12203(c). Venue for those claims is also proper under 42 U.S.C. § 2000e-5(f)(3), incorporated by § 12117(a), because the challenged employment practices were committed in Virginia, including the decisions made by CSP's leadership at its North Chesterfield employment operation in this District.

5. Gray worked for CSP as Director of Application Development from March 2020 until June 30, 2025. CSP's records also use the title Development Director. His assigned organizational worksite was the Arboretum office in North Chesterfield, Virginia. His regular salary immediately before discharge was $8,889.79 semimonthly, approximately $213,354.96 annually. His compensation also included employer-paid health-insurance, retirement, life-insurance, and disability benefits. (Ex. O, source p. 1.) His total compensation was approximately $290,000 annually.

6. Virginia created CSP as "a body politic and corporate" and "an independent agency of the Commonwealth." Its Board administers the Plan, exercises statutory contracting and investment powers, and employs the chief executive officer. The chief executive officer directs, manages, and administers the Plan and may employ needed staff. Plan employees are exempt from the Virginia Personnel Act. Virginia law dedicates Plan assets to the Plan's statutory purposes and prohibits their use for unrelated Commonwealth purposes. Savings-trust contributions go into separate bank or trust-company accounts. Other Plan money first enters a special nonreverting treasury fund and then separate accounts. Prepaid benefits and operating

expenses are paid from that Fund. Biennium-end balances do not revert to the general fund, and investment income earned on Fund money remains in the Fund. CSP employed Gray and was a public-agency employer covered by the FMLA. Va. Code §§ 23.1-701(A)-(E), 23.1-703(A), 23.1-704(1), (3), (5), 23.1-706(B), and 2.2-2905(23).

7. CSP's Chief Financial Officer stated that CSP is funded solely by revenues generated through administration of its programs, apart from a temporary Virginia Treasury loan for RetirePath Virginia. Defendants filed that declaration in this action. (ECF No. 15-1, ¶ 3.) For purposes of § 23.1-705, current obligations include contract benefits, other Plan obligations, maintenance, and current-biennium operating expenses. Under § 23.1-705(B), the Board acts and undertakings covered by that subsection do not constitute Commonwealth debt or a pledge of Commonwealth credit. They are payable solely from the Plan. Notwithstanding subsection B, § 23.1-705(C) requires the Governor to propose a sum-sufficient appropriation for current obligations. Sums appropriated by the General Assembly are advances repayable without interest, subject to contract-holder rights, from operating revenue exceeding current obligations. The mandatory budget proposal does not itself appropriate funds. Nor does the provision expressly make the Commonwealth liable for a judgment against CSP arising from Gray's employment. Va. Code § 23.1-705(A)-(C).

8. CSP's corporate structure, statutory allocation of obligations, dedicated assets, and independent operating revenues support Gray's allegation that it is legally separate from the Commonwealth rather than an arm of the State. See Galette v. New Jersey Transit Corp., 607 U.S. 509, 523-30 (2026). He asserts Counts III, V, and VI against CSP on that basis. If CSP is held to be an arm of the Commonwealth, he maintains the separately pleaded personal-capacity claims and prospective official-capacity relief.

9. Counts I and II concern leave to care for Gray's spouse. Even if CSP is an arm of the Commonwealth, those claims fall within Congress's valid abrogation of state immunity for

family-care leave. Nevada Department of Human Resources v. Hibbs, 538 U.S. 721, 725-26, 740 (2003). The personal FMLA claims concern each official's own conduct specified in paragraphs 11A-11C and Counts I and II.

10. Mary G. Morris is CSP's Chief Executive Officer. She participated in the June 27 decision and transition discussion as described in paragraph 11C. On June 5, Allan identified Morris as Gray's internal appeal and stated that the Board delegates staff decisions to her; Allan also said allegations of harassment or illegality should go to the Board. (Ex. G at 13:36-14:25, 31:52-32:27; Ex. H at 12:10-13:30, 26:22-26:25.) Gray sues Morris individually under Counts I and II for her own June 27 FMLA conduct and under Count III for her own constitutional conduct. He sues her officially for prospective constitutional relief and ADA record relief within her present authority.

11. Carolyn Bishop was CSP's Chief Operations Officer. By May 2025, during CTO Mike Henry's retirement transition, Gray reported directly to her. Debra ("Debbie") Allan was Chief Engagement Officer and head of HR. Their respective control over Gray's work, leave, and departure is described in paragraphs 11A-11B and the chronology below. Gray sues each individually under Counts I and II for her own FMLA conduct and under Count III for her own constitutional acts. He also sues Bishop individually under Count IV for her written publication. The challenged constitutional conduct occurred under color of state law.

11A. Bishop controlled Gray's work and leave arrangements and the termination of his employment. As his direct supervisor, she directed the office-day PTO arrangement, addressed FMLA classification and a possible restart, and required the June 27 choice between the offered transition and immediate termination. On Friday, she promised Monday access and outreach. On June 30, she issued the immediate discharge after receiving his family-medical notice as alleged below. Through those acts, she acted directly or indirectly in CSP's interest with respect to Gray's employment and was an employer within 29 U.S.C. § 2611(4)(A)(ii)(I).

11B. Allan exercised control over Gray's employment through her administration of the work and leave discussions and participation in the June 27 decision. On June 5, she heard Gray describe his wife's bipolar disorder and explain why weekly travel would leave him unavailable when his wife needed care. She linked those needs to PTO and applying for FMLA, as described in paragraph 32. On June 27, she explained the offered departure arrangement by reference to ending the Tuesday-Thursday PTO pattern, asserted abandonment, and presented and administered the departure choices. Through those acts, she acted directly or indirectly in CSP's interest with respect to Gray's employment and was an employer within 29 U.S.C. § 2611(4)(A)(ii)(I). Counts I and II concern her own June 27 conduct and its consequences. (Ex. G at 2:56-3:52, 27:39-28:16; Ex. H at 14:23-15:12, 19:06-22:27.)

11C. Morris exercised control over Gray's employment through the work-location decision and her participation in the June 27 decision. Allan's June 5 follow-up identified Morris as part of the work-location decision and stated that schedules were delegated to the CEO. In the recorded discussion, Allan said, "Mary knows the decision," and "we did talk to her about it," and identified her as the final internal decisionmaker. In the May meeting alleged in paragraph 25, Gray had personally described his wife's serious medical circumstances and need for care and family support to Morris. On June 27, Allan said management had assembled "all the decision makers." Morris questioned Gray's approved flexible work arrangement, defended her own refusal of full-time Utah work, and participated in the transition-benefits discussion. Gray alleges on information and belief that Morris joined and approved the forced-exit decision. He bases that allegation on his prior disclosure, her identified control, and her active participation as management required departure and Allan tied the transition to ending the Tuesday-Thursday PTO pattern. Through her own acts, Morris acted directly or indirectly in CSP's interest with respect to Gray's employment and was an employer within 29 U.S.C. § 2611(4)(A)(ii)(I). Counts I and II concern only her own June 27 conduct and its consequences.

(Paragraphs 10, 25, 41, 43-49; Ex. A1, physical p. 2; Ex. G at 13:36-13:58, 31:52-32:27; Ex. H at 2:30-2:49, 8:13-8:19, 12:10-13:30, 14:23-15:12, 26:22-26:25; Ex. AB.)

## III. FACTUAL ALLEGATIONS

### A. Gray's work, demonstrated performance, and the office requirement

12. Gray led two Agile development teams with approximately ten direct-report employees and approximately ten contractors. The workforce was geographically distributed across the country and across multiple time zones. All contractors worked entirely remotely from locations across the country. Gray supervised and mentored employees, coordinated application delivery and priorities, worked with business leaders and product owners, managed development practices, and coordinated technology and security work. He performed that work through Microsoft Teams, Jira, email, telephone, and related systems. His position was within CSP's technology function. He reported to the Chief Technology Officer, who reported to the Chief Operations Officer. By May 2025, Gray reported directly to Bishop as described in paragraph 11. (Ex. W, p. 4.)

13. The Application Development Director posting Gray applied to describes technology strategy, application-development leadership, stakeholder relationships, development standards, and delivery responsibilities. Its Work Environment section describes a typical office environment, movement about the office for meetings, computer work, frequent communication, and occasional travel. (Ex. S, physical pp. 1, 4, 7, 10.)

14. For nearly three years - from his March 2020 hire until January 2023, during CSP's pandemic-era remote operations - Gray performed the director role entirely remotely, without working a day in the office. He later worked under the approved flexible work arrangement described in paragraph 15. (Ex. A1, physical p. 1; Ex. W, p. 3.) He performed every responsibility remotely, including managing and meeting with his teams, coordinating delivery and stakeholder work, and conducting weekly or twice-monthly one-on-one coaching sessions.

None of his actual duties, including supervision, mentoring, coaching, architecture, and project reviews, required his physical presence in Richmond. He performed them through the remote communication and development systems described in paragraph 12.

15. Gray recalls attending the office three days weekly for approximately four to six weeks after his hybrid agreement took effect in January 2023. His team worked remotely, and most people with whom he regularly interacted or met participated remotely. Henry approved a flexible work arrangement combining remote work with scheduled office attendance while Gray continued to perform the full director role. The principal expectation became attendance for an approximately 9:00 a.m.-noon planning meeting every other Thursday with about six local team members; Henry also requested weekly Thursday attendance during one period. The March 19, 2025 directive announced the change to that arrangement effective April 1. The March 19 memorandum itself described his then-current attendance expectation as "at least one day per week." (Ex. X, physical p. 1.) On June 5, Allan identified Gray's distributed team and contractors, then stated, “So that's why we gave you an exception.” (Ex. G at 5:30-6:12.) Gray's broader statement in that discussion that he had not previously worked a three-day schedule was mistaken as to the brief initial period. Allan recalled an earlier three-day period followed by the arrangement Henry approved. (Ex. G at 8:32-9:10.)

15A. Under that approved flexible work arrangement, Henry documented Gray's broader leadership and collaboration. In February 8, 2024 Namely entries, Henry credited Gray's communication of critical-project progress to leadership and weekly updates with the SIT group, COO and Henry. He wrote that Gray was "prepared and is open and honest about progress, lack of progress and hurdles," "was very interactive with his team and provided good leadership," and had "been working well with Security and IT Operations." Another entry credited stakeholder demonstrations and progress tracking. The comments also requested attention to quieter team members and critical HR or other non-IT needs. These evaluations

concern work beyond supervising developers, performed while Gray worked under that arrangement. He photographed the entries on June 27, 2025. (Ex. AJ, pp. 2-4.)

16. Gray's formal FY2025 midyear review in Namely displayed a completed date of February 13, 2025. Its review-writer field separately displayed "Mike Henry submitted February 25, 2025." Henry rated four of five goals "On Target" and one "Behind Schedule." The review credited Gray's leadership of a large team and outside development group, substantial application-project progress, and software delivery pipelines (CI/CD) that were working well and being used by IT Operations. It praised his tracking and communication of progress to leadership, including improved communication about difficult projects that were behind schedule. It also requested improvements in camera use, engagement, metrics, documentation, and progress communications. (Ex. I, physical pp. 1-5; Ex. AJ, p. 5.) The single goal rated "Behind Schedule" at midyear was completed by the fiscal-year end, June 30, 2025.

17. On March 19, twenty-two calendar days after the submission date displayed for Henry's review, Henry sent a memorandum following a meeting, copying Bishop and Geis. It withdrew Gray's approved flexible work arrangement and required at least three office days each week beginning April 1. It asserted inconsistent availability, untimely work, and failure to follow instructions. It also required advance approval for schedule changes, cameras during virtual meetings, team meetings at least every two weeks, at least one full office day every other week for his team, stakeholder meetings at least quarterly, and every effort to meet his supervisor in person every other week, with rescheduling when necessary. Gray disputes the accuracy and severity of the performance allegations used to withdraw his arrangement, including the characterization that he was unavailable or unable to lead remotely. The three-day directive nevertheless remained CSP's stated requirement through discharge, with the approved Utah work periods and directed office-day PTO described below. (Ex. X, physical pp. 1-4; Exs. G, H, I.)

17A. CSP used Namely as its official performance-management system. Allan repeatedly instructed Gray and other managers to document performance concerns there, explaining in substance that concerns not recorded in Namely did not count. The March 19 criticisms came through the separate meeting and Henry's follow-up email. On June 27, Gray reviewed all Namely records available through his employee account and photographed the accessible records. He found no new adverse performance entry between the February review and the March 19 meeting. The March 19 memorandum itself was also absent. Allan later relied on reported complaints about Gray's availability, including feedback she said came from interviews with employees and stakeholders. In the June 5 discussion she added: "So people have been saying this to me for years, that they can't find you. Whether it's true or not," followed by, "Whether it's a perception, whether it's just a work hour difference." Gray disputed that he was unavailable. (Ex. G at 6:34-8:14.)

17B. Two of the March memorandum's three complaint categories, "Timely Completion of Duties" and "Failure to Follow Instructions," revisited earlier matters, including metrics and camera-use concerns already addressed in the formal February review described in paragraph 16. The memorandum cited planning and metrics requests from September 30, 2024, early January 2025, January 29, and January 31. Yet the February review had rated the "Operational Excellence, Strategic Planning and Process Improvement" goal "On Target," acknowledged Gray's ongoing production-metrics work, and thanked him for communicating his approach to Bishop and Henry. Gray alleges that the March memorandum recast that work more severely when withdrawing his approved flexible work arrangement. The memorandum also identified a later March 17 follow-up and acknowledged that Gray supplied additional information containing analysis after Bishop responded. (Ex. I, physical pp. 2-5; Ex. X, physical pp. 1-4.)

17C. Before the March change, Gray had discussed his wife's medical circumstances and possible need to be in Utah with Henry, including a face-to-face conversation in Henry's office

about her condition. Management later disputed when it learned that his earlier family difficulties involved medical needs. (Ex. H at 10:50-12:10.) Bishop stated that there had been no clear discussion of medical need before April, distinguishing earlier personal difficulties from medical need "Until April 18th." CSP's later EEOC account acknowledged disclosure of his wife's mental-health issues "in about May." Thus, even management's later accounts place medical knowledge before the June employment decisions. (Ex. H at 11:24-12:10; Ex. W, pp. 7-8.)

17D. CSP later told the EEOC that Bishop and Geis received comments about Gray's availability and camera use during February and March 2025 meetings concerning Henry's replacement, and that another senior manager raised a lack of meetings in March. CSP furnished no contemporaneous interview notes or individual statements with that submission. Gray disputes that these asserted concerns accurately described his performance or justified withdrawal of his approved flexible work arrangement. (Ex. W, pp. 6-7, 10-11; paragraphs 16-17B.)

18. CSP’s written telework policy permits authorization for all or part of a workweek. It defines full-time teleworkers as those “regularly scheduled to work at an alternate site for all working hours in a work week and visit the main office only for meetings as needed.” It also defines hybrid and limited telework. The written policy contains no categorical exclusion of managers or directors from those arrangements. It provides for a feasibility discussion involving the employee, manager, and Chief Engagement Officer, addressing work habits, performance, responsibilities, equipment, and legal or fiscal implications. The policy makes telework approval dependent on managerial assessment of the work and business needs. (Ex. A; Ex. AA, source pp. 7-9, handbook pp. 23-25.)

19. Gray's telework agreement is dated December 28, 2022 and states an initial term of January 1, 2023 through January 1, 2024, with an agreed extension contemplated. It selects

part-time/hybrid telework, identifies the Arboretum as the main location, and marks Monday and Friday as the preferred normal remote days. It permits CSP to end telework. The form defines hybrid telework as "32 hours or more per month, typically one to two days a week" and records Monday and Friday as the preferred normal remote days. It contains no separate sentence requiring Tuesday, Wednesday and Thursday office attendance every week. CSP later described the agreement as establishing that exact weekly office pattern, and Allan called it "a contract that agreed that you would be in the office three days a week." (Ex. W, p. 4; Ex. H at 21:14-21:48.) Gray does not recall executing an extension or new agreement after January 1, 2024, and CSP's EEOC production included only the December 28, 2022 agreement. CSP continued Gray's approved flexible work arrangement after the agreement's initial term. (Ex. Y, source pp. 1-3.)

20. Allan expressly distinguished management's choices from a written prohibition. In the June 5 discussion, she explained: "It's on manager approval. It can allow you to work remotely." Asked whether any policy prohibited full remote work, she answered, "Nope." Asked whether any policy required Gray to be in Virginia, she again answered, "Nope," and added, "It's a practice, not a policy." Her follow-up email likewise stated, "There is no policy restricting Managers from working remotely or living out of state, nor is there a policy allowing Managers to work remotely or live out of state full time." In discussing schedule options, Allan also stated, "Everything is manager's discretion." CSP had already exercised approval authority through Gray's approved flexible work arrangement and later temporary Utah remote-work approvals. (Ex. G at 14:37-15:21, 26:54-26:57; Ex. A1, physical p. 1; paragraphs 15, 24, 26.)

20A. The written materials Allan supplied did not state the uniform three-day rule she asserted. Her email said, "Every Manager currently works in the office three days per week" and claimed consistent application. But the December 19, 2022 message she supplied said "most employees are expected to work 2 or 3 of those core days from the office." The reproduced

Manager's Guide also described two or three office days and tied long-term telework to position responsibilities, performance, and a safe and productive workspace. Neither supplied a manager-specific, three-day mandate. Allan had also acknowledged Gray's approved flexible work arrangement: "So that's why we gave you an exception." When he asked about reducing the requirement, she described a route to modification, as alleged in paragraph 33. The written telework policy likewise permitted approved full-time, hybrid, and limited arrangements. Gray therefore disputes that his job necessarily demanded an unchangeable, uniformly applied three-day schedule, while acknowledging the specific directive described in paragraph 17. On days Gray attended the office, he often observed few other employees present. With few exceptions, he participated in meetings from his office through Teams with people working remotely. (Ex. A1, physical pp. 1-2; Ex. G at 5:00-6:12, 24:45-25:20, 30:34-30:41; Ex. AA, source pp. 7-9, handbook pp. 23-25.)

21. In 2021, CSP approved an arrangement under which employee Chad Bailey could live and work remotely in Utah, as reflected in Gray's contemporaneous “Utah is a go” message and Bailey's response and exit account. Bailey was an individual contributor, and Allan later described the arrangement as a six-month trial. (Ex. D; Ex. G at 14:00-14:25.) Allan also recalled CSP's "research for Chad" and described Utah as "Pretty employer friendly like Virginia," after identifying Colorado among states whose employment-law requirements CSP wanted to avoid. She nevertheless said she needed to check Utah law for Gray's proposed work. (Ex. G at 24:07-24:45.) Morris later gave a competing account: CSP had considered the arrangement but was moving toward denial, and Bailey left before a final decision. (Ex. H at 12:30-13:30.)

**B. CSP's knowledge of the medical circumstances and the distinction between work and leave**

22. Gray's wife received continuing treatment for bipolar disorder, a chronic, serious mental-health condition. In the months before May 2025, her condition worsened. Recurring acute episodes placed her safety at risk and required his care, comfort, and psychological support. Family support available in Utah formed part of her treatment and support arrangement. Being near his wife in Utah did not itself prevent Gray from working. When her condition required care that prevented work, he needed time away to provide it. (Ex. G at 2:56-3:52, 27:39-28:16; Exs. AB, B, C, M.)

23. Gray also made direct disclosures to each individual defendant: Morris in the May meeting described in paragraph 25; Bishop in the May communications and May 27 meeting described below; and Allan in the June 5 discussion. (Exs. B, C, G, M; Ex. AB; see paragraph 25.)

24. On April 20, Gray texted Henry that his wife was "not doing great," that they were going to southern Utah to find temporary housing near her family, and that "this is something I have to do for her well being at this point." He requested permission to work remotely or use PTO for two weeks. Henry approved remote work, asked him to remain engaged and use his camera when possible, and said that if things became hectic he could take PTO and "just send me a text when you need to take time." That instruction established a direct text channel for a need to stop working and take leave. (Ex. L.)

25. During the first part of May 2025, Gray met with Morris and read aloud prepared notes describing his wife's serious medical circumstances. He told her that his wife had suffered from bipolar disorder throughout her adult life and needed "an environment with a strong, consistent support system"; for her, that was her family in Utah. He retained the script in a May 6 email to himself. It stated, "I want to be a part of CommonwealthSavers for the long haul," requested continued remote work as Director, offered regular travel to Richmond, and proposed discussion of a different title or compensation if necessary. (Ex. AB.) Morris referred

to earlier relocation requests and said she would discuss the matter with Bishop and Allan. The email's date identifies the retained script, not the precise day of the meeting.

25A. Gray had earlier made separate requests to relocate to Florida and the Eastern Shore of Virginia while continuing to work remotely as Director. CSP declined both. Gray continued working under his existing arrangement, and neither refusal included a warning that his employment would end. CSP's later EEOC statement places those requests in approximately May and October 2024 and acknowledges that Henry permitted a one-day-per-week office schedule for a period in 2024. It attributes the Florida refusal both to the manager office-attendance expectation and to concerns about a Director of a Virginia state agency living in Florida, and the Eastern Shore refusal to the office-attendance expectation. (Ex. W, p. 5.) On June 5, Allan suggested that an Eastern Shore arrangement might have been possible. Gray replied that he had been told no. Allan then linked her statement, “I don't care where you live,” to the condition, “If you work here three days a week,” while maintaining that permanent Utah work was a “nonstarter.” (Ex. G at 12:56-13:29.)

26. On May 18, following a difficult weekend for his wife, Gray requested remote work and offered to use PTO if remote work was unavailable. Bishop asked how long he expected to be away and replied: “Given the need to be with her, you are welcome to take pto so you can focus on her,” again recommending that he speak with HR about FMLA. Gray explained that he did not need to focus on her all day and that being nearby was often sufficient, so he sought to keep working when able. The exchange ended with a meeting arrangement. (Ex. M.) In a May 19 email copied to Geis and Henry, Bishop confirmed approval for that week's Utah remote work. She required East Coast hours and reliable availability, particularly to Gray's team, and directed PTO when family obligations took him away from work. Gray worked remotely from Utah that week under her approval. The approval was limited to that week. Future last-minute remote work required an agreed long-term solution, for which Bishop

requested a written proposal. Bishop also wrote that Jessica would soon send FMLA paperwork and that Gray would have “about 15 days to return that paperwork.” (Ex. AI.)

27. During both the approved April and May Utah remote-work periods, Gray maintained full productivity, met all deadlines, and received no complaints about his work during those periods. Defendants acknowledge that CSP "allowed Plaintiff to work remotely for several weeks in late April and May." (ECF No. 41 at 5.)

28. At the May 27 meeting, Gray expressly told Bishop that his wife was suicidal and that he could not be away from her for weekly travel to Richmond. He asked for another way to continue working. Bishop required PTO for the Tuesday-Thursday office days while he remained in Utah and refused remote work on those days. She continued to permit Monday and Friday remote work. Her June 13 email identified the May 27 meeting and restated that future days on which he could not attend because of Utah travel would require PTO. Gray followed that direction. (Ex. B1, physical p. 1.)

29. Gray had previously used a same-day PTO text for this caregiving need with management's knowledge. On May 29, he needed PTO for that purpose and sent the morning message, “good morning, I need to take PTO today.” Bishop replied, “Ok thank you,” and Henry replied, “Thanks.” (Ex. N.)

30. Gray sought a predictable schedule of Richmond visits that he could plan around his wife's care. He proposed approximately one week per month or a few days per month, with additional trips for important and quarterly meetings, rather than ruling out onsite work. Traveling between his Utah home and Richmond took approximately a full day each way. On June 5, he proposed coming "once a month, a week a month, or a few days a month," while explaining why weekly cross-country travel was incompatible with his wife's care circumstances. Gray sought the same kind of scheduling flexibility he had under his approved flexible work

arrangement, now with recurring Richmond visits planned around his wife's care, so he could continue working. (Paragraphs 14-15; Ex. G at 11:31-12:19, 12:40-12:55.)

31. On June 5, Gray sought a way to keep working while meeting his wife's medical needs. When Allan raised FMLA, Gray said, "I don't need leave. That's not really what I need." Allan answered, "Leave is a short-term solution. Not a long-term solution." Gray explained that unpaid leave ending with the same office requirement would not solve the continuing-work problem. He told her, "How to make this work is my primary goal." When Allan later explained that FMLA need not be taken as twelve continuous weeks, Gray responded, "Like a day," while expressing concern about the impact on his team. (Ex. G at 16:07-16:41, 17:41-18:01, 22:37-23:13.)

32. Allan confirmed that Gray would use PTO when he could not attend the designated Tuesday-Thursday office days, while Monday and Friday could be worked from Utah; she qualified that answer by saying she needed to check Utah law. Gray explained that weekly travel could leave him across the country when his wife needed him and was having a bad day. He said, "It doesn't work with somebody suicidal." Allan answered, "It doesn't. And those are the days I would hope you would just take the PTO," adding, "And so I would hope you would apply for FML." Gray understood that FMLA protection remained available to seek when he later needed time away to care for his wife. (Ex. G at 23:38-24:45, 27:39-28:16.)

33. Allan said telework could be authorized through manager approval and discussed different office days and a four-day, ten-hour schedule. In discussing those options, she stated, "Everything is manager's discretion." When Gray asked how to reduce the three-day requirement, she advised him to demonstrate his availability and build a working relationship with the incoming CTO. She also said that if the arrangement went well, "you can ask for a modification, but you have to prove it to us first." Gray understood that he could seek manager

approval for a flexible work arrangement with fewer weekly office days. (Ex. G at 14:54-15:21, 20:21-20:59, 24:45-25:20, 26:40-26:57, 30:34-30:41.)

34. When Gray asked what would happen after he used his remaining PTO, Allan stated, “We're not terminating your employment,” while maintaining CSP's stated office requirement. Gray also explored a defined period of remote work, and Allan described management's discussion of a possible future transition. No transition agreement or employment end date was set on June 5. (Ex. G at 18:28-18:57, 28:16-30:41.)

35. On June 13, Gray requested remote work on June 17 and 18 because his wife's mental-health treatment required her to be in Utah with family support. If remote work was unavailable, he said he would need PTO "to address my family's medical situation." Bishop responded: "First I wish you and your family well as you navigate your wife's medical needs. Your PTO is available for these situations, and I will approve your time off next week to be with your wife." Bishop declined the requested remote work for June 17-18 and directed Gray to use PTO for those days, reiterating her May 27 requirement. Her response expressly recognized the June 19 holiday and stated that "PTO would only be necessary for Tuesday and Wednesday if you are working remotely Monday and Friday." (Ex. B1, physical pp. 1-2.)

36. Bishop also wrote that the original FMLA eligibility notice had “expired since you declined to return the paperwork,” declared the absences “not FMLA-protected in nature,” and invited Gray to “restart the process” through Geis or HR. Gray alleges that CSP applied that unprotected classification to his later qualifying care absences and relied on those absences to require his departure. (Ex. B1, physical p. 1.)

**C. The June 23 opposition and care absences, followed by the June 27 ultimatum**

37. On June 23, Gray sent Bishop a written complaint opposing what he believed was disability-linked unequal treatment and requesting a meeting to resolve the situation. He wrote: "This change occurred shortly after I had initial conversations with my former supervisor about potentially needing to work remotely from Utah due to my wife's condition." He stated that the timing "raises questions about the motivation behind these scheduling changes." He identified changing explanations for the restrictions. He reminded Bishop that his wife's mental-health treatment required their permanent presence in Utah for essential family support. He described the Tuesday-Thursday PTO arrangement, expressed concern that paid leave would run out in approximately four to five weeks, and explained why temporary unpaid FMLA leave did not solve the longer-term problem. Gray intended both to oppose the perceived unequal treatment and to persuade CSP to reconsider the restrictions through its existing scheduling discretion. By explaining the consequences of continuing the work/PTO arrangement, he sought a way to keep working while supporting his wife. He also proposed discussing transition arrangements and an orderly handover. (Ex. C1, physical pp. 2-3.)

38. Bishop agreed to meet, writing, "A meeting sounds like a great idea. I will put something on our calendars." She expressly addressed his "statement about the accommodation process," said the ADAAA did not require caregiver accommodations, and added: "While we understand you do not like the Agency's position, we have consistently informed you we do not allow people leaders to work remotely from other states." She copied HR. Her reply did not distinguish that categorical statement from the Monday and Friday Utah work she had expressly permitted in her June 13 email. (Ex. C1, physical p. 1; Ex. B1, physical p. 1.)

38A. Gray sought a sustainable work arrangement with periodic Richmond travel so that he could continue working and leading his team. If CSP would not permit a workable alternative, he intended to use FMLA protection for necessary family-care leave. His criticism of FMLA concerned its inability to provide that long-term working solution, not an intention to reject

protection for qualifying care absences. After Bishop copied HR on the June 23 exchange, Gray understood that his explanation of the continuing medical need and PTO arrangement had begun the restart process she offered on June 13.

39. After responding to Gray's June 23 email describing the medical circumstances and existing PTO arrangement, Bishop texted that she had received his out-of-office response and that "you had not let me know you were planning to be out of the office this week." Gray replied: "I believe I have clearly indicated that I need to be located in Utah and I am unable to come in the office on Tuesday Wednesdays and Thursdays." The absence identified in her message covered June 24-26 - the same Tuesday-Thursday office days for which Bishop had directed PTO - as CSP later confirmed in its EEOC statement. Bishop also wrote, "I will schedule the requested meeting for Friday." (Ex. Z, source p. 1; Ex. W, p. 9.)

39A. In a separate June 23 email titled "RE: Draft Renewal," Bishop responded to Gray's explanation that he had been out on PTO. She acknowledged that he had been working at least Monday and Friday the prior week and Friday the week before, said she had been unaware he could not work on requests during the preceding weeks, and pointed to several emails seeking questions and comments about goals. Referring to future work on the goals, she wrote, "I will keep you in the loop as we move forward." The retained photograph displays her message at 5:51 p.m.; Exhibit C displays her substantive response to Gray's work-arrangement and ADA-related email at 5:27 p.m. (Ex. AC; Ex. C.)

40. Gray used PTO on June 24, 25, and 26 as Bishop required for the Tuesday-Thursday office days while he remained in Utah. His wife needed him nearby: in the circumstances described in paragraph 22, his presence helped moderate her condition and provided psychological comfort and reassurance. He remained near her to provide that support and respond if her symptoms worsened. Gray was ready, willing, and able to work remotely and wanted to support his team, but Bishop denied that arrangement on the designated office days while

permitting Monday and Friday remote work. Weekly Richmond attendance required approximately a travel day each way and several days away, preventing him from providing that nearby care. The care required his presence near his wife and prevented the required Richmond attendance, not productive remote work. Before those absences began, his June 23 email described the ongoing medical circumstances and Tuesday-Thursday PTO course, and his separate text confirmed his inability to attend those office days. (Paragraphs 37-39; Exs. C1, Z.)

41. Bishop's June 23 response copied Geis. At the June 27 meeting, while waiting for Morris to join, Allan explained that CSP had assembled the decisionmakers because of Gray's email and request for resolution: "we just wanted to get all the decision makers together." (Ex. C1, physical p. 1; Ex. H at 2:30-2:49.)

42. Bishop began the June 27 discussion by citing Gray's June 23 text: "on Monday you had texted stating that you have clearly indicated you're unable to come to the office or not willing to come to the office on Tuesdays, Wednesdays, and Thursdays." She asked whether he was refusing to work in the office. Gray answered, "I'm not refusing to work in the office on those days, I'm not able to come in on those days. I would love to work, I would love to work remotely on those days, absolutely." Bishop said his move to Utah and inability to work in the office as required meant he could not continue and was "in essence" resigning. In the same statement, she offered a notice period "which we're willing to allow virtually," with specified deliverables, monitoring, and a reserved right to terminate early. (Ex. H at 4:12-5:35; Ex. Z.)

43. Gray challenged the asserted restrictions, expressly raised associational discrimination and the timing of CSP's treatment, and disputed management's account of when it learned of the medical circumstances. Morris personally defended the work-location decision and distinguished Bailey's circumstances. These discussions followed, rather than preceded, Bishop's opening announcement that Gray could not continue. (Ex. H at 8:36-14:22.)

44. Allan characterized the move as "your personal choice" and said it meant Gray could not continue in the role. She told Gray that CSP would let him "have a notice period and work remotely in your notice period so we're not having to play this PTO thing Tuesday, Wednesday, Thursday." Explaining that period, she said, "you don't have to fly back here. You can work Tuesday, Wednesday, Thursday." The work would shift into transition mode, with deliverables set by Bishop. CSP thus offered remote work on those days as part of ending his employment, after requiring PTO on the same days while he sought to remain employed and care for his wife. Management also asserted office requirements, performance concerns, and relocation as its reasons. Gray alleges that CSP used his care-related absences under the directed PTO arrangement to require his departure instead of allowing him to continue working and taking leave. (Ex. H at 14:23-18:42; Ex. W, p. 9.)

45. Allan described CSP's offer as “letting you work a remote notice period if you choose to resign.” Gray sought a mutually beneficial resolution and discussed a transition package. Allan then stated, “you have abandoned your job.” Gray answered, “I have not abandoned my job,” and said he was trying to work things out. Allan asserted abandonment “by the legal definition” and offered a month of work or an immediate departure. (Ex. H at 16:37-19:19, including 16:50-16:55.)

46. Gray then said he needed to consider external processes addressing the policy and discrimination implications. Allan immediately asked whether he was not resigning. Gray said he was not resigning "at this moment" and explained, "I'm trying to save my position. That's what I've been trying to do for months now." When he asked to think over the weekend, Bishop refused: "Right now, the offer, the options on the table are to resign, or we will terminate you effectively at the end of this meeting." The renewed immediate ultimatum followed his express opposition. (Ex. H at 19:22-21:02.)

47. Faced with termination at the meeting's end after Bishop refused time to consider the ultimatum, Gray responded: "Okay, so if you're telling me that those are my only two choices, I will continue with the one month, but I also want to reserve my rights under that agreement." Management then specified communication, availability, deliverables, and possible early termination. Gray said, "I will accept those terms at this point in time. Yes." Within that imposed departure discussion, management later proposed August 1 to preserve additional health coverage, and Gray indicated that date worked for him. He gave those responses to limit the immediate harm to himself and his wife and preserve income and coverage, not because he wished to leave his job. (Ex. H at 20:14-22:27, 25:35-26:28.)

48. Allan then asked Gray to email a resignation in his own words with an end date, stating, "Carolyn will respond and accept it." A Monday discussion would address the work and communications plan. Bishop said, "I will await your resignation email, Zander, and respond," and "you and I will establish a communications plan on Monday." Deliverables and transition details remained to be settled. (Ex. H at 22:29-23:28, 25:35-26:17.) Gray's later Board letter described an end-of-day ultimatum and stated, "I refused to resign." The recording supplies the complete sequence: Bishop demanded a choice before the meeting ended, and Gray gave the response quoted in paragraph 47 with his rights reserved. No deadline was stated for the subsequently requested resignation email, which he did not send. (Ex. R1, physical p. 5, printed p. 6.)

49. Allan explained that "your health benefits are based on a month" and that management was "trying not to have you lose health benefits immediately." She proposed August 1 to preserve an additional month of health coverage and said the arrangement would provide two months of coverage. Morris participated in that benefits discussion. Management contemplated working time, transition tasks, and possible PTO for the final days. Allan had already acknowledged on

June 5 that Gray was trying to keep his job and health insurance while being with his wife. (Ex. G at 4:28-5:00; Ex. H at 17:31-18:42, 25:35-26:28.)

50. Allan first asserted abandonment at 19:06 of the June 27 meeting. Gray immediately denied the charge and said he was trying to work things out; Allan repeated it as management's existing conclusion. At 20:36, Bishop required him to choose between the offered notice period and termination at the meeting's end. After his response to that ultimatum, Allan cited the telework agreement and performance meeting as documented support, but no supporting documents were presented for his review. The later invitation for questions followed his response and management's request for a resignation email; the ensuing discussion concerned how he would leave. Allan stated: "We understand why your family is taking you to Utah. Hopefully you understand why that means that you can't continue in this role." (Ex. H at 19:06-24:49.)

**D. The promised Monday access, family-medical request, and immediate discharge**

51. Gray did not send the requested resignation email, Bishop did not issue the contemplated written acceptance, and Monday planning did not occur. Gray alleges that his response to the ultimatum was involuntary and resulted from the unlawful conduct alleged below.

52. At 5:09 p.m. Eastern Time on June 27, Bishop texted: “Zander, we did not hear from you as agreed and it's now past 5 pm for our business hours. While we navigate this, we are disabling your access now through the weekend and we will reenable access on Monday morning and we will reach out then. Jessica Geis is included on this text message. Should you have any questions, contact us.” This was the first time she mentioned 5:00 p.m. business hours in connection with the missing response. Gray had received no deadline for the resignation email. Although Bishop knew it had not arrived, she promised Monday access and outreach. (Ex. F1.)

53. On June 30, Gray's wife experienced an acute episode requiring immediate, unforeseen care and attention from him. He needed the day away from work to provide that care. Monday was ordinarily a permitted remote-work day under the June 13 arrangement; he otherwise could have worked from Utah. (Ex. B1, physical p. 1.)

54. At 8:46 a.m. Eastern Time, Gray texted Bishop: "I need to take PTO today for family medical reasons." He used the direct text method Henry had instructed and Bishop and Henry had accepted, sending it to the same mobile number used in their June 23 exchange and listed in Bishop's email signature. The saved message displays a 6:46 a.m. sent time and a same-time receipt entry for Carolyn. Gray alleges that Bishop knew the family-medical context from the preceding communications and received this notice before issuing the discharge. (Exs. E1-E2, L, M, N, Z.)

55. Between his 8:46 a.m. text and the 12:13 p.m. letter, Gray received no inquiry about the care needed, no request for clarification, no leave determination, and no request for certification.

56. The preserved termination-letter PDF identifies Jessica Geis in its author field and records creation at 11:50:17 a.m. and modification at 11:51:54 a.m. Eastern Time on June 30. Both recorded times follow Gray's 8:46 a.m. family-medical text. (Exs. P, Q.)

57. At 12:13 p.m., Bishop emailed Gray the termination letter, copying Morris, Geis, and General Counsel McGee. The letter itself also identifies those copies. Its opening states: "This letter serves as confirmation that your employment with Commonwealth Savers is terminated effective immediately due to job abandonment. As we have discussed to include most recently on Friday June 27th, your permanent move to Utah and resulting inability to work in-office as this role requires cannot be supported." The letter stated, "Your health insurance benefits will continue through today, June 30, 2025," and said that information about COBRA continuation rights would be mailed by the plan administrator. It set a final-paycheck date and provided for

later payment of unused PTO. It did not state that CSP was accepting an August 1 resignation. It identified no conduct after the June 27 meeting as a reason for termination and mentioned neither a missed June 30 meeting nor a failure to send the resignation email. It also omitted Gray's June 30 family-medical notice. (Exs. E2-E3.)

58. CSP communicated no June 30 meeting time or invitation to Gray before discharging him. The Friday communications contemplated Monday planning and outreach without identifying a particular meeting. The next message shown in the group text Bishop had created on Friday came after the termination email. It instructed Gray to "check your personal email as correspondence was sent to your personal email address." The phone displays that Monday message at 10:15 a.m. Mountain Time, corresponding to 12:15 p.m. Eastern Time, two minutes after the termination email. Neither that message nor the letter mentioned a missed June 30 meeting. (Exs. E2-E3, F1; Ex. H at 22:29-24:23.)

59. Gray alleges that CSP used his qualifying family-care absences to require his departure at the June 27 meeting. It then used his June 30 family-medical notice to discharge him immediately and end continued employment-related health benefits after June 30. Alternatively, the June 30 protected notice caused CSP to advance or materially worsen a contemplated departure.

**E. Later explanations, the official separation record, and requests for review**

60. CSP later told EEOC that Gray verbally accepted a resignation offer but was terminated June 30 when the requested written confirmation did not timely arrive. It acknowledged that Gray disclosed his wife's mental-health issues "in about May" and that CSP encouraged FMLA leave "to help in dealing with his wife's medical situation," while asserting that he declined. The statement described his "refusal or inability" to comply with the office requirement, acknowledged weeks of remote work from Utah with CSP's knowledge, and said the transition would have allowed remote work. It did not mention the June 30 family-medical text, Bishop's Friday promise of Monday access and outreach, or any missed June 30 meeting, and did not use the word "abandonment." Its missing-writing explanation differs from the contemporaneous letter's stated abandonment reason. Gray had received no deadline for that email, and Bishop promised Monday access and outreach after she knew it had not arrived. (Ex. W, pp. 2, 7-10; Exs. E-F.)

60A. CSP's position statement also stated, "Gray's decision to live in Utah and not meet the in-office work requirement led to his termination. His June 23 email had nothing to do with it." (Ex. W, p. 11.) In their October 14, 2026 memorandum in this action, Defendants cited the June 23 email and separate text and asserted that "the events directly leading to Plaintiff's termination occurred on Monday, June 23, 2025" and that his termination "was solidified based on the events of June 23." (ECF No. 41 at 14-15.) The text reiterated Gray's inability to attend on Tuesdays through Thursdays, a limitation Bishop already knew from the May 27 discussion alleged in paragraph 28 and had addressed in her June 13 email. The June 23 email also opposed the disability-linked treatment described in paragraph 37, while addressing permanent presence, PTO exhaustion, and transition options. Gray challenges both CSP's stated reason for ending his employment and its account of what immediately triggered each decision and when. He relies on the differing accounts, the already-known attendance

limitation, the directed work/PTO course, and the intervening communications to challenge the stated cause and timing of the June 27 forced exit and June 30 discharge.

60B. CSP's August 2025 response to the Virginia Employment Commission described the May 27, June 5 and June 13 exchanges as part of a warning history. It described Bishop's June 23 written communication as a final reminder about office expectations. On information and belief, that entry refers to Bishop's response to Gray's June 23 objection and the associated text described in paragraphs 38-39. The VEC response listed return to the office as the corrective action and said a meeting would address resignation versus termination. Asked what Gray did to comply, CSP answered: "Did not return, called out Tuesday-Thursday." It listed June 24, 25 and 26 as attendance occurrences after the warning and said his behavior had not improved after the warnings. The response also answered "No" when asked whether there was a policy relating to the reason for discharge. These were the care absences described in paragraph 40. Gray took PTO for them as Bishop directed. He alleges that this later account, read with Bishop's instructions and the June 27 discussion described in paragraph 44, supports his claim that CSP counted those absences against him in requiring his departure. Gray further alleges that, in this later account, CSP recast its response to his discrimination objection as a disciplinary step supporting his departure.

60C. The same VEC response repeated job abandonment and the Utah/office conflict. It listed June 27 as the date of the final incident and June 30 as the date Gray was first told he was being discharged. It also said that a meeting was to be held on June 30, that Gray did not attend, and that he was terminated that day. Gray disputes that explanation: CSP had communicated no June 30 meeting time or invitation to him before discharging him, as paragraph 58 alleges. He relies on the warning history and claimed failure to comply, the missed-meeting explanation, the differing accounts in paragraphs 60-60A, and the intervening

communications to challenge CSP's stated cause and timing of the June 27 forced exit and June 30 discharge.

61. On information and belief, CSP retained its formally issued job-abandonment reason in Gray's personnel or separation record. The preserved PDF identifies HR Business Partner Jessica Geis in its author field; the COO issued it and copied the CEO, HR Business Partner, and General Counsel. Gray had remained in communication, sought to keep his job, responded to the ultimatum by agreeing to continue working with his rights reserved, and given notice of the June 30 medical absence. Yet classifying this senior technology director's departure as abandonment falsely imputed deliberate desertion of his professional duties and serious unreliability.

62. Gray seeks comparable technology-leadership work and intends to apply for positions where prospective employers are likely to ask CSP about his employment and why it ended. The Virginia Department of Human Resource Management's current public employment-verification guidance directs a verifier to the human resources office of the person's current or former agency. That guidance identifies whom to contact. On information and belief, CSP maintains abandonment as its official separation reason and is likely to communicate that reason in response to those inquiries. Gray bases that prediction on CSP's formal adoption of the charge, its issuance to HR and the officials responsible for his employment, and its continued maintenance despite his request for review. CSP controls its separation record and the practices used to answer those inquiries.

63. The June 30 termination letter identified no grievance, appeal, or review procedure. (Exs. E2-E3.) On August 27, 2025, Gray sent CSP's Board and JLARC the letter reproduced in Exhibit R. He disputed the abandonment account and requested an investigation of the employment practices, review of executive decisions, remedial action, and redress. He also proposed a monetary settlement. Allan had identified the Board as a channel for reporting

illegality. CSP's handbook likewise directed employees to report suspected discrimination or harassment to management, HR, or the Board and called for prompt HR investigation. The certified-mail records establish delivery through the institutional channels shown, including a Board copy addressed care of Morris. Gray received no opportunity to clear his name, no review addressing the abandonment charge, and no correction. (Ex. R; Ex. G at 31:52-32:27; Ex. AA, source p. 3, handbook p. 4.)

64. Allan personally formulated and pressed the abandonment accusation at the June 27 meeting. Bishop adopted it and issued it as CSP's formal discharge reason after the medical notice. Morris participated in the decision discussion, defended CSP's work-location position, and was copied on the June 30 letter. Based on her identified decisionmaking role and participation, Gray alleges on information and belief that Morris approved abandonment as the official reason for his separation.

65. Allan said the Board hired Morris and "delegates all staff decisions to her," and identified Morris as Gray's final internal avenue for the work-location decision. She said allegations of harassment or illegality should go to the Board. Allan's June 5 written follow-up likewise identified Morris as part of the work-location decision, said the Board Charter delegated schedules to the CEO, and identified the Board as a channel for reported law violations. (Ex. A1, physical p. 2.) Morris participated in the June 27 decision, defended CSP's position, and received the June 30 letter stating abandonment as the official reason. Based on that stated delegation and her actual participation, Gray alleges on information and belief that Morris held and exercised CSP's delegated final authority over the separation classification and the process for challenging it. He challenges her adoption and implementation of that decision as CSP's own decision. (Ex. G at 13:36-14:25, 31:52-32:27; Exs. E, H.)

66. Morris remains CSP's Chief Executive Officer and directs the employment administration at issue. Based on the staff-decision delegation described above, Gray alleges on information

and belief that she has authority to convene review and direct correction or annotation of CSP-controlled separation records. He seeks prospective process and record relief from her under Count III to address the maintained charge and its likely use in employment references.

**F. FMLA eligibility and injury**

67. At the relevant times Gray had worked for CSP for more than twelve months and at least 1,250 hours during the preceding twelve months. CSP was a public-agency employer covered by the FMLA. On information and belief, it employed at least fifty employees at or within seventy-five miles of Gray's assigned North Chesterfield worksite, including employees reporting to or receiving assignments from that worksite under the applicable worksite rule. Gray had available family-care leave entitlement. His wife's chronic condition and continuing treatment constituted a serious health condition, and he was needed to provide the care described above. 29 U.S.C. §§ 2611-2612; 29 C.F.R. §§ 825.110-111, 825.124.

68. The challenged actions ended Gray's employment on June 30 and, as stated in the letter, limited his employment-related health-insurance benefits to coverage through that date. He seeks the wages, employment benefits, and other recoverable losses caused by the violations proved, including the consequences of losing the communicated transition and coverage period. The payroll records identify regular compensation and a separate $7,317.34 payment for accrued leave. That payment will be accounted for; it did not compensate all alleged lost future wages or continued health coverage. (Exs. E, H, O.)

69. Gray wanted to remain employed, perform his duties, and use available family-care leave when necessary care conflicted with required onsite attendance or prevented remote work, as distinguished in paragraphs 40 and 53-54. He alleges that CSP's unlawful use of his qualifying family-care leave caused his forced departure and that, absent those violations, he would have remained employed. Alternatively, he seeks recovery for the additional compensation and benefit losses caused by the immediate June 30 discharge and cutoff of continued

employment-related health benefits. The constitutional and defamation claims seek their separately caused injuries.

**G. ADA coverage, charge, and requested prospective relief**

69A. CSP employed Gray and engaged in an industry affecting commerce through its savings and investment programs. Gray alleges on information and belief that CSP had at least fifteen employees for each working day in twenty or more calendar weeks in 2024 or 2025. He bases that allegation on CSP's established employment operation, the management and employee functions described above, and his own employment and supervisory experience. He asserts the ADA employer claims on the non-arm-of-the-State basis pleaded in paragraphs 6-8.

69B. Gray's wife had bipolar disorder, a mental impairment that substantially limited brain function when active. Her recurring acute episodes, continuing treatment, and need for care are described in paragraph 22. Before June 27, Bishop, Allan, and Morris each knew she was Gray's wife and knew the medical basis of his requests through their respective communications described in paragraphs 23-38. Their later participation is described in paragraphs 41-50. CSP's EEOC statement acknowledged disclosure of his wife's mental-health issues "in about May," and Defendants' memorandum states that "[b]y May 2025, Plaintiff disclosed to Commonwealth Savers leadership that his wife was dealing with bipolar disorder." (Ex. W, pp. 7-8; ECF No. 41 at 5.)

69C. On April 9, 2026, the Richmond EEOC office described the supplied Form 5A as "Your charge (Form 5A)" and said an interview would follow to prepare a "formal/perfected Form 5." On April 11, 2026, Gray filed a signed EEOC Form 5A, verified under penalty of perjury, naming CSP and alleging disability discrimination and retaliation. It identified his wife's bipolar disorder, the June 23 opposition, the June 27 resignation-or-termination demand, and the June 30 discharge. The form states that signing files a charge with the EEOC and records Gray's understanding that it will also be filed with the applicable state or local agency. The

saved portal records Charge No. 438-2025-02440 as filed April 11; its document table separately records April 14 as the Form 5A upload date. (ECF No. 38-2, pp. 2-4.) The Form 5A's shorthand that the June 27 demand preceded "any absence" and that the February review had "no issues" is clarified by paragraphs 16 and 40: Gray used directed PTO June 24-26, and the review contained a Behind Schedule rating and improvement comments. His September 22 memorandum already made that clarification. (ECF No. 36 at 19; Ex. AH-3.)

69D. On May 26, 2026, Gray digitally signed Form 5 for the same charge, alleging association discrimination and termination in retaliation for opposing disability discrimination. Its date fields list June 30, but its narrative also identifies the June 23 opposition, June 27 ultimatum, and promised Monday restoration of access. Form 5 names the EEOC and Virginia Office of Civil Rights and requests filing with both. It clarified and perfected the existing charge; Gray invokes relation back for any necessary clarification or verification under 29 C.F.R. § 1601.12(b). (Ex. AD.) CSP addressed both the association theory and June 23-30 events on the merits before the EEOC, asserting that Gray's association "had nothing at all to do with his work schedule or his termination from employment." (Ex. W, pp. 9-11.)

69E. Gray invokes the 300-day period through the applicable EEOC-Virginia Office of Civil Rights worksharing process. CSP's EEOC position statement likewise applied "the 300 day allowable period for filing a charge with the EEOC and/or the Virginia Office of Civil Rights." (Ex. W, p. 9.) The signed forms described in paragraphs 69C-69D contain dual-filing language, and the EEOC's May 26 acknowledgment describes dual filing when state or local law also covers a charge. Based on those documents and the EEOC's acceptance and processing of his charge, Gray alleges on information and belief that his EEOC filing commenced proceedings for both agencies. April 11 was 288 days after June 27 and 285 days after June 30. Counts V and VI seek relief for those forced-exit and discharge decisions and their resulting losses. Earlier attendance, work-arrangement, and medical-disclosure events

provide background concerning knowledge, qualification, motive, and reasonable opposition; they are not asserted as separately timely discrete ADA claims.

69E1. Alternatively, Gray invokes his November 18, 2025 email to the EEOC's Richmond and information addresses as an initial charge later clarified and verified by the April 11 Form 5A and May 26 Form 5. The email identified Gray, CSP, disability and retaliation, the June 30 family-medical notice followed by discharge, and the challenged abandonment reason. It said his deadlines were running and he needed to "amend and perfect my charge," requesting an intake or amendment appointment or immediate submission instructions. The support system acknowledged receipt that day as an inquiry and warned that a charge could not be filed by email. The December 4 response acknowledged the unavailable appointment choices, directed continued checking, and gave April 26, 2026 as the filing deadline. The later verified forms identify the same employer and June 30 discharge. They further specify his wife's disability, his June 23 opposition, and the preceding June 27 resignation-or-termination ultimatum. Gray invokes 29 C.F.R. § 1601.12(b) for that related clarification and verification. This alternative concerns the earlier email's legal effect; the portal's recorded filing date remains April 11, 2026.

69F. The United States Department of Justice (DOJ) issued, and Gray received by email on October 16, 2026, a Notice of Right to Sue Within 90 Days for EEOC Charge No. 438-2025-02440, DOJ reference 851727-LRG. It expressly authorizes suit under ADA Title I and disclaims a merits determination. Gray presents these ADA claims within ninety days of receipt. (Ex. AE.) His prior motion for leave explained that the ADA claims were being omitted pending completion of the administrative process. He presents them now following the DOJ notice. (ECF No. 35 at 2-3.)

69G. Gray alleges on information and belief that CSP still maintains abandonment as its official separation reason. He bases that inference on the letter's formal issuance, its author

field identifying HR Business Partner Jessica Geis, its circulation to the CEO and General Counsel, and the absence of a communicated correction after his request for review. For prospective relief only, Gray challenges the present maintenance and threatened employment-reference use of that classification. He challenges that maintenance and threatened use only insofar as they continue the retaliatory or discriminatory treatment alleged in Counts V and VI and threaten the employment harm described in paragraphs 61-62. If CSP is immune, Gray seeks only prospective correction or annotation of that CSP-controlled record from Morris in her official capacity, as necessary to remedy a proved ongoing ADA violation. He alleges on information and belief that she can implement that relief based on her present CEO role and the delegated employment authority described in paragraphs 6, 10, 65, and 66. This official-capacity request seeks no damages, back pay, front pay, or other retrospective monetary award. Gray does not presently seek reinstatement or assert individual-capacity ADA liability.

## IV. CLAIMS FOR RELIEF

### COUNT I - FMLA INTERFERENCE 29 U.S.C. § 2615(a)(1) - Against CSP, Carolyn Bishop individually, Debra Allan individually, and Mary G. Morris individually

70. Gray incorporates the preceding common factual allegations, paragraphs 1-69.

71. Gray was an eligible employee with available leave to care for his spouse's serious health condition in the circumstances described above. CSP was a covered employer. Bishop, Allan, and Morris were employers through the control and conduct alleged above. His qualifying care leave remained protected when paid through PTO, which could run concurrently with FMLA leave. He challenges the denial and adverse use of that protection. 29 U.S.C. § 2612(a)(1)(C), (d)(2); 29 C.F.R. §§ 825.124(a)-(c), 825.207(a).

72. Monday, June 30, was ordinarily a permitted remote-work day. An acute, unforeseen episode required Gray to take that day away from work to provide immediate care. He notified

Bishop as soon as practicable through the accepted direct-text channel. His family-medical request, Bishop's knowledge of his wife's condition and care needs, and their preceding care and leave communications supplied sufficient information that the FMLA might apply. Bishop had herself approved earlier office-day leave as time "to be with your wife" while acknowledging his wife's medical needs (paragraph 35). CSP and Bishop discharged him within hours without clarifying the notice or addressing the qualifying need. That discharge denied protection of the absence and the leave, restoration, and benefit rights otherwise available to him. CSP's June 13 communication classified the absences it addressed as unprotected. Earlier PTO for the same medical reason did not, by itself, establish the previously provided FMLA-protected leave required for the subsequent-request rule. Gray relies on the specific care notices in their known context. 29 C.F.R. § 825.303(b).

73. Gray also alleges interference through the June 27 forced exit. He used PTO on June 24-26 for the care described in paragraph 40, as Bishop directed on May 27 and restated June 13. Bishop and Allan participated in the decision and knew the medical basis of the work/PTO arrangement through their own communications. Morris's prior medical knowledge, participation, and alleged approval are specified in paragraph 11C. Bishop opened the June 27 discussion by citing Gray's notice that he could not attend the Tuesday-Thursday office days; Allan connected the offered remote notice period to ending that PTO pattern (paragraphs 42, 44). Through those respective acts, CSP treated the qualifying care absences and continuing need for leave as grounds to require resignation or immediate termination. This claim concerns necessary care leave, not hours actually worked remotely.

74. CSP, Bishop, and Allan caused the June 27 forced exit by treating the earlier qualifying care absences as unprotected attendance. Morris's own participation and alleged approval described in paragraph 11C also caused that decision. Separately, CSP and Bishop denied available leave protection and caused the immediate June 30 discharge through their failure to

clarify the notice and adverse use of the qualifying absence. Gray seeks the compensation and benefit losses caused by each defendant's violation. 29 C.F.R. §§ 825.220(b), 825.301(a), 825.303(b).

75. The June 13 classification informed CSP's later treatment of the care absences as grounds for separation. The June 27 ultimatum restrained Gray's continued use of qualifying family-care leave and caused the pleaded employment and benefit losses. Gray's earlier preference to continue working did not waive otherwise available FMLA rights for later qualifying absences. 29 C.F.R. § 825.220(b), (d).

75A. CSP's assertion that the eligibility notice had expired did not, by itself, establish a loss of statutory eligibility or a continuing certification bar to Gray's later care leave. Gray challenges the unprotected classification under the certification requirements applicable to those absences. Those requirements include an applicable request, written notice when required, advice about the anticipated consequences of noncompliance, and the ordinarily applicable 15-calendar-day response period. Any asserted demand must be assessed for its actual terms and continuing reach alongside Bishop's restart invitation and the later communications and actions. 29 C.F.R. §§ 825.300(b)-(c), 825.305(a), (b), (d), 825.313.

76. As a result of the respective violations, Gray lost wages, benefits, and compensation. He seeks relief against each liable defendant under 29 U.S.C. § 2617(a), including appropriate equitable relief, interest, costs, and liquidated damages as provided by the statute, without duplicate recovery for the same loss.

**COUNT II - FMLA RETALIATION AND PROHIBITED USE OF LEAVE 29 U.S.C. § 2615(a)(1)-(2); 29 C.F.R. § 825.220(c) - Against CSP, Carolyn Bishop individually, Debra Allan individually, and Mary G. Morris individually**

77. Gray incorporates the common factual allegations, paragraphs 1-69.

78. Gray exercised or attempted to exercise family-care leave rights through the qualifying PTO used June 24-26 and continuing care need described in paragraph 40, and through the separate June 30 request. His June 23 communications described the medical circumstances, directed Tuesday-Thursday PTO course, and coming June 24-26 absence. He alleges that, read in that known context, they conveyed his continuing need for necessary family-care leave before the June 27 forced exit. CSP knew the context and notices through the identified supervisors and HR communications. Bishop and Allan knew the earlier care and leave circumstances through their own communications and participation; Morris's prior medical knowledge and role are specified in paragraph 11C. Bishop also received the June 30 request for that day's acute care need, as alleged in paragraphs 53-54.

79. CSP, Bishop, Allan, and Morris used Gray's qualifying family-care leave and communicated continuing need for it as a negative factor in the June 27 decision. Gray alleges that this use was a but-for cause of the forced exit when and as it occurred, through each defendant's own acts identified in paragraphs 11A-11C and this paragraph. Bishop already knew the medical basis for Gray's inability to make weekly Richmond trips and had directed office-day PTO while permitting Monday and Friday work. His June 23 communications described the continuing medical circumstances, directed PTO course, and coming absence before he took the June 24-26 care leave. Bishop then opened the June 27 discussion by citing his Tuesday-Thursday text, and management treated his inability to attend as abandonment and demanded resignation or immediate termination. Allan connected the offered remote exit period to ending "this PTO thing Tuesday, Wednesday, Thursday." Morris participated in and allegedly approved the decision with the prior medical knowledge specified in paragraphs 11C and 25. (Paragraphs 28, 32, 35-40, 42, 44; Ex. H at 4:12-5:35, 14:23-15:12, 19:06-21:02.) The later employer account in paragraph 60B corroborates the alleged adverse use of those absences.

80. Bishop knew on Friday that the requested resignation email had not arrived, yet promised Monday access and outreach. Gray had received no deadline for that email. After receiving his June 30 family-medical notice through the accepted channel, she and CSP discharged him effective immediately at 12:13 p.m., with health-insurance benefits continuing only through June 30. CSP later attributed the June 30 termination to the missing writing, as described in paragraph 60. Gray alleges that his medical notice was a but-for cause of CSP's and Bishop's change in how they treated that already-known omission. They replaced the communicated Monday course with immediate discharge and benefit loss after June 30.

81. Alternatively, the June 30 protected notice was a but-for cause of CSP's and Bishop's decision to advance or materially worsen a previously contemplated departure, replacing the communicated transition and Monday planning with immediate termination and health-insurance benefits continuing only through June 30.

81A. Gray separately alleges retaliation for his adequately communicated efforts to obtain potentially available family-care leave through the process CSP offered. Those efforts included his June 23 communications and a separate June 30 request for that day's leave. He does not concede a valid continuing certification default. Even if such a requirement barred coverage of a particular absence, he alternatively alleges that the responsible defendants punished the legitimate requests and attempts themselves. He alleges that this punishment was a but-for cause of the respective employment actions. This alternative concerns CSP and Bishop for their respective June 27 and June 30 conduct, and Allan and Morris for their respective June 27 conduct, as specified in paragraphs 11B-11C and 79-81.

82. Bishop and Allan knew the family-medical circumstances and work/PTO arrangement relevant to their June 27 conduct, yet used qualifying care as abandonment or grounds for the forced exit. Morris participated in and allegedly approved that decision with the prior medical knowledge described in paragraph 11C. Bishop separately received the June 30 notice before

issuing the immediate discharge. Gray alleges that CSP and each individual acted intentionally through their respective conduct and knew it violated the FMLA or recklessly disregarded that possibility.

83. The retaliation caused loss of employment, wages, benefits, and other recoverable compensation. Gray seeks relief under 29 U.S.C. § 2617(a) against CSP, Bishop, Allan, and Morris for the losses caused by their respective violations, coordinated with Count I and the other claims to avoid duplicate recovery.

**COUNT III - PROCEDURAL DUE PROCESS: STIGMATIZING DISCHARGE 42 U.S.C. § 1983 - Against CSP; Morris, Bishop, and Allan individually; limited prospective relief against Morris officially**

84. Gray incorporates the common factual allegations, paragraphs 1-69. Paragraphs 60B-60C are incorporated only for the corroborative purpose stated in paragraph 86A.

85. Through their own acts, Morris, Bishop, and Allan caused CSP to adopt the substantially false abandonment charge in connection with Gray's discharge. As a senior IT director, Gray was entrusted with leading and mentoring two development teams, coaching employees, coordinating application delivery, and working with security and IT operations to secure agency applications and mitigate risks. His formal goals included evaluating and promoting internal controls and security of customer assets. (Ex. I, physical p. 4; Ex. S, physical p. 4.) In that professional setting, the abandonment charge accused him of deliberately forsaking the people and responsibilities entrusted to his leadership, a serious breach of professional integrity and trust. Gray had taken office-day PTO as Bishop directed, remained in communication, sought to keep his job, and responded to the ultimatum by agreeing to continue working with his rights reserved. Before Bishop issued the letter, he had also given her the June 30 care notice. Those communications and actions contradicted the charge that he had deliberately deserted his professional responsibilities.

86. On information and belief, CSP maintains the charge in Gray's personnel or separation record and is likely to communicate it to prospective employers in response to the employment inquiries described in paragraph 62. Gray seeks comparable technology-leadership positions for which employers are likely to ask about his prior employment and departure. The charge's likely disclosure threatens his ability to obtain comparable professional work.

86A. CSP's later response to the VEC, described in paragraphs 60B-60C, repeated the abandonment charge and added a warning history and missed-meeting assertion to its written account. On information and belief, CSP retains that expanded written account, together with its official abandonment reason, in human-resources or other records concerning Gray's separation. Gray bases that inference on CSP's formal HR response, the issuance and circulation described in paragraph 61, and the absence of a communicated correction after his review request. The likelihood that the reason will reach prospective employers rests on the separate inquiry facts alleged in paragraphs 62 and 86.

87. The June 27 meeting did not give Gray a practical opportunity to assemble and present a response to the abandonment charge. Management had discussed location and performance with him, but Allan first asserted abandonment at 19:06, immediately repeated it after his denial, and limited his choice to a notice period or immediate departure. At 20:36, Bishop required that choice before the meeting ended and refused his request to consider it over the weekend. Allan then invoked documented support, but no supporting documents were presented for his review. The later invitation for questions came after he had agreed to continue working with his rights reserved and management had requested a resignation email. Gray alleges that this immediate ultimatum left no meaningful opportunity to organize and present the June 13 PTO direction and his existing work communications to rebut the charge. Those communications addressed whether he had deserted his responsibilities or followed management's instructions about work and leave. His later written request for official review

also brought no meaningful opportunity to clear his name. (Paragraph 50; Ex. H at 19:06-23:28; Ex. R.)

88. Allan personally formulated and pressed the abandonment charge. Bishop adopted it and issued it as the formal discharge reason. Morris participated in the decision; based on her identified decisionmaking role and participation alleged above, Gray alleges on information and belief that she approved the official classification. Each caused the challenged record and denial of process through her own conduct.

89. Gray asserts Count III against CSP as a legally separate entity subject to 42 U.S.C. § 1983. Morris's exercise of the delegated final authority alleged in paragraph 65 made the challenged classification and review process CSP's own decision. Her adoption and implementation of that decision caused the maintained charge, its alleged likelihood of disclosure through employment references, and the absence of meaningful name-clearing process. Gray seeks entity liability for that decision and personal liability for each individual's own conduct.

90. Before the challenged conduct, the right to meaningful name-clearing process for false, constitutionally stigmatizing public-employment discharge information likely to reach prospective employers was clearly established. Sciolino v. City of Newport News, 480 F.3d 642, 646, 649-50 (4th Cir. 2007); Cannon v. Village of Bald Head Island, 891 F.3d 489, 501-06 (4th Cir. 2018).

91. The maintained charge and its likely use in employment references threaten continuing professional harm. Gray seeks a constitutionally adequate opportunity to clear his name and appropriate correction or annotation of the identified CSP-controlled record, as warranted by that process and its findings. He seeks this prospective relief from Morris in her official capacity and within her present authority to implement it.

92. Gray seeks compensatory damages for the economic, reputational, professional, and emotional injuries caused by the constitutional denial of adequate name-clearing process. He seeks those damages from CSP under the entity theory pleaded above and from Morris, Bishop, and Allan individually, to the extent each is responsible for that denial. If he establishes a constitutional violation without proving compensable actual injury from it, he seeks nominal damages. He seeks punitive damages only against a liable individual upon the required showing.

**COUNT IV - VIRGINIA WRITTEN DEFAMATION**
Against Carolyn Bishop individually

93. Gray incorporates paragraphs 1-59, 61, and 67-69 only to the extent relevant to the June 30 written publication, his professional duties, Bishop's knowledge, and injury caused by that publication. This count concerns Bishop's written statement quoted in paragraph 57, including its complete explanation of the office-location dispute.

94. Bishop published the June 30 statement to Morris, HR Business Partner Jessica Geis, and General Counsel McGee, as well as Gray. Read as a whole in its employment context, the letter conveyed a substantially false factual implication through its charge of job abandonment: Gray had deliberately deserted his position and professional responsibilities as a senior technology director. Three days earlier, Allan had asserted abandonment "by the legal definition" in Bishop's presence. Bishop adopted that charge as the official cause of termination. Gray's duties required reliable supervision and mentoring of two development teams, individual coaching, coordination of application delivery, and work with security and IT operations to secure agency applications and mitigate risks. Accusing him of deserting those responsibilities imputed professional unfitness and lack of integrity. Gray denies that desertion; the office-location dispute did not make the accusation true. Management ended the

work/PTO course it had directed and attributed the separation to Gray's abandonment. (Paragraphs 12-14, 28, 40; Ex. H at 19:06-19:19; Ex. E3; Ex. S, physical p. 4.)

95. Bishop personally knew facts that contradicted desertion. She directed the office-day PTO arrangement and recognized Monday and Friday work from Utah. Her June 13 email directed, "please use your PTO next week for the days you were scheduled to be in the office," and described the leave as time "to be with your wife." On June 22, when Gray said he could dial into the next day's meeting but could not attend in person, Bishop replied, "Ok. Let me see what we can do. Will let you know tomorrow. Thank you." On June 23, her text acknowledged the coming absence while asserting that Gray had not previously told her; he reiterated that he could not attend Tuesdays through Thursdays. Her Draft Renewal email acknowledged recent work and contemplated further goal work, as paragraph 39A describes. Gray used PTO on June 24-26 under the continuing arrangement. At the June 27 meeting, Bishop heard him deny abandonment, seek to keep his position, and agree to continue working under the immediate ultimatum. She said, "I will await your resignation email, Zander, and respond," and promised to establish a communications plan with him on Monday. No resignation-email deadline had been communicated to Gray. Bishop knew the email had not arrived when she later promised Monday access and outreach. Monday ordinarily permitted remote work, and she received his family-medical request before issuing the letter, as alleged in paragraph 54. The letter omitted that work and leave arrangement, his agreement to continue working with rights reserved, her Monday promise despite the known missing email, and the June 30 notice. (Paragraphs 28, 40, 48, 52-54; Ex. B1, physical p. 1; Ex. Z; Ex. H at 23:11-23:28; Exs. E1-E3, F1, AC.)

96. Bishop intended the letter to convey to its identified management recipients that Gray deliberately deserted his continuing professional responsibilities. In the employment context alleged above, it conveyed that factual meaning. Despite her own contrary directions, promises, and knowledge specified in paragraph 95, she published the false implication

knowing it was false or with reckless disregard for its truth. She used that classification to justify the immediate discharge and discredit Gray's professional conduct.

97. To the extent the publication occurred on a common-interest privileged occasion, Bishop abused that privilege through the knowing or reckless falsity alleged above. The same facts show that she used the classification in bad faith to discredit Gray's professional conduct. The letter communicated the discharge decision to its management recipients and put that decision into effect. This count concerns that written employment publication, not a judicial submission, VEC statement, hypothetical outside reference, or Allan's earlier negotiation statements.

98. The publication harmed Gray's professional reputation and caused professional and emotional injury. He seeks compensatory damages for injury caused by that publication, including general damages available for defamation per se when the applicable fault requirements are met. If presumed damages are unavailable, he alternatively seeks compensation for the actual injury caused by the publication, to the extent proved. He seeks punitive damages upon the required showing and within applicable limits.

99. This count adds a legal theory for the same false published abandonment reason and reputational harm identified in the timely September 19, 2025 First Amended Complaint. That complaint named Bishop in her individual capacity, described the June 30 abandonment termination in paragraphs 27 and 42, and alleged in paragraphs 56-58 that Defendants "published or relied upon" false, stigmatizing reasons in connection with termination and denied name-clearing process. It attached Bishop's signed June 30 letter identifying the copied recipients as Exhibit E, ECF No. 6-5 at 3, PageID 59. Gray invokes relation back under Federal Rule of Civil Procedure 15(c)(1)(B).

**COUNT V - ADA RETALIATION**

**42 U.S.C. § 12203(a) - Against CSP; alternative prospective relief against Morris in her official capacity**

99A. Gray incorporates the common factual allegations in paragraphs 1-69 and the ADA-specific allegations in paragraphs 69A-69G, including paragraph 69E1, to the extent relevant to this count.

99B. Gray's June 23 email opposed what he reasonably and in good faith believed was disability-based unequal treatment. He told Bishop that the increased office requirements followed discussions about his wife's condition, identified changing justifications, and wrote that the timing "raises questions about the motivation behind these scheduling changes." He challenged the changed treatment within CSP's existing work arrangements, not merely the inconvenience of the schedule. His belief rested on his actual duties and remote performance, his approved flexible work arrangement and CSP's managerial discretion, successful approved April and May Utah work, and his explanation that nearby presence often allowed him to work while supporting his wife. The email also sought flexibility and discussed transition. Those proposed solutions accompanied his objection to disability-linked treatment; they did not withdraw it. (Paragraphs 12-38; Exs. B, C, G, L, M.)

99C. Bishop received and answered that objection, addressed the ADA issue, copied Geis, and scheduled the requested meeting. At the June 27 meeting, Allan explained that CSP had assembled the decisionmakers because Gray's email requested a resolution. Bishop began the substantive discussion by asking whether he was refusing to attend the office. Gray answered that he was unable to come on those days and wanted to work remotely. In her next response, Bishop said he could not continue and was "in essence" resigning. Gray then expressly raised association discrimination. Allan identified his concern as "discrimination against a caregiver," and Gray told the decisionmakers, "It feels discriminatory in my case." His June 23 opposition preceded Bishop's opening announcement; his renewed June 27 opposition followed that

announcement but preceded the later immediate ultimatum and June 30 discharge. (Paragraphs 38-46; Ex. C1, physical p. 1; Ex. H at 2:30-2:49, 4:12-5:35, 9:05-11:23, 13:31-13:44, 19:22-21:02.)

99D. Gray alleges that his June 23 opposition was a but-for cause of CSP's June 27 decision to compel his departure through a finite resignation transition or immediate termination. The attendance conflict was already known. CSP later told the EEOC that Gray "already knew, well before that email, that he would not be allowed to work remotely from Utah," while Defendants now identify the June 23 email and text as the events directly leading to termination. Gray relies on the particular comparison in paragraph 60A to challenge what prompted the forced exit. (Ex. W, p. 11; ECF No. 41 at 14-15.) Earlier relocation refusals had left him working under his existing arrangement, as paragraph 25A describes. Bishop knew his weekly-travel limitation from May 27 and memorialized the work/PTO course on June 13. On June 5, Allan had discussed permanent Utah residence, finite PTO, a possible transition and schedule modification. She stated, "We're not terminating your employment," while maintaining the office requirement; that discussion set no transition agreement or end date. (Paragraphs 25A, 28, 33-34; Ex. G at 12:56-13:05, 18:28-18:45, 29:50-30:41; Ex. B.)

99D1. After answering his June 23 objection, Bishop acknowledged recent work and contemplated future involvement, while criticizing unanswered requests as paragraph 39A describes. Four days after his opposition, the requested meeting became a compulsory departure: CSP demanded a choice before the meeting ended. Bishop's opening announcement that he could not continue also preceded the specific salary-and-benefit terms Gray later proposed in that meeting. Gray alleges that his opposition caused this change from the existing work/PTO course to the imposed exit. He challenges that forced exit and the June 30 discharge as materially adverse actions, and alleges that his June 23 and June 27 opposition were but-for causes of the later discharge. Decisionmaker knowledge, the subsequent handling of the

continuing-work period, and the differing causal accounts in paragraphs 60-60C further support that inference. (Paragraphs 37-52, 60-60C; Exs. B, C, H, AC.)

99D2. Alternatively, even if CSP had been considering some future departure before June 23, Gray alleges that his opposition caused it to impose a materially harsher course on June 27. On June 5, Allan had described management's discussion of a possible three-month remote transition; that idea was not adopted and set no end date. On June 27, CSP required an immediate choice between about one month of conditional work and termination at the meeting's end, refusing time over the weekend. Gray challenges that imposed endpoint, as well as the separate June 30 acceleration. He does not allege an entitlement to the earlier three-month idea. (Paragraphs 34, 46-49, 99E; Ex. G at 29:50-30:16; Ex. H at 17:11-17:31, 20:14-21:02.)

99E. Gray separately alleges retaliation in CSP's decision to end his employment immediately on June 30, replacing the course Bishop had communicated after Friday's meeting. Under the ultimatum, Gray had accepted a month of continuing work and its conditions while reserving his rights. Management requested a resignation email and Monday planning. He sent no resignation email, but no deadline had been communicated. Bishop knew on Friday that the email had not arrived and nevertheless promised Monday access and outreach. On Monday, she instead discharged him immediately, with health coverage continuing only through June 30. Gray alleges that his June 23 and June 27 opposition caused this harsher outcome. Even if his employment would later have ended for reasons independent of retaliation, the opposition caused CSP to advance or materially worsen that departure. He concedes no independently lawful departure date. The protected ADA activity is his June 23 and June 27 opposition; the June 30 medical text supplies context. (Paragraphs 37, 43, 46-60; Exs. C, E, F, H.)

99F. Gray alleges that the retaliatory June 27 forced exit and June 30 discharge caused his loss of employment and compensation. Without retaliation, he would have remained employed.

August 1 arose within the challenged course; he alleges his employment would not independently have ended then without retaliation. He seeks compensation lost because of those violations, including loss beyond August 1 to the extent proved. Under paragraph 99E's separate alternative, he seeks the additional loss caused by acceleration. Causation, actual work and leave capacity, mitigation, and lawful independent causes govern the recoverable period and amount. Against CSP, he seeks back pay, benefits, appropriate front pay in lieu of reinstatement when warranted under the equitable standard, interest, equitable record relief, and allowable costs and fees. If CSP is immune, he seeks only paragraph 69G's prospective official relief. He seeks no statutory compensatory or punitive retaliation damages and no duplicate recovery.

**COUNT VI - ADA ASSOCIATION DISCRIMINATION: UNEQUAL SCHEDULING AND REMOTE-WORK BENEFITS AND DISCHARGE**
**42 U.S.C. § 12112(a), (b)(4) - Against CSP; alternative prospective relief against Morris in her official capacity**

99G. Gray incorporates the common factual allegations in paragraphs 1-69 and the ADA-specific allegations in paragraphs 69A-69G, including paragraph 69E1, to the extent relevant to this count.

99H. CSP knew that Gray's wife had the disability described in paragraphs 22 and 69B and that he needed to remain near her for care and family support. Gray alleges that CSP restricted scheduling and remote-work benefits it had already provided because of that association, then used the resulting attendance conflict to force his departure on June 27 and discharge him on June 30. The discrimination alleged in this count concerns how CSP treated his known association when exercising its existing work-arrangement authority and deciding whether he could keep his job.

99I. Gray was qualified to perform the Application Development Director's essential functions. He had performed the full role remotely for nearly three years: leading geographically

distributed teams, mentoring and coaching employees, coordinating architecture and delivery work, and working with stakeholders through the systems described in paragraph 12. He continued under the approved flexible work arrangement Henry authorized and successfully performed approved Utah work in April and May. Henry's February 2024 entries credited leadership communication, team engagement, Security and IT Operations collaboration, and stakeholder demonstrations under that arrangement. (Paragraph 15A; Ex. AJ, pp. 2-4.) None of those duties required his physical presence in Richmond. The March memorandum identified periodic contacts - team meetings at least every two weeks, his team's onsite attendance at least one full day every other week, stakeholder meetings at least quarterly, and every effort to meet his supervisor in person every other week, with rescheduling when necessary - while imposing three office days every week. Gray proposed recurring Richmond visits while maintaining that he could perform all actual essential duties remotely. He acknowledges the March directive, the temporary Utah approvals, and his inability to sustain weekly cross-country travel. He could nevertheless perform the director's work. He disputes that the imposed three-day cadence was essential to that work. (Paragraphs 12-20A, 24-30; Exs. G, I, L, M, S, X, Y, AA.)

99J. Gray's approved flexible work arrangement and later approved Utah remote work were benefits he had received under CSP's existing telework system. Allan acknowledged that approved arrangement, identifying his distributed team and contractors: "So that's why we gave you an exception." That arrangement continued after the written agreement's initial term until the March withdrawal. The telework policy allowed individualized full-time, hybrid, and limited arrangements; Allan later explained how Gray could pursue another modification through manager approval. After Gray disclosed his wife's medical circumstances and possible Utah needs to Henry, the March memorandum withdrew his approved flexible work arrangement on performance grounds he disputes in paragraphs 16-17C. CSP nevertheless approved April and May Utah work, during which he remained productive and met his deadlines. Those approvals show that management could authorize Utah remote work despite

the office directive. (Paragraphs 15-20A, 24-28, 30, 33; Ex. G at 5:30-6:12, 24:45-25:20, 30:34-30:41; Exs. A, I, L, M, X, Y, AA, AI.)

99K. CSP's response to Gray's work-first requests changed. In April, Henry approved Utah work and directed Gray to use PTO if circumstances required him to stop working. On May 18, Gray again asked to work. Bishop offered PTO "so you can focus on her." Gray immediately explained that he did not need to focus on his wife all day and that nearby presence was often sufficient. Bishop then approved that week's work, requiring East Coast hours and reliable availability, particularly to his team; Gray successfully performed it. After his May 27 explanation that his wife was suicidal and weekly Richmond travel would keep him away from her, Bishop required PTO on Tuesday through Thursday while permitting Monday and Friday Utah work. Her June 13 email repeated that direction, invoking his director role and ten reports. His role, location, and remote-work tools did not change between Monday and Tuesday. On June 24-26, he was ready and able to work remotely and wanted to support his team, but was required to spend accrued PTO instead. Gray alleges that this restriction reflected his wife's disability-related care needs rather than an inability to perform his work from Utah. (Paragraphs 22, 24, 26-28, 32, 35, 40; Exs. B, G, L, M, AI.)

99L. Gray proposed a Utah work arrangement with recurring Richmond visits through the same individualized scheduling system CSP had already used for him. He seeks equal administration of existing scheduling and remote-work benefits without his wife's disability counting against him. His claim does not require a contractual guarantee of permanent Utah work, a new caregiver accommodation, or removal of an essential duty. On June 24-26, necessary nearby psychological care and productive remote work were compatible, as paragraph 40 explains. He provided that care while using the PTO Bishop required. June 30 was different: an acute episode required a day away from otherwise available remote work. (Paragraphs 14-20A, 24-30, 33, 40, 53-54.)

99M. The officials who administered those restrictions also ended Gray's employment. Bishop gave the wife-focused PTO response, imposed and repeated the office-day PTO requirement, delivered the June 27 forced-exit decision, and signed the June 30 termination. Allan heard Gray's medical and work explanations on June 5, discussed the available scheduling choices, and participated in the June 27 decision. She then told him: "We understand why your family is taking you to Utah. Hopefully you understand why that means that you can't continue in this role." Earlier, Allan had characterized the circumstances taking him to Utah as "your personal choice" while stating that he could not continue in the role, as paragraph 44 describes. Gray alleges that these statements and the course of approvals, work-first requests, successful remote work, and required PTO show that CSP treated his need to remain near his disabled wife as incompatible with continued leadership, although he could perform the work. For the June 30 immediate discharge, Gray also relies on Bishop's Friday promise of Monday access and outreach after she already knew the requested resignation email had not arrived. Monday ordinarily permitted remote work, although the acute episode required leave that day. After receiving his family-medical notice, Bishop discharged him immediately in a letter citing abandonment and the previously known Utah attendance conflict, without identifying any conduct after the June 27 meeting as a reason. Gray relies on that changed course together with Bishop's wife-focused PTO response and her administration of the existing work arrangements described above. (Paragraphs 26, 52-60; Exs. B1, E1-E3, F1, M, W.) Gray alleges that his wife's disability and his association with her were a but-for cause of the June 27 and June 30 decisions; without that discriminatory treatment, CSP would not have ended his employment when and as it did. This claim is independent of retaliation for his opposition and does not rest on the geographic conflict alone. The earlier decisions supply the background described in paragraph 69E. (Paragraphs 17-17C, 24-28, 30-40, 42-50, 54-60; Exs. B, G, L, M; Ex. H at 24:23-24:49.)

99N. The association discrimination caused loss of employment, wages, benefits, and professional opportunities. Against CSP, Gray seeks back pay and benefits, appropriate front pay in lieu of reinstatement when warranted under the equitable standard, interest, and equitable relief. He also seeks compensatory damages for injury caused by intentional association discrimination under 42 U.S.C. § 1981a, subject to its limits. No employee-count damages tier is assumed, and no punitive damages are sought against CSP. If CSP is immune, he seeks only paragraph 69G's prospective official relief. Recovery for the June 27 forced endpoint or, alternatively, incremental June 30 loss remains subject to causation, work and leave capacity, mitigation, lawful independent causes, and nonduplication.

## V. PRAYER FOR RELIEF

100. For Counts I and II, Gray seeks judgment against CSP and against Bishop, Allan, and Morris individually for the wages, benefits, and other compensation lost by reason of each liable defendant's violations. Alternatively, if wages, benefits, or other compensation were not denied or lost, he seeks actual monetary losses directly resulting from the violation within the limit in 29 U.S.C. § 2617(a)(1)(A)(i)(II). He seeks interest and liquidated damages equal to the statutory loss-and-interest amount unless the liable defendant establishes the legally required basis for reduction. Gray principally seeks monetary relief. He also requests appropriate equitable relief, including front pay in lieu of reinstatement where warranted, against a defendant with authority to provide that relief, and recoverable costs. 29 U.S.C. § 2617(a). The same loss may be recovered only once.

101. For Count III, Gray seeks the compensatory and nominal damages specified in paragraph 92 against CSP under the entity theory pleaded above and against each liable individual. He seeks punitive damages only against a liable individual upon the required showing. From Morris in her official capacity, he also requests a meaningful name-clearing opportunity and

appropriate prospective correction or annotation of CSP-controlled records, as warranted by that process and its findings.

102. For Count IV, Gray seeks compensatory damages against Bishop personally for injury caused by the actionable publication, including general damages legally available for defamation per se upon the applicable showing. Alternatively, he seeks compensation for actual injury to the extent proved. He also seeks punitive damages upon the required proof and within the applicable state-law limit, and allowable interest and costs.

102A. For Count V, Gray seeks the relief specified in paragraph 99F; for Count VI, the relief specified in paragraph 99N, subject to its statutory limits. If CSP is immune, he seeks only paragraph 69G's prospective record correction or annotation from Morris in her official capacity, without a retrospective monetary award.

102B. The ADA claims do not seek duplicate compensation for wages, benefits, or other injuries recovered under another count. A finding that only the June 30 implementation or acceleration was unlawful may support a different loss period from a finding that the June 27 forced endpoint itself was unlawful. No independently lawful August 1 cutoff is conceded, and no indefinite recovery is presumed.

103. Benefit loss includes health coverage and replacement costs, retirement and employer contributions, leave, and other benefits recoverable under the applicable plan and statute. Wage and health-benefit losses begin on their respective actual dates; the claimed loss of continued employment-related health coverage begins July 1. The calculation will account for compensation paid, the accrued-leave payout, actual COBRA or replacement coverage and costs, legally applicable offsets, and overlapping losses among counts.

104. Gray requests allowable pre- and post-judgment interest, costs, attorney's fees if counsel is retained and the statutory requirements are met, and other appropriate relief. The recoverable period and amount of each loss depend on the violations and causation proved.

**VI. JURY DEMAND**

105. Gray demands a jury trial on all issues so triable under Counts I-IV and VI. He asserts no independent jury right under Count V. Relief that is exclusively equitable is sought from the Court.

Respectfully submitted,

_______________________

Alexander C. Gray, Plaintiff pro se
150 N. Snow Canyon Dr., Unit 19
Ivins, UT 84738
(804) 335-7579
zandergray1@gmail.com
Date: 10/22/2026

CERTIFICATION
I declare under penalty of perjury that:
(1) No attorney has prepared, or assisted in the preparation of this document.
Alexander C. Gray
Name of Pro Se Party (Print or Type)

_______________________
Signature of Pro Se Party
Executed on: 10/22/2026