**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

Alexander C. Gray, Plaintiff
v.
Commonwealth Savers Plan, et al., Defendants
Civil Action No. 3:25-cv-00742-RCY

# EXHIBITS TO THE PROPOSED THIRD AMENDED AND SUPPLEMENTAL COMPLAINT

This index uses the combined PDF's page counter. Previously filed records retain their original pages, covers, signatures, court stamps and exhibit labels.


| Section | PDF pages |
|---|---|
| Prior record - ECF 38-1 - Previously filed exhibits, original index and certification | 4-171 |
| Prior record - ECF 38-2 - Previously filed Form 5A and portal record | 172-175 |
| AC - June 23 Draft Renewal email - photograph excerpt and reading aid | 176-177 |
| AD - May 26 signed EEOC Form 5 | 178-182 |
| AE - October 16 DOJ notice - email-body printout | 183-184 |
| AH - EEOC correspondence - five dated message/thread printouts | 185-196 |
| AI - May 19 work-approval email - photograph and reading aid | 197-198 |
| AJ - Namely photographs - February 2024 comments and FY2025 review overview | 199-203 |


Total: 203 pages. Original exhibit locations appear on index page 2. Source descriptions and execution fields appear on index page 3.

# ORIGINAL EXHIBIT LOCATIONS - ECF No. 38-1

Original packet-page citations remain unchanged. Add 3 to an original ECF 38-1 packet page to locate it in this combined PDF.


| Ex. | Record | Original | PDF |
|---|---|---|---|
| A | June 5, 2025 HR email and telework policy | 5-10 | 8-13 |
| B | June 13, 2025 work-schedule email exchange | 11-13 | 14-16 |
| C | June 23, 2025 work-arrangement and discrimination email exchange | 14-17 | 17-20 |
| D | Chad Bailey Utah approval and exit materials | 18-20 | 21-23 |
| E | June 30, 2025 family-medical text and termination communications | 21-27 | 24-30 |
| F | June 27, 2025 access-and-outreach text | 28-29 | 31-32 |
| G | June 5, 2025 HR meeting transcript | 30-63 | 33-66 |
| H | June 27, 2025 leadership meeting transcript | 64-80 | 67-83 |
| I | February 13, 2025 performance review | 81-87 | 84-90 |
| L | April 20, 2025 remote-work approval texts | 88-89 | 91-92 |
| M | May 18, 2025 remote-work/PTO discussion | 90-93 | 93-96 |
| N | May 29, 2025 PTO notice and acknowledgment | 94-95 | 97-98 |
| O | Pay advices and accrued-leave payout | 96-99 | 99-102 |
| P | Termination-letter PDF properties | 100-101 | 103-104 |
| Q | Termination-letter metadata screenshot | 102-103 | 105-106 |
| R | August 27, 2025 Board/JLARC correspondence | 104-115 | 107-118 |
| S | Complete Application Development Director posting capture | 116-132 | 119-135 |
| W | Complete July 6, 2026 CSP EEOC position statement | 133-144 | 136-147 |
| X | March 19, 2025 email memorandum | 145-149 | 148-152 |
| Y | December 28, 2022 signed telework agreement | 150-153 | 153-156 |
| Z | June 23, 2025 text-message exchange | 154-155 | 157-158 |
| AA | Supplied employee-handbook excerpts | 156-165 | 159-168 |
| AB | May 6, 2025 retained self-email/meeting notes | 166-168 | 169-171 |


The previously filed packet omits labels J, K and T-V. Its original labels and historical signed certification are preserved. The employer's internally labeled EEOC Exhibit J is distinct from those omitted packet labels.

# SUPPLEMENTAL SOURCES AND CITATION GUIDE

ECF 38-2: PDF 172-175: all four filed pages unchanged. Original page 2 is Form 5A; pages 3-4 show the portal record. The original signed cover remains historical. Its internal C1/C2 labels identify Form 5A and the portal record, distinct from the Exhibit C email components.

AC: PDF 176-177: cropped photograph of the complete visible Bishop message and a labeled reading aid. Surrounding notes and the incomplete lower quoted thread are excluded; the uncropped original is preserved.

AD / AE: AD, PDF 178-182: cover and all four signed Form 5 pages. AE, PDF 183-184: faithful print of the DOJ notice in its original email body, not an originally issued PDF.

AH: PDF 185-196: five complete substantive email/thread prints. Agency warnings and conditional language are retained. The personalized-link omission and display-encoding repair are identified on the applicable printouts.

AI: PDF 197-198: May 19 email photograph and reading aid. Exhibit M remains the distinct May 18 exchange. No unseen attachment or later certification transmission is inferred.

AJ: PDF 199-203: cover and four complete photographs taken June 27, 2025. AJ pages 2-4 show comments dated February 8, 2024; AJ page 5 shows review-completion and writer-submission fields dated February 13 and 25, 2025. Displayed record dates are distinct from the photograph date.

Exhibit S is indexed as one exhibit; the historical cover refers to section bookmarks not present in this compilation. Source documents control over prepared reading aids. Original page labels and source formats are retained. No new signature is supplied by reproducing a previously signed document.

Respectfully submitted,

Alexander C. Gray, Plaintiff pro se
150 N. Snow Canyon Dr., Unit 19
Ivins, UT 84738
(804) 335-7579 | zandergray1@gmail.com
Date: 10/22/2026

CERTIFICATION
I declare under penalty of perjury that no attorney has prepared, or assisted in the preparation of, this document.

Signature: __________ Executed on: 10/22/2026

# ATTACHMENT B

## Exhibits to Attachment A

INDEX TO EXHIBITS

The page ranges include each exhibit's cover. Component locations appear on index page 3; citation conventions appear on page 2.


| **Exhibit and record** | **Packet pages** |
|---|---|
| **A.** June 5, 2025 HR email and telework policy | 5-10 |
| **B.** June 13, 2025 work-schedule email exchange | 11-13 |
| **C.** June 23, 2025 work-arrangement and discrimination email exchange | 14-17 |
| **D.** Chad Bailey Utah approval and exit materials | 18-20 |
| **E.** June 30, 2025 family-medical text and termination communications | 21-27 |
| **F.** June 27, 2025 access-and-outreach text message | 28-29 |
| **G.** June 5, 2025 HR meeting transcript | 30-63 |
| **H.** June 27, 2025 leadership meeting transcript | 64-80 |
| **I.** February 13, 2025 performance review | 81-87 |
| **L.** April 20, 2025 remote-work approval texts | 88-89 |
| **M.** May 18, 2025 remote-work and PTO discussion | 90-93 |
| **N.** May 29, 2025 PTO notification and acknowledgment | 94-95 |
| **O.** Pay advices and accrued-leave payout record | 96-99 |

# ATTACHMENT B

## Exhibits to Attachment A

INDEX TO EXHIBITS (continued)


| Exhibit and record | Packet pages |
|---|---|
| **P.** Termination-letter PDF properties | 100-101 |
| **Q.** Termination-letter metadata screenshot | 102-103 |
| **R.** August 27, 2025 Board and JLARC correspondence | 104-115 |
| **S.** Application Development Director job posting | 116-132 |
| **W.** CSP's July 6, 2026 EEOC position statement | 133-144 |
| **X.** March 19, 2025 email memorandum | 145-149 |
| **Y.** December 28, 2022 signed telework agreement | 150-153 |
| **Z.** June 23, 2025 text-message exchange | 154-155 |
| **AA.** Employee-handbook excerpts | 156-165 |
| **AB.** May 6, 2025 email from Gray to himself | 166-168 |


A source or physical page citation counts pages within the identified source component, excluding the added exhibit cover; a printed page citation uses that source's existing printed number. Packet pages are positions in this combined PDF. Transcript citations use the recorded timestamps.

Exhibits J, K, and T-V are not tendered. Existing identifiers are retained. The complete job-posting capture and the supplied handbook excerpt set remain included.

# COMPONENT LOCATIONS


| Source component | Packet pages |
|---|---|
| A1 - June 5 email and telework policy | 6-10 |
| B1 - June 13 email exchange | 12-13 |
| C1 - June 23 email exchange | 15-17 |
| D1 - August 27, 2021 Utah approval message | 19 |
| D2 - September 21, 2021 exit material | 20 |
| E1 - June 30 family-medical text and delivery details | 22 |
| E2 - June 30 transmitting email | 23 |
| E3 - June 30 termination letter | 24 |
| FAC Exhibit E - ECF 6-5, complete filed attachment | 25-27 |
| F1 - June 27 access text and thread continuation | 29 |
| G1 - June 5, 2025 HR transcript | 31-63 |
| H1 - June 27, 2025 meeting transcript | 65-80 |
| I1 - February 13, 2025 performance review | 82-87 |
| L1 - April 20, 2025 approval texts | 89 |
| M1 - May 18, 2025 text exchange | 91-93 |
| N1 - May 29, 2025 PTO notification | 95 |
| O1 - July 1 pay advice for June 10–24 | 97 |
| O2 - July 16 pay advice for June 25–July 9 | 98 |
| O3 - August 1 accrued-leave payout | 99 |
| P1 - PDF properties | 101 |
| Q1 - Advanced PDF metadata | 103 |
| R1 - August 27 retained Board and JLARC letter | 105-114 |
| R2 - Certified-mail records | 115 |
| S - Complete job-posting capture | 117-132 |
| W - Complete employer EEOC position statement | 134-144 |
| X - March 19, 2025 memorandum | 146-149 |
| Y - Signed telework agreement | 151-153 |
| Z - June 23 screenshot from EEOC attachments | 155 |
| AA - Supplied employee-handbook excerpts | 157-165 |
| AB - May 6 self-email with meeting notes | 167-168 |


The letters and component identifiers above match the pleading's exhibit references. Covers identify retained-copy qualifications and the source of separately produced records.

# ATTACHMENT B - SIGNATURE AND CERTIFICATION

Respectfully submitted,

______________________________

Alexander C. Gray, Plaintiff pro se

Date: September 21, 2026

**CERTIFICATION**

I declare under penalty of perjury that:

(1) No attorney has prepared, or assisted in the preparation of this document.

Alexander C. Gray
Name of Pro Se Party (Print or Type)

______________________________

Signature of Pro Se Party

Executed on: September 21, 2026

# EXHIBIT A

## June 5, 2025 HR email and telework policy

**Contents**

A1 contains the June 5, 2025 email exchange with Debbie Allan and the accompanying telework policy.

**Version note**

This exhibit reflects the copy maintained in Gray's records. Any additional version obtained from agency records or device backups will be preserved and compared with this copy. Any material discrepancy will be disclosed.

**From:** Debbie Allan <dallan@commonwealthsavers.com>
**Sent:** Thursday, June 5, 2025 4:51 PM
**To:** Zander Gray <zgray@commonwealthsavers.com>
**Subject:** RE: Follow-up on our Discussion Regarding Work Arrangement Options

Hi Zander, I am glad we got to connect today and appreciate you ensuring we are on the same page. I think there is some clarification needed on these and I am happy to provide it. For sake of this email, Managers are all people who manage employees including managers, directors, and chief officers.

**Expectation for Managers and Employees in the Office**

Prior to the pandemic, when you were originally offered your position, Managers all worked in the building 5 days per week. Upon our return from COVID, we updated that to three days per week with a preference for T, W, and TH for Managers and 2 days per week for individual contributors, again with a preference for T, W, or TH. We understand that some teams need coverage so those days may vary. Every Manager currently works in the office three days per week; managers in customer service may work different days but still work three days per week in the Arboretum. In our conversation today, I suggested that if those days don't work for you, you can request different days. We specifically discussed working in the office M, T, and W to fly to Utah TH and work remotely on Fridays (4, 10 hr days).

There is no policy restricting Managers from working remotely or living out of state, nor is there a policy allowing Managers to work remotely or live out of state full time. Our Telework policy assumes employees work onsite unless approved otherwise. No Manager has ever been allowed to relocate and work remotely, only individual contributors in extenuating circumstances. And, all those employees are on the east coast, and in the same time zone as the office. Similarly, there is not a policy on residency, just a practice that all Manager position require that Managers work in the office three days per week which is backed by any job posting for a Manager since our hybrid schedules began. We have applied this consistently for all Managers.

As to your awareness of your availability, I think that was well covered in the March 19 meeting and in briefly looking back at your Namely comments, I do see feedback on proactive leadership and communication. Happy to discuss that one further if needed.

Since you asked, here is an excerpt from Mary's Message, sent December 19, 2022, to the agency explaining the core days:

**Year-End Celebration and New Year Modifications to Hybrid Work**

Many thanks to the ACE team for planning our year-end celebratory lunch last week. We were delighted to see so many of you in the office for both our Board meeting and year-end celebratory lunch. We had games, prizes, a stiff ping-pong competition, lots of food, and the best part – catching up with teammates who we haven't seen in a while. As they say, "a good time was had by all!"

We truly believe that these opportunities to connect, communicate, and collaborate are part of what makes Virginia529 special and a big part of what makes us successful in meeting our missions. It is for these reasons that we are returning to the Arboretum in a more structured manner after the first of the year. As you have heard from your management team, Tuesday, Wednesday, and Thursday will be core days each week and most employees are expected to work 2 or 3 of those core days from the office. On those days, you can expect opportunities to collaborate with your team or teams across the agency, to participate in training and development, and to meet with your team and manager. On Mondays and Fridays, as is often the case now, we will have a small number of employees in the office to greet customers, maintain systems, process mail, and manage the facilities. Employees are welcome to work in the office on these noncore days and for those required to, they will count towards your 2–3 day requirement.

Additionally, here are two FAQ's from our Manager's Guide for Transition Back to Office 2021:

**Q: How many days will employees need to work in the office?**

A: During the initial transition back to the office, the building will have limited capacity with social distance and mask requirements. To maintain a safe environment and ensure continuity of operations, some teams may limitations on how many team members may be in the office at the same time. Therefore, we expect that employees will be in the office 2-3 days each week.

**Q: Will I be able to telework 100% of the time?**

A: The number of days an employee will be able to telework long-term will depend on the position responsibilities, performance, and the ability to maintain a safe and productive workspace at home (this remains unchanged from before the pandemic). Most positions in the agency are not conducive to teleworking 100% of the time.

**Regarding Decision-Making Authority**

In our conversation, I encouraged you to talk with Mary when you asked who you should appeal Carolyn's decision to. We discussed that Mary was part of the decision, but I encouraged you to reach out to her, nonetheless. I continue to encourage you to reach out to her and discuss any concerns as she is always available to employees. We did also discuss the role of the Board, and the functions delegated to the CEO in our Board Charter and schedules are delegated to the CEO. I did encourage you to go to the Board with any issues like fraud, harassment, or other law violations.

**4 x 10 Schedule**

Understood

**Next Steps**

You asked in our meeting where we go from here and that is not something I can answer for you. We require all Managers to work in the office three days a week and you indicated in this email that traveling each week wasn't doable. Your best next step if a modified schedule and commute won't work is to discuss this with Mary directly. I understand you are in an extremely difficult situation and have a lot of empathy for both you and your wife and will remain available for any questions you may have.

Our Telework Policy can be found in our Employee Handbook in Policy Tech but I also pasted it here for your convenience.

## Telework

Commonwealth Savers may authorize certain positions and certain employees to telework. This practice enables employees to work at an alternate work site for all or part of a work week as a means of achieving administrative efficiencies and business continuity. As teleworking is a voluntary work alternative its terms and conditions are subject to review by Commonwealth Savers based on business needs.

Definitions:
Full-time teleworkers are those who are regularly scheduled to work at an alternate site for all working hours in a work week and visit the main office only for meetings as needed.

Hybrid teleworkers are regularly scheduled to work at an alternate site for 32 or more hours per month and also work regularly in the main office.

Limited teleworkers work at an alternate site on an ad hoc basis due to personal or business need.
Before determining if an employee is eligible to telework, the employee, their manager and the Chief Engagement Officer will discuss the feasibility of a teleworking arrangement including the following:

- Employee performance including work habits and quality of work
- Job responsibilities
- Equipment needs
- Other legal and fiscal implications

If it is determined that an employee will telework on a full-time, part-time, or ad hoc basis then the employee and the manager must complete a Telework Agreement which outlines the expectations of all parties to the arrangement. Employees who work from home during non-business hours in addition to working full time in the office are not required to complete a Telework Agreement however they must abide by the Teleworking policy.

### *Expectations*

The teleworking employee is expected to maintain a satisfactory level of performance in order to continue teleworking. Performance will be monitored on an ongoing basis with expectations being clearly communicated by the supervisor and employee. The employee is expected to work regularly scheduled hours and to notify their manager in advance if there will be times the employee is unavailable during work hours. Non-exempt employees must report all hours worked in accordance with the Fair Labor Standards Act; overtime hours must be approved in advance and will be paid according to applicable laws and policies.

Teleworking employees are responsible for creating a safe work environment that is free of known hazards and distractions. Commonwealth Savers will not pay for renovations, furniture, or other equipment needed to create the work area.

If an employee is injured while working in their established alternative location then they must report it immediately to their manager or Chief Engagement Officer. Injuries that occur while performing normal work duties are typically covered by Commonwealth Savers' workers compensation plan and/or Virginia Sickness and Disability plan.

Teleworking is not an appropriate replacement for child or adult care as the focus of the employee should be on meeting the requirements of the job. Another individual must be present at the work location if there are children or adults who need supervision during the employee's scheduled work hours. Furthermore, teleworking is not intended to be used in place of leave including Family and Medical Leave, Worker's Compensation leave or leave used under the Virginia Sickness and Disability Program however it may be considered a reasonable accommodation under the ADAAA.

Commonwealth Savers Employee Handbook | Effective July 1, 2024 Page 23

Teleworking employees may be required to report to a central office for meetings and will be given notice when possible, of this requirement.

**From:** Zander Gray <zgray@commonwealthsavers.com>
**Sent:** Thursday, June 5, 2025 12:48 PM
**To:** Debbie Allan <dallan@commonwealthsavers.com>
**Subject:** Follow-up on our Discussion Regarding Work Arrangement Options

Debbie,

Thank you for taking the time to meet with me today to discuss potential work arrangement options given my family's current situation. I wanted to follow up on our conversation to ensure I understood everything correctly and to clarify a few points.

****Meeting Summary:****

As I understand from our discussion:

- The Tuesday-Wednesday-Thursday office presence is a recommendation rather than a formal policy
- The restriction on directors working remotely is also a guideline rather than a written policy
- There is no policy that requires employees have Virginia state residency
- Commonwealth Savers operates as an "office-first employer" but has a telework policy with a process for employees to become teleworkers
- You mentioned the recent change from my previous schedule (one day every other week) to three days per week was due to reports that I was unreachable, though I'm not aware of any documented instances of this

**Regarding Decision-Making Authority:**

You also clarified that Mary Morris our CEO, was the final decision-maker on this matter and has already been involved in all discussions regarding my request. While you mentioned I could appeal to her again, you indicated that any change would be unlikely given her involvement. You also advised that appealing to the board would not be appropriate as they have delegated this authority to Mary.

**Regarding the 4x10 Schedule Option:**

I appreciate you exploring the four 10-hour day schedule as a potential accommodation. However, given that my wife needs to be in Utah with her family for mental health support, the requirement to travel from Utah to Virginia three days per week would create significant financial hardship. The weekly flight costs alone, plus lodging expenses, would make this arrangement financially unfeasible for our family.

**Next Steps:**

You mentioned that you would provide me with the telework policy document. I would very much appreciate receiving this as soon as possible so I can better understand the process for requesting telework arrangements. Given my wife's ongoing need for family support in Utah for her mental health condition, I'm hoping we can explore whether the formal telework process might offer a more workable solution for both the organization and my family's circumstances.

I remain committed to finding a solution that allows me to continue contributing effectively to Commonwealth Savers while addressing my family's medical needs. Please let me know when I can expect to receive the telework policy and what the next steps in that process would be.

Thank you again for your time and consideration.

Best regards, Zander

This communication and any attachments are confidential and intended only for the addressee. If you are not the intended recipient, you may not copy, disclose, or distribute this message to anyone else; any such actions may be unlawful. If you have received this communication in error, please contact the sender of the message immediately to inform him or her of the error. Commonwealth Savers cannot provide legal, financial, or tax advice and this communication and any attachments do not contain legal, financial, or tax advice and cannot be construed as such or relied upon for those purposes.

# EXHIBIT B

## June 13, 2025 work-schedule email exchange

**Contents**

B1 contains Gray's request concerning the week of June 16 and Carolyn Bishop's response addressing office days, PTO, and FMLA paperwork.

**Version note**

This exhibit reflects the copy maintained in Gray's records. Any additional version obtained from agency records or device backups will be preserved and compared with this copy. Any material discrepancy will be disclosed.

Gmail

Zander Gray <zandergray1@gmail.com>

## FW: Work Schedule Request for Week of June 16th.

1 message

**Zander Gray** <zgray@commonwealthsavers.com> Mon, Jun 23, 2025 at 2:25 PM
To: Zander Gray <zandergray1@gmail.com>

---

**From:** Carolyn Bishop <cbishop@commonwealthsavers.com>
**Sent:** Friday, June 13, 2025 3:44 PM
**To:** Zander Gray <zgray@commonwealthsavers.com>
**Cc:** Jessica Geis <jgeis@commonwealthsavers.com>
**Subject:** RE: Work Schedule Request for Week of June 16th.

First I wish you and your family well as you navigate your wife's medical needs. Your PTO is available for these situations, and I will approve your time off next week to be with your wife.

As we discussed during our meeting on May 27, 2025, further remote work from Utah is not authorized given your director role with 10 direct reports. While we were temporarily flexible as you initially navigated your wife's move to Utah, we explained that any future days for which you are unable to come to the Arboretum due to travel to Utah would require the use of PTO. Accordingly, please use your PTO next week for the days you were scheduled to be in the office. You are correct that Thursday is a holiday, so PTO would only be necessary for Tuesday and Wednesday if you are working remotely Monday and Friday.

As I believe you were notified earlier this week, the original FMLA eligibility notice that was sent to you has expired since you declined to return the paperwork, so please note that these absences are not FMLA-protected in nature. If you would like to restart the process, please let Jessica or any member of the HR team know.

Carolyn Bishop | Chief Operations Officer

Commonwealth Savers

Mobile: 804.652.8036

---

**From:** Zander Gray <zgray@commonwealthsavers.com>
**Sent:** Friday, June 13, 2025 10:51 AM
**To:** Carolyn Bishop <cbishop@commonwealthsavers.com>
**Subject:** Work Schedule Request for Week of June 16th.
**Importance:** High

Hi Carolyn,

I wanted to reach out regarding my work schedule for next week given my ongoing family circumstances.

As you know, my wife's mental health treatment requires her to be in Utah with family support, which has created challenges with our current office requirements. For the week of June 16th, I'm requesting to work remotely on Tuesday, June 17th and Wednesday, June 18th to accommodate these family circumstances.

I understand Thursday, June 19th is the Juneteenth holiday, so I'll plan to work remotely on Monday and Friday as usual.

If remote work isn't possible for Tuesday and Wednesday, I'll need to use PTO for those days to address my family's medical situation.

I'm hoping we can find a workable solution that allows me to maintain my productivity while addressing these challenging family circumstances. Please let me know how you'd like to handle the Tuesday and Wednesday coverage.

Thank you for your understanding.

Best regards,

Zander

This communication and any attachments are confidential and intended only for the addressee. If you are not the intended recipient, you may not copy, disclose, or distribute this message to anyone else; any such actions may be unlawful. If you have received this communication in error, please contact the sender of the message immediately to inform him or her of the error. Commonwealth Savers cannot provide legal, financial, or tax advice and this communication and any attachments do not contain legal, financial, or tax advice and cannot be construed as such or relied upon for those purposes.

# EXHIBIT C

## June 23, 2025 work-arrangement and discrimination email exchange

**Contents**

C1 contains Gray's email concerning his work arrangement and discrimination concerns, together with Bishop's response.

**Version note**

This exhibit reflects the copy maintained in Gray's records. Any additional version obtained from agency records or device backups will be preserved and compared with this copy. Any material discrepancy will be disclosed.

Gmail **Zander Gray <zandergray1@gmail.com>**

---

**FW: Discussion Regarding Work Arrangement Resolution**
1 message

---

**Zander Gray** <zgray@commonwealthsavers.com> Mon, Jun 23, 2025 at 8:40 PM
To: Zander Gray <zandergray1@gmail.com>

---

**From:** Carolyn Bishop <cbishop@commonwealthsavers.com>
**Sent:** Monday, June 23, 2025 5:27 PM
**To:** Zander Gray <zgray@commonwealthsavers.com>
**Cc:** Jessica Geis <jgeis@commonwealthsavers.com>
**Subject:** RE: Discussion Regarding Work Arrangement Resolution

Zander,

A meeting sounds like a great idea. I will put something on our calendars. You have a few statements and questions below and for this email, I do want to address your statement about the accommodation process. The ADAAA allows for accommodations for the employee with a disability; however, the ADAAA does not require accommodations to be provided for caregivers. While we understand you do not like the Agency's position, we have consistently informed you we do not allow people leaders to work remotely from other states. I have added HR to this email in case there are further questions.

For any additional questions, we can discuss when we meet.

Carolyn

Carolyn Bishop | Chief Operations Officer

Commonwealth Savers

Mobile: 804.652.8036

---

**From:** Zander Gray <zgray@commonwealthsavers.com>
**Sent:** Monday, June 23, 2025 10:22 AM
**To:** Carolyn Bishop <cbishop@commonwealthsavers.com>
**Subject:** Discussion Regarding Work Arrangement Resolution

Dear Carolyn,

I wanted to follow up on our recent communications regarding my work schedule and family situation.

Current Situation:

As we've discussed, my wife's mental health treatment requires our permanent presence in Utah for essential family support. The current arrangement of using PTO for Tuesday-Thursday office requirements is not sustainable long-term - I will exhaust available PTO within approximately 4-5 weeks, creating an urgent need for resolution.

Accommodation Process Review:

I've been reflecting on our discussions and note several challenges in finding a workable accommodation:

- Our Telework Policy indicates telework "may be considered a reasonable accommodation under the ADAAA," yet this framework hasn't been applied to my caregiving situation

- Individual contributors receive full remote work approval while directors are categorically denied, despite HR confirming no written policy prohibits remote work for managers

Pattern of Shifting Justifications:

The rationale for denying my accommodation has evolved significantly throughout our discussions:

- Initially focused on geographic concerns and "optics" of a state employee living out of state

- Then cited the Tuesday-Wednesday-Thursday office requirement (described as a "guideline," not policy)

- Performance concerns about availability were raised only after my accommodation request, despite my years of successful remote work as a director

- Most recently, emphasis on the requirement that directors work in the office three days per week, though this wasn't applied during my previous years of full remote work

This pattern of changing explanations, combined with the acknowledgment that these are "guidelines" rather than formal policies, suggests the need for a different approach to resolution.

FMLA Limitations:

While I appreciate that FMLA eligibility was offered, this provides only temporary unpaid leave and doesn't address the core issue. My wife's condition requires our permanent relocation to Utah for ongoing family support - FMLA's 12-week temporary leave would not resolve our geographic and caregiving needs. Additionally, I'm seeking to continue working productively for Commonwealth Savers, not take extended unpaid time away from my responsibilities.

Additional Context from Our Discussions:

It's worth noting that I successfully worked fully remote as a director for several years prior to recent policy changes, demonstrating that remote director-level work is operationally feasible. The current inflexibility represents a significant change from past practice, occurring after my accommodation request was made.

Timeline of Policy Changes:

Particularly concerning is the timing of increased office requirements. Beginning in April 2025, I was newly required to be in the office three days per week, representing a significant change from my previous schedule of one day every other week. This change occurred shortly after I had initial conversations with my former supervisor about potentially needing to work remotely from Utah due to my wife's condition. While I had not yet made a formal accommodation request, the timing of this policy tightening - immediately following discussions about my wife's potential need for treatment in Utah - raises questions about the motivation behind these scheduling changes.

Recognition of Organizational Position:

I understand Commonwealth Savers has made difficult decisions regarding my situation. However, the pattern of policy applications and the approaching PTO deadline suggest we need a different approach than continuing to seek accommodation through current processes.

Resolution Discussion:

Rather than allow this situation to reach a crisis point, I believe we should explore transition arrangements that serve both parties' interests:

- Orderly handover ensuring continuity of operations

- Recognition of my tenure and these unique medical circumstances

- Resolution approach that avoids potential complications for both the organization and my family

I have greatly valued my time with Commonwealth Savers and would prefer to address this collaboratively. Could we schedule a meeting this week to discuss options that work for everyone involved?

Thank you for your understanding.

Best regards,

Zander

This communication and any attachments are confidential and intended only for the addressee. If you are not the intended recipient, you may not copy, disclose, or distribute this message to anyone else; any such actions may be unlawful. If you have received this communication in error, please contact the sender of the message immediately to inform him or her of the error. Commonwealth Savers cannot provide legal, financial, or tax advice and this communication and any attachments do not contain legal, financial, or tax advice and cannot be construed as such or relied upon for those purposes.

# EXHIBIT D

## Chad Bailey Utah approval and exit materials

**Contents**

D1 is the August 27, 2021 message concerning Utah approval. D2 is the September 21, 2021 exit-interview material concerning the Utah alternative.

**Version note**

This exhibit reflects the copy maintained in Gray's records. Any additional version obtained from agency records or device backups will be preserved and compared with this copy. Any material discrepancy will be disclosed.


8:25
91
Chad Bailey
Friday, Aug 27, 2021 • 7:17 AM
good news...
Utah is a go
Yay!!!
7:27 AM
Thank you so much for al of your work
As soon as you sent the messages Carolyn and Sheela called me
7:27 AM
RCS mess...




been beneficial? I was offered all the training necessary to perform and excel in my position.

5. What factors contributed to your decision to leave? This will be a longer answer so I will break it up into a few paragraphs.

The culture on the team and lack of desire to push for something better than what we have now is one of the largest reasons that I chose to leave. There are members of the ITOD team that are actively working to stop progress in a way that is not only obvious to other team members, but detrimental to the progress of the team and agency. Throughout my time, I have seen a lot of changes happen at VA529, none surprised me as much as the resistance to change that my team members exhibit. We have slowed down on progress to ensure that people feel comfortable with the change and that the change it is being managed properly – in a lot of ways – this caused people to dig in and resist further. I can point to specific and documented examples of when training or a resource was offered for members of the team, and people scheduled something overtop of it or chose not to attend. I feel as if someone should not have to champion, teach, push for, and defend so vigorously for standards in the industry (not even the new standards, standards that have been around since I started learning programming). There are abundant

opportunities and vocal encouragement from Zander about training, resources, and guides but people don't take advantage of them.

The next two reasons are smaller, but still significant. During the work-from-home environment, I chose to move out to Colorado. While I deeply appreciate the work that went into allowing me to work from another state, this did play a factor in my decision to leave. Colorado was my top choice and after being presented with Utah as an alternative, I knew that I had wanted to be in Colorado. The offer that was made to me was very competitive and came with excellent benefits, along with the other factors, it was hard not to seriously consider it.

# EXHIBIT E

## June 30, 2025 family-medical text and termination communications

**Contents**

E1 contains the text-message screenshot and delivery information. E2 contains Bishop's email transmitting the termination letter. E3 reproduces the termination letter. The complete previously filed FAC Exhibit E is also included; its signed letter appears at physical page 3, ECF No. 6-5, PageID 59.

**Time and source references**

The phone displayed the text at 6:46 a.m. Mountain Time, corresponding to 8:46 a.m. Eastern Time. The transmitting email is dated 12:13 p.m. Eastern Time. Component labels refer to the source records; packet page numbers appear in the index.

**Version note**

The text and email information were captured from Gray's mobile device and email account. This exhibit reflects the copy maintained in Gray's records. Any additional version obtained from agency records or device backups will be preserved and compared with this copy. Any material discrepancy will be disclosed.


9:29
Carolyn Bishop, VA529, (804...
come in the office on Tuesday Wednesdays and Thursdays
6:46 AM
I need to take PTO today for family medical reasons
6:46 AM
Liked "I'm sure the conference rooms with video cameras are available"
Message Details
Type: Rich Communication Service Message
Priority: Normal
From: (804) 335-7579
To: (804) 652-8036
Sent: 06/30/25 6:46 AM
Received: Carolyn 06/30/25 6:46 AM
Read by:
Close
6:46 AM
RCS message

Gmail

Zander Gray <zandergray1@gmail.com>

## Enclosed correspondence

**Carolyn Bishop** <cbishop@commonwealthsavers.com > **Mon, Jun 30, 2025 at 12:13 PM**
To: "zandergray1@gmail.com" <zandergray1@gmail.com>
Cc: Jessica Geis <jgeis@commonwealthsavers.com>, Mary Morris <MMorris@commonwealthsavers.com>, Chris McGee <cmcgee@commonwealthsavers.com>

Zander,

Please see the enclosed letter regarding your position with Commonwealth Savers.

As noted in the letter, please send us your mailing address by Wednesday at 5:00PM.

Commonwealth Savers
Formerly Virginia529

Carolyn Bishop | Chief Operations Officer

9001 Arboretum Parkway
North Chesterfield, VA 23236
804-652-8036

Invest529.com | ABLEnow.com | RetirePathVA.com

This communication and any attachments are confidential and intended only for the addressee. If you are not the intended recipient, you may not copy, disclose, or distribute this message to anyone else; any such actions may be unlawful. If you have received this communication in error, please contact the sender of the message immediately to inform him or her of the error. Commonwealth Savers cannot provide legal, financial, or tax advice and this communication and any attachments do not contain legal, financial, or tax advice and cannot be construed as such or relied upon for those purposes.

**3 attachments image002.jpg**27K
**Termination Benefits Summary Rev. 05.15.2025.pdf** 171K
**ZGray_correspondence_6 30 2025.pdf**122K

Commonwealth Savers

June 30, 2025

Zander Gray
109 Kennondale Lane
Richmond, Virginia 23226

Dear Zander,

This letter serves as confirmation that your employment with Commonwealth Savers is terminated effective immediately due to job abandonment. As we have discussed to include most recently on Friday June 27th, your permanent move to Utah and resulting inability to work in-office as this role requires cannot be supported.

Your final paycheck will be provided to you on July 16, 2025. Payment for unused, accrued PTO (if applicable) up to the allowable maximum will be paid on August 1, 2025.

Your health insurance benefits will continue through today, June 30, 2025. Your rights to continue coverage under COBRA will be provided to you by mail from our plan administrator. Please ensure your mailing address is up to date in Cardinal to ensure receipt of these materials. Enclosed you will find additional information regarding all other benefits including plan options and contact information for each. Note that it is your responsibility to contact each plan administrator, as applicable or needed, to make any changes or elections.

The following Commonwealth Savers property must be returned to human resources immediately at no cost to you. Please provide us with your address in Utah *by 5:00PM EST on Wednesday July 2nd* so we can send the shipping materials.

- Computer(s)
- Monitor(s)
- Docking Station
- Keyboard/Mouse
- RSA Token(s)
- ID and Building Access Badge(s) & Office Keys
- Any other CSP property or materials.

Additionally, all Commonwealth Savers related applications must be removed from any personal electronic devices to include InTune and other related systems.

We wish you well in your future endeavors.

Sincerely,
Carolyn Bishop

Carolyn Bishop
Chief Operations Officer Commonwealth Savers

CC: Mary Morris, Chief Executive Officer
Jessica Geis, Human Resources Business Partner
Chris McGee, General Counsel

9001 Arboretum Parkway • North Chesterfield, Virginia 23236
1-888-567-0540 • CommonwealthSavers.com

EXHIBIT E

June 30, 2025 Leave Request & Termination Letter

Excerpt Full file available upon request


9:29
53
Carolyn Bishop, VA529, (804...
come in the office on Tuesday Wednesdays and Thursdays
6:46 AM
I need to take PTO today for family medical reasons
6:46 AM
Liked "I'm sure the conference rooms with video cameras are available"
Message Details
Type: Rich Communication Service Message
Priority: Normal
From: (804) 335-7579
To: (804) 652-8036
Sent: 06/30/25 6:46 AM
Received: Carolyn 06/30/25 6:46 AM
Read by:
Close
6:46 AM
RCS message

**Commonwealth Savers**

June 30, 2025

Zander Gray
109 Kennondale Lane
Richmond, Virginia 23226

Dear Zander,

This letter serves as confirmation that your employment with Commonwealth Savers is terminated effective immediately due to job abandonment. As we have discussed to include most recently on Friday June 27th, your permanent move to Utah and resulting inability to work in-office as this role requires cannot be supported.

Your final paycheck will be provided to you on July 16, 2025. Payment for unused, accrued PTO (if applicable) up to the allowable maximum will be paid on August 1, 2025.

Your health insurance benefits will continue through today, June 30, 2025. Your rights to continue coverage under COBRA will be provided to you by mail from our plan administrator. **Please ensure your mailing address is up to date in Cardinal to ensure receipt of these materials.** Enclosed you will find additional information regarding all other benefits including plan options and contact information for each. Note that it is your responsibility to contact each plan administrator, as applicable or needed, to make any changes or elections.

The following Commonwealth Savers property must be returned to human resources immediately at no cost to you. **Please provide us with your address in Utah *by 5:00PM EST on Wednesday July 2nd* so we can send the shipping materials.**

- Computer(s)
- Monitor(s)
- Docking Station
- Keyboard/Mouse
- RSA Token(s)
- ID and Building Access Badge(s) & Office Keys
- Any other CSP property or materials.

Additionally, all Commonwealth Savers related applications must be removed from any personal electronic devices to include InTune and other related systems.

We wish you well in your future endeavors.

Sincerely,

Carolyn Bishop

Carolyn Bishop
Chief Operations Officer
Commonwealth Savers

CC: Mary Morris, Chief Executive Officer
Jessica Geis, Human Resources Business Partner
Chris McGee, General Counsel

9001 Arboretum Parkway • North Chesterfield, Virginia 23236
1-888-567-0540 • CommonwealthSavers.com

# EXHIBIT F

## June 27, 2025 access-and-outreach text message

**Contents**

F1 contains Bishop's text message following the June 27 meeting, including the statements about disabling access through the weekend, reenabling access Monday morning, and reaching out then.

**Timezone note**

The displayed 3:09 p.m. Mountain Time timestamp corresponds to 5:09 p.m. Eastern Time.

**Version note**

This exhibit reflects the copy maintained in Gray's records. Any additional version obtained from agency records or device backups will be preserved and compared with this copy. Any material discrepancy will be disclosed.


8:50
Carolyn Bishop, VA529, (804...
Friday, Jun 27 • 3:09 PM
Carolyn created this group chat with you and (804) 337-5316
Zander, we did not hear from you as agreed and it's now past 5 pm for our business hours. While we navigate this, we are disabling your access now through the weekend and we will reenable access on Monday morning and we will reach out then. Jessica Geis is included on this text message. Should you have any questions, contact us.
Monday, Jun 30 • 10:15 AM
Zamder, check your personal email as correspondence was sent to your personal email address.
RCS message

# EXHIBIT G

## June 5, 2025 HR meeting transcript

**Contents**

G1 contains the complete transcript of the meeting between Gray and Debbie Allan concerning telework practices, residency expectations, and accommodation requests.

**Transcript use notice**

The transcript was generated from the original audio using TurboScribe and lightly proofread by Gray for general accuracy. Minor transcription variations may exist. Timestamps identify elapsed recording time. In any dispute about wording, the original audio controls. The unedited audio has been preserved and is available for the Court's review upon request.

**Certification**

I, Alexander C. Gray, participated in the June 5, 2025 meeting and recorded it on my mobile device while I was in Richmond, Virginia. I certify under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Executed on: September 21, 2026

Alexander C. Gray

Case 3:25-cv-00742-RCY Document 34-2 Filed 01/30/26 Page 34 of 203 PageID# 668

[Gray] (1:16 1:22) Hey, good, how are you?

[Allan] (1:23 - 1:24) Hey.

[Gray] (1:24 - 1:25) How's it
going?

[Allan] (1:25 - 1:26)
Good, how are you?

[Gray] (1:26 - 1:27) I'm here.

[Allan] (1:27 - 1:32)
Come on in. I hear you. So late night on the train last night.

[Gray] (1:32 - 1:33)
Late night on the train? Where were you?

[Allan] (1:34 - 1:34)
We were in Baltimore.

[Gray] (1:45 - 1:59)
I used to do that from Richmond to the Federal Reserve up in D.C. and it was like, in the summer you get heat delays, so I guess the tracks get too hot and the train can go like 30 miles an hour. It's like, oh, God, here we go.

[Allan] (1:59 - 2:07)
At one point I finally got my phone to work, because you know it's the section where there's no, and I was moving my eye, and it was like we were moving 12 miles an hour.

[Gray] (2:08 - 2:08) It was
killer.

[Allan] (2:08 - 2:11)
But we left at five. I didn't want to drive out of Baltimore at five so late.

[Gray] (2:11 - 2:13)
It'd probably take you longer to drive.

[Allan] (2:13 2:14)
Oh, yeah. I used to have my headphones. It was a late night.

[Gray] (2:15 - 2:19)
I was like, huh, I'll survive. I get it. I used to do that a lot. Memories.

[Allan] (2:19 - 2:25)
Oh, my gosh. I remember thinking yesterday I was on the train. I was like, at least I'm not flying this year. The last couple of years I've had to fly.

[Gray] (2:25 - 2:32)
Yeah. We used to debate whether it was quicker to drive up to the Board of Governors or take the train. About 50-50.

[Allan] (2:32 - 2:36)
I think it's a crapshoot, right? Like, this week this was faster, this week this is faster.

[Gray] (2:36 - 2:37) Yeah, you
never know.

[Allan] (2:37 - 2:39)
And now they've called all federal employees back in.

[Gray] (2:40 - 2:40) Yeah.

[Allan] (2:40 - 2:45)
Traffic's worse. I just don't think I want to be anywhere near that corridor at all. Yep.
Yep.

[Gray] (2:45 - 2:46)
I get it.

[Allan] (2:46 - 2:50)
I don't know. How's your wife doing? I don't have a lot of details.

[Gray] (2:50 2:51) It comes
and goes.

[Allan] (2:52 - 2:52) Yeah.

[Gray] (2:52 - 2:53) I don't mind sharing.

[Allan] (2:54 - 2:54) Yeah.

[Gray] (2:56 - 3:01)
She has suffered from borderline personality disorder and bipolar for her entire life.

[Allan] (3:02 - 3:02) Yeah.

[Gray] (3:04 - 3:14)
She had family here for a long time and everybody's moved away and things have aggressively gotten worse and worse. I'm sorry. Yeah, no, it's been tough.

[Allan] (3:15 - 3:18)
My mom's bipolar, so I completely understand.

[Gray] (3:19 - 3:25)
And borderline is like, I don't know if you're familiar with it, but it's almost like bipolar on steroids.

Case 3:25-cv-00742-RCY Document 38-1 Filed 01/30/26 Page 33 of 168 PageID# 670

[Allan] (3:25 - 3:26) Yep.

[Gray] (3:26 3:29)
Right? The cycles are just sometimes five a day.

[Allan] (3:29 - 3:38)
Some psychiatrists have thought my mom was also borderline. Some have said she's not, but I understand the extra complication.

[Gray] (3:38 - 3:52)
Yeah. And she's managed it well for many years, just I think not having family here has crushed her. We've been trying to figure it out.

Her son moved, I've lost track a year ago, to Florida. That's when I requested.

[Allan] (3:53 3:53) Yeah.

[Gray] (3:53 - 4:19)
He moved to Florida, then we looked at, she had this idea of let's get a place on the summer. Yeah. So yeah, anyway. Yeah, so it's been tough, but I just, I want to understand a little bit more about my options. Yeah. Any policies, anything?

Yeah. Any appeal processes? Is there anything I can do?
So I wrote down a hundred questions.

[Allan] (4:19 - 4:23)
Yeah, no. I mean, you can hit me. I can tell you our perspective.

[Gray] (4:23 - 4:23) Yeah.

[Allan] (4:24 - 4:26) Jessica has kept me sort of in the loop.

[Gray] (4:26 - 4:27) Okay.

[Allan] (4:28 - 5:00)
So what, I'm sorry, this sucks. Yeah, no, it sucks big time. It just, it's a lose-lose situation, right?

Like for you, and I can see that you're in this place where you're trying to keep your job and probably your health insurance, and you're trying to be with your wife. Yeah. And I understand, we understand completely.

Yeah. Our position, and this has been true for every employee, you remember we went through with Chad and the particular managers is they have to be in the building three days a week. So- So that's one of the things I've heard
.
[Gray] (5:00 - 5:01) Is that like a written policy?

[Allan] (5:02 - 5:09) Is that a- We, so when we, this is where it's just like, it's weird. You started two

weeks into the shutdown.

[Gray] (5:09 5:10) Yeah, I get it.

[Allan] (5:10 5:19) So prior to COVID, we were all in the building five days a week. So non-managers could work remotely one day a week.

[Gray] (5:19 - 5:19) Okay.

[Allan] (5:20 - 5:29)
So then obviously that changed. So the closest thing to something written is probably when we were coming back and we were laying out the rules. So we said managers had to be in Tuesday, Wednesday, Thursday, now.

[Gray] (5:29 - 5:29) Yeah.

[Allan] (5:30 - 5:34)
Whether or not, not all managers are here Tuesday, Wednesday, Thursday, because like customer service, for example.

[Gray] (5:34 - 5:36) And I didn't have to do that for a long time.

[Allan] (5:36 - 5:41) You didn't have to do that because your team was the last one to come back in. And we've been talking about that.

[Gray] (5:41 - 5:41) Right.

[Allan] (5:42 - 5:47) Your team's a little weird because you do have someone in Florida and someone in Pennsylvania and Michael's in Virginia.

[Gray] (5:47 - 5:48) The one in Virginia, yeah, yeah, yeah.

[Allan] (5:48 - 6:12)
And you have all the contractors. So that's why we gave you an exception. So is it like, do we have a written policy?

No, but our telework policy still really is office centric, right? It says we can't approve telework. It doesn't start with telework. So you are the only, I know you've been in three days a week. We're the only manager not here three days a week.

[Gray] (6:12 - 6:22) Yeah. Okay. And that just changed recently. I guess I'm kind of curious that it changed.

[Allan] (6:23 6:25) Do you understand why that changed?

[Gray] (6:26 - 6:28) I mean, no.

(6:29 - 6:29) Okay.

[Gray] (6:29 - 6:30) Not really.

[Allan] (6:30 - 6:33) So are you okay if we just lay it all out?

[Gray] (6:33 - 6:34) Yeah, lay it all out.

[Allan] (6:34 6:45)
So one of the things we've heard about you, we HR, and I know people have experienced, people that work for you, your peers, is that you're often, the word used is disappear. So people find it hard to find you.

[Gray] (6:46 - 7:10)
I've heard that feedback. But at the same time, I meet with my people like every, well, it used to be once a week. And then I get enough people where it's like, it's not doable anymore.

So it's every other week. And I don't know how I could ever not be findable. I mean, everybody has my cell phone number.

Everybody knows to text me, message me if I'm not on Teams. And we meet, we stick to it.

[Allan] (7:11 - 7:20)
You and I don't work together regularly. But I think it's things like, hey, here's a Teams message, I need a response. And then it takes a couple hours.

[Gray] (7:21 - 7:22) I'd love to see that.

[Allan] (7:23 - 7:24) I'm just telling you what it is.

[Gray] (7:24 - 7:27) I get that it's been put out there, I guess.

[Allan] (7:27 7:30) And it's been put out there regularly over the five years you've worked here.

[Gray] (7:30 - 7:30) Interesting.

[Allan] (7:31 - 7:41)
So when Mike resigned or retired, you know, because you had a meeting, Mike Henry. Yeah, yeah, okay. So we scheduled a meeting with every single person in IT.

[Gray] (7:41 - 7:41) Yep.

[Allan] (7:42 - 7:47) As well as all the, like, external stakeholders and other teams.

[Gray] (7:47 - 7:48) Yep.

[Allan] (7:48 - 7:52)
Universally, almost every single person said they can't find you when they need you.

[Gray] (7:52 - 7:52) Interesting.

Case 3:25-cv-00742-RCY Document 34-1 Filed 01/30/26 Page 36 of 168 PageID# 673

[Allan] (7:52 - 7:56) So that was why it changed.

[Gray] (7:56 - 7:57) Okay.

[Allan] (7:57 - 8:04)
So people have been saying this to me for years, that they can't find you. Whether it's true or not.

[Gray] (8:04 - 8:05) Yeah.

[Allan] (8:05 - 8:08) Whether it's a perception, whether it's just a work hour difference.

[Gray] (8:08 - 8:14)
I'm on earlier than everybody, I'm on later than everybody. I don't get it. But I hear perceptions, reality, that's fine.

[Allan] (8:15 8:17)
I can tell you when I work from home, I work different hours, right?

[Gray] (8:17 - 8:17) Yeah.

[Allan] (8:17 - 8:23)
So when I work from home, I stop and I walk the dogs during the day. I might step away and do whatever.

[Gray] (8:24 - 8:24) Yeah.

[Allan] (8:24 - 8:25) So I get my eight hours in.

[Gray] (8:25 - 8:26) Yeah.

[Allan] (8:26 - 8:28) I frequently work more than eight hours.

[Gray] (8:28 - 8:28) Yeah.

[Allan] (8:28 - 8:31) But it's not necessarily, like, I might go yellow a lot more.

[Gray] (8:31 - 8:32) Yeah.

[Allan] (8:32 - 8:42)
Like, so that was the impetus to bring you back in. Because when you, you were here three days a week. When we brought all managers in, you were here three days a week.

And then you asked Mike for an exception.

[Gray] (8:42 - 8:46)
No, I wasn't ever here three days a week. Until just in the last month.

[Allan] (8:47 - 8:53)
I thought two, three years ago you were coming in. No. Because you asked Mike for an exception and he

granted it.

[Gray] (8:53 - 9:04)
I never came in. No. I was in every other Thursday when my team came in.
Up until, what did we say, April 30th or whatever. Whatever, it just happened.

[Allan] (9:05 - 9:10)
I feel like I remembered a few years ago you were coming in more and you went to Mike and said this doesn't make sense, my team's not here. I'm just sitting here.

[Gray] (9:11 - 9:14)
It was before, before I even came in. I said, does it make sense for me to come in?

[Allan] (9:14 - 9:14) Okay.

[Gray] (9:14 - 9:16) But I never, I was never here on a regular basis.

[Allan] (9:17 - 9:17) Yep.

[Gray] (9:17 - 9:20) I was here every other Thursday when my team came in.

[Allan] (9:20 - 9:23) And the weird thing on your team, you have your director.

[Gray] (9:23 - 9:24) Yep. Right?

[Allan] (9:24 - 9:31)
Your team are the ten people you manage and the single team. But your team are absolutely two, Vivian and Sherry and Scott.

[Gray] (9:31 - 9:31) Yep.

[Allan] (9:31 - 9:36) And so that's why we really were making managers come in more than their staff.

[Gray] (9:36 - 9:36) Yeah.

[Allan] (9:36 - 9:38) Because staff are only two days a week.

[Gray] (9:38 - 9:38) Yep.

[Allan] (9:38 - 9:42) So unless you're, I mean some IT staff are more in front desk.

[Gray] (9:42 - 9:43) Yeah, it depends, right.

[Allan] (9:43 - 9:45) Because it's this interaction we need.

[Gray] (9:45 - 9:45) Right.

[Allan] (9:45 - 9:46) We need leadership working together.

[Gray] (9:47 - 9:47) Yeah.

[Allan] (9:47 - 9:50) And we saw this huge communication divide those two years we were home.

[Gray] (9:51 - 9:51) Okay.

[Allan] (9:51 - 10:02) So that's why we have the rule. And then with the feedback, I mean it was pretty universal. So it was like, okay, if we can't find him when he's remote.

[Gray] (10:02 - 10:03) Yeah.

[Allan] (10:03 - 10:07) We're just going to need him in the office. So that is why that happened.

[Gray] (10:07 - 10:13) Im more available remote, but it's neither here nor there. Because when I'm at home, I'm up at 7. First thing I do is go log in.

[Allan] (10:14 - 10:16) But no one else is on at 7. That doesn't necessarily make you accessible.

[Gray] (10:17 10:30) I understand. Right. But what I'm trying to say is I'm on at 7.
I'm usually on until 7. Yeah. But when I'm here in the office, I don't get on until whenever I pull up 845. Yeah. And then I'm off at, you know, 5, 515, 520. Driving home.

[Allan] (10:30 - 10:30) Sure.

[Gray] (10:30 - 10:37) So I'm definitely on less. But it's okay. I hear what you're saying.
And I don't, it's not worth debating.

[Allan] (10:38 - 10:43) Yeah. I mean, like, I am, if anything, I believe in honesty and transparency.

[Gray] (10:43 - 10:44) Yeah.

[Allan] (10:44 - 10:48)
Because I think that you have to know what our expectations are. Yeah. We need to know what your needs are.
[Gray] (10:48 - 10:48) Yeah.

[Allan] (10:48 - 10:50) We don't get anywhere by beating around the bush.

[Gray] (10:50 - 10:50) Right.

[Allan] (10:51 - 10:53) And we need our managers accessible. So, yeah.

[Gray] (10:54 - 11:03) Totally understand. So, so Tuesday through Thursday, in-office requirement. That's, you said that's not in writing. Is there a policy? There's nothing?

[Allan] (11:03 - 11:07)
Tuesday through Thursday is, was our recommendation.

[Gray] (11:08 - 11:08) Okay.

[Allan] (11:08 - 11:15)
So, for example, HR works in the office's core days. I'm usually here on Mondays, too. But that's just because I like working in the office.

[Gray] (11:15 - 11:15) Okay.

[Allan] (11:16 - 11:21) So there are some managers that do different days. So I think that if you wanted to say, hey.

[Gray] (11:22 - 11:22) Yeah.

[Allan] (11:22 - 11:25) Can I be in the office? I'm just going to make a fix.

[Gray] (11:25 - 11:25) Yeah.

[Allan] (11:26 - 11:28) Monday, Tuesday, Wednesday, fly back to Utah Wednesday night.

[Gray] (11:28 - 11:28) Right.

[Allan] (11:28 - 11:31) Fly back Sunday. I think that that would be something we would consider.

[Gray] (11:31 - 11:36) I just don't know that I can do it on a weekly basis. Right. It's a haul.

[Allan] (11:36 - 11:39) Oh, yeah. Where in Utah? Are you near Salt Lake or a big airport?

[Gray] (11:39 - 11:41) No. No. Southern Utah.

[Allan] (11:41 - 11:41) Okay.

[Gray] (11:41 11:45) So it's two hours from Vegas. That's the closest big airport. There's a St. George airport.

[Allan] (11:46 - 11:46) Okay.

[Gray] (11:46 - 11:48) But that's regional. And you end up having to connect.

[Allan] (11:49 - 11:49) Inside of Vegas.

[Gray] (11:49 - 11:53)Might as well just. Yeah. You might as well just drop to Vegas and leave from there.

[Allan] (11:53 - 11:54) Okay.

[Gray] (11:55 - 12:19) So that's going to be a huge challenge. I mean, the ideal scenario would be to be able to accommodate a remote request. And I come in on some routine.

Maybe it's once a month, a week a month, or a few days a month. Come in for important meetings. Come in for quarterly meetings, things like that.

But every week would be just. It would kill me.

[Allan] (12:20 - 12:30)  No one wants to kill you. Yeah. This is why I started with you're in a really. Yeah. I understand you're in a really difficult position. We don't allow managers to do that.

[Gray] (12:30 - 12:30) Okay.

[Allan] (12:30 - 12:36)
We don't allow any employees to live outside of drivable distance. So, Yin is the very first one.

[Gray] (12:36 - 12:36) Oh, and Chong Chong.

[Allan] (12:37 - 12:39) Chong Chong's drivable. He drives in.

[Gray] (12:39 - 12:40) Sure There's a road.
[Allan] (12:40 12:53)
And he's not in leadership. And this is the thing that's hard. As a director in this organization, it's a huge difference to be two or three time zones behind us. And a whole day. As you mentioned, it's a haul. It's a whole day.

[Gray] (12:53 - 12:55)
Yeah. Oh, yeah. It's a long haul. Yep.

[Allan] (12:56 - 13:05)
And I'm not trying to be a jerk about this. But Utah, on a permanent long haul, that's just a nonstarter for us.

[Gray] (13:05 - 13:05) All right.

[Allan] (13:05 - 13:12)
So, we're trying to put our cards on the table. Sure. And Eastern Shore was probably something we could have.

[Gray] (13:12 - 13:13) Yeah.  I was told no, but.

[Allan] (13:14 - 13:17)  I think permanently. Yeah. I don't care where you live.

[Gray] (13:17 - 13:17) Yeah.

[Allan] (13:17 - 13:18) If you work here three days a week.

[Gray] (13:18 - 13:19) Yeah, yeah, yeah.

[Allan] (13:19 - 13:21)  So, if that's up to you.

[Gray] (13:21 - 13:21) Right.

[Allan] (13:22 13:29)

Sherry Wyatt lives out in the middle of nowhere and drives however long to come in. We had someone who lived in Urbana and came in. The commute's up to you.

[Gray] (13:29 - 13:34) Yep. Okay. So, is there any appeal process for any of this?

[Allan] (13:36 - 13:38) Yeah. I mean, we can. So, Mary knows the decision.

[Gray] (13:39 - 13:39) Yep.

[Allan] (13:39 - 13:39) Mary.

[Gray] (13:40 - 13:43) Is she the final decision? Mary's the final, I guess, the final decision maker.

[Allan] (13:43 - 13:43) Yep

[Gray] (13:43 - 13:44) All right.

[Allan] (13:44 - 13:49) You're an At will employee hired at the CEO. So, as an independent agency, that's just sort of.

[Gray] (13:49 - 13:50) That's kind of figured. Okay.

[Allan] (13:50 - 13:55) So, we did talk to her about it. She. I strongly would encourage. She's coming back from Baltimore today.

[Gray] (13:55 - 13:55) Okay.

[Allan] (13:55 - 13:58) Encourage you to talk to her as well. I think you're going to get the same answer.

[Gray] (13:58 - 13:58) Okay.

[Allan] (14:00 - 14:06) She. I don't know if you remember with Chad. Like, we really had to talk her into a six month trial.

[Gray] (14:06 - 14:11)
Yeah. I think she was okay with Utah at one point, but not Colorado because of the labor laws in Colorado.

[Allan] (14:11 - 14:15)
Yeah. But she was not happy about Utah. She was not happy about any of it.

[Gray] (14:15 - 14:15) Right.

[Allan] (14:16 - 14:18)
We were trying to keep Chad in a pandemic when everyone.

[Gray] (14:18 - 14:18) Sure.

Case 3:25-cv-00742-RCY Document 41-2 Filed 09/30/25 Page 42 of 168 PageID# 679

[Allan] (14:18 - 14:21)
You know, again, Chad's like, no. I mean, Chad wanted to move every three weeks.

[Gray] (14:22 - 14:22) And.
Okay.

[Allan] (14:22 - 14:25)
Log in forever. So, Mary would be your appeal.

[Gray] (14:25 - 14:25) Okay.

[Allan] (14:28 - 14:34)
Absolutely. You are welcome to talk to her. I think that.

Okay. You'll probably get the same answer.

[Gray] (14:34 - 14:34) Sure.

[Allan] (14:35 - 14:37)
But it never hurts to talk to her.

[Gray] (14:37 14:47)
So, I'm trying to understand from a policy perspective. We said Tuesday, Thursday. It's not really in writing.

Is there a policy on being drivable? Any of the other stuff we've talked about? Or is it just kind of like.

[Allan] (14:47 - 14:51)
It's more of our practice. But our policy actually is that people work in the office.

[Gray] (14:51 - 14:51) Yeah.

[Allan] (14:51 - 14:53)
So, if you look at our telework policy.

[Gray] (14:54 - 14:54) Okay.

[Allan] (14:54 - 14:58)
It's on manager approval. It can allow you to work remotely.

[Gray] (14:59 - 14:59) Right.

[Allan] (14:59 - 15:04)
So, there's no policy that allows or even dictates that we're remote first.

[Gray] (15:04 - 15:04) Right.

[Allan] (15:04 - 15:07)
So, the policy would indicate office first.

[Gray] (15:07 - 15:15) Yeah.
So, in there. Sorry.

So, the policy would indicate office first. Is there any policy that says you cannot be fully remote?

[Allan] (15:15 - 15:15) Nope.

[Gray] (15:16 - 15:18)
Is there any policy that says I have to be in Virginia?

[Allan] (15:19 - 15:19) Nope.

[Gray] (15:19 - 15:19) Okay

[Allan] (15:20 - 15:21) It's a practice, not a policy.

[Gray] (15:21 - 15:25) Okay. All right. What do I do?

[Allan] (15:26 - 15:30)
I think you're in a tough spot.

[Gray] (15:31 - 15:31) Yeah.

[Allan] (15:32 - 15:36)
So, we did talk at length about is there a different role outside of a director? Yeah.

[Gray] (15:36 - 15:36) Yeah.

[Allan] (15:37 - 15:37) Because I think.

[Gray] (15:38 - 15:39) I'm open to
that.

[Allan] (15:39 - 15:47)
We genuinely asked. The problem we're running into is we are full. We have no open positions.
I'm not back filling tents when he leaves.

[Gray] (15:47 - 15:47) Okay.

[Allan] (15:47 - 15:49)
And we have to have a director.

[Gray] (15:49 - 15:49) Sure.

[Allan] (15:49 - 16:00)
No, I understand. If we had a developer or like a different vacancy, I think that this would be a little bit of

a different conversation. We have to have a director on that too.

[Gray] (16:00 - 16:00) Right.

[Allan] (16:00 - 16:02)
Okay. I mean, you and I were just talking about budget time.

[Gray] (16:03 - 16:03) Yeah.

[Allan] (16:03 - 16:04) Do
we need a manager too?

[Gray] (16:04 - 16:06)
Yeah. No, I understand. We have to have leadership.

[Allan] (16:07 - 16:15)
I don't think anyone wants you to just resign. Did you? I know we've given you FMLA paperwork.
I don't think we've gotten it back yet. I haven't checked with Jessica.

[Gray] (16:15 - 16:18)
I mean, I don't need leave. That's not really what I need.

[Allan] (16:18 - 16:21)
I mean, it's more than. Leave is a short-term solution. Not a long-term solution.

[Gray] (16:22 - 16:28)
Yeah. But it still doesn't help, right? I mean, it doesn't. It's
unpaid leave.

[Allan] (16:29 16:31)
I mean, you get to use your leave, but then, yeah.

[Gray] (16:31 - 16:41)
It's unpaid. Yeah. It's unpaid.
And at the end of it, I would need to be back here. Otherwise, I've got any benefits. Like, it just doesn't really fit.
I don't see how it helps.

[Allan] (16:41 - 16:45)
Yeah. It's hard. We're a state agency.

[Gray] (16:45 - 16:46) No, I
understand.

[Allan] (16:46 - 16:53)
I mean, we're not a private sector business. We don't have an agency. Right.
Or Mississippi.

[Gray] (16:54 - 16:54) Yeah.

Case 3:25-cv-00742-RCY Document 34-2 Filed 11/30/26 Page 45 of 168 PageID# 682

[Allan] (16:54 - 16:55) Pick your state.

[Gray] (16:55 - 16:55) Right.

[Allan] (16:56 - 16:59)
And state agencies are primarily state employees.

[Gray] (16:59 - 16:59) Right.

[Allan] (17:00 - 17:02)
People who live in the Commonwealth pay taxes in the Commonwealth. Yeah.

[Gray] (17:03 - 17:03) Yeah.

[Allan] (17:03 - 17:06)
I mean, I think you remember, we had to go through a lot of things to get Yin.

[Gray] (17:07 - 17:07) Yeah.

[Allan] (17:08 - 17:26) So.
Okay. It's just such.
I have so much empathy for you. Like, I really, really do. I think that what FMLA could give you is just. some weeks to get her stable Yeah. And I don't know her situation. I'm not projecting. For my mom.

[Gray] (17:27 - 17:30)
She's in Utah now. She is more stable.

[Allan] (17:30 - 17:30) Right.
Okay.

[Gray] (17:30 - 17:36)
But she's living with her sister. And it's just. Yeah.
She needs a more permanent residence.

[Allan] (17:37 - 17:41)
Sure. Have you looked for jobs in Utah? Yeah.

[Gray] (17:41 - 18:01)
Of course. I, you know, this would be. How to make this work is my primary goal.
I've invested so much in this. I've invested in the team. Yeah.
Things have come so far. Yeah. It just.
I want to make sure this is what. You know. What I'm hearing.

[Allan] (18:01 - 18:01) Yeah.

[Gray] (18:02 - 18:07)

All right. So there's no avenue. Maybe one more conversation with Mary beyond that.

[Allan] (18:07 - 18:13)
Yeah. We'll be in the office tomorrow. I don't know if you're still going to be here. Yeah.
Or if you're flying back Friday. Which is tomorrow.

[Gray] (18:13 - 18:13) Yeah. Okay.

[Allan] (18:14 - 18:21)
So. Because we have all. Sure.

I'm making everyone come in tomorrow for a meeting. But I'm sure she would make time for you. You can always have a virtual call.

[Gray] (18:21 - 18:22) Sure.

[Allan] (18:22 - 18:26) Yeah.
Mary is also. I mean.

I think she's one of the kindest CEOs.

[Gray] (18:26 - 18:26) Okay.

[Allan] (18:26 - 18:27) I've ever met.
Consider it.

[Gray] (18:28 - 18:37)
So how would this. So assuming Mary says no. How does it play out?
I have three weeks. Four weeks of vacation time. Somewhere in that range. I
take my three weeks. And then I'm done.

[Allan] (18:38 - 18:45) How it plays out is up to you. We're not terminating your employment. We have said this is the requirement. So you decide whether you can meet that requirement or not.

[Gray] (18:45 - 18:57)
But if I can't meet the requirement. Let's say. If I need to be in Utah.
Then. I resign. I resign.
I get fired. I mean. You see what I'm asking?
I don't even know what to tell my team at that point.

[Allan] (18:57 - 19:07)
I think. So I don't know what to tell you. Because I can't tell you what your actions are.
Right? So if you're like. No.
I have to move to Utah. And we say. No.

You can't work from Utah.

[Gray] (19:07 - 19:24)
It's kind of weird. Almost. I mean.

It's not. They're there. I haven't made a final decision.
But I just don't see how. Either I maintain residency. Hey.
My wife lives there. Like. That's an option.
That's not a good option. The other option is. I try and fly back.

[Allan] (19:24 - 19:25) Yeah.

[Gray] (19:25 - 19:32)
It would kill me. Right? I'd have to fly.
I mean. I'm trying to play it out. So it's a flight on Sunday.
Would put me back in here. Late Sunday night.

[Allan] (19:32 - 19:33) Okay.

[Gray] (19:33 - 19:44)
The next. If I have to work. Through Thursday.
On site. And then. Friday.
Remote. Like. I've even been told.
I can't work remote. From Utah. Is that.
True or false?

[Allan] (19:44 - 19:46)
Um. I believe your two days a week. Can be anywhere.

[Gray] (19:46 - 19:48) Okay.
So if my two days.

[Allan] (19:48 - 19:51)
Then your residency is still Virginia. Because three days a week. In Virginia.

[Gray] (19:52 19:53) Even if it's in a hotel?

[Allan] (19:53 - 19:55) Yeah.
It's a hotel. Okay.So.

[Gray] (19:55 - 20:00)
But then I would fly out on. Friday afternoon. I'd get into Utah.

[Allan] (20:01 - 20:02) Is there a Wednesday night flight?

[Gray] (20:03 - 20:05) Um. I know there's a.

[Allan] (20:05 - 20:05) Because you fly to Vegas.

[Gray] (20:05 - 20:14) I know there's a Thursday. I know you can fly direct to Vegas. Yeah.
Well. Breeze is the one that has the most direct. Okay. I think it's Tuesday. Tuesday. Thursday. Sunday.

[Allan] (20:14 - 20:14) Okay.

[Gray] (20:15 - 20:16) So if flew.

[Allan] (20:16 - 20:17) Breeze esn't do
every day.

[Gray] (20:17 - 20:21)
Yeah. They don't do every day. So if I flew back in.

But even like Thursday.

[Allan] (20:21 - 20:28)
The flight leaves here at 9 a.m. So could you ask to have your in-office days be Monday, Tuesday, Wednesday? And then fly.

[Gray] (20:28 - 20:29) I don't
ask. Yeah. I don't.

I just don't.

[Allan] (20:29 - 20:32)
Take PTO on Thursdays? Or work a 4-10?

[Gray] (20:32 - 20:32) Yeah.

[Allan] (20:33 - 20:36)
Like if you were asked for a 4-10. You work Monday, Tuesday, Wednesday.

[Gray] (20:36 - 20:37)
That's what I'm saying. Like what are my options?

[Allan] (20:37 - 20:37) Yeah.

[Gray] (20:37 - 20:39)
Is there anything we can work out?

[Allan] (20:39 - 20:40)
You can ask. This is not my decision.

[Gray] (20:40 - 20:40) Yeah.

[Allan] (20:40 - 20:42)
But if I were in your shoes, I would ask to do.

[Gray] (20:42 - 20:42) Yep.

[Allan] (20:43 - 20:44) A 4-10
schedule.

[Gray] (20:44 - 20:44) Okay.

[Allan] (20:44 20:45)
Which is allowable under policy.

[Gray] (20:46 - 20:46) Yep.

[Allan] (20:47 - 20:51)
Monday, Tuesday, Wednesday. 10 hours in the office. Thursdays are your flex day.

[Gray] (20:51 - 20:53)
Thursday's flex. Thursday's my flight day.

[Allan] (20:54 - 20:54) Yeah.

[Gray] (20:54 - 20:54) And then
Friday.

[Allan] (20:54 - 20:59)
Friday you work remotely for 10 hours. That's a 40-hour week.

[Gray] (20:59 - 21:00) Yep.

[Allan] (21:00 - 21:01) That's flying
every.

[Gray] (21:03 - 21:14)
Sunday. Friday, Thursday. Yeah.
And then Thursday would be flight. Maybe Pretty sucky schedule.

[Allan] (21:14 - 21:15) I'm sure.

[Gray] (21:15 - 21:15) Yeah.

[Allan] (21:16 - 21:20)
You know, in all reality, maybe it's a schedule so you can find a job in Utah, right?

[Gray] (21:20 - 21:20) Yeah.

[Allan] (21:20 - 21:23)
Like no one's trying to make you unemployed. You ask what happens.

[Gray] (21:23 - 21:23) Yeah, yeah,
yeah.

[Allan] (21:24 - 21:25)
We're not throwing you out the door.

[Gray] (21:25 - 21:26) Right.

[Allan] (21:27 - 21:30)
It may feel that way to you, but like.

[Gray] (21:30 - 21:31) Yeah.
No, I get it.

[Allan] (21:31 - 21:55)
You know, this is a. So. Everyone wants her.
Everyone wants. Your wife to get what she needs. Everyone.
Like. Dialog. You probably have to reschedule some Thursday things.
Because I think the team comes in on Thursdays. I think that's the hard part. You have to change their day. Yeah. I think that if you explain to the team that you have some family things

[Gray] (21:56 - 21:56) Yeah.

[Allan] (21:56 - 21:58)
You don't have to give them details.

[Gray] (21:58 - 21:59) I don't
think that's.

[Allan] (22:00 - 22:00) And that.

[Gray] (22:00 - 22:01) Insurmountable.

[Allan] (22:01 22:02) In office
day is Wednesday.

[Gray] (22:02 - 22:05)
Because we've already moved Rogu to Wednesday.

So, I mean, we could do it on Wednesday. That's not a problem.

[Allan] (22:06 - 22:06) Okay.

[Gray] (22:08 - 22:10)
Thursday's so arbitrary. We pick that day just.

[Allan] (22:10 - 22:10) Yeah.

[Gray] (22:10 - 22:11) Because.

[Allan] (22:12 - 22:17)
Honestly. And we've talked for a better part of two years. It's probably time to bring your team in more often.

[Gray] (22:17 - 22:17) Yeah.

[Allan] (22:17 - 22:22)
I think that a lot of your team comes in on Thursdays. And leaves at noon. I think people notice it.

[Gray] (22:22 - 22:23)
Yeah. I've talked to them about it.

[Allan] (22:24 - 22:34)
I don't think anyone has to be in three days a week. Right. Or individual contribute.

No individual contributor outside of IT help desk. But like. I think that it's valuable for the team to work together.

[Gray] (22:34 - 22:35) Okay.

[Allan] (22:35 - 22:36)
Some and then work from home some.

[Gray] (22:36 - 22:37) Yep.
Makes sense.

[Allan] (22:37 - 22:54)
So, if I were in your shoes. I'd be requesting that. For at least short term.

And we evaluate. And if you get yourself approved for FMLA. So, you have been here five years now.

You accrued 9.333 hours. If you get approved for FMLA. Doesn't mean you take 12 weeks all the time.

[Gray] (22:54 - 22:55) Right.

[Allan] (22:55 - 22:57)
So, you could do that for a week. And take a week off.

[Gray] (22:57 - 22:57) Yeah.

[Allan] (22:58 - 23:00)
Or you could do. Do you know what I mean?

[Gray] (23:00 - 23:10) Like a
day. Yeah. No.

I do. I get what you're saying. I worry about the impact to the team.

I know FMLA protects everything. But it's kind of a. Less than ideal scenario.

[Allan] (23:11 - 23:13)
All of this is a less than ideal scenario.

[Gray] (23:13 - 23:13) I know.

[Allan] (23:14 - 23:15)
I mean we're playing the cards for Delt

[Gray] (23:16 - 23:16) Yep.

[Allan] (23:16 - 23:18) I can't help on the state agency.

[Gray] (23:18 - 23:18) Yeah.

[Allan] (23:18 - 23:23)
You can't help that your wife's family all moved away. We're all just trying to play the cards we were delt

[Gray] (23:23 - 23:30) Yep.
Okay. So.
What about the other. The other. So, I think I heard you say.

[Allan] (23:30 - 23:32)
The flip side would be due Wednesday, Thursday, Friday.

[Gray] (23:32 - 23:32) Yeah.

[Allan] (23:32 - 23:34)
And probably on Tuesdays and Saturdays.

[Gray] (23:34 - 23:35) So.
Yeah.

[Allan] (23:35 - 23:35) Yeah.

[Gray] (23:35 - 23:38)
Some flexibility there. Let me. Let me play with this.

[Allan] (23:38 - 23:38) Yeah.

[Gray] (23:38 - 23:44)
And see what I can come up with. And then if for some reason. I can't be in on a Tuesday, Wednesday, Thursday.
I have to take.

[Allan] (23:45 - 23:45) PTO.

Case 2:25-cv-00742-RCY Document 34-2 Filed 01/12/26 Page 53 of 168 PageID# 690

[Gray] (23:45 23:50)
PTO. But I could work remote Monday, Friday. Is that what I'm understanding from Utah?

[Allan] (23:52 - 23:57)
Yeah. Our policy does not prevent you from working for Utah Mondays and Fridays.

[Gray] (23:57 - 23:57) Okay.

[Allan] (23:58 - 24:01)
Or your two days a week. People do it all the time. Yeah.
They go on vacation.

[Gray] (24:01 - 24:02) Yeah.

[Allan] (24:02 - 24:03)
And they take their computer with them.

[Gray] (24:03 - 24:04) Yeah.

[Allan] (24:04 - 24:06)
I do want to. Can I asterisk that?

[Gray] (24:07 - 24:07) Yeah.
Of course.

[Allan] (24:07 - 24:12)
I need to look at what Utah law is. Because like. California.
I'm telling you. Nope.

[Gray] (24:12 - 24:12) Yeah.

[Allan] (24:12 - 24:16)
Because California. One day a month you work there. You're a California employee that day.

[Gray] (24:16 - 24:16) I see.

[Allan] (24:16 - 24:17)
We don't want anything to do with California.

[Gray] (24:17 - 24:17) Yeah.

[Allan] (24:18 - 24:22) So Massachusetts would be the same. Colorado. There's just some states we don't.

Gray] (24:22 24:23)
That are really particular. I get it.

[Allan] (24:23 - 24:26)
Utah. If I remember from our research for Chad was.

[Gray] (24:27 - 24:27) Pretty flexible.
[Allan] (24:27 24:28)

Pretty employer friendly like Virginia.

[Gray] (24:28 - 24:28) Yeah.

Yeah.

[Allan] (24:29 - 24:32)
And so it's usually where the majority of your work happens.

[Gray] (24:32 - 24:32) Right.

[Allan] (24:32 - 24:38)
Is your state of residency. I got to establish myself as a business in Utah. If you're working in Utah.

Yeah.

[Gray] (24:38 - 24:38)
I get it.

[Allan] (24:38 - 24:39) More than
50%.

[Gray] (24:39 - 24:40) Okay.

[Allan] (24:41 - 24:42)
And then I got to pay Utah taxes.

[Gray] (24:42 - 24:42) Yep.

[Allan] (24:42 - 24:45)
And then I'm subject to their rules and regulations. And I don't want to do that.

[Gray] (24:45 - 24:53)
Is there any way to. Claw back on some of this. Three day a week requirement.
And go back to where things were. But I maintain.

[Allan] (24:53 - 24:56)
I think the challenge is where we started this. Yeah. Everyone said they couldn't find you.

[Gray] (24:56 - 24:57) But.

[Allan] (24:57 - 24:58) I know
you reject that.

[Gray] (24:58 - 25:00)
I will make sure that I. Yeah.

[Allan] (25:00 - 25:03)
I think the best way to go to claw back is demonstrate it.
[Gray] (25:04 25:04) Demonstrate what?

[Allan] (25:05 - 25:06)

Demonstrate that you're findable.

[Gray] (25:06 - 25:09)
Yeah. Absolutely. I understand that.

[Allan] (25:09 - 25:13)
Yeah. It's going to take some time. But you have to.
We're also going to get a new CTO.

[Gray] (25:13 - 25:13) Yeah.

[Allan] (25:13 - 25:20)
At some point. So then you'll have a new person to build that relationship with.

[Gray] (25:20 - 25:20) Yeah.

[Allan] (25:20 25:27)
I was very happy to hear that I think you and Mike have kind of. Yeah. Come a long way from where it was a few years ago.

So.

[Gray] (25:27 - 25:38)
No. I think when Mike and I were both directors. There was a lot of power struggle.

Yeah. Whose role was what. Yeah.

Right. Was it my role to come up with the architecture or his role.

[Allan] (25:38 - 25:38) Yeah.

[Gray] (25:38 - 25:42) And I know Michael was clear. But then Michael disappeared. Pretty early on.

[Allan] (25:42 - 25:43) Michael played
both sides.

[Gray] (25:43 - 25:47)
Yeah. I mean, it was clear to me. He probably was.

I don't know what he.

[Allan] (25:47 - 25:48) Just as
clear to Mike.

[Gray] (25:48 - 25:48) Yeah.

[Allan] (25:48 - 25:49) Michael played
both sides.

[Gray] (25:50 - 25:50) Yeah.

[Allan] (25:50 - 25:51) So what

Case 3:25-cv-00742-RCY Document 34-2 Filed 01/30/26 Page 56 of 168 PageID# 1028

doesn't help you.

[Gray] (25:51 - 25:52) Right.

[Allan] (25:52 25:53) Doesn't help Mike.

[Gray] (25:53 - 25:53) Right.

[Allan] (25:53 - 25:56)
So when you get a message from Michael that says. No, keep pushing.

[Gray] (25:56 - 25:57)
This is what I want. Go forth and do this. Yeah.

[Allan] (25:57 - 25:59)
And then Mike gets the message saying. You got to.

[Gray] (26:00 - 26:00) Yeah.

[Allan] (26:00 - 26:01) Wind this back in.

[Gray] (26:01 - 26:02) Yeah.
Yeah.

[Allan] (26:02 - 26:03) That was Michael's downfall.

[Gray] (26:03 - 26:04) Yeah.
Yeah.

[Allan] (26:04 - 26:04) You can't do that.

[Gray] (26:05 - 26:05)
Both sides against the middle.

[Allan] (26:05 - 26:06) Yeah.
You can't do that.

[Gray] (26:06 - 26:07) Yeah.
Yeah. No.

[Allan] (26:07 - 26:10)
Understood. So and I understand. You and I talked about that at the time. [Gray] (26:10 26:10) Yeah.
[Allan] (26:10 - 26:17)
We understood you were doing what your manager told you to do. So I.

[Gray] (26:18 - 26:21)
But I know. I know. I know Mike and I have been on the same page for a long time.

[Allan] (26:21 - 26:22) Yes.
And I love that.

[Gray] (26:22 - 26:25)
Right. Ever since early on in Okta. And he was like, OK, I see where you're going.

[Allan] (26:25 - 26:26) Yep.

[Gray] (26:26 - 26:27) Let's go.

[Allan] (26:27 - 26:27) Yep.

[Gray] (26:28 - 26:29) So yeah.

[Allan] (26:29 - 26:31) So I
get this sucks. Like.

[Gray] (26:32 - 26:32) Yeah.

[Allan] (26:32 - 26:39)
And I think it. Any solution sucks. Right.

Like because you're in a sucky place right now.

[Gray] (26:39 - 26:39) Yeah.

[Allan] (26:40 - 26:52)
But if I were in your shoes, I know that's a lot of flying. That's what I would be asking for. And I would. And you can talk to Mary and you can float it by her. Those are things that are allowable per policy.

[Gray] (26:53 - 26:53) OK.

[Allan] (26:53 - 26:54) Still manager's
discretion.

[Gray] (26:54 - 26:54) Yeah.

[Allan] (26:54 - 26:57)
Everything is manager's discretion. That's just the way life is.

[Gray] (26:57 - 26:59)
How would expense for all that work?

[Allan] (26:59 - 27:00)
Those would be your expenses.
[Gray] (27:01 - 27:01) Yeah.

[Allan] (27:03 - 27:03) Yep.

[Gray] (27:04 - 27:07) All right.
OK.

Case 3:25-cv-00742-RCY Document 34-2 Filed 01/30/26 Page 58 of 168 PageID# 695

[Allan] (27:07 - 27:14)
And again, maybe the best case. People always look at me like I'm crazy when I say this, but maybe the best case scenario is this holds you out till you can get a job in Utah.

[Gray] (27:15 - 27:15) Yeah.
No.

[Allan] (27:16 - 27:22)
Not that I'm trying to push you out the door, but plenty of people come in here and said, my life. This doesn't work for my life anymore. I'm like, how can I help you?

[Gray] (27:22 - 27:31)
That's what I'm worried about. I'm just worried about. This is doable to me. did this when I worked at the Federal Reserve. I pretty much traveled three weeks out of the month.

[Allan] (27:31 - 27:32) Yeah.
That's a lot.

[Gray] (27:33 - 27:38)
I was on the road all the time. And I don't mind it. It's fine with me.

But what's the impact on my wife going to be?

[Allan] (27:38 - 27:39) Right.

[Gray] (27:39 - 27:45)
I don't know. When she needs me and she's having a bad day, and I'm like, well, too bad. So sad I'm flying today.

[Allan] (27:46 - 27:46) It's hard.

[Gray] (27:46 - 27:48)
It doesn't work with somebody suicidal.

[Allan] (27:49 - 27:53)
It doesn't. And those are the days I would hope you would just take the PTO.

[Gray] (27:53 - 27:54) Yeah.

[Allan] (27:54 - 27:55)And so I would hope you would apply for FML.

[Gray] (27:56 - 28:04)
Yeah. But if I'm, like I'm saying, if I'm here on a- I know. Monday and she's having a, sorry for my language, a shit day.

[Allan] (28:04 - 28:04) Yeah.

[Gray] (28:04 - 28:05) Like, what
do I do?

[Allan] (28:05 - 28:07) I understand. It's fine. I live with my mom in Richmond.

Case 2:25-cv-00742-RCY Document 34-2 Filed 09/02/25 Page 59 of 168 PageID# 696

[Gray] (28:07 - 28:07) Yep.

[Allan] (28:07 - 28:09)
From across the country. I understand.

[Gray] (28:09 - 28:10) Yep.

[Allan] (28:10 - 28:12)
Please know there's a lot of empathy.

[Gray] (28:12 - 28:13) No,
I get it.

[Allan] (28:13 - 28:16)
For the situation. No one's happy about this.

[Gray] (28:16 - 28:38)
Yep. Is there any, so one of the other things I suggested or recommended, I don't know if it was thought about or discussed, was is there some way to do this for a defined time period? To have an accommodation for, I don't know, four months, three months, six months, whatever the number is.

I'm remote for that time period. We say on the pick a date, it's over.

[Allan] (28:39 - 28:46)
Like employment's over or- But it just- Yeah. So you can ask for that.

[Gray] (28:46 - 28:49)
I kind of did, but I didn't get much feedback from Carolyn.

[Allan] (28:49 - 28:58)
It was basically, you need to be here- I think our concern is, it goes back to that start of the conversation, why you got called back in. Yeah. People routinely feel like we can't find you.

[Gray] (28:58 - 28:58) Right.

[Allan] (28:58 - 29:01)
So when you're across the country at a different time zone, it just gets harder.

[Gray] (29:02 29:18)
Yeah. So- But I've been doing that somewhat, a fair amount. I don't know if anybody knew.
Mike said, just do it and we're going to keep it to ourselves. And so I've been in Utah a lot. And I don't want to throw Mike under the bus, but he's not here, so it's a little bit different.

Right? And I know I've been findable.

[Allan] (29:18 - 29:25)
So I can tell you that people have been telling me for some time that they think you've moved and not told anyone.

[Gray] (29:25 - 29:27)
No. I've got a residence here.

[Allan] (29:28 - 29:29)
We know you sold your house.

[Gray] (29:29 - 29:32)
Yeah. Okay. But that was, gosh, when was that? October.

[Allan] (29:32 - 29:46) Yeah, yeah, yeah. I'm not in the middle of this. She was in the middle of this Jessica's in the middle of this. But- Okay. If Mike did that, Mike shouldn't have done that, because that puts this agency at risk, because I didn't set you up to work in Utah. Right. So if you've been in Utah this whole time-

[Gray] (29:46 - 29:50)
No, no, no, no, no. I've not been- Off and on. No, that's what I'm saying. Off and on, as needed for a week here and a week there. We were there about two weeks, and then we were there again another week.

[Allan] (29:50 - 30:09)
So again, we're trying to be flexible, but at some point, we just have to figure it out. So we did talk about, do we just say, hey, go ahead and move three months, and then we'll fill in your position and you're retiring, or to be resigning.
But the problem is getting stuff out of those three months. Honestly- Getting what?

[Gray] (30:09 30:10) Stuff out of
it?

[Allan] (30:10 - 30:14)
Yeah. When people are ready to move on, they've just moved on and checked out.

[Gray] (30:14 - 30:14)
I get it.

[Allan] (30:14 - 30:16)
Human nature is human nature.

[Gray] (30:16 - 30:16) I agree.

[Allan] (30:17 - 30:20)
So that's hard. Yours is a critical critical role

[Gray] (30:29 - 30:34)
I get it.

[Allan] (30:34 - 30:41) one of the most critical in the organization so I dont think you would be as successful in getting that I think that my opinion is your best chance is probably start here see how its going and if its going well you can ask for a modification, but you have to prove it to us first

[Gray] (30:41 - 30:43)
I get it but I'm worried about the schedule and my wifes impact

[Allan] (30:43 - 30:43) I understand.

[Gray] (30:44 - 30:45) I don't

know.

[Allan] (30:45 - 30:46) Trust me, I
understand.

[Gray] (30:46 - 30:46) I
don't know. Yeah.

[Allan] (30:48 30:49)
And you should go home and talk to her.

[Gray] (30:49 - 30:51) I will.
Absolutely.

[Allan] (30:53 - 31:07)
And see. I don't know what the job market's like in Utah, or for- Yeah. Yeah.
I mean, you have, obviously, you're very employable, and- Yeah. You're also at a high salary for, you know, there's fewer director jobs than there are architect jobs.

[Gray] (31:08 - 31:18)
There's a lot of remote stuff. I just haven't really explored it. I mean, I've looked.
Obviously, I've looked at LinkedIn and see what's there, but yeah. Okay. Anything more I'm not missing?
Anything else? Any other thoughts, ideas?

[Allan] (31:22 - 31:23)
Yeah. No. Off the top of my head.

[Gray] (31:24 - 31:24) Okay.

[Allan] (31:24 - 31:28)
But I'm open to always continue talking about, did I get everything on your list?

[Gray] (31:28 - 31:32) I think so. Yeah. I was looking at it.
Just the policy stuff is the main questions I have.

[Allan] (31:32 - 31:32) Yeah.
[Gray] (31:32 - 31:33) Like, what
are the policies?

[Allan] (31:34 - 31:41)
The policy assumes you work in the office. Yeah. And then managers can approve telework. So the telework policy is what you want to look at.

[Gray] (31:41 - 31:46)
That's the main thing that would address any. Are there any other policies that would- Just sort of the communications.

[Allan] (31:47 - 31:50)
I could go back and look for them when we were coming back from COVID, when we laid out what we expect people to do.

[Gray] (31:50 - 31:51) Okay.

Case 3:25-cv-00742-RCY Document 3-2 Filed 09/23/26 Page 62 of 168 PageID# 699

[Allan] (31:51 - 31:52)
I can go back and look for those.

[Gray] (31:52 - 32:03)
That'd be great. Okay. Final decision.
We talked about that. That was Mary. No additional internal review process other than Mary.

[Allan] (32:04 - 32:04) Yeah.

[Gray] (32:04 - 32:05) Mary is
the- Mary's it.

[Allan] (32:08 - 32:13)
The way we're structured as an agency, the board hires Mary and it delegates all staff decisions to her.

[Gray] (32:14 - 32:16)
Yeah. So there's no appeal to the board or anything like that?

[Allan] (32:16 - 32:20)
Nope I can tell you one employee appealed something once to the board.

[Gray] (32:20 - 32:20) Yeah.

[Allan] (32:20 - 32:21)
I'm just giving you a heads up.

[Gray] (32:21 - 32:21) Yeah.

[Allan] (32:21 - 32:27)
No, I- If it's- If it's harassment, illegal activity, that should absolutely go to the board. But they were appealing a compensation decision.

[Gray] (32:28 - 32:28) Okay.

[Allan] (32:28 - 32:33)
And they were quite annoyed. Okay. To have to get called in to do it. They're like, this is why we hire a CEO.

[Gray] (32:33 - 32:33) Yeah.

[Allan] (32:33 - 32:36)
Mary is very fair. She's very thoughtful. But yes.
[Gray] (32:37 - 32:43) We talked about individual contributors being remote. Okay. No, I think I got it.

I think we covered all the bases.

[Allan] (32:44 - 32:44) Okay.
Cool.

[Gray] (32:45 - 32:45) Yep.

Case 3:25-cv-00742-RCY Document 38-1 Filed 09/22/26 Page 63 of 168 PageID# 700

[Allan] (32:45 - 32:49)
Come see me anytime. I appreciate it. I appreciate it.
I wish her well. I really appreciate it.

[Gray] (32:49 - 34:30)
I appreciate that. Thank you. Thanks.

# EXHIBIT H

## June 27, 2025 leadership meeting transcript

**Contents**

H1 contains the complete transcript of the meeting involving Gray, Mary Morris, Carolyn Bishop, and Debbie Allan concerning Gray's work arrangement and the resignation and termination options discussed at that meeting.

**Transcript use notice**

The transcript was generated from the original audio using TurboScribe and lightly proofread by Gray for general accuracy. Minor transcription variations may exist. Timestamps identify elapsed recording time. In any dispute about wording, the original audio controls. The unedited audio has been preserved and is available for the Court's review upon request.

**Certification**

I, Alexander C. Gray, participated in the June 27, 2025 meeting and recorded it on my mobile device while I was in Utah. I certify under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Executed on: September 21, 2026

________________________________

Alexander C. Gray

[Gray] (0:11 - 1:41)
Hello, hello, hello, hey, good afternoon, I'm doing good, thanks, how are you?

[Allan] (1:42 - 2:03)
Well, well, it's Friday, so that's where we can ask for the best part. Your wife doing okay? your hair cut?

[Gray] (2:03 - 2:27)
Yes, trying to keep it short, less maintenance that way, yeah, just less maintenance, you know, get out of the shower and do that and I'm done. Yeah, yeah, yeah, yeah.

[Allan] (2:30 - 2:49)
Yeah, Mary's going to join us too, Jessica, we just wanted to get all the decision makers together, we sent your email, asked for a resolution, so we just thought it would just make some sense, so I'm sure they're joining momentarily, but that's just why we're kind of waiting and not jumping quite in yet. What is your part of Vegas like?

[Gray] (3:02 - 3:37)
Salt Lake City, yeah, like six or seven hours north, I'm in the far, let me get my geography right, southwest corner. So almost, almost Arizona state line, Nevada state line, Utah state line, kind of they all come together right in this area, but it's desert, it's gorgeous, extremely dry, like relative humidity is less than 10%, which didn't really mean a whole lot to me, but I can go outside and run five miles and I don't sweat a drop, it's crazy. Yeah, yeah.

[Allan] (3:42 - 3:48)
Okay. garbled Big deal

[Gray] (3:48 - 4:02)
It is, it is. It's extremely dry.

[Bishop] (4:12 - 4:32)
Thanks for meeting with us, and before we get started, we want to talk to you about the fact that on Monday you had texted stating that you have clearly indicated you're unable to come to the office or not willing to come to the office on Tuesdays, Wednesdays, and Thursdays, and yeah, so we wanted to confirm that you're refusing to work in the office on Thursdays as required.

[Gray] (4:32 - 4:40)
I'm not refusing to work in the office on those days, I'm not able to come in on those days. I would love to work, I would love to work remotely on those days, absolutely.

[Bishop] (4:41 - 5:35)
Okay, well, we've stated several times that this is a requirement for managerial roles, and we had

some expectations during COVID that were different, but that was different for the entire agency, and so this is an expectation of a leadership role, and so with that, your decision to move to Utah, and, you know, essentially saying that you cannot work in the office as required means that you can't continue, so in essence, you're resigning at this point. And so if this is the case, we can discuss a notice period, which we're willing to allow virtually, and so, you know, we have a notice period that would come with clear expectations on deliverables in that timeframe that will be set for you, and we'll monitor availability and performance, all of the typical things, the deliverables, and reserve the right to terminate early if those conditions aren't met. Okay. So. Okay.

[Gray] (5:35 - 5:36) Okay? Yep.
Okay.

[Allan] (5:39 - 5:41)
Does that make sense for you, Zander?

[Gray] (5:41 - 6:04)
I mean, I understand what I'm hearing, yes, but, you know, I would love to talk through, you know, some policy clarifications about some things that have been said, so I don't know if you guys have more you want to discuss, but I would love to be able to talk about a couple other topics as well, some of the things that I included in my email. Is there other things you guys wanted to bring up, or should I jump into that now?

[Allan] (6:06 - 6:18)
I mean, that's sort of our, Carolyn covered it perfectly. That's the expectation of this position. I know when last year you asked to go to Florida and you asked to go to the Eastern Shore, we said no to those two and explained, this job's got to be in the office.

It just has to be.

[Gray] (6:18 - 6:18) Right.

[Allan] (6:18 - 6:21)
So, you know, we've been pretty consistent with that.

[Gray] (6:22 - 6:22) Okay.

[Allan] (6:22 - 6:23)
We always want to answer your questions.

[Gray] (6:23 - 6:24) Yeah.

[Allan] (6:24 - 6:26)
Not to leave you without questions.

[Gray] (6:26 - 6:37)
So I'd like to go through some of the policy clarifications. So people leaders not being remote, as we just brought up, is that a policy, or is that a written policy, and where is that policy written?
[Allan] (6:38 - 6:39)
So we talked about this before.

[Gray] (6:39 - 6:40) Correct.

[Allan] (6:40 - 7:02)
Our policy is that people work in the office. Our telework policy allows manager approval for employees to work remotely. So the last telework policy you signed has you working in the office Tuesdays, Wednesdays, and Thursdays, and virtually Mondays and Fridays. So what you're looking for is a policy because managers can't do that. There's no policy.

[Gray] (7:02 - 7:02) There's no
policy.

[Allan] (7:03 - 7:07)
There's also a policy that says managers can't, there's no policy allowing people to work in another state.

[Gray] (7:07 - 7:09)
But we do have people that do that.

[Allan] (7:09 - 7:16)
Your telework agreement is an agreement, and in your telework agreement, what we approved is three days in the office.

[Gray] (7:16 - 7:31)
But in this, so, and that changed just recently. So up until April, I was only in the office one day every other week. And so there were changes made to my telework policy just in this past April.

[Allan] (7:32 - 7:37)
You got called in because the work was not sufficient when you were not in the office.

[Gray] (7:37 - 7:37) Right.

Case 3:25-cv-00742-RCY Document 34-1 Filed 01/30/26 Page 68 of 168 PageID# 705

[Allan] (7:37 - 7:41)
And so the telework policy says that it's all conditional upon performance.

[Gray] (7:41 - 7:42) Okay, so
I'd like to.

[Allan] (7:42 - 7:43) And so,
yeah, go ahead.

[Gray] (7:43 - 7:45)
No, I'm sorry. I didn't mean to interrupt you.

[Allan] (7:47 - 8:08)
Virtual is hard So when you met with Mike in March, it was because, we talked about this, we received unsolicited feedback that people couldn't find you. So as a result thats not performance we expected a leader, people have to find you. You were called back to the office three days, which is our, every other manager in this agency works three days in the office.

[Gray] (8:08 - 8:11)
Right. So that three days, three days in the office.

[Morris] (8:13 - 8:19) the other was ad-hoc it feels like but that never was fully approved. Carolyn didn't approve it. I
mean, I think Mike allowed you to work less than

[Gray] (8:19 - 8:20)
But that happened for two years.

[Bishop] (8:22 - 8:24)
You know, we're beyond that.

[Gray] (8:24 - 8:25) No, but,
all right, so.

[Bishop] (8:25 - 8:28) In March,
you were told.

[Gray] (8:28 - 8:31)
Oh, I know. I'm very, very aware.

Case 3:25-cv-00742-RCY Document 34-2 Filed 01/30/26 Page 69 of 168 PageID# 706

[Bishop] (8:31 - 8:36)
In the office and that was related to performance issues that we have many times spoken about.

[Gray] (8:36 - 8:44)
Well, those, so I'd like to kind of follow this logically down the path. So there is no Tuesday, Wednesday, Thursday policy, correct?

[Allan] (8:45 - 8:48)
There's no policy to allow you to work remotely.

[Gray] (8:48 - 8:56)
But there is a telework policy that allows for reasonable accommodations under the ADAAA, three A's.

[Bishop] (8:56 - 8:57) For employees.

[Allan] (8:58 - 9:05)
Accommodations are for employees. There's nothing in the ADAAA that allows for accommodations for caregivers.

[Gray] (9:05 - 9:14)
But there is, there are, the ADAAA, I'm just going to call it the ADA, it covers associational discrimination, correct?

[Allan] (9:17 - 9:19) it does but It doesn't cover work accommodations.

[Gray] (9:19 - 9:28)
But there is a policy there that says an employee could be accommodated under the ADA to work remote.

[Allan] (9:30 - 9:32)
Accomodations Under the ADA are for employees.

[Gray] (9:33 - 9:33) Correct.

[Allan] (9:33 - 9:36)
What you are referencing is discrimination against a caregiver.

[Gray] (9:36 - 9:37) Correct.

[Allan] (9:37 - 9:44)
It has nothing to do with failure to give an accommodation. Caregivers are not required to be given or even considered for accommodations.

[Gray] (9:44 - 9:50)
But there is a policy that says you could do that for an employee, correct?

[Allan] (9:50 - 10:04)
An employee with an ADA qualifying disability is eligible to request an accommodation. And accommodations have to be reasonable for the employer. And working remotely is not reasonable.

[Gray] (10:04 - 10:13)
But in some cases that would be reasonable if somebody had a disability. And so there is a policy that would allow that if somebody were disabled.

[Allan] (10:14 - 10:40)
If an employee had a disability and a doctor said the person could not work in the office, we engage in the interactive process. And we as the employer get to determine if working remotely is reasonable. So we do have employees that request that, but we're often able to find a different accommodation that works for both employer and employee. You have not prior to this day asked for an accommodation for yourself.

[Gray] (10:40 - 10:48)
No, I understand. But so we are clear though that it does provide protections against associational discrimination.

[Allan] (10:49 - 10:50) law does yes

[Gray] (10:50 - 11:23)
Yes, okay. So that's where I want to shift a little bit. So the pattern and timing of these decisions, in my case, in my situations, it raises some of those concerns to me.

Because I had mentioned, I've talked to Mike about my Utah need prior to any of these other decisions being made. So Mike was aware that there was the potential that I may need to relocate to Utah. And that was raised before, you know, any of these availability concerns were raised.

That was raised before I was requested or required to come in the office three days a week.

[Allan] (11:24 - 11:37) our understanding from Mike is it was raised in April after you had

already had this conversation. And there was zero mention of your wife's medical condition until after you were already called back into the office.

[Gray] (11:37 - 11:40)
No….no.. no.. So it was clearly discussed with Mike in January.

[Bishop] (11:40 - 11:56)
I would like to make a comment here. There was no clear discussion of any medical need prior to April. There were discussions of issues that you had going on in your personal life with your wife, but not medical need. Until April 18th.

[Gray] (11:57 - 12:01)
And that I may need to relocate to Utah. I know that was brought up with Mike.

[Allan] (12:02 - 12:07)
It was not because of a medical need. This was because of your personal issues with your relationship with your wife.

[Gray] (12:07 - 12:10)
Which was a medical need. Until April 18th.

[Morris] (12:10 - 12:15)
I have a question, did anyone give you any indication that that was going to work for the organization?

[Gray] (12:16 - 12:16) Possibly. Yes yes

[Morris] (12:16 - 12:18)
If you were going to move to Utah.

[Gray] (12:18 - 12:18) Yes.

[Morris] (12:18 - 12:28)
The last time that I talked, I said I don't see any situation in which we would approve an employee working full-time remote in Utah.

[Gray] (12:28 - 12:30) I was told that there was...

[Morris] (12:30 - 13:30)
In fact, we talked about the fact that several years ago an employee asked for that. We were

considering it and it really got to the point where we were going to say no, that just doesn't work. We really tried. We would like to accommodate people. We have to do what makes sense. And that was someone who was a lower level, you know, entry level employee. And he left and so we didn't have to make any final statement. But that was what it was going to be.

And your situation is different because of your position in the organization. And again, working remote isn't a right. It is a privilege.

And it has always been said. Every time I've talked about it to anybody, it has to work for the employer and it has to work for the employee. And so if we can make a reasonable accommodation for someone to work remote occasionally or, you know, for whatever reason, then maybe that's how it works out.

But there's no hard and fast rule that says a reasonable accommodation is to allow someone to live and work remotely 100% of the time.

[Gray] (13:31 - 13:44)
So I hear you and I understand. It feels discriminatory in my case. It feels as if, you know, all of these issues, the issues with my work came up.

All of this came up after I discussed the possibility of needing to move to Utah.

[Allan] (13:45 - 13:50)
I think you're ignoring the fact that you asked to move a year ago and we said no.

[Gray] (13:50 - 13:51) I'm not ignoring that.

[Allan] (13:51 - 14:20)
You asked to move a year ago to two closer places and we said no. So we have been very consistent prior to sharing. This whole call has a lot of empathy for you. We understand that you were in a rock and a hard place. A lot of empathy for you.

You were told no to a move well before we knew there were any issues other than my understanding that your children had moved away and you wanted to consider living on the water in Florida or the eastern shore.

[Gray] (14:21 - 14:22)
Trying to move near family, correct.

[Allan] (14:23 - 15:12)
I understand that. I just moved my mom here a few years ago. I understand wanting to be near

Case 2:25-cv-00724-RCY Document 34-2 Filed 09/02/25 Page 73 of 168 PageID# 710

family.

You have a lot of empathy in this room. But the reality is we've told you no to a move all along. I understand why you had to move anyway.

That's your personal choice. But that means you can't continue to work here in this role. So we're trying to be really kind here and let you have a notice period and work remotely in your notice period so we're not having to play this PTO thing Tuesday, Wednesday, Thursday and that you get a transition and we get a transition.

We're trying to come to something mutually agreeable. I understand how it may feel to you but the reality is we are persistent long before this. And so this is the same issue.

You can't do this job remotely.

[Gray] (15:13 - 15:16)
But I did. I did this job remotely for two plus years.

[Allan] (15:16 - 15:17) No.

[Gray] (15:17 - 15:17) I did.

[Allan] (15:18 - 15:20)
No. That's the standard that we require.

[Gray] (15:20 - 15:35)
During COVID I did this job. There has never been any mention in any of my Namely, any of my reviews, anything else prior to March 19th about my inability or my availability prior to that conversation. Never.

[Bishop] (15:35 - 15:37) Zander I beg to differ

[Gray] (15:37 - 15:41) Where is it then?

[Allan] (15:44 - 16:13)
We were all remote during covid under different scenario you accepted this job for 5 days a week in the office and the timing was such right before the shutdown everybody in the agency is in person and development came in the least we have been talking bringing them back more



EXHIBIT H — Transcript provided for convenience; original audio controls.

Case 2:25-cv-00742-RCY Document 31-2 Filed 09/30/25 Page 74 of 168 PageID# 1046

about a year bringing everbody back to work more because what we see is there a disconnect your job is not just development your job is working with Carolyn its working with Mary its working with Scott Ridgely its working with finance

[Gray] (16:13- 16:13) I understand.

[Allan] (16:14 - 16:15) all these people are in the office so when your not reachable or your not there theres a disconnect

[Gray] (16:19 – 16:20) But I am reachable.

[Allan] (16:20 - 16:32)
So your looking at it of the view well my team is remote which is a true statement for the most part but your team is also Rosario, Ben Keener

[Gray] (16:31 - 16:31)
I understand

[Allan] (16:31 - 16:35)
This job cant be remote. I don't want to beat this dead horse. I really dont

[Gray] (16:37 - 16:48)
So I'm not asking for the job to be – I'm not asking for it to be remote any longer. Really, I'm asking for something that would mutually benefit the both of us because I do feel like I have been treated unfairly.

[Allan] (16:50 - 16:55)
What mutually benefits you is us letting you work a remote notice period if you choose to resign

[Gray] (16:56 - 16:58)
Ok So what does that remote – what does that period look like?

[Allan] (16:58 - 17:07)
That's what we are here to talk about. So I think we have some ideas about what's reasonable we also want to hear from you what you think is reasonable

[Gray] (17:08 - 17:09)
OK What do you guys think is reasonable to start there?

[Allan] (17:11- 17:18)
A month? Three weeks? Two weeks? What do you need to transition?

[Gray] (17:19 - 17:23)
A month of working time? Help me understand. When you say a month, what do you mean by that?

[Allan] (17:24 - 17:25) Four weeks.

[Gray] (17:25 - 17:30)
Four weeks of working Monday through Friday and then at the end of four weeks we're done.

[Allan] (17:31 - 18:42)
You would submit a resignation because you've moved to Utah. We would do a four-week notice period. You'd have all benefits.

You'd do your job. You'd have (inaudible) If you want to squeeze it out, part of what we're trying to do is your health benefits are based on a month.

So we're trying not to have you lose health benefits immediately. Today is the 27th. I know you and I talked.

You've been looking for work in Utah, but that allows you to – It's not a bad thing. I understand your feelings. The situation has changed.

We went this route. Carolyn would give you a list of deliverables. Just like when Mike resigned, what he was doing changed.

Sheila resigned because we switched into transition mode. We would work on a transition that's mutually beneficial because you don't have to fly back here. You can work Tuesday, Wednesday , Thursday. We're not registered as an employer in Utah.

There's a lot of reasons why people can't just get up and go to a different state, but we think that's mutually beneficial.

[Gray] (18:42 - 19:03)
Okay. So when I'm thinking of transition package, I think to avoid the potential complications for both parties, to me what feels appropriate would be 12 to 15 months of salary continuation,[ Audible scoff] a benefit continuation during that time period, a positive reference, and a transition timeline of a month seems appropriate.

[Allan] (19:06 - 19:07)

Zander you have abandoned your job we are being really kind to you

[Gray] (19:08 19:10)
I have not abandoned my job Im trying to work things out.

[Allan] (19:10 - 19:19) by the legal definition you have abandoned your job so we are offering a month you can work your notice or we can walk away right now

[Gray] (19:19 - 19:20) Okay.

[Allan] (19:21 - 19:22)
We are not offering you a package.

[Gray] (19:22 - 19:31) ok Well, I think I need to consider external processes to address the policy and discrimination implications here.

[Allan] (19:31 - 19:35)
Do I hear that you are not resigning your position

[Gray] (19:38 - 19:49)
That Im not resigning? I'm not resigning my position at this moment, no. I'm not sure. Why are you asking me if I'm resigning my position?
I'm trying to save my position. That's what I've been trying to do for months now.

[Allan] (19:49 - 20:13)
Zander You can't get up and move across the country. We told you you can't relocate for a year plus and think that you can keep your job. So that's just not doable.

We've already walked through all of this with counsel. We understand the situation. We were trying to be nice to give you a chance to resign.

[Gray] (20:14 - 20:35)
Well, I'd like to think about it over the weekend. I feel like you're not considering how to avoid the complications. I've talked with counsel as well, and I was advised to have this conversation today and see where it goes.
And depending upon the outcome of this conversation, go from there.

[Bishop] (20:36 - 21:02)
No, Zander. Right now, the offer, the options on the table are to resign, or we will terminate you

effectively at the end of this meeting. So we are willing to be kind, to put it in Debbie's words, to give you a month with notice, with specific details, with specific notice that if anything goes awry, you will be terminated immediately.

Or we will terminate employment with you at the end of this meeting.

[Gray] (21:02 - 21:10)
Okay, so if you're telling me that those are my only two choices, I will continue with the one month, but I also want to reserve my rights under that agreement.

[Allan] (21:14 - 21:48)
Zander You always have rights as an employee as an at will employee. So there's no right one way or the other. so our view is, and our counsel shares this view, is you have abandoned your job.

You had a requirement, you had a contract that agreed that you would be in the office three days a week. You had a performance meeting that said you weren't meeting performance standards virtually, and you were called back to the office. Which you agreed to.

In that meeting, the first thing you said is you understood you weren't meeting performance expectations. And we have that well documented as well.

[Gray] (21:49 - 21:49) Okay, that's great.

[Allan] (21:49 - 22:18)
So if you want a transition period, and you can agree to the terms of being communicative with your team and with Carolyn, and not communicating with your team until Carolyn is ready to, to let them know what's going on, and you are meeting deliverables, and you are reachable, we are happy to give you that month as recognition that you are an existing employee in a tricky situation. But that is our term. You don't have to accept it.

[Gray] (22:18 - 22:19) Okay.

[Allan] (22:20 - 22:21) You do not have to accept it.

[Gray] (22:21 - 22:27)
Right, understand. I hear what you're saying. I will accept those terms at this point in time.

Yes.

[Allan] (22:29 - 22:54)
Can you please email Carolyn and I saying, pursuant to our conversation, your own words, that you're resigning the position, give us your end date. Carolyn will respond and accept it. And then you two on Monday, this probably makes sense, you sit down and talk about what that looks like.

So we would ask you not to share this with your team yet. We want you to have a chance to share this with your team, but we want you and Carolyn to have a chance to work out what that is.

[Gray] (22:54 - 22:55) Sure, that
makes sense.

[Allan] (23:03 23:06)
Do you have any questions for us right now?

[Gray] (23:06 - 23:08)
Not at this point, no. I think you've answered all my questions.

[Allan] (23:10 - 23:18)
Carolyn, do you have any questions for me right now?

[Bishop] (23:11 - 23:17)
I don't have any questions. I will await your resignation email, Zander, and respond.

[Gray] (23:19 - 23:19) Okay.

[Bishop] (23:19 - 23:28)
And I agree with Debbie, this is not to be spoken outside this group of people, and you and I will establish a communications plan on Monday.

[Gray] (23:28 - 23:28) Okay.

[Allan] (23:36 - 24:23)
Zander, I'm out of the office next week, so Jessica is working as our Alicia, so if you would like to talk to someone in HR, you can reach either of them. So I think Mary is in and out next week. She has things on her calendar.

Carolyn, I believe, is here, so she can reach you if you have questions. So please feel free to reach out if you have questions, and then we will touch base with the team probably Monday. I just want you and Carolyn to do that jointly.

That's our protocol for everybody, regardless of the reason why they leave. So we can start working on that transition. And I imagine, at least to be true, that if you have interviews and such, that Carolyn would be more than happy to be flexible with you so that you can go to those.

[Gray] (24:23 - 24:23) Sure.

[Allan] (24:23 - 24:49)
We don't want you – we want you to land successfully. We understand why your family is taking you to Utah. Hopefully you understand why that means that you can't continue in this role.

So let us know if we can help. And then at some point, too, during your last month, we will schedule an exit process with you so we can talk about the impact on benefits, et cetera. But I just don't think that right now is the best time to do that.

[Gray] (24:49 - 24:50) Sure.
That's fine.

[Bishop] (24:52 - 24:54)
Can we talk about specific dates?

[Gray] (24:57 - 25:01)
Are you asking me or – I'm fine with discussing dates, sure.

[Bishop] (25:01 - 25:10)
The group I'm holding on a calendar in a month from today, obviously, is July 27th. Debbie, What is your advice there?

[Allan] (25:13 - 25:14)
What day of the week is that?

[Gray] (25:15 - 25:15) Friday.

[Bishop] (25:16 - 25:17) Friday.

[Gray] (25:25 - 25:26) I'm looking
at June.

[Bishop] (25:26 - 25:28) It's a
Sunday. That's correct.

[Allan] (25:35 - 26:17)

I think that's fine if that's the time period that makes sense. Again, I think we have to agree to what is going to be done. And what I don't know is how much we need him to do and how much Zanderyou would like to do to close that out.

August 1st, gives you health insurance for another month. We can always do PTO for the last couple of days as an exception. So we can figure that out.

It's not solely up to me. I guess it's mine. Does August 1st work?

Is it Friday?

[Gray] (26:18 - 26:21)
It works for me. Yeah. I don't deal with that.

[Morris] (26:22 - 26:25)
It gives you health insurance for insurance and time to get covered.

[Gray] (26:26 - 26:26) Okay.

[Allan] (26:26 - 26:28)
That gives you two months of health insurance.

[Gray] (26:28 - 26:28) Sure.

[Allan] (26:34 - 26:42)
If you have any questions, same goes for everyone on this call. So I wish you well, Zander

[Gray] (26:42 - 26:45)
Okay. Thanks. You too.
All right. Appreciate it. Thanks.

# EXHIBIT I

## February 13, 2025 performance review

**Contents**

I1 contains the six-page performance review, including the recorded goals, ratings, and comments.

**Version note**

This exhibit reflects the copy maintained in Gray's records. Any additional version obtained from agency records or device backups will be preserved and compared with this copy. Any material discrepancy will be disclosed.

MID YEAR PROGRESS CHECK

# Performance Review Summary: Zander Gray

## Overview

STATUS Complete
REVIEW CYCLE **FY2025 Mid Year Progress Check**
COMPLETED 02/13/2025

## Due Dates

OVERALL DUE 02/14/2025

# Writer Answers

## FY2024 Mid-Year Goal Progress

### Demonstrate Core Competencies-2025

- Commitment to Customer Service
- Commitment to Team
- Flexibility
- Communication Skills
- Continuous Improvement
- Quality Results
- Technical Acumen
- Leadership
- Performance Support

1 **Select the current status of this goal.**

**Mike Henry**

On Target

2 **Provide details to describe your selection if needed.**

**Mike Henry**

Zander has done a good job tracking and updating leadership on the progress of the responsive web page conversion as well as on the Application re-design. I would still like to see you on camera more during meetings and daily standups because I believe it help your team feel more engaged with you. Please make sure you are regularly engaging with your partners on the SIT team (especially Brittany). I always like to hear you are going to touch base with her for one thing or another. It might also be useful for you to have regular meetings with SIT to make sure development is providing them with what they need.
I am happy that there seems to be a little less hesitation for people to jump into production issues. This could be that more is moving to the new architecture, so they are more comfortable looking at the problems. I encourage you to continue making sure that the whole team is helping out in this critical area and when needed step in and direct them to help.

### Development Leadership-2025

**Lead IT Development department in the execution of operational and strategic goals, and all busines processes.**

**1. Lead the development teams in the creation and delivery of software systems that support the execution of Agency goals. Remove obstacles and provide stretch goals for the Development team members.**
**2. Provide communication and updates to the CTO and other leadership to build employee alignmen with company goals, oversee Development talent development and work with the HR IT business partner to continuously enhance diversity, inclusion, and belonging efforts.**
**3. Proactively work with business partners to ensure the Development department is providing excellent service to meet increasing demands for competing priorities, great ideas, and ensure constant alignment with business objectives.**

3 **Select the current status of this goal.**

**Mike Henry**

On Target

4 **Provide details to describe your selection if needed.**

**Mike Henry**

Zander has provided leadership for his large team. He is also directing the SingleStone group and has done well with the personnel changes they have made. With such a large group I think it can be difficult to meet with everyone on a regular basis. I know most of your senior engineers are very self-directed, please make sure you are still giving them ample time to meet with you. Even though they are completing their tasks and leading from where they are, they still need your support. Please make sure you are building connections with them.
I believe it would also be good for you to start thinking about how you may re-organize the team so that you have another level of management/leadership to help you. I think we would be open to ideas around team leads based on either the two scrum teams we have now or just team leads in general. This could also provide growth opportunities for existing staff.

## Operational Excellence, Strategic Planning and Process Improvement - 2025

**Ensure results and linkages to organizational goals. Push self and others to successfully achieve goals. Strive to improve the way ITOD develops and delivers code to ensure the most efficient path from concept to production.**
**1. Ensure operational excellence with a focus on customer experience.**
**2. Efficiently and effectively deliver on Agency Goals.**
**3. Understand the flow of value from ITOD to VA529 Customers; Fix the flow of value when it breaks down and actively find ways or implement efforts to improve flow.**
**4. Actively support a culture of continuous improvement; evolve processes and procedures to become more efficient and effective; Continuously seek out software development and delivery pain points and improve processes and find better ways to communicate throughout the agency**
**5. Work to implement action plans to meet qualitative, as well as quantitative performance standards**
**6. Communicate with external stakeholders and contacts as needed to support VA529's mission.**

**7. Ensure operational excellence and safeguarding of agency assets by evaluating and promoting proper internal controls and security of customer assets.**

5 **Select the current status of this goal.**

**Mike Henry**

On Target

6 **Provide details to describe your selection if needed.**

**Mike Henry**

Zander has been able to design and fully implement to CI/CD pipelines that have been working well. There are still improvements needed with our DevOps initiatives, but we have made significant progress.
I like that Zander has been working on a number of new processes that will hopefully provide great benefit to software development. I appreciated the demo and POC he performed for CodeScene which uses static code analysis and AI/ML to identify trouble areas in our code. It can then help direct the software engineers on how to improve their code. It can also help identify applications that may be too controlled by one person. This could help identify risk areas in case we have attrition later down the road.
Another area I think we have room to improve is in production bug metrics. We always expect a ramp up period when implementing new technologies. I think now would be a good time to make sure we get a baseline of our number and type of defects that are slipping through QA and UAT. I think a lot of that may need us to focus on standardizing reporting of issues. Then we can see about integrating that through Jira or something like CodeScene to automate tracking. I know you are looking at this and appreciate it. Thank you for communicating your ideas on how to go about this to Carolyn and myself.

## Software Delivery Innovation - 2025

**Investigate and Implement innovations to simplify and automate how ITOD delivers software.
Implement innovation solutions to simplify and improve code delivery including CI/CD pipelines.
Integrate test automation solutions to include regression testing performance testing of APIs.
Simplify delivery of angular software
investigate and implement innovations to increase innovations and improve overall performance/delivery of software**

7 **Select the current status of this goal.**

**Mike Henry**

On Target

8 **Provide details to describe your selection if needed.**

**Mike Henry**

Zander has been able to design and fully implement to CI/CD pipelines that have been working well. There are still improvements needed with our DevOps initiatives, but we

have made significant progress. Zander has also put strict quality gates in the CI/CD platforms that enforce certain levels of automated code testing. In the long run this will enable us to avoid production issues.
The CI/CD pipelines are now being executed by IT Operations for PROD and TEST as separation of duties require. I believe IT Operations is getting more and more comfortable with the processes. I appreciate Zander making development staff available to IT Operations so that they are getting more and more comfortable. I would like to see more procedure and policy documentation as this has become a regular part of our procedures.

## Customer Journey Enhanced and Improved

**Provide leadership for the Development team as they develop new software to support the agency efforts to improve our customer experience. Work with each team and external professional services to incrementally, thoughtfully, and cohesively deliver solutions to enhance and improve the customer experience.**
**Guide development work, project plans, remove impediments, and ensure compliance with project timelines. Communicate to leadership team necessary changes to plans, and provide stakeholder communications for:**
**1. Support rebranding initiative**
**2. PL/SQL gateway conversions to responsive technology.**
**3. continue the redesign of Invest529 application in responsive design to non-individual and portfolio picker**

9 **Select the current status of this goal.**

### Mike Henry

Behind Schedule

10 **Provide details to describe your selection if needed.**

### Mike Henry

Zander is making good progress towards finishing the Responsive web page goal and the Invest529 Application revamp. These are difficult and extensive goals. While everything is moving well here it will probably be difficult to achieve 100% by the end of the fiscal year. The rebranding is moving along but is also taking more effort than originally anticipated. We are hopefully still on track with the rebrand, but it may impact the other goals.
I feel Zander is improving the communication of their progress and even if something is behind, we can help plan accordingly. This communication is incredibly import and I appreciate him working on it over the first half of this year.

# EXHIBIT L

## April 20, 2025 remote-work approval texts

**Contents**

L1 contains the text-message exchange between Gray and Henry concerning travel to Utah and remote work.

**Version note**

This exhibit reflects the copy maintained in Gray's records. Any additional version obtained from agency records or device backups will be preserved and compared with this copy. Any material discrepancy will be disclosed.

8:07

Mike Henry 529

Mike,
As I mentioned on Friday, my wife is not doing great and we have decided to get her much closer to her family, not sure of the exact plan but we are headed out to Southern Utah to find temporary housing for her. Im hopeful that I can get her settled and get her supported in 2 weeks. I am prepared to work remotely for the next 2 weeks or take PTO if needed. Again I apologize for the last minute notice, but this is something I have to do for her well being at this point. Let me know what you think is the best way to proceed

Sunday, Apr 20 • 10:50 AM

Texting with Mike (SMS/MMS)

Two weeks is fine. When remote working please stay engaged and on camera when possible. If things get hectic don't hesitate to take pto. You can just send me a text when you need to take time.

RCS chat with Mike

Monday, 7:03 AM

RCS message

# EXHIBIT M

## May 18, 2025 remote-work and PTO discussion

**Contents**

M1 contains three pages of text-message screenshots concerning remote work, PTO, and a meeting arrangement. The final screenshot also shows the May 29 continuation separately presented in Exhibit N.

**Version note**

This exhibit reflects the copy maintained in Gray's records. Any additional version obtained from agency records or device backups will be preserved and compared with this copy. Any material discrepancy will be disclosed.


7:16
93
Carolyn Bishop, VA529, Mike...
Mike created this group chat with you and Carolyn
Mike Henry 529
From Zander: unfortunately Im heading to Utah this morning. It has been a hard weekend particularly for my wife... I have my laptop and If it is ok I would like to work remotely. If not I need to take PTO. Not sure yet when Im heading back yet
Hi Zander I think you had an old unused number for Carolyn
I got her current in this thread
Thanks!!!
i Didn't think sms would work on plane wifi, but does
Sunday, May 18 • 8:02 AM
Carolyn Bishop, VA529
I am so sorry and gl u are with her. Do you have an idea of h long you will be
RCS message

7:16

Carolyn Bishop, VA529, Mike...

Sunday, May 18 • 8:02 AM

Carolyn Bishop, VA529

I am so sorry and glad you are with her. Do you have an idea of how long you will be there so we can answer your question?

Given the need to be with her, you are welcome to take pto so you can focus on her. And as before, I recommend talking with HR to get an understanding about FMLA.

so are you saying remote is not an option this week? i don't need to focus all day.... every day.... often being in the same place is sufficient....

im not sure how long. guessing this week, fly back next weekend?

Sunday, May 18 • 9:24 AM

Carolyn Bishop, VA529

Please set up a meeting with me as early as

RCS message


7:16
93
Carolyn Bishop, VA529, Mike...
Carolyn Bishop, VA529
Please set up a meeting with me as early as possible tomorrow to discuss.
will do... can meet at 830 ET. will send invite later today
Sunday, May 18 • 10:26 AM
Carolyn Bishop, VA529
I can meet at 9:30. Thank you.
Thursday, May 29 • 7:06 AM
good morning, I need to take PTO today
Carolyn Bishop, VA529
Ok thank you.
Mike Henry 529
Thanks
RCS message

Case 3:25-cv-00742-RCY Document 34-1 Filed 01/30/26 Page 94 of 168 PageID#

# EXHIBIT N

## May 29, 2025 PTO notification and acknowledgment

**Contents**

N1 contains the text-message screenshot showing Gray's PTO notification and the responses. The screenshot also includes an earlier meeting-arrangement exchange.

**Version note**

This exhibit reflects the copy maintained in Gray's records. Any additional version obtained from agency records or device backups will be preserved and compared with this copy. Any material discrepancy will be disclosed.


7:16
93
Carolyn Bishop, VA529, Mike...
Carolyn Bishop, VA529
Please set up a meeting with me as early as possible tomorrow to discuss.
will do... can meet at 830 ET. will send invite later today
Sunday, May 18 • 10:26 AM
Carolyn Bishop, VA529
I can meet at 9:30. Thank you.
Thursday, May 29 • 7:06 AM
good morning, I need to take PTO today
Carolyn Bishop, VA529
Ok thank you.
Mike Henry 529
Thanks
RCS message

Case 3:25-cv-00742-RCY Document 34-3 Filed 01/30/26 Page 96 of 168 PageID# 733


# EXHIBIT O

## Pay advices and accrued-leave payout record

**Contents**

O1 is the July 1, 2025 pay advice for June 10-24, 2025. O2 is the July 16, 2025 pay advice for June 25-July 9, 2025. O3 is the August 1, 2025 accrued-leave payout record.

**Version note**

This exhibit reflects the copy maintained in Gray's records. Any additional version obtained from agency records or device backups will be preserved and compared with this copy. Any material discrepancy will be disclosed.

**COMMONWEALTH OF VIRGINIA**

**OFFICIAL PAY RECORD**

| | | |
|---|---|---|
| **Commonwealth Savers Plan**<br>9001 Arboretum Parkway<br>N Chesterfield, VA 23236 | Pay Group: SM1-Semimonthly Class (SUNSAT07)<br>Pay Begin Date: 06/10/2025<br>Pay End Date: 06/24/2025 | Business Unit: 17400<br>Advice #: **000000066208543**<br>Advice Date: 07/01/2025 |

| | | |
|---|---|---|
| **ALEXANDER GRAY**<br>109 KENNONDALE LN<br>RICHMOND, VA 23226-2310 | Employee ID: 00794800100<br>Department: 401-IT Operations and Development<br>Location: ARBORETUM NORTH CHESTERFIELD<br>Job Title: Development Director<br>Pay Rate: $8,889.79 Semimonthly | |

| TAX DATA | Federal | VA State |
|---|---|---|
| Tax Status | Married | N/A |
| Allowances | N/A | 4 |
| Dependent Amount | 2,500.00 | N/A |
| Deductions | 1,805.00 | N/A |

**HOURS AND EARNINGS**

| Description | Current Hours | Current Earnings | YTD Hours | YTD Earnings |
|---|---|---|---|---|
| REGULAR | | 8,889.79 | | 106,677.48 |
| VRS Contribution Base | | 8,889.79 | | 106,677.48 |
| Annual Leave Payout | | 0.00 | | 820.60 |
| **TOTAL:** | **0.00** | **8,889.79** | **0.00** | **107,498.08** |

**TAXES**

| Description | Current | YTD |
|---|---|---|
| Fed Withholding | 694.98 | 8,722.17 |
| Fed MED/EE | 125.93 | 1,537.11 |
| Fed OASDI/EE | 538.42 | 6,572.45 |
| VA Withholding | 355.84 | 4,345.28 |
| **TOTAL:** | **1,715.17** | **21,177.01** |

**BEFORE-TAX DEDUCTIONS**

| Description | Current | YTD |
|---|---|---|
| COVACARE | 205.50 | 2,466.00 |
| Def Comp | 1,000.00 | 12,000.00 |
| HYB VDC | 355.59 | 4,267.08 |
| HVRMDB | 355.59 | 4,267.08 |
| HYB MDC | 88.90 | 1,066.80 |
| **TOTAL:** | **2,005.58** | **24,066.96** |

**AFTER-TAX DEDUCTIONS**

| Description | Current | YTD |
|---|---|---|
| **TOTAL:** | **0.00** | **0.00** |

**EMPLOYER PAID BENEFITS**

| Description | Current | YTD |
|---|---|---|
| COVACARE | 1,028.00 | 12,336.00 |
| Def Comp | 20.00 | 240.00 |
| HYB VDC | 222.24 | 2,666.88 |
| HVRMDB | 1,113.00 | 13,356.00 |
| Grp Life | 104.90 | 1,258.80 |
| Ret Hlth | 99.57 | 1,194.84 |
| VSDP LTD | 44.45 | 533.40 |
| HYB MDC | 88.90 | 1,066.80 |
| Imp Life* | 0.00 | 975.24 |
| ***TAXABLE** | | |

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current | 8,889.79 | 6,884.21 | 1,715.17 | 2,005.58 | 5,169.04 |
| YTD | 107,498.08 | 84,406.36 | 21,177.01 | 24,066.96 | 62,254.11 |

| YEAR-TO-DATE | PAID TIME OFF | SICK LEAVE |
|---|---|---|
| Start Balance | 0.0 | 0.0 |
| + Earned | 0.0 | 0.0 |
| + Bought | 0.0 | 0.0 |
| - Taken | 0.0 | 0.0 |
| - Sold | 0.0 | 0.0 |
| + Adjustments | 0.0 | 0.0 |
| **End Balance** | **0.0** | **0.0** |

**NET PAY DISTRIBUTION**

| | Account Type | Routing Number | Deposit Amount |
|---|---|---|---|
| Advice #000000066208543 | Checking | XXXXX0549 | 5,169.04 |
| **TOTAL:** | | | **5,169.04** |

**MESSAGE:**

**COMMONWEALTH OF VIRGINIA**

**OFFICIAL PAY RECORD**

| | | |
|---|---|---|
| **Commonwealth Savers Plan**<br>9001 Arboretum Parkway<br>N Chesterfield, VA 23236 | Pay Group: SM1-Semimonthly Class (SUNSAT07)<br>Pay Begin Date: 06/25/2025<br>Pay End Date: 07/09/2025 | Business Unit: 17400<br>Advice #: **000000066290596**<br>Advice Date: 07/16/2025 |

| | | | TAX DATA | Federal | VA State |
|---|---|---|---|---|---|
| **ALEXANDER GRAY** | Employee ID | 00794800100 | Tax Status | Married | N/A |
| 109 KENNONDALE LN | Department | 401-IT Operations and Development | Allowances | N/A | 4 |
| RICHMOND, VA 23226-2310 | Location | ARBORETUM NORTH CHESTERFIELD | Dependent Amount | 2,500.00 | N/A |
| | Job Title | Development Director | Deductions | 1,805.00 | N/A |
| | Pay Rate | $8,889.79 Semimonthly | | | |

**HOURS AND EARNINGS**

| Description | Current Hours | Current Earnings | YTD Hours | YTD Earnings |
|---|---|---|---|---|
| REGULAR | | 3,232.65 | | 109,910.13 |
| VRS Contribution Base | | 8,889.79 | | 115,567.27 |
| Annual Leave Payout | | 0.00 | | 820.60 |
| **TOTAL:** | **0.00** | **3,232.65** | **0.00** | **110,730.73** |

**TAXES**

| Description | Current | YTD |
|---|---|---|
| Fed Withholding | 104.85 | 8,827.02 |
| Fed MED/EE | 46.87 | 1,583.98 |
| Fed OASDI/EE | 200.43 | 6,772.88 |
| VA Withholding | 145.87 | 4,491.15 |
| **TOTAL:** | **498.02** | **21,675.03** |

**BEFORE-TAX DEDUCTIONS**

| Description | Current | YTD |
|---|---|---|
| COVACARE | 0.00 | 2,466.00 |
| Def Comp | 0.00 | 12,000.00 |
| HYB VDC | 0.00 | 4,267.08 |
| HVRMDB | 0.00 | 4,267.08 |
| HYB MDC | 0.00 | 1,066.80 |
| **TOTAL:** | **0.00** | **24,066.96** |

**AFTER-TAX DEDUCTIONS**

| Description | Current | YTD |
|---|---|---|
| **TOTAL:** | **0.00** | **0.00** |

**EMPLOYER PAID BENEFITS**

| Description | Current | YTD |
|---|---|---|
| Imp Life* | 0.00 | 975.24 |
| COVACARE | 0.00 | 12,336.00 |
| Def Comp | 0.00 | 240.00 |
| HYB VDC | 0.00 | 2,666.88 |
| HVRMDB | 0.00 | 13,356.00 |
| Grp Life | 0.00 | 1,258.80 |
| Ret Hlth | 0.00 | 1,194.84 |
| VSDP LTD | 0.00 | 533.40 |
| HYB MDC | 0.00 | 1,066.80 |
| ***TAXABLE** | | |

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current | 3,232.65 | 3,232.65 | 498.02 | 0.00 | 2,734.63 |
| YTD | 110,730.73 | 87,639.01 | 21,675.03 | 24,066.96 | 64,988.74 |

| YEAR-TO-DATE | PAID TIME OFF | SICK LEAVE |
|---|---|---|
| Start Balance | 0.0 | 0.0 |
| + Earned | 0.0 | 0.0 |
| + Bought | 0.0 | 0.0 |
| - Taken | 0.0 | 0.0 |
| - Sold | 0.0 | 0.0 |
| + Adjustments | 0.0 | 0.0 |
| **End Balance** | **0.0** | **0.0** |

**NET PAY DISTRIBUTION**

| | Account Type | Routing Number | Deposit Amount |
|---|---|---|---|
| Advice #000000066290596 | Checking | XXXXX0549 | 2,734.63 |
| **TOTAL:** | | | **2,734.63** |

**MESSAGE:**

**COMMONWEALTH OF VIRGINIA**

**OFFICIAL PAY RECORD**

**Commonwealth Savers Plan**
9001 Arboretum Parkway
N Chesterfield, VA 23236

| | |
|---|---|
| Pay Group: | SM1-Semimonthly Class (SUNSAT07) |
| Pay Begin Date: | 07/10/2025 |
| Pay End Date: | 07/24/2025 |

| | |
|---|---|
| Business Unit: | 17400 |
| Advice #: | **000000066372784** |
| Advice Date: | 08/01/2025 |

**ALEXANDER GRAY**
109 KENNONDALE LN
RICHMOND, VA 23226-2310

| | |
|---|---|
| Employee ID | 00794800100 |
| Department | 401-IT Operations and Development |
| Location | ARBORETUM NORTH CHESTERFIELD |
| Job Title | Development Director |
| Pay Rate | $8,889.79 Semimonthly |

| TAX DATA | Federal | VA State |
|---|---|---|
| Tax Status | Married | N/A |
| Allowances | N/A | 4 |
| Dependent Amount | 2,500.00 | N/A |
| Deductions | 1,805.00 | N/A |

**HOURS AND EARNINGS**

| Description | Current Hours | Current Earnings | YTD Hours | YTD Earnings |
|---|---|---|---|---|
| Annual Leave Payout | | 7,317.34 | | 8,137.94 |
| VRS Contribution Base | | 0.00 | | 115,567.27 |
| **TOTAL:** | **0.00** | **7,317.34** | **0.00** | **118,048.07** |

**TAXES**

| Description | Current | YTD |
|---|---|---|
| Fed Withholding | 1,609.82 | 10,436.84 |
| Fed MED/EE | 106.10 | 1,690.08 |
| Fed OASDI/EE | 453.67 | 7,226.55 |
| VA Withholding | 420.75 | 4,911.90 |
| **TOTAL:** | **2,590.34** | **24,265.37** |

**BEFORE-TAX DEDUCTIONS**

| Description | Current | YTD |
|---|---|---|
| COVACARE | 0.00 | 2,466.00 |
| Def Comp | 0.00 | 12,000.00 |
| HYB VDC | 0.00 | 4,267.08 |
| HVRMDB | 0.00 | 4,267.08 |
| HYB MDC | 0.00 | 1,066.80 |
| **TOTAL:** | **0.00** | **24,066.96** |

**AFTER-TAX DEDUCTIONS**

| Description | Current | YTD |
|---|---|---|
| **TOTAL:** | **0.00** | **0.00** |

**EMPLOYER PAID BENEFITS**

| Description | Current | YTD |
|---|---|---|
| Imp Life* | 0.00 | 975.24 |
| COVACARE | 0.00 | 12,336.00 |
| Def Comp | 0.00 | 240.00 |
| HYB VDC | 0.00 | 2,666.88 |
| HVRMDB | 0.00 | 13,356.00 |
| Grp Life | 0.00 | 1,258.80 |
| Ret Hlth | 0.00 | 1,194.84 |
| VSDP LTD | 0.00 | 533.40 |
| HYB MDC | 0.00 | 1,066.80 |
| ***TAXABLE** | | |

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current | 7,317.34 | 7,317.34 | 2,590.34 | 0.00 | 4,727.00 |
| YTD | 118,048.07 | 94,956.35 | 24,265.37 | 24,066.96 | 69,715.74 |

| YEAR-TO-DATE | PAID TIME OFF | SICK LEAVE |
|---|---|---|
| Start Balance | 0.0 | 0.0 |
| + Earned | 0.0 | 0.0 |
| + Bought | 0.0 | 0.0 |
| - Taken | 0.0 | 0.0 |
| - Sold | 0.0 | 0.0 |
| + Adjustments | 0.0 | 0.0 |
| **End Balance** | **0.0** | **0.0** |

**NET PAY DISTRIBUTION**

| | Account Type | Routing Number | Deposit Amount |
|---|---|---|---|
| Advice #000000066372784 | Checking | XXXXX0549 | 4,727.00 |
| **TOTAL:** | | | **4,727.00** |

**MESSAGE:**

# EXHIBIT P

## Termination-letter PDF properties

**Contents**

P1 is the preserved PDF-properties record for the June 30 termination letter, showing the recorded author, creation time, and modification time.

**Version note**

This exhibit reflects the copy maintained in Gray's records. Any additional version obtained from agency records or device backups will be preserved and compared with this copy. Any material discrepancy will be disclosed.

Commonwealth Savers

June 30, 2025

Zander Gray
109 Kennondale Lane
Richmond, Virginia 23226

Dear Zander,

This letter serves as confirmation that your employment with Commonwea
immediately due to job abandonment. As we have discussed to include m
permanent move to Utah and resulting inability to work in-office as this ro

Your final paycheck will be provided to you on July 16, 2025. Payment for
the allowable maximum will be paid on August 1, 2025.

Your health insurance benefits will continue through today, June 30, 2025
COBRA will be provided to you by mail from our plan administrator. **Please
in Cardinal to ensure receipt of these materials.** Enclosed you will find add
benefits including plan options and contact information for each. Note tha
plan administrator, as applicable or needed, to make any changes or elec

The following Commonwealth Savers property must be returned to human
**Please provide us with your address in Utah *by 5:00PM EST on Wednesda*
materials.**

- Computer(s)
- Monitor(s)
- Docking Station
- Keyboard/Mouse
- RSA Token(s)
- ID and Building Access Badge(s) & Office Keys
- Any other CSP property or materials.

Additionally, all Commonwealth Savers related applications must be remo
to include InTune and other related systems.

We wish you well in your future endeavors.

Sincerely,

*Carolyn Bishop*

Carolyn Bishop
Chief Operations Officer
Commonwealth Savers

CC: Mary Morris, Chief Executive Officer
Jessica Geis, Human Resources Business Partner
Chris McGee, General Counsel

Document Properties

Description | Security | Fonts | Custom | Advanced

Description

File: ZGray_correspondence_6 30 2025.pdf

Title:

Author: Jessica Geis

Subject:

Keywords:

Created: 6/30/2025 11:50:17 AM

Modified: 6/30/2025 11:51:54 AM

Application: Microsoft® Word for Microsoft 365

Advanced

PDF Producer: Microsoft® Word for Microsoft 365

PDF Version: 1.7 (Acrobat 8.x)

Location: C:\Users\Dad\Downloads\

File Size: 121.08 KB (123,986 Bytes)

Page Size: 8.50 x 11.00 in    Number of Pages: 1

Tagged PDF: Yes    Fast Web View: Yes

OK    Cancel

# EXHIBIT Q

## Termination-letter metadata screenshot

**Contents**

Q1 is the advanced-metadata screenshot for the termination-letter PDF. The screenshot preserves the metadata values as displayed.

**Version note**

This exhibit reflects the copy maintained in Gray's records. Any additional version obtained from agency records or device backups will be preserved and compared with this copy. Any material discrepancy will be disclosed.



ZGray_correspondence_6 30 2025.pdf

Description
Advanced

Advanced

PDF Properties (pdf, http://ns.adobe.com/pdf/1.3/)
pdf:Producer: Microsoft® Word for Microsoft 365
Dublin Core Properties (dc, http://purl.org/dc/elements/1.1/)
dc:format: application/pdf
dc:creator (seq container)
[1]: Jessica Geis
XMP Core Properties (xmp, http://ns.adobe.com/xap/1.0/)
xmp:CreatorTool: Microsoft® Word for Microsoft 365
xmp:CreateDate: 2025-06-30T11:50:17-04:00
xmp:ModifyDate: 2025-06-30T11:51:54-04:00
xmp:MetadataDate: 2025-06-30T11:51:54-04:00
XMP Media Management Properties (xmpMM, http://ns.adobe.com/xap/1.0/mm/)
xmpMM:DocumentID: uuid:3DC7C40A-7457-459F-86C5-474FFFBBFED1
xmpMM:InstanceID: uuid:b6f84a84-a4a8-4146-8765-c0365a4834c8

Powered By xmp

Replace... Append... Save... Delete

OK Cancel

Additional Metadata...

Number of Pages: 1

Fast Web View: Yes

Help OK Cancel

Commo[nwealth] Saver

June 30, 2025

Zander Gray
109 Kennondale Lane
Richmond, Virginia 23226

Dear Zander,

This letter serves as confirmati
immediately due to job abando
permanent move to Utah and r

Your final paycheck will be pro
the allowable maximum will be

Your health insurance benefits
COBRA will be provided to you
**in Cardinal to ensure receipt o**
benefits including plan options
plan administrator, as applicab

The following Commonwealth S
**Please provide us with your ad**
**materials.**

- Computer(s)
- Monitor(s)
- Docking Station
- Keyboard/Mouse
- RSA Token(s)

# EXHIBIT R

## August 27, 2025 Board and JLARC correspondence

**Contents**

R1 is Gray's complete retained copy of his August 27 letter to the Commonwealth Savers Board of Directors, copied to the Joint Legislative Audit and Review Commission. R2 contains the related certified-mail records.

**Limited purpose**

This exhibit documents the correspondence, the requests made in it, and the delivery information reflected in the mailing records. The letter's factual and legal characterizations are not submitted as independent proof of their truth.

**Version note**

This is the complete version maintained in Gray's records and believed to be the version mailed on August 27, 2025. Minor wording or formatting differences may exist among late drafts prepared that day. If an authenticated recipient copy is obtained, Gray will compare it with this retained version and promptly disclose and address any material discrepancy.

**COMMONWEALTH SAVERS BOARD NOTIFICATION PACKAGE**

**COVER LETTER**

August 27, 2025

Board of Directors
Commonwealth Savers
9001 Arboretum Parkway North Chesterfield, VA 23236 cc:
Joint Legislative Audit and Review Commission (JLARC)

**RE: Time-Sensitive Board Matter - Employment Claims**

Dear Board Members:

Enclosed please find:

1. Board notification letter regarding employment claims (4 pages)
2. Evidence documentation (4 pages)
3. EEOC Charge filing confirmation

This matter requires immediate board attention.

Please direct any discussions to Alexander Gray at the contact information provided.

Respectfully,

Alexander Gray

Alexander Gray
150 N Snow Canyon Dr Unit 19
Ivins, UT 84738 804-335-7579
zandergray1@gmail.com

**BOARD NOTIFICATION LETTER**

August 27, 2025

Board of Directors c/o
Corporate Secretary
Commonwealth Savers
9001 Arboretum Parkway
North Chesterfield, VA 23236

**RE: Request for Board Investigation - Employment Claims**

Dear Board Members:

I seek your intervention to address employment claims that present legal, financial, and reputational risks for Commonwealth Savers. As fiduciaries, you have the authority and duty to investigate these matters.

**The Situation**

For five years, I successfully served as Director of IT Development at Commonwealth Savers, managing 20+ employees across multiple states and leading critical technology initiatives. My performance was consistently rated positively, including an 'On Target' review in February 2025. That changed after I disclosed my wife's bipolar disorder and our need to relocate to Utah for family support during her mental health crisis.

On June 30, 2025, I was terminated hours after submitting a PTO request for family medical reasons. The termination followed months of escalating conflict after my disability disclosure.

The issue is not whether directors may be required to work in-office. The issue is that unwritten 'practices' were selectively enforced after I requested disability-related accommodation.

**Recorded Admissions**

On June 5, 2025, in a recorded conversation, Chief Engagement Officer Debbie Allan confirmed there were no written policies preventing my requested accommodation - a hybrid arrangement allowing me to work from Utah while traveling to Richmond regularly for important meetings:

- "There is no policy restricting managers from working remotely or living out of state."
- "The restriction on directors working remotely is also a guideline rather than a written policy."
- "There is no policy that requires employees have Virginia state residency."
- "Tuesday-Wednesday-Thursday is our recommendation."
- "It's a practice, not a policy."

Despite these recorded admissions that no written policies prevented Commonwealth Savers from accommodating my request to relocate to Utah, undocumented, unwritten, and fabricated 'practices' and 'recommendations' were enforced — I was terminated 25 days later.

**The Impossible Arrangement**

The contrast was stark. Under Mike Henry (CTO), I was approved to work remotely from Utah for multiple weeks in April and May 2025 with his text stating: "Two weeks is fine. When remote working, please stay engaged." This arrangement worked successfully with no operational issues. When I later disclosed this to Chief Engagement Officer Debbie Allan, she admitted "Mike shouldn't have done that" — revealing my weeks of successful remote work contradicted their performance claims.

However, once I began reporting directly to Carolyn Bishop in May 2025, she immediately ended this working arrangement. Management then approved me to work from Utah ONLY on Mondays and Fridays. For Tuesday-Wednesday-Thursday, I was required to be physically present in Richmond or use PTO — no exceptions, even during my wife's medical crisis.

This meant weekly flights costing over $600, plus hotels and meals, totaling $4,500+ monthly out of pocket. When I explained this was financially and logistically impossible while caring for a spouse in mental health crisis, they told me to use PTO for any Tuesday-Wednesday-Thursday I couldn't be in Richmond.

This impossible financial burden constituted constructive discharge — forcing resignation through intolerable conditions. When an employer makes continued employment contingent on $4,500 monthly personal expenses they know the employee cannot afford, while having already approved the same arrangement for others, that is both discrimination and retaliation designed to force resignation.

As Carolyn stated in her June 13 email: "further remote work from Utah is not authorized" and "any future days for which you are unable to come to the Arboretum due to travel to Utah would require the use of PTO." This arrangement sent a clear message: abandon your wife or abandon your job. The mental anguish of being forced to choose between my family's medical needs and my livelihood was devastating

**The Chad Bailey Precedent**

When my direct report Chad Bailey requested relocation to Colorado for personal preference, management denied Colorado due to "labor laws" but indicated Utah would be "feasible" and "easy" to accommodate. Text confirmation stated: "Utah is a go." The company determined Utah was operationally feasible for personal preference. The same accommodation cannot be 'feasible' for personal preference but 'infeasible' for disability-related need. This is textbook discrimination — approving identical arrangements for personal reasons while denying them for protected disability accommodation.

**Policy Contradiction**

Commonwealth Savers' telework policy explicitly states remote work 'may be considered a reasonable accommodation under the ADAAA.' Yet when I requested this accommodation for my wife's disability, management stated: 'The ADAAA does not require accommodations for caregivers.' The company would accommodate an employee with bipolar disorder but refused to even consider the same accommodation for an employee caring for a spouse with bipolar disorder.

**Timeline of Retaliation**

On February 13, 2025, my annual performance review was 'On Target' - personally reviewed and approved by COO Carolyn Bishop. In February, I disclosed to Mike Henry that my wife had bipolar disorder and our situation was 'a matter of life and death.' On March 19, 2025, just weeks after this disability disclosure, Carolyn Bishop suddenly claimed I was 'unreachable' and escalated my office requirement from 2 days per month to 3 days per week — a 600% increase making Utah accommodation impossible.

**Termination Meeting**

In a recorded meeting on June 27, 2025, executives admitted 'we've already walked through all of this with counsel' before giving me a termination ultimatum. During this meeting, they offered to extend my benefits through August if I resigned immediately. When I suggested a reasonable severance to avoid complications for both parties, they dismissed it. They gave me until end of day to resign or face immediate termination.

**Benefits Manipulation**

I refused to resign. On June 30, I was terminated for 'job abandonment' just hours after requesting PTO for 'family medical reasons'. Choosing June 30 termination instead of July 1 deliberately stripped an additional month of health coverage during my wife's mental health crisis.

**Legal Exposure**

**Claims Against Commonwealth Savers:**

- **Associational Disability Discrimination (ADA):** Adverse action based on spouse's disability
- **Retaliation:** Termination following protected accommodation requests
- **Constructive Discharge:** Intolerable conditions forcing resignation

**Individual Liability Under Section 1983:**

- **Constitutional Violations:** Equal protection and due process deprivations

- **Personal Assets at Risk:** No sovereign immunity in individual capacity (*Hafer v. Melo*) **Institutional Liability:** With annual compensation of approximately $290,000 (base salary, retirement contributions, and benefits), liability grows at more than $24,000 per month.

**Personal Liability:** Individual executives — including Mary Morris, Carolyn Bishop, and Debbie Allan — face uncapped personal damages beyond institutional protections under Section 1983. When sued in their individual capacities for constitutional violations, state officials have no sovereign immunity protection. *Hafer v. Melo*, 502 U.S. 21 (1991). This risk cannot be shifted to the agency, and their personal assets are at risk.

**Reputational Impact:** As the agency that administers ABLEnow, a national disability savings program, litigation would undermine public trust in your mission to serve families affected by disability. This matter has been copied to JLARC for their awareness of potential institutional governance concerns.

**Request for Board Action**

I respectfully request the Board immediately:

1. **Investigate** these employment practices
2. **Review** the executive decisions that led to my termination
3. **Determine** what remedial action is appropriate
4. **Address** the harm caused to me and my family

Your leadership caused tremendous suffering to my wife during her mental health crisis. The evidence is documented. The violations are undeniable. What will you do about it?

**Settlement Alternative**

While I believe a thorough investigation would validate these claims, I remain willing to discuss a professional resolution that would avoid protracted proceedings for all parties. Given the evidence, exposure, and damages outlined above:

**Primary Resolution:** $900,000 inclusive of all claims, damages, and attorneys' fees, with full release of all claims, confidentiality, and no admission of liability.

**Expedited Resolution (14-Day Acceptance)**: If Commonwealth Savers responds by September 12, 2025 at 5:00 PM EST with full settlement authority, I will accept $650,000 on the same terms, recognizing the value of prompt resolution.

Both options cost substantially less than defending litigation through trial, eliminate personal liability exposure for your executives, and avoid reputational damage to ABLEnow's administrator.

If the Board does not respond with settlement authority by September 12, 2025, I will file Section 1983 claims against Mary Morris, Carolyn Bishop, and Debbie Allan individually. Under *Hafer v. Melo*, they face unlimited personal liability without sovereign immunity protection.

**Conclusion**

The recorded evidence and documented timeline speak for themselves. I remain committed to a professional resolution of this matter.

Respectfully,



Alexander Gray
150 N Snow Canyon Dr Unit 19
Ivins, UT 84738 804-335-7579
zandergray1@gmail.com

Enclosures: EEOC Charge No. 438-2025-02440, Evidence Documentation

**EVIDENCE DOCUMENTATION**

**BACKGROUND**

As Director of IT Development for five years, I maintained exemplary performance while successfully managing hybrid and remote work arrangements. I managed 20+ employees across multiple states:

- 8 fully remote contractors nationwide
- 3 employees fully remote in Pennsylvania, Florida, and Northern Virginia
- All Richmond-based team members worked remotely except 2 days per month
- All meetings conducted via Teams even on office days
- 5 years of successful remote team transformation

**CRITICAL TIMELINE OF EVENTS**

| Date | Event | Significance |
|---|---|---|
| 2020-2024 | Fully remote during COVID with exceptional performance | Established remote work success |

| | | |
|---|---|---|
| Post-COVID | Required office attendance every other Thursday (2 days/month) | Minimal office requirement |
| February 2025 | Disclosed wife's bipolar disorder and 'matter of life and death' situation to Mike Henry | Protected disability disclosure |
| February 13, 2025 | Performance Review: 'On Target' - Supervisor: Mike Henry, CTO; Reviewed/Approved: Carolyn Bishop - 'Communication is incredibly important and I appreciate him working on it' | COO Bishop personally approved positive review |
| March 2025 | Applied for CTO position after Mike's retirement announcement | Career advancement attempt |
| March 19, 2025 | 'Anonymous complaints' + office increased to 3 days/week - Same COO who approved 'On Target' review now claims 'unreachable' | Retaliation 5 weeks after positive review (600% increase) |
| May 2025 | Approved Utah remote work Mondays/Fridays only; Required to use PTO for Tues-Wed-Thurs if in Utah | Designed to force resignation |
| May 6, 2025 | Formal accommodation request to CEO | 'You have tried this before' |
| June 5, 2025 | Chief Engagement Officer admits in recorded conversation: 'There is no policy restricting managers from working remotely'; 'It's a practice, not a policy'; 'Tuesday-Wednesday-Thursday is our recommendation' | Recorded evidence |
| June 13, 2025 | Carolyn Bishop email: "further remote work from Utah is not authorized"; Must use PTO for Tuesday-Wednesday despite family medical need; "the ADAAA does not require accommodations to be provided for caregivers" | Denial of accommodation |
| June 27, 2025 | Recorded termination meeting admissions: 'We've already walked through all of this with counsel'; Offered benefits extension to July/August if resigned; Laughed at reasonable settlement request; 'Resign or we will terminate you' | Bad faith + forced resignation attempt |
| June 30, 2025 | Terminated hours after PTO request for 'family medical reasons' | Retaliation |

**KEY EVIDENCE SUMMARY**

**1. Recorded HR Admissions (June 5, 2025)**

- No written policies preventing remote work
- Office requirements are "recommendations" and "practices"
- Telework policy allows ADAAA accommodations

**2. Documentation Contradictions**

- February 13: COO Bishop approves positive review
- March 19: Same COO claims "unreachable"
- Years prior: Utah approved for Chad Bailey's personal preference
- June 2025: Same Utah arrangement denied for medical accommodation

**3. Termination Meeting Recording (June 27, 2025)**

- Executives admit consulting counsel beforehand
- Offered extended benefits if resigned
- Ultimatum: Resign or be terminated

**4. Benefits Manipulation**

- Terminated June 30 vs July 1
- Deliberately eliminated additional month of healthcare
- During spouse's mental health crisis

**EEOC CHARGE FILING CONFIRMATION**

**EEOC Charge Number:** 438-2025-02440
**Filing Date:** August 16, 2025
**Status:** Active Investigation

**CLAIMS FILED**

- Disability (Associational): Adverse action based on spouse's mental health disability
- Retaliation: Termination following protected accommodation requests
- Additional Claims: Age-related considerations under investigation

**SIGNIFICANCE**

This EEOC charge filing triggers mandatory investigation with potential findings of:

- Reasonable Cause: Leading to civil rights enforcement action
- Pattern/Practice Investigation: Reviewing institutional bias policies

- Individual Liability: Personal exposure for named executives under Section 1983

Employment law proceedings are now in motion regardless of any discussions.

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Board of Directors c/o Mary Morris
Commonwealth Savers
9001 Arboretum PKWY
N. Chesterfield 23236

9590 9402 9436 5069 3386 53

2. Article Number (Transfer from service label)

9589 0710 5270 3132 2863 25

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature X Pamela Pert ☐ Agent ☐ Addressee

B. Received by (Printed Name) PAMELA PERT

C. Date of Delivery 9/8/25

D. Is delivery address different from item 1? ☐ Yes If YES, enter delivery address below: ☐ No

9001 ARBORETUM

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
Mail
Mail Restricted Delivery
00)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053 Domestic Return Receipt

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Scott Adams, State Comptroller
James Monroe Building
101 N. 14th st, 2nd Floor
Richmond, VA 23219

9590 9402 9436 5069 3386 15

2. Article Number (Transfer from service label)

9589 0710 5270 3132 2863 63

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature X Nissi S ☐ Agent ☐ Addressee

B. Received by (Printed Name)

C. Date of Delivery 09/09

D. Is delivery address different from item 1? ☐ Yes If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
Mail
Mail Restricted Delivery
0)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053 Domestic Return Receipt

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

SCOTT FLEMING
SCHEV
101 N 14th St. 9th floor
RICHMOND, VA 23219

9590 9402 9436 5069 3392 85

2. Article Number (Transfer from service label)

9589 0710 ... 2864 31

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature X Virginia Bennett ☐ Agent ☐ Addressee

B. Received by (Printed Name) Virginia Bennett

C. Date of Delivery 9/9/25

D. Is delivery address different from item 1? ☐ Yes If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
Mail
Mail Restricted Delivery
(over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053 Domestic Return Receipt

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

COMMONWEALTH SAVERS
BOARD MEMBERS
9001 ARBORETUM PKWY
N. CHESTERFIELD, VA
23236

9590 9402 9436 5069 3432 51

2. Article Number

958...

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature X Pamela Pert ☐ Agent ☐ Addressee

B. Received by (Printed Name) PAMELA PERT

C. Date of Delivery 9/8

D. Is delivery address different from item 1? ☐ Yes If YES, enter delivery address below: ☐ No

9001 ARBORETUM

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
...onfirmation
...elivery

PS Form 3... Domestic Return Receipt

# EXHIBIT S

## Application Development Director job posting

**Contents**

The complete 16-page archived-webpage capture of the Application Development Director posting identified by Gray as the posting to which he applied.

**Source and pagination**

The source capture is reproduced in full, including its original page breaks and navigation pages. References to this posting's physical pages identify pages of that 16-page source capture, excluding this cover. PDF bookmarks also identify the substantive posting sections.

The Wayback Machine - https://web.archive.org/web/20191206175140/https://www.virginia52...
Skip to main content

Toggle navigation Virginia529 Search

# Application Development Director

## Summary

As the largest 529 plan in the nation, Virginia529 helps students dream, save and achieve. We offer a variety of programs to help families save for future education expenses. Every day we continue to provide value to our customers through program enhancements, technology improvements, and education and scholarship opportunities. Our employees are the heart of our organization's success, which is why we believe in promoting an engaging, positive, and rewarding workplace. Working for Virginia529 provides an opportunity to do meaningful work and contribute your talent to a collaborative organization.

We are seeking an experienced professional to join our team as an Application Development Director. This position will lead a talented development team and provide overall vision and leadership for the design, development, and implementation of the organization's applications development and analysis function.

### Apply

jobs.virginia.gov right arrow

- LinkedIn
- Print

**Primary Responsibilities:**

- Work with Information Technology leaders to develop overall IT strategy in the context of the Agency’s strategic plans, mission and goals.  Lead IT efforts to prioritize technical projects needed across the Agency.
- Provide leadership, management, and vision to the application development team by developing the team’s skills, addressing needs and requirements, establishing goals and expectations, and identifying any skill gaps to ensure the team has the resources necessary to achieve the Agency’s goals.
- Work with the security and IT operations teams to ensure that the Agency's applications are effectively secured and that risks are mitigated.
- Understand customer requirements and how they translate into application features. Maintain productive relationships with business leaders across the Agency.
- Define and enhance methodologies and standards for the application life cycle in line with best practice and practical experience of continuous improvement.
- Provide support and facilitate innovative and experimental application work to test new ideas. Investigate new technology and incorporate into development.
- Lead overall development strategy and roadmap focusing on both short and long term business needs including: testing, release of software upgrades and modifications, as well as reports for the division.
- With IT operations, ensure development and implementation of code and servers are optimized so that they function appropriately in production and automate the handoff of code releases from development to operations (DevOps).

**Knowledge, Skills, and Abilities:**

- An undergraduate or postgraduate degree in computer science, engineering, mathematics, or a related field.
- Ten years of experience in: Software design/development, mobile applications, application architecture, project management, software as a service (SaaS), software integration, automated software testing, data management/governance, business intelligence, security and/or business process analysis. An equivalent combination of relevant education and experience may be considered.
- 5+ years of demonstrated leadership and management experience with high-performing, cross-divisional teams in an Agile environment
- Experience programming in multiple languages including, but not limited to: C, SQL, PL/SQL, UNIX/Linux, Perl, PHP, Java, JavaScript and HTML
- A thorough understanding of strategic IT development business objectives and the ability to drive results toward those objectives.
- Knowledge of DevOps principles and frameworks.
- Knowledge of current development practices, tools, and methodologies including agile development
- Broad knowledge of current technology and best practices in its use including: software development, information security, project management and business process improvement
- Knowledge of complex data security requirements, regulations, and trends
- Experience with Ellucian (formerly SunGard) Higher Education Banner software or other Oracle based application a plus

**Work Environment:**

- Typical office environment with considerable time in a sitting, stationary position. Must move about the office to attend meetings.
- Constantly operate a computer and other office equipment including typing and keying
- Frequently communicate with team members; must be able to exchange accurate information accordingly
- Occasional travel required

**Apply**

Case 3:25-cv-00742-RCY Document 38-1 Filed 09/23/26 Page 127 of 168 PageID#
1084

jobs.virginia.gov

- [LinkedIn]
- [Print]

**Current Openings**

Application Development Director

Document 48-2 Filed 10/30/26 Page 132 of 168 PageID# 1769

×

**Search**

Custom Search

**You are leaving Virginia529.com and headed to a third party site:**

That site may have a privacy policy and security that is different from Virginia529's website. Virginia529 is not responsible for the products, services, and content on the third-party site.

Do you want to continue to the third-party site?

Cancel Continue

# EXHIBIT W

## CSP's July 6, 2026 EEOC position statement

**Contents**

The complete 11-page employer position statement. Selected supporting records are separately identified in Exhibits X, Y, and AA.

**Source note**

Reproduced from the employer's position-statement PDF maintained with the EEOC materials.

HUNTON ANDREWS KURTH

HUNTON ANDREWS KURTH LLP
RIVERFRONT PLAZA, EAST TOWER
951 EAST BYRD STREET
RICHMOND, VIRGINIA 23219-4074

TEL 804 • 788 • 8200
FAX 804 • 788 • 8218

C. RANDOLPH SULLIVAN
DIRECT DIAL: 804-788-8399
EMAIL: rsullivan@huntonak.com

FILE NO: 122810.17

July 6, 2026

**Via EEOC Portal**

Mr. Daron Calhoun
Equal Employment Opportunity Commission
Richmond District Office
Richmond, Virginia 23219

Alexander Gray v. Commonwealth Savers Plan
EEOC Charge No. 438-2025-02440

Dear Mr. Calhoun:

As you know, our firm represents Commonwealth Savers Plan ("Commonwealth Savers") with respect to the above Charge of Discrimination ("Charge") filed by former employee Alexander Gray ("Gray"). This will serve as Commonwealth Savers' Position Statement[1] in response to the Charge.

In his Charge, filed on May 26, 2026, Gray alleges that he was "subjected to discriminatory terms and conditions of employment because of [his] association with a person with a disability and terminated in retaliation for opposing disability-based discrimination, in violation of the Americans with Disabilities Act of 1990." Specifically, Gray alleges that Commonwealth Savers employed him as the Director of Application Development in 2020, that after he informed his employer "of his wife's disability" in February 2025, Commonwealth Savers changed his "remote work arrangement" on March 19, 2025, so that he had to be physically present in the office three (3) days per week," that he opposed disability-based unequal treatment on June 23, 2025, and that he was terminated from employment on June 30, 2025.

As set forth in detail below, Gray's allegations have no factual or legal merit. As an initial matter, Gray's Charge is time-barred because he did not file his Charge until May 26, 2026, which was more than a year after he alleges his in-office work schedule was changed and eleven (11) months after his employment was terminated. This was well beyond the 300 day allowable period for filing a charge with the EEOC and/or the Virginia Office of Civil Rights. His Charge, therefore, must be dismissed.

---

[1] Commonwealth Savers reserves all available defenses in this case, including without limitation any and all objections regarding timeliness or jurisdictional matters.

Moreover, regardless of the timeliness of Gray's Charge, Commonwealth Savers did not in any way discriminate or retaliate against Gray in violation of the ADA. His alleged "association with a person with a disability" had ***nothing at all to do*** with his work schedule or his termination from employment.[2] Gray was in a Director role for Commonwealth Savers and directly managed about 10 employees. Commonwealth Savers, an independent agency of the Commonwealth of Virginia with its office in Richmond (specifically, North Chesterfield), requires that managers physically work in the office at least three (3) days per week.[3] This requirement is in place to promote effective communication and engagement between managers with their direct reports, with other department leaders, and with other stakeholders of the Agency, among other reasons.

Despite being keenly aware of this requirement, around late April 2025, Gray notified Commonwealth Savers he was heading with his wife to Utah, where her family lived, to find temporary housing for her. Commonwealth Savers leadership granted him extensive flexibility on a short-term basis, allowing him to work remotely for several weeks and to take paid time off so that he could initially navigate getting his wife settled with family in Utah. Commonwealth Savers also alerted Gray on multiple occasions to the availability of taking leave under the Family and Medical Leave Act ("FMLA"), but Gray declined to apply for such leave.

Ultimately, Gray told Commonwealth Savers he was relocating to Utah, requested to work remotely from Utah, and expressly told Commonwealth Savers leadership that he was ***not*** going to be able to comply with the in-office attendance requirement for managers. Commonwealth Savers has never allowed a manager to relocate to a different state and work remotely. Based on Gray's refusal or inability to comply with the in-office attendance requirement, which applied equally to all managers, Commonwealth Savers told him on June 27, 2025, that he would either need to resign or his employment would be terminated. Commonwealth Savers offered to give him a one month notice period, allowing him to resign effective August 1, 2025, which would have provided an additional period of pay and benefit coverage for him. Gray initially verbally accepted this resignation offer, but when he did not timely provide the requested written confirmation that he was accepting this offer, Commonwealth Savers terminated his employment on June 30, 2025.

Commonwealth Savers' application of its uniformly applied in-office attendance requirement for managers was straightforward and legitimate. Commonwealth Savers did not in any way discriminate or retaliate against Gray and respectfully requests that Gray's Charge be dismissed.

---

[2] Commonwealth Savers notes that, contrary to Gray's allegation in his Charge and as discussed further below, he did not provide notice of his wife having a health issue until late April or May 2025, well after he alleges Commonwealth Savers changed his office work schedule.

[3] As described below, Commonwealth Savers' Chief Technology Officer (Gray's direct supervisor) temporarily granted Gray an exception to this requirement so that he only had to physically work in the office one (1) day per week, but Commonwealth Savers revoked this exception on March 19, 2025, due to concerns with Gray's performance.

Mr. Daron Calhoun, EEOC
July 6, 2026
Page 3

## I. Background

***Commonwealth Savers and its EEO Policy***

Commonwealth Savers Plan (formerly, Virginia College Savings Plan dba Virginia529) is a body politic and corporate and an independent state agency of the Commonwealth of Virginia. Its office is located at 9001 Arboretum Parkway, North Chesterfield, Virginia, 23236. Commonwealth Savers administers Virginia's 529 college savings programs: Invest529, Prepaid529®, CollegeWealth®, and CollegeAmerica®. Both the Prepaid529 and CollegeWealth programs are closed to new customers. In addition to these 529 programs, Commonwealth Savers also administers ABLEnow®, a program for individuals with certain disabilities, and RetirePath Virginia$^{SM}$, a program for certain private sector Virginia employees who do not have access to a retirement plan at work.

Commonwealth Savers is an Equal Opportunity Employer and does not tolerate discrimination in the workplace based on disability or any other protected trait. Commonwealth Savers' policy explicitly prohibits discrimination based on disability and likewise prohibits retaliation. (*See* Exhibit A – *Equal Employment Opportunity Policy*, *Discrimination and Harassment Prohibited*, and *Accommodations for Employees with Disabilities*).

***Commonwealth Savers' In-Office Work Requirement for Managers***

Prior to March 2020, when the COVID pandemic began, Commonwealth Savers' expectation for its managers (i.e., those who directly supervise other employees) was that they physically work in the Commonwealth Savers office five (5) days a week (obviously unless they were out of the office for some business reason). Greater flexibility for remote work was allowed during the pandemic, although some managers still continued to work in the office every workday during that time. As the pandemic period subsided, in late 2022, Commonwealth Savers announced its expectation for in-office work schedules that would begin January 1, 2023. Specifically, the core in-office workdays would be Tuesday, Wednesday and Thursday, with Monday and Friday being the typical remote workdays, although the specific in-office workdays might vary. Managers were expected to physically work in the office at least three (3) days each week, and "individual contributors" (i.e., employees who do not directly supervise others) were generally expected to physically work in the office at least two (2) days per week.

Specific to managers, the in-office work requirement is designed to promote effective communication, collaboration and engagement between the manager and their direct reports, providing important opportunities for mentoring, training and feedback, among other things. The requirement is also in place to promote face to face time and effective communication between the manager and other department leaders and agency stakeholders (i.e., vendors, other involved parties) to help ensure understanding and teamwork on important Agency initiatives and goals.

Mr. Daron Calhoun, EEOC
July 6, 2026
Page 4

Commonwealth Savers does have a Telework Policy. (See Exhibit B, *Telework*) The fundamental assumption is that employees work onsite in the office unless a Telework Agreement is reached and approved by an employee's manager. Regardless of the Telework Policy, the expectation remains in place that all managers physically work in-office at least three (3) days a week. No manager has ever been allowed to relocate to a different state and work remotely.

***Background Concerning Gray's Employment with Commonwealth Savers***

Gray began employment with Commonwealth Savers in March 2020, serving as the Director of Application Development within the IT department.[4] The Development team is responsible for developing, implementing and maintaining the customer-facing software applications that allow customers to electronically invest in, withdraw from, and otherwise interact with their 529 college savings plans. As Director of this team, Gray was in an important position. He was a manager directly supervising approximately ten (10) employees and also had responsibility for overseeing a number of external contractors. Gray's direct supervisor was the Chief Technology Officer ("CTO"), and the CTO in turn reported to the Chief Operations Officer ("COO"). For most of Gray's employment, Mike Henry ("Henry") was the CTO and Gray's direct supervisor. Carolyn Bishop ("Bishop") was the COO the entire time that Gray was employed at Commonwealth Savers.

As Director of Application Development, one of Gray's key duties was to regularly engage with the employees on his team in order to ensure they were on target with their projects, had the information and resources they needed to be successful with their work, and also to provide mentoring, advice and feedback to them, among other things. Gray also needed to routinely engage with other Commonwealth Savers leaders and stakeholders to ensure effective alignment and sharing of information on business needs, projects, budgets, goals and the like.

***The In-Office Work Requirement for Managers and Commonwealth Savers' Denial of Gray's Initial Requests to Relocate and Work Remotely***

As described above, Commonwealth Savers announced its "return to office" expectation in late 2022 after the COVID pandemic, with managers required to physically work in the office at least three (3) days every week starting the beginning of 2023. Consistent with this, and clearly showing his understanding of the requirement, Gray executed a Telework Agreement with Commonwealth Savers effective January 1, 2023, establishing that he would physically work in the office on Tuesday, Wednesday and Thursday of every workweek. (See Exhibit C, *Telework Agreement)*. This Telework Agreement, on its face, had a one-year effective period (January 1, 2023 – January 1, 2024), but in reality it was simply capturing the minimum in-office work requirement Commonwealth Savers expected from Gray (and all managers) regardless of whether or not such a Telework Agreement was in place.

---

[4] The Human Resources/internal title for this position is Development Director.

Over time, even during the term of the Telework Agreement, Gray was either unable or unwilling to comply with the in-office work expectation, often working remotely on days that were scheduled for the office and not meeting the in-office requirement. In addition, for some reason, when Gray was on virtual meetings with his team members or with Agency leaders/stakeholders, he often would not turn on his camera so that he was not visible to the other participants. There were also concerns that he sometimes was not an active participant in such virtual meetings and that he would still be listed as being in a meeting well after it had ended. Both Henry (CTO) and Bishop (COO) asked Gray numerous times to turn on his camera in such meetings. They reminded Gray that leaders having their cameras on during virtual meetings fosters better engagement and communication, sets the tone for his team members, and was expected by the Agency. However, Gray routinely failed or refused to turn on his camera.

Henry and Bishop also both reminded Gray several times that he needed to meet regularly with other Agency leaders and stakeholders in person during his in-office days. As described, an integral part of Gray's role as Director of Application Development involved collaborating with key leaders and stakeholders in order to understand business needs and ensure effective alignment and sharing of information. However, Henry and Bishop realized over time that Gray was not regularly having these meetings.

Despite these concerns with Gray's performance, Henry worked to be flexible with Gray on the in-office requirement. Henry allowed Gray for a period of time (e.g., 2024) to reduce his in-office presence to just one day per week. Specifically, Henry set Gray's schedule so that Gray was supposed to be in the office every Thursday. Even with this limited requirement, Gray still often failed to come in on the one scheduled in-office day per week, sometimes citing unexpected issues that seemed to Henry to regularly arise on Thursdays when Gray was supposed to be in the office.

It is important to highlight that twice in 2024, Gray raised the possibility that he and his wife might move from Richmond to a distant location, and he asked about the possibility of maintaining his Director position and working remotely. Commonwealth Savers told him on both occasions that he could ***not*** do this. First, in approximately May 2024, Gray mentioned that he and his wife were thinking of moving to Florida. He indicated they were about to finish fixing up their house in Richmond and were planning for where to move next. Commonwealth Savers told him that as a Director/manager within the Agency, he could ***not*** live in Florida and work remotely, both because of the weekly in-office work requirement applicable to managers and because of concerns about a Director-level employee of a Virginia state agency living in Florida. Gray tried again in about October 2024, stating that he and his wife had completed their house fix-up project and were thinking about moving to the Eastern Shore of Virginia. He again asked about doing this and being allowed to work remotely. Commonwealth Savers told Gray he would not be allowed to do this, once again reminding Gray of the weekly in-office work requirement for managers.

***The March 19, 2025 Meeting with Gray Concerning Performance Concerns***

As COO, Carolyn Bishop's role involves overseeing all of the internal administration of Commonwealth Savers, including Finance, IT, and Administration, among other departments. In this process, she relies upon the various Directors and leaders to communicate effectively with her and with each other and timely provide needed business information. Bishop had worked with Gray since he began employment with Commonwealth Savers and, as noted above, had had some prior concerns that he was not engaging enough with other leaders/stakeholders, including his refusal or failure to turn on his camera during virtual meetings and sometimes not being an active participant in such meetings. She also had concerns that he was not timely responding to her requests for business information or completing other business projects.

Bishop's concerns in this regard continued in late 2024 and early 2025. For example, on September 30, 2024, Bishop asked Gray to provide her with the staffing/work plan for Gray's Development team for the 2025 year. (See Exhibit D, *March 19, 2025 Email from Mike Henry to Gray*). She needed this information for strategic planning, goal setting and budgeting purposes. (*Id.)* Three months later, in early January 2025, Bishop asked Gray again for this information, as she was getting ready for leadership discussions. (*Id.*) On March 17, 2025, another two months later, Bishop reminder Gray again that she still had not received the information. (*Id.*)

Also in early 2025 (specifically, late January), Mike Henry, CTO and Gray's direct supervisor, announced his retirement, scheduled for May 2025. Bishop, as part of the process for hiring Henry's replacement, held meetings with almost all of the IT and Technical Business Team employees and managers in February and March, including all but one of the Development Team members directly supervised by Gray (one employee did not make his meeting), in order to get feedback concerning what they were looking for in the new Chief Technology Officer that would be hired to replace Henry. Jessica Geis ("Geis"), who had just started employment with Commonwealth Savers as a Human Resources Business Partner around the time Henry announced his retirement, joined Bishop in these meetings. Geis was going to be helping with hiring the new CTO and also wanted to use the meetings as a way to get to know employees she was going to be working with.

During these meetings, unsolicited by Bishop and Geis, a number of Gray's Team members volunteered negative information about Gray's availability, including comments that he sometimes was not reachable or they did not where he was, or he often would not turn his camera on in meetings. Some employees outside of Gray's team volunteered that he was hard to get in touch with. Separately, another senior manager told Henry in March that Gray had not met with him/her in months.

Mr. Daron Calhoun, EEOC
July 6, 2026
Page 7

Based on all of this, Bishop, Henry and Geis met with Gray on March 19, 2025, to discuss the various performance concerns. Gray actually started the meeting by acknowledging that there were work items he had not timely gotten to Bishop. Henry led the discussion, emphasizing to Gray the concern that he needed to be accessible to employees, needed to turn his camera on in meetings, and needed to regularly meet with other managers/stakeholders and participate in Agency meetings in person, in addition to timely completing projects and other duties. (See Exhibit D, *March 19, 2025 Email from Henry to Gray*). Based on these concerns and focus points, Henry instructed Gray that ***he needed to return to working in-office at least three days per week*** beginning April 1, 2025, and that he needed to be readily available to his team and to the organization. This was consistent with the in-office requirement ***that applied to all other managers***. (*Id.*) Henry sent Gray a lengthy email the same day capturing the points made during the meeting. (*Id.*)

***Subsequently, Gray tells Commonwealth Savers he is Moving to Utah with his Wife and will not be able to comply with the In-Office Work Requirement Applicable to Managers***

Shortly after the March 19, 2025 meeting, Gray made comments to both Bishop and Henry leading them to believe that he and his wife were separating or getting a divorce. For example, on April 1, 2025, the day Gray was supposed to resume his three days per week in-office schedule, he texted Henry and said, in part, "I have had a night of hell. . . . My wife is moving out today and I'm struggling." (See Exhibit E, *April 1, 2025 text from Gray to Henry*) Gray requested to take that day off and work the next three days in the office, and Henry said "no problem" for him to take paid time off ("PTO") that day. (*Id.*)

It was not until Friday, April 18, 2025, a month ***after*** the March 19 performance discussion meeting, that Gray first mentioned something to Henry to the effect that his wife was "not doing well." Gray did not say anything specific about his wife's health, however, and Henry still took the comment as referring to a divorce situation. On Sunday, April 20, Gray sent Henry a text again saying his wife was "not doing great" and they "had decided to get her much closer to her family." (See Exhibit F, *April 20, 2025 Text from Gray to Henry*). Gray continued that they "were headed out to Southern Utah to find temporary housing for her," and he asked to work remotely or take PTO for the next two weeks. (*Id.*). Henry responded that working remotely for two weeks "is fine," but added that Gray needed to "stay engaged and on camera when possible" while working remotely. (*Id.*). Henry also told Gray not to hesitate to use PTO if things got "hectic." (*Id.*).

Over the next two months (May and June), Bishop, Henry, Geis and others within Commonwealth Savers leadership spent a significant amount of time talking with Gray about his situation. Gray ultimately in about May disclosed that his wife was dealing with mental health issues. Over time, he made clear that his focus was on relocating with his wife to Utah, which apparently is where her other family is. Commonwealth Savers leadership allowed Gray to work remotely for several weeks in late April and May as he navigated getting his wife settled with family in Utah, allowed him to

use PTO as needed, and encouraged him multiple times to apply for Family and Medical Leave ("FMLA") to help in dealing with his wife's medical situation (which he declined). Commonwealth Savers reminded Gray on several occasions, however, that as a Director within the Agency, he was required, like all managers, to comply with the three days per week in-office attendance expectation (which had been clearly spelled out for him again in the March 19, 2025 performance discussion and email) (See Exhibit D, *Henry March 19, 2025 Email to Gray*).

For example, on June 5, 2025, Debbie Allan ("Allan"), head of the Human Resources team whose position title is Chief Engagement Officer, talked with Gray and sent him a lengthy email following up on their discussion. (See Exhibit G, *June 5, 2025 Emails between Allan and Gray*). Allan again highlighted for Gray the expectation that managers work in the office at least three days per week, with the preference being Tuesday-Thursday. (*Id.*). Gray was seeking to work remotely from Utah, and Allan emphasized both that every manager "works in the office three days per week" and that "[n]o manager has ever been allowed to relocate and work remotely." (*Id.*) Allan brainstormed with Gray the idea that maybe he could work a 4 day, 10 hour a day schedule where he worked in the office Monday through Wednesday, used Thursday as a travel day to get back to Utah, and then worked remotely on Friday. (*Id.*). Gray, while he appreciated the thought process, said this idea would not be feasible for him. (*Id.*).

Similarly, Bishop had an email exchange with Gray on June 13, 2025. (See Exhibit H, *June 13, 2025 mails between Bishop and Gray*). Gray requested to work remotely on his scheduled in-office days for the following week (June 16-20). (*Id.*). In her response, Bishop highlighted:

> *As we discussed during our meeting on May 27, 2025, **further remote work from Utah is not authorized given your director role with 10 direct reports**. While we were temporarily flexible as you initially navigated your wife's move to Utah, we explained that any future days for which you are unable to come to the Arboretum [Commonwealth Savers' office] due to travel to Utah would require the use of PTO. Accordingly, please use your PTO next week for the days you were scheduled to be in the office. You are correct that Thursday is a holiday, so PTO would only be necessary for Tuesday and Wednesday if you are working remotely Monday and Friday.*
>
> *As I believe you were notified earlier this week, the original FMLA eligibility notice that was sent to you has expired since you declined to return the paperwork, so please note that these absences are not FMLA protected in nature. If you would like to restart the process, please let Jessica or any member of the HR team know.*

(*Id.*) (emphasis added).

Ultimately, Gray made clear to Bishop and other leadership that he was permanently relocating to Utah and would not comply with the in-office work expectation for managers. For example, in a Monday, June 23 email to Bishop, Gray stated that his "wife's mental health treatment requires our permanent presence in Utah for essential family support." (See Exhibit I, *June 23, 2025 Emails between Gray and Bishop*). In her response, Bishop emphasized that "we have consistently informed you that we do not allow people leaders to work remotely from other states." (*Id.*). When she sent that email, Bishop received a "bounce back" response saying that Gray was out of the office from June 24-26 (the Tuesday-Thursday he would be expected to work in the office that week). Bishop texted Gray that she had sent him an email, noting that he had not let her know he was planning to be out of the office that week. (See Exhibit J, *June 23, 2025 Text exchange between Bishop and Gray*). Gray responded, "I believe I have clearly indicated that I need to be located in Utah and I am unable to come in the office on Tuesdays Wednesdays and Thursdays." (*Id.*).

Based on Gray's refusal or inability to comply with the in-office attendance requirement, which applied equally to all managers, Commonwealth Savers told him on June 27, 2025, that he would either need to resign or his employment would be terminated. Commonwealth Savers offered to give him a one month notice period, allowing him to resign effective August 1, 2025, which would have allowed him to work remotely during that time so that there was an orderly transition, and this would have provided an additional period of pay and benefit coverage for Gray. Gray initially verbally accepted this resignation offer in a discussion with Bishop, Geis and others, but when he did not timely provide the requested written confirmation that he was accepting this offer, Commonwealth Savers terminated his employment on June 30, 2025.

## II. Commonwealth Savers's Position

Commonwealth Savers did not in any way discriminate or retaliate against Gray.

***Gray's Allegations Are Time-Barred***

As already described above, Gray's Charge is time-barred because he did not file his Charge until May 26, 2026, which was more than a year after he alleges his in-office work schedule was changed (on March 19, 2025) and eleven (11) months after his employment was terminated (on June 30, 2025). This was well beyond the 300 day allowable period for filing a charge with the EEOC and/or the Virginia Office of Civil Rights. His Charge, therefore, must be dismissed.

Mr. Daron Calhoun, EEOC
July 6, 2026
Page 10

***Commonwealth Savers Terminated Gray's Employment Because he Refused to Comply with the In-Office Work Requirement that Applied Equally to All Managers***

Moreover, regardless of the timeliness of Gray's Charge, Commonwealth Savers did not in any way discriminate or retaliate against Gray in violation of the ADA. His alleged "association with a person with a disability" had ***nothing at all to do*** with his work schedule or his termination from employment. Gray moved with his wife to Utah in the April-June 2025 time period, requested to work remotely from there, and made clear to Commonwealth Savers that he was not going to comply with the universally applied expectation that managers work in the Commonwealth Savers North Chesterfield office at least three days per week. While Commonwealth Savers was flexible with Gray as he initially got his wife settled in Utah close to her family, allowing him to work remotely for several weeks and to use PTO as needed, Bishop, Allan and others consistently reminded Gray that as a Director within the Agency, he was required to comply with the three days per week in-office attendance expectation. (See Exhibit D, *Henry March 19, 2025 Email to Gray* (again spelling out the requirement); Exhibit G, *June 5, 2025 Emails between Allan and Gray* (highlighting the in-office expectation and emphasizing that every manager "works in the office three days per week" and that "[n]o manager has ever been allowed to relocate and work remotely."); Exhibit H, *June 13, 2025 mails between Bishop and Gray* (Bishop expressly stating that no further remote work from Utah will be authorized). Despite these clear instructions, when Gray made the choice to live in Utah and not to comply with the clear requirement, Commonwealth Savers told him he either needed to resign or be terminated. He did not timely accept the offered resignation offer and therefore his employment was terminated. (See *Tyndall v. Nat'l Educ. Centers, Inc. of California*, 31 F.3d 209, 214 (4th Cir. 1994) ("The ADA does not require an employer to restructure an employee's work schedule to enable the employee to care for a relative with a disability. *See* 29 C.F.R. § 1630, App. Because Tyndall's termination was not based on any assumption regarding future absences related to Kevin's care, but instead resulted from her record of past absences and her clear indication that she needed additional time off, we hold that Kee's actions did not constitute discrimination based on Tyndall's association with a disabled individual").

There was nothing discriminatory or retaliatory about Commonwealth Savers' straightforward application of its uniformly applied in-office attendance requirement for managers. This had nothing to do with him telling Commonwealth Savers that his wife was dealing with mental health issues. Importantly, as described, Gray had raised the idea of his relocating to places distant from Richmond (Florida and the Eastern Shore) two times before in 2024, ***well before any issue with his wife was raised, and had been told that it would not be allowed on both occasions***. And Gray's allegation that the March 19, 2025 performance meeting was somehow motivated by him disclosing his wife's mental health condition completely misses the mark. As described, he did not notify Commonwealth Savers leadership about his wife's health condition until ***well after*** that meeting. And regardless, the performance meeting was based on longer-running concerns with Gray not engaging in person with other leaders, not completing projects/tasks, not turning on his camera and

sometimes not actively participating in virtual calls and the recently learned information that employees, including his own team members, sometimes had difficulty finding him or getting in touch with him.

Finally, Gray's allegation that he "opposed disability-based unequal treatment on June 23, 2025" in an email with Bishop, and the termination of his employment was in retaliation for that is completely without merit. As described fully above, Gray already knew, well before that email, that he would not be allowed to work remotely from Utah. Allan had reminded him on June 5 about the in-office expectation, that every manager "works in the office three days per week" and that "[n]o manager has ever been allowed to relocate and work remotely." (Exhibit G, *June 5, 2025 Emails between Allan and Gray).* Bishop had expressly told him on June 13 that he would not be authorized to work remotely from Utah. (Exhibit H, *June 13, 2025 mails between Bishop and Gray*). And Bishop reiterated this in her June 23 response to Gray, saying, "we have consistently informed you that we do not allow people leaders to work remotely from other states." (Exhibit I, *June 23, 2025 Emails between Gray and Bishop*). Gray's decision to live in Utah and not meet the in-office work requirement led to his termination. His June 23 email had nothing to do with it.

For these reasons, Commonwealth Savers respectfully requests that Gray's Charge be dismissed.

Sincerely,

/s/C. Randolph Sullivan
C. Randolph Sullivan

# EXHIBIT X

## March 19, 2025 email memorandum

**Contents**

The four-page March 19, 2025 email memorandum concerning office attendance.

**Source note**

Physical pages 17-20 of the exhibits to CSP's July 6, 2026 EEOC position statement, reproduced as supplied.

**From:** Mike Henry
**To:** Zander Gray
**Cc:** Carolyn Bishop; Jessica Geis
**Subject:** Meeting 3/19/2025
**Date:** Wednesday, March 19, 2025 3:26:02 PM
**Attachments:** image001.png

Zander,

Thank you for meeting with us on 3/19/2025. The purpose of this email is to summarize our conversation.

As we discussed, the following concerns were noted:

- **Consistent and Reliable Availability**: It has been noted by various team members and leaders across the organization, that you are not consistently available or accessible. Additionally, though you are expected to be in office at least one day per week, those in-office days are not consistently taking place. Examples as we discussed include:
    - Recurring team concerns regarding availability and support
    - Frequent unexpected issues, arising frequently on Thursdays when you are to be in office
    - Inconsistent participation in and presence at Agency wide meeting in person

- **Timely Completion of Duties**: As we noted, there have been several projects, tasks, and/or duties you have been asked to complete that either haven't been completed or have been completed late. Examples as we discussed include:
    - On September 30, 2024, in a project meeting, the COO requested you send her the staffing/workplan for the development team for the year, especially with regards to the two development teams as the discussion centered around how both teams felt overloaded. In early January 2025, the COO requested this information from you again during a project meeting and stated that there are upcoming strategic planning and agency goal setting discussions for which she needs this data. On January 29th, she followed up with you for a status report on the estimation/best practices to ensure we have operational issues and/or other interjections to a workflow plan/sprints, etc. Part of the request was for you to show the extras above the agency goals and the "cost" to the team in resource time. She stated that she wanted to be armed with your thoughts for leadership discussions. On that day, you stated that the project manager sent you some information and that you would parse through it and try and get back with her the next day. You shared a quick update and a hunch, but no analysis. Again, you stated that the project manager sent over several reports that should help, and that you would start to comb through that the next day.

- On January 31st. The COO stated she wanted metrics around bugs and operational and production issues over the past several years and other relevant metrics that you recommended, and she asked if we were getting better at coding, having fewer bugs, etc. and you stated you would see what you could come up with. This was as it relates to the earlier requests for estimation and resource planning.
- On March 17th, the COO reminded you again that she had not received any of the requested information. You stated that you didn't believe you finalized it and stated you would get back in a bit. She requested that since you stated you had been working on it, including the industry benchmarks from the earlier conversations and all analysis as it relates to resource planning, she wanted it by COB that day. You sent a minimal amount of information at the end of the day that did not show much work effort, and it is not in a format that helps advance the development efforts for strategic planning that is needed and had been requested. It did not include your thoughts on our own development work, estimation, metrics around production issues, resource planning, etc. as had been requested. Given the time you had to work on this important issue after it was requested multiple times, it was difficult to see the value in what was sent. You asked for thoughts on what you had sent, and the COO shared with you that she was unable to see any of your conclusions or analysis to assist in the evaluation and reiterated what had been requested. The information received was not such that could be used in the strategic planning discussions coming up in the following week as had been stated several times. You then answered her concerns with additional information that has some analysis in it for her review.
- On February 13, the COO requested that since you had to miss the technical conversation with one alternative forms of payment vendor, to get with the staff who attended and learn how that went and get a high-level understanding of the overall potential path. In addition, she requested for you to provide her a comparative analysis/your thoughts for all three vendors from the development integration perspective as your department is extremely important to the success of the integrations for this project.

- **Failure to Follow Instructions**: Similarly, there have been several things asked of you with which you have failed to comply.
  - You have been asked on numerous occasions by both your supervisor as well as the COO to turn your camera on during virtual meetings. For example, on February 13, 2025, the COO shared her expectations that you be more present in the alternative forms of payments meetings, including turning on your

camera. This did not happen. She also stated that you should do so in other virtual meetings. This continues to be an issue even after multiple discussions and notes made in Namely. Leaders simply having cameras on during virtual meetings fosters better engagement and communication and is the expectation of the agency.

- Over the years, both the COO and the CTO have requested that you meet regularly with relevant agency stakeholders so that you understand the business needs and that should be done on your days in office for collaboration purposes. We understand that a few meetings were held, but they have stopped. An integral part of your role is to collaborate with key stakeholders.

As we also discussed, the following are our expectations of you moving forward effective immediately:

- You are to return to working in-office at minimum three days per week beginning April 1, 2025, to align with organizational expectations for manager-level positions. You are to work with your supervisor to determine what your schedule will be and adhere to that schedule. Any changes to your schedule must be communicated to and approved by your supervisor in advance. Please note that in the event of schedule changes, you may be expected to alter your in-office days the remainder of the week to maintain the three-day requirement.

- As a leader, you must be readily available and visible to your team and to the organization. You are expected to be on camera for virtual meetings. You are expected to meet with your team at least every two weeks and share with the CTO the general and career development discussions, and high-level concerns so that they can be evaluated and assisted as needed. In the event you are unable to attend any of those meetings, you are expected to reschedule to a mutually agreed upon date and time. Additionally, you are to ensure that your team is also meeting their in-office expectations, working at least one ***full*** day in office every other week. In addition, you are expected to meet regularly (at least once a quarter) with pertinent business leaders, the product owner and SIT members, and other business partners to discuss pain points and application development needs as has been discussed in the past. This information should also be shared with the CTO at the appropriate level.

- You should make every effort to meet with your supervisor every other week in person. Going forward if you are unable to meet in person on a regularly scheduled day, it is expected that the meeting be rescheduled to a mutually agreed upon date

and time. To each of these meetings you are to come prepared to discuss project status updates, any questions, issues or challenges you may be facing, as well as any other pertinent items needing discussion.

- You are expected to complete assignments in a timely manner and if you have concerns or questions, you immediately address them with the CTO.

Thank you for your prompt attention to these concerns. If you have any questions about any of the expectations noted above, it is your responsibility to communicate those questions directly to your manager.
We appreciate the work you do for Commonwealth Savers and look forward to seeing improvements in the items noted above.

Mike

Mike Henry | Chief Technology Officer

9001 Arboretum Parkway
North Chesterfield, VA 23236
Mobile: 804-937-7089
Direct: 804-786-0435

Invest529.com | ABLEnow.com | RetirePathVA.com

# EXHIBIT Y

## December 28, 2022 signed telework agreement

**Contents**

The three-page signed telework agreement.

**Source note**

Physical pages 13-15 of the exhibits to CSP's July 6, 2026 EEOC position statement, reproduced as supplied.

# Virginia529/ABLEnow Telework Agreement

This Telework Agreement dated 12/28 ______, 20 22 ("Agreement") between Virginia College Savings Plan ("Agency") and Zander Gray ______ ("Employee") constitutes an agreement on the terms and conditions of Employee's telecommuting.

Employee agrees to participate in telecommuting and to adhere to applicable guidelines and policies. Agency concurs with Employee's participation in telecommuting and agrees to adhere to applicable guidelines and policies. Employee agrees to participate in telecommuting for an initial period not to exceed one year, beginning 1/1/2023 and ending 1/1/2024.

**This Agreement may be extended beyond the initial one year period, if agreeable to the Agency and to the Employee. In such case, the terms of this Agreement will be reviewed and updated as necessary.**

Both the Agency and Employee acknowledge that a copy of the telework policy has been given to all parties involved and the Employee has read and agreed to the telework policy found in the Virginia529 Employee Handbook.

| | |
|---|---|
| **Main Location:** 9001 Arboretum Parkway, North Chesterfield, VA 23236 | **Telework Type:** ☐ Full-Time Emergency Telework<br>☐ Full-Time Telework<br>☑ Part-time/Hybrid Telework<br>☐ Ad Hoc/Limited Telework |
| **Alternative Locations/Addresses:** | |

**TELEWORK ARRANGEMENT TYPE [SELECT ONE ABOVE]**

**FULL-TIME:** EMPLOYEE TELEWORKS THEIR ENTIRE WORK SCHEDULE FROM THE ALTERNATE WORK LOCATION[S] DOCUMENTED IN THIS AGREEMENT. EMPLOYEE MAY TRAVEL TO OTHER OFFICES ON OCCASION

**FULL-TIME PANDEMIC:** EMPLOYEE TELEWORKS THEIR ENTIRE WORK SCHEDULE FROM THE ALTERNATE WORK LOCATION[S] DOCUMENTED IN THIS AGREEMENT *ONLY FOR THE DURATION OF THE EMERGENCY/PANDEMIC*

**PART-TIME/HYBRID:** EMPLOYEE CONSISTENTLY TELEWORKS 32 HOURS OR MORE PER MONTH, TYPICALLY ONE TO TWO DAYS A WEEK FROM AN ALTERNATE WORK LOCATION[S] DOCUMENTED IN THIS AGREEMENT

**AD-HOC/ LIMITED:** EMPLOYEE CONSISTENTLY TELEWORKS LESS THAN 32 HOURS PER MONTH ON A SPORADIC OR TASK DRIVEN BASIS. EMPLOYEE MAY BE EXPECTED AND/OR REQUIRED TO WORK IN A TELEWORK MODE FOR LIMITED PERIODS IN RESPONSE TO A SPECIFIC AGENCY NEED

**Hybrid Telework Pattern** – Document normal pattern of days and hours the Employee will telework each week

preference is to telework ☑ **MONDAY** ☐ **TUESDAY** ☐ **WEDNESDAY** ☐ **THURSDAY** ☑ **FRIDAY**

NORMAL WORK HOURS AT ALTERNATE WORK LOCATION WILL BE FROM 8 TO 5.

**Continuity of Operations "Emergency Closing Status" [select one]**

Employee ☑ IS or ☐ IS NOT

Expected to telework for the duration of an emergency pursuant to a pandemic and/or Employee's central workplace is closed due to natural or manmade emergency situations including, but not limited to: snowstorms, hurricane, act of terrorism, etc. If Employee is unable to telework during an emergency due to an illness or dependent care responsibilities, the Employee must take appropriate leave. In addition, the Employee may be asked and expected to report to an Agency central workplace, other alternative location, or be granted emergency authorization, on a case-by-case basis when other circumstances including, but not limited to, power failure or other events that prevent the Employee from teleworking at the alternative work locations listed above.

ABLEnow Virginia

**Section I: This Agreement constitutes the terms of the telework agreement for the following:**

**CONFIDENTIALITY/SECURITY**

1. Employee will apply approved safeguards, in accordance with Agency policy, to protect Agency or state records from unauthorized disclosure or damage.
2. Comply with the privacy and confidentiality requirements set forth in the Virginia529 Employee Handbook.

**WORK STANDARDS/PERFORMANCE**

1. Employee will meet with the supervisor to receive assignments and to review completed work as the supervisor deems necessary or appropriate.
2. Employee will complete all assigned work according to work procedures mutually agreed upon by the Employee and the supervisor, and according to guidelines and expectations stated in the Employee's performance plan.
3. Supervisor will evaluate Employee's job performance according to the goals and responsibilities as set by the supervisor.
4. Employee agrees to limit performance of his/her officially-assigned duties to the central workplace, customer site or Agency-approved alternate work location. Failure to comply with this provision may result in loss of pay, termination of this Agreement, and/or appropriate disciplinary action.

**COMPENSATION/BENEFITS**

1. All salary rates, leave accrual rates, and travel entitlements will remain as if the Employee performed all work at the central workplace.
2. Overtime must be approved in advance by the Employee's supervisor and will be compensated in accordance with applicable law and Agency policy.
4. Employee must obtain supervisory approval before taking leave in accordance with established office procedures. By signing this form, Employee agrees to follow established procedures for requesting and obtaining approval of leave.

**EQUIPMENT/EXPENSES**

1. Employee who uses Agency equipment agrees to protect such equipment in accordance with Agency guidelines. Agency-owned equipment will be serviced and maintained by the Agency and must be returned upon termination of this Agreement.
2. If Employee provides own equipment, he/she is responsible for servicing and maintaining it.
3. Neither the Agency nor the state will be liable for damages to an Employee's personal or real property during the course of performance of official duties or while using state equipment in the Employee's residence.
4. Neither the Agency nor the state will be responsible for operating costs, home maintenance, or any other incidental costs (e.g., utilities) associated with the use of the Employee's residence for telecommuting purposes.

**INITIATION AND TERMINATION OF AGREEMENT**

1. The Agency and Employee understand that telecommuting employment shall be governed by the same Agency policies as those applicable to employees at the Agency's central workplace except as modified by this Agreement.
2. Agency concurs with Employee participation in telecommuting and agrees to adhere to applicable policies and procedures.
3. Employee may terminate the telecommuting arrangement at any time unless it was a condition of employment. Two weeks' notice to the Agency is recommended.
4. Agency may terminate the telecommuting arrangement at any time. Two weeks' notice will be given to the Employee when feasible.

**SAFETY**

1. Employee is covered by the Commonwealth's Workers' Compensation Program or the Virginia Sickness and Disability Program (VSDP), as appropriate, if injured while performing official duties at the central workplace or alternate work location.
2. Employee agrees to bring to the immediate attention of his/her supervisor any accident or injury occurring at the central workplace or alternate work location.
3. Supervisor will investigate all accident and injury reports immediately following notification.
4. Employee agrees to complete the Safety Checklist below and agrees to appropriately maintain the safety features outlined at the alternate work location for the term of this Agreement.

**Safety Checklist**

| Safety Feature Verified at Alternate Work Location Listed Above | Yes | No |
|---|---|---|
| 1. Temperature, ventilation, lighting, and noise levels are adequate for maintaining a work location | ☒ | ☐ |
| 2. Electrical equipment is free of recognized hazards that would cause physical harm [frayed, exposed or loose wires; loose fixture; bare conductors; etc.] | ☒ | ☐ |
| 3. Electrical System allows for grounding of electrical equipment [ three prong receptacles] | ☒ | ☐ |
| 4. Alternate work location is free of any obstructions that could restrict visibility and movement [including doorways] | ☒ | ☐ |
| 5. File cabinets and storage closets are arranged so drawers and doors do not enter into walkways | ☒ | ☐ |
| 6. Phone lines, electrical cords, and surge protectors are secured under a desk or alongside a baseboard | ☒ | ☐ |
| 7. If materials containing asbestos are present, they are in good condition | ☒ | ☐ |
| 8. Work location space is free of excessive amounts of combustibles, floors are in good repair, and carpets are well secured | ☒ | ☐ |

By signing below the Employee, Supervisor and Agency agree to adhere to the terms of this Telework Agreement:

Employee Zander Gray Date 12/28/2022

Manager [signature] Date 1/6/2022

Division Head (or designee) [signature] Date 1/6/2023

ABLEnow Virginia529 3

# EXHIBIT Z

## June 23, 2025 text-message exchange

**Contents**

The screenshot of the text-message exchange concerning Gray's availability, the out-of-office notice, and Tuesday–Thursday office attendance.

**Source note**

Reproduced as supplied from physical page 38 (Exhibit J) of the attachments CSP submitted with its July 6, 2026 EEOC position statement.


3:57
5G
48
ZG
Zander
let me know. Feel better.
Hi Zander. Not sure if you remember that we are supposed to have an in person IT resources planning meeting tomorrow with lunch. will you be able to make it? Thank you.
I will not be able to be in person, but can dial in
Ok. Let me see what we can do. Will let you know tomorrow. Thank you.
I'm sure the conference rooms with video cameras are available
I got your bounce back when I responded to your email just now. I sent you an email, too - you had not let me know you were planning to be out of the office this week. I will schedule the requested meeting for Friday. Thank you.
Delivered
I believe I have clearly indicated that I need to be located in Utah and I am unable to come in the office on Tuesday Wednesdays and Thursdays

# EXHIBIT AA

## Employee-handbook excerpts

**Contents**

The supplied nine-page excerpt set, including telework provisions. This is not the entire employee handbook.

**Source note**

Physical pages 2-6 and 8-11 of the exhibits to CSP's July 6, 2026 EEOC position statement, reproduced as supplied.

Commonwealth Savers℠

# EMPLOYEE HANDBOOK

# Chapter 3: Culture and Belonging

We inspire a sense of belonging where everyone can be their authentic selves at work. We contribute to a culture that values diversity through actions of respect, encouragement, and support for our people. Through our commitment to empowerment and development opportunities, we're able to energize our communities and beyond in all that we do.

## *Equal Employment Opportunity Policy*

Commonwealth Savers is committed to equal employment opportunity to all persons. It is the policy of the Agency to prohibit unlawful discrimination and harassment of any type and to provide equal opportunities to employees and applicants without regard to race, age, color, sex, national origin, religion, disability, political affiliation, sexual orientation, gender identity, genetics, marital status, military status, pregnancy, childbirth, or related medical conditions including lactation, or any other characteristic protected under applicable federal, state, or local law. This policy covers all aspects of employment including but not limited to, recruitment, selection, promotion, demotion, transfer, termination, rates of pay or other forms of compensation, selection for training, working conditions, the use of all facilities, and participation in all Agency-sponsored employee activities.

## *Discrimination and Harassment Prohibited*

Discrimination and/or harassment can result from the unlawful employment-related treatment of a person due to one of their protected statuses listed above. Harassment is a form of employment discrimination. Any unlawful discrimination or harassment violates Commonwealth Savers policy and is prohibited.

Harassment could be a severe one-time action or a pattern of behavior that is considered offensive, or hostile based on one of the statuses above. This includes, but is not limited to, conduct such as derogatory comments, racial jokes, slurs, epithets, threats, graffiti, physical acts, etc. Commonwealth Savers has an obligation to maintain a place of employment that is free of discriminatory, harassing, abusive, or disruptive conduct and is committed to taking positive corrective action where the need arises. No form of unlawful discrimination or harassment will be tolerated.

### *Sexual Harassment*

Sexual harassment is a violation of Title VII of the Civil Rights Act of 1964, as amended, and will not be tolerated. All Commonwealth Savers employees, other workers, vendors, clients, and visitors are prohibited from harassing employees and other covered persons based on that individual's sex or gender (including pregnancy, sexual orientation, gender identity, and status as a transgender or transsexual individual) and regardless of the harasser's sex or gender.

Sexual harassment means any harassment based on someone's sex or gender. It includes harassment that is not sexual in nature (for example, offensive remarks about an individual's sex or gender), as well as any unwelcome sexual advances, requests for sexual favors, or any other conduct of a sexual nature, when any of the following is true:

- submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment;
- submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting such individual; and/or
- such conduct has a purpose or effect of substantially or unreasonably interfering with an individual's work performance by creating an intimidating, hostile, or offensive work environment.

Commonwealth Savers will not tolerate any form of sexual harassment, regardless of whether it is:

- Verbal (for example, epithets, derogatory statements, slurs, sexually related comments or jokes, unwelcome sexual advances, or requests for sexual favors).
- Physical (for example, assault or inappropriate physical contact).
- Visual (for example, displaying sexually suggestive posters, cartoons, or drawings, sending inappropriate adult-themed gifts, leering, or making sexual gestures).
- Online (for example, derogatory statements or sexually suggestive postings in any social media platform including Facebook, X (formerly Twitter), Instagram, Snapchat, etc.).

This list is illustrative only and not exhaustive. No form of sexual harassment will be tolerated. Harassment is prohibited both at the workplace and at employer-sponsored events.

## Other Types of Harassment

Commonwealth Savers' anti-harassment policy applies equally to harassment based on an employee's race, age, color, sex, national origin, religion, disability, political affiliation, sexual orientation, gender identity, genetics, marital status, military status, pregnancy, childbirth, or related medical conditions including lactation, or any other characteristic protected under applicable federal, state, or local law.

Such harassment often takes a similar form to sexual harassment and includes harassment that is:

- Verbal (for example, epithets, derogatory statements, slurs, derogatory comments, or jokes).
- Physical (for example, assault or inappropriate physical contact).
- Visual (for example, displaying derogatory posters, cartoons, or drawings, or making derogatory gestures).
- Online (for example, derogatory statements or sexually suggestive postings in any social media platform including Facebook, X (formerly Twitter), Instagram, Snapchat, etc.).

This list is illustrative only, and not exhaustive. No form of harassment will be tolerated. Harassment is prohibited both at the workplace and at employer-sponsored events.

### *Fraternization*

Due to unequal power dynamics, managers are prohibited from dating or pursuing dating subordinates or any employee in their department. Division leaders are prohibited from dating or pursuing dating anyone in the organization. Employees in management who begin a romantic relationship with another employee must immediately notify the Human Resources Department who will work to resolve any conflicts of interest. Failure to follow this expectation or report it will result in disciplinary action up to and including termination.

### *Reporting Discrimination or Harassment*

Employees are required to report to a member of management, the Human Resources Department, or the Commonwealth Savers Board any suspected discrimination including harassment. If you experience or witness behavior that could be discrimination or harassment, including sexual harassment, you should report it to a manager, member of the Human Resources Department, or the Commonwealth Savers Board. Employees who experience or witness discrimination or harassment are expected to participate in the investigation of the initial complaint by providing factual information witnessed or experienced. If your manager is the subject of your complaint, do not report to them, instead report it to the next level manager, a member of the Human Resources department, or the Commonwealth Savers Board. Managers or other appropriate officials are to immediately report any act of discrimination or harassment of which they become aware to Human Resources, who will act according to established procedures. This includes promptly investigating the complaint, calling attention to the Agency's policy prohibiting such behavior and/or, if appropriate, applying disciplinary action.

### Retaliation

No one will be subject to, and Commonwealth Savers prohibits, any form of retaliation for, in good faith, reporting allegations regarding violations of this policy, filing a charge or complaint of discrimination, reporting harassment, or assisting, testifying, or participating in an equal employment proceeding.

### Discrimination, Harassment or Retaliation May Result In Discipline

Violation of this policy may result in disciplinary action being taken against the offender, up to and including termination of employment. Commonwealth Savers' commitment to prohibit discrimination and harassment from occurring in the workplace should not be viewed as a license for employees to engage in unfounded, frivolous, or vindictive actions in violation of the intent of this policy. In dealing with complaints of discrimination or harassment, the rights of all parties will be protected.

## Accommodations for Employees with Disabilities

The policy of equal employment opportunity applies fully to qualified persons with known mental or physical disabilities where these persons are able to perform the essential functions of their position, with or without reasonable accommodation. It is our policy not to discriminate against qualified individuals with disabilities in regard to all aspects of employment including but not limited to, recruitment, selection, promotion, demotion, transfer, termination, rates of pay or other forms of compensation, selection for training, working conditions, the use of all facilities, and participation in all Agency-sponsored employee activities.

Commonwealth Savers complies with the Americans with Disabilities Act (ADA), as amended by the ADA Amendments Act, and all applicable state or local law. Consistent with those requirements, Commonwealth Savers will reasonably accommodate qualified individuals with a disability if such accommodation would allow the individual to perform the essential functions of their position, unless it can be demonstrated that such accommodation would impose an undue hardship upon the Agency.

### Disability Accommodation Requests

Employees and other persons who have disabilities, are pregnant, or are experiencing a medical condition related to pregnancy or childbirth and need assistance in obtaining any services from the Agency are encouraged to request accommodation. Such requests should be in writing and be directed to the Human Resources Department.

Commonwealth Savers will reasonably accommodate qualified individuals with a disability if such accommodation would allow the individual to perform the essential functions of the job unless doing so creates a direct threat to these individuals or others in the workplace and the threat cannot be eliminated by reasonable accommodation and/or if the accommodation creates an undue hardship to Commonwealth Savers. Current illegal drug use is excluded from coverage under this disability policy.

The Human Resources Department is responsible for the interpretation of and overall compliance with this policy including resolution of reasonable accommodation, safety/direct threat, and undue hardship issues. All questions regarding its application should be directed to a member of the Human Resources Department.

### Definitions

**Disability** means a physical or mental impairment that substantially limits one or more major life activities of the individual, *a record of such an impairment or being regarded as having such an impairment.*

**Major life activities** include the following, but are not limited to: caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating and working.

The ADAAA also includes the term "major bodily functions," which may include physical or mental impairment such as any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin and endocrine. Also covered are any

mental or psychological disorders, such as intellectual disability, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

**Substantially limiting:** In accordance with the ADAAA final regulations, the determination of whether an impairment substantially limits a major life activity requires an individualized assessment. An impairment that is episodic or in remission may also meet the definition of disability if it would substantially limit a major life activity when active. Some examples of these types of impairments may include, but are not limited to, epilepsy, hypertension, asthma, diabetes, major depressive disorder, bipolar disorder, and schizophrenia. An impairment such as cancer that is in remission but that may possibly return in a substantially limiting form also is considered a disability under EEOC final ADAAA regulations.

**Direct threat** means a significant risk of substantial harm to the health, safety, or well-being of individuals with disabilities or others when this risk cannot be eliminated by reasonable accommodation.

**Qualified individual** with a disability is a person who meets legitimate skill, experience, education, or other requirements of an employment position that they hold or seek, and who can perform the essential functions of the position with or without reasonable accommodation.

**Reasonable accommodation** is any modification or adjustment to a job or the work environment that will enable a qualified applicant or employee with a disability to participate in the application process or to perform essential job functions. Reasonable accommodation also includes adjustments to assure that a qualified individual with a disability has rights and privileges in employment equal to those of employees without disabilities. This includes any changes to the work environment and may include making existing facilities readily accessible to and usable by individuals with disabilities, job restructuring, part-time or modified work schedules, telecommuting, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

The accommodation process includes the employee, HR, and management and involves an extensive review of the job requirements and limitations the employee's disability creates. With the employee, we will attempt to identify changes or modifications as part of the interactive process that will allow the employee to perform the essential duties of their job.

**Undue hardship** means an action requiring significant difficulty or expense by the employer. In determining whether an accommodation would impose an undue hardship on a covered entity, factors to be considered include, but are not limited to:

- The nature and cost of the accommodation.
- The overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources; or the impact of such accommodation upon the operation of the facility.
- The overall financial resources of the employer; the size, number, type and location of facilities.
- The type of operations of the employer, including the composition, structure and functions of the workforce; administrative or fiscal relationship of the particular facility involved in making the accommodation to the employer.
- The impact of the accommodation on the operation of the facility.

**Essential functions of the job** refer to those job activities that are determined by the employer to be essential or core to performing the job; these functions cannot be modified.

The examples provided in the above terms are not meant to be all-inclusive and should not be construed as such. They are not the only conditions that are considered to be disabilities, impairments or reasonable accommodations covered by the ADA/ADAAA policy.

Commonwealth Savers℠

# EMPLOYEE HANDBOOK

When inclement weather conditions create individual transportation difficulties that result in late arrivals, the lost time does not have to be charged to employees' personal leave balances if, in the judgment of the CEO the lost time was justifiable in view of the weather conditions.

## *Telework*

Commonwealth Savers may authorize certain positions and certain employees to telework. This practice enables employees to work at an alternate work site for all or part of a work week as a means of achieving administrative efficiencies and business continuity. As teleworking is a voluntary work alternative its terms and conditions are subject to review by Commonwealth Savers based on business needs.

Definitions:
Full-time teleworkers are those who are regularly scheduled to work at an alternate site for all working hours in a work week and visit the main office only for meetings as needed.

Hybrid teleworkers are regularly scheduled to work at an alternate site for 32 or more hours per month and also work regularly in the main office.

Limited teleworkers work at an alternate site on an ad hoc basis due to personal or business need.
Before determining if an employee is eligible to telework, the employee, their manager and the Chief Engagement Officer will discuss the feasibility of a teleworking arrangement including the following:

- Employee performance including work habits and quality of work
- Job responsibilities
- Equipment needs
- Other legal and fiscal implications

If it is determined that an employee will telework on a full-time, part-time, or ad hoc basis then the employee and the manager must complete a Telework Agreement which outlines the expectations of all parties to the arrangement. Employees who work from home during non-business hours in addition to working full time in the office are not required to complete a Telework Agreement however they must abide by the Teleworking policy.

### *Expectations*

The teleworking employee is expected to maintain a satisfactory level of performance in order to continue teleworking. Performance will be monitored on an ongoing basis with expectations being clearly communicated by the supervisor and employee. The employee is expected to work regularly scheduled hours and to notify their manager in advance if there will be times the employee is unavailable during work hours. Non-exempt employees must report all hours worked in accordance with the Fair Labor Standards Act; overtime hours must be approved in advance and will be paid according to applicable laws and policies.

Teleworking employees are responsible for creating a safe work environment that is free of known hazards and distractions. Commonwealth Savers will not pay for renovations, furniture, or other equipment needed to create the work area.

If an employee is injured while working in their established alternative location then they must report it immediately to their manager or Chief Engagement Officer. Injuries that occur while performing normal work duties are typically covered by Commonwealth Savers' workers compensation plan and/or Virginia Sickness and Disability plan.

Teleworking is not an appropriate replacement for child or adult care as the focus of the employee should be on meeting the requirements of the job. Another individual must be present at the work location if there are children or adults who need supervision during the employee's scheduled work hours. Furthermore, teleworking is not intended to be used in place of leave including Family and Medical Leave, Worker's Compensation leave or leave used under the Virginia Sickness and Disability Program however it may be considered a reasonable accommodation under the ADAAA.

Teleworking employees may be required to report to a central office for meetings and will be given notice when possible, of this requirement.

## *Split Schedules*

A split-schedule is one in which an employee works from home (or other remote location) for part of the day and in the office (or other location) for another part of the day. The FLSA requires non-exempt employees be compensated for the travel time between locations when there is no break for personal activities. Therefore, non-exempt employees must work from one location for their full workday whenever possible. Regularly scheduled exceptions are not allowed, but if an exception to this is approved for an isolated event or reasonable accommodation, the non-exempt employee must take a 30+ minute personal break between locations, and their timesheet should reflect a break for the duration of the travel and personal time taken off.

The following are some examples for what is permitted for non-exempt employee schedules:

Example Scenarios Not Permitted for Non-Exempt Employees:

- Employee logs in from home and works for 2 hours, drives into the office for a meeting and works the remainder of the day in the office.
- Employee arrives at their normal time, works until the afternoon, drives home at 3pm and logs back in to continue working from home.

These are not permitted because in these scenarios we must pay the commuting time as worksite-to-worksite travel.

Example Scenarios Permitted for Non-Exempt Employees:

- Employee logs in and works from home then logs off to attend a doctor's appointment which lasts at least 30 minutes, not including driving time. Employee travels from doctor to the office and works in the office the remainder of the day.
- Employee arrives at their normal time and works until 2pm. They leave at 2pm and travel to their child's school for a school event that lasts 1 hour. They travel home and log in again to continue working.

In these situations, the employee has a personal break of longer than 30 minutes, not including driving/travel time. That is a key component that makes this possible.

## *Equipment and Materials*

Commonwealth Savers will provide the employee with the necessary equipment and materials to successfully telework. Commonwealth Savers will determine what equipment is necessary on a case-by-case basis according to job function and business need. Commonwealth Savers issued equipment and supplies will be maintained by the Agency and are for authorized Agency use by Agency employees only. All equipment and supplies remain the property of the Agency and must be returned to Commonwealth Savers at the termination of the teleworking arrangement.

Commonwealth Savers will pay a $50 monthly stipend to full-time remote employees for costs incurred including internet access. Part-time and ad hoc teleworkers are not eligible for a stipend. Since itemized bills are not required, the stipend will be taxed.

In certain circumstances Commonwealth Savers may authorize the use of personal equipment, such as fax machines, printers, copiers, phones, etc., for Agency use. In these cases, Commonwealth Savers will not assume responsibility for the cost of the equipment, repair, or service. Additionally, Commonwealth Savers will not assume responsibility for any damage to equipment even if used in the course of Agency business.

At all times, employees are expected to ensure the protection of proprietary Commonwealth Savers information, including customer information, in accordance with the Internet and Acceptable Use Policy found in this handbook. As such, only authorized users may have access to Commonwealth Savers computers, equipment, or files. Failure to secure Commonwealth Savers assets, including customer information, may result in disciplinary action up to and including termination.

### *Termination of Agreement*

Commonwealth Savers may terminate any teleworking arrangement at its discretion. Commonwealth Savers will attempt to give as much notice as possible before terminating a teleworking arrangement however it is not required to do so. As long as it was not a condition of a job when offered or so long as it has not become one during the course of the employment with Commonwealth Savers, the employee may also terminate a telework agreement at any time and should give at least two weeks' notice.

# EXHIBIT AB

## May 6, 2025 email from Gray to himself

**Contents**

The complete two-page rendering of Gray's self-email containing his prepared meeting notes, with its identifying headers.

**Source note**

Reproduced from the preserved original email. It was sent to Gray himself, not to Morris. The email date does not establish the precise date of the meeting.

# EXHIBIT AB

## May 6, 2025 email from Gray to himself

From: Zander Gray <zandergray1@gmail.com>

To: Zander Gray <zandergray1@gmail.com>

Date: Tue, 06 May 2025 13:22:22 -0600

Subject: (blank)

Message-ID: <CAMfD1b5sy5q=DDVJw3FabHx+VrQcmppmsyf+g2575MS6Mn-faw@mail.gmail.com>

Mary, thank you so much for making this time. I know how busy you are. I'm coming to you today because you've always made me feel I could talk to you directly if something truly significant was weighing on me, and honestly, I'm in a situation where I deeply value your wisdom and support.

This is very personal and difficult to discuss Mary. Shauna My wife is facing some grave health issues with her mental well-being.

She ha suffered all her adult life with being bipolar and having borderline personality disorder. The last 6 months have been an incredibly difficult journey for her, and for us as a family.

We've reached a point where it's become unmistakably clear, and her medical team is strongly advising, that she needs to be in an environment with a strong, consistent support system.

For her, that's her family, and they are all in Utah. We don't have that kind of family support left here in Richmond anymore

I've just spent the last couple of weeks in Utah with her, and it truly highlighted how critical this move is for her healing, her stability, and frankly, for our family to be able to navigate this and for her to feel safe and supported.

As I hope you know, I am so deeply committed to my work here at CommonwealthSavers. I genuinely love my role, the team I have the privilege to lead, and the mission we're all working towards. It's important for you to know that.

Mike is aware of the family health issues I've been navigating. And because this situation is so critical for my family, and because I truly trust your judgment and compassionate leadership, Mary, I wanted to come directly to you to see if there's a way forward.

My deepest hope, Mary, is to find a way to relocate to Utah to provide my wife with the essential care and support she needs, while continuing my role as Director, working remotely. I know this is a significant request.

I know I can continue to exceed, my current level of performance and team leadership from Utah. I'm absolutely prepared to travel back to Richmond regularly for important meetings or whenever the team needs me here physically – that's a given.

Mary, my absolute priority in all of this is my wife's well-being and her stability. If the 'Director' title itself creates an insurmountable barrier for remote work from Utah, please know I am entirely open to exploring other possibilities.

Perhaps a title change a 'Principal' title, 'senior' title helps make it more feasible.

I want to be a part of CommonwealthSavers for the long haul. While I naturally hope to maintain my current compensation, as I intend to deliver the same, if not more, value, I am willing to discuss this if a change is necessary to make this compassionate accommodation possible.

I wanted to lay this all out for you, Mary. More than anything, I’m seeking your understanding and guidance. Given the circumstances, do you see a potential path that could allow me to care for my wife in this critical way and also continue to serve CommonwealthSavers

# ATTACHMENT C

## Administrative records supporting the motion

C1: EEOC Form 5A signed April 11, 2026 (one page).

C2: Physical page 1 of the EEOC portal capture preserved on September 1, 2026. The complete source page is followed by an enlarged view of its charge-identification and filing-date block. The source file's blank second page is not reproduced.

These records identify the earlier charge-filing date on which Gray relies. The September 1 capture records status on that date; it is not a representation of a later portal update. The motion seeks no present ruling on administrative or judicial timeliness.

Respectfully submitted,

Alexander C. Gray, Plaintiff pro se
Date: September 21, 2026

**CERTIFICATION**

I declare under penalty of perjury that:
(1) No attorney has prepared, or assisted in the preparation of this document.

Alexander C. Gray, Signature of Pro Se Party
Executed on: September 21, 2026

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## CHARGE OF DISCRIMINATION

For Official Use Only – Charge Number:

EEOC Form 5A (July 2024)

| | |
|---|---|
| **Personal Information** | First Name: Alexander MI: C Last Name: Gray<br>Address: 150 N Snow Canyon Dr, Unit 19 Apt.:<br>City: Ivins County: Washington State: UT Zip Code: 84738<br>Phone: 8043357579 Home ☐ Work ☐ Cell ☑ Email: zandergray1@gmail.com |
| **Who do you think discriminated against you?** | Employer ☑ Union ☐ Employment Agency ☐ Other Organization ☐<br>Organization Name: Commonwealth Savers<br>Address: 9001 Arboretum Parkway Suite:<br>City: North Chesterfield State: VA Zip Code: 23236 Phone: 1-855-472-8382 |
| **Why you think you were discriminated against?** | Race ☐ Color ☐ Religion ☐ Sex ☐ National Origin ☐ Age ☐ Pregnancy ☐<br>Disability ☑ Genetic Information ☐ Retaliation ☑ Other ☐ (*specify*) |
| **What happened to you that you think was discriminatory?** | **Date of most recent job action you think was discriminatory:** 6/30/2025<br>**Also describe briefly each job action you think was discriminatory and when it happened (estimate).**<br>June 30, 2025 – Terminated for "job abandonment" hours after requesting PTO for family medical reasons.<br>June 27, 2025 – At meeting I requested, told I had "abandoned" my job and must resign or be terminated, before any absence.<br>June 23, 2025 – Submitted written complaint of unequal treatment after disclosing spouse's bipolar disorder and requested meeting.<br>March 19, 2025 – In-office requirement increased after disclosure, based on period already covered by positive review.<br>February 13, 2025 – Received "On Target" performance review with no issues.<br>Others were allowed remote work, including Utah; I was denied similar treatment. |
| **Signature and Verification** | I understand this charge will be filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address, phone, or email. I will cooperate fully with them in the processing of my charge in accordance with their procedures.<br><br>I understand by signing below that I am filing a charge of employment discrimination with the EEOC. I understand that the EEOC is required by law to give a copy of the charge, which includes my allegations and my name, to the organization named above. I also understand that the EEOC can only investigate charges of job discrimination based on race, color, religion, sex, national origin, age, disability, genetic information, or based on retaliation for filing a charge of job discrimination, participating in an investigation of a job discrimination complaint, or opposing job discrimination.<br><br>**I declare under penalty of perjury that the above is true and correct.**<br>**Signature:** [signature] **Date:** 4/11/2026 |

U.S. Equal Employment Opportunity Commission

Welcome, Alexander | Log Out

Filing with EEOC

Assessment | Inquiry | Schedule Interview | More Details | File Charge

## My Charge

**EEOC Number:** 438-2025-02440 **Status:** Investigation

EEOC is collecting evidence about your charge.

The charge of discrimination filed on **04/11/2026** with the U.S. Equal Employment Opportunity Commission (EEOC) by **Alexander C Gray** against **COMMONWEALTH SAVERS PLAN** is available for you to view online

The EEOC's **Richmond Local Office** is handling this charge. Your point of contact at the EEOC for this charge is **INVESTIGATOR,ERIC PETERSON** and can be reached at **ERIC.PETERSON@EEOC.GOV**

Add or Modify My Representative's Information | Update My Information

## My Documents

You can upload, view, and download documents related to your charge here (including the respondent's position statement, if you requested a copy). If the EEOC closes your charge, the documents will be available for 90 days.

**You should save all physical and electronic information and material related to your charge, even if you do not upload it here.**

Upload

| Name | Type | Added On | Added By |
|---|---|---|---|
| rebuttal_exhibits_submission(1) | Evidence Provided by Charging Party | 09/01/2026 | Charging Party |
| rebuttal_submission(1) | Rebuttal to Position Statement | 09/01/2026 | Charging Party |
| rebuttal_cover(1) | ADR-Correspondence from Charging Party/Representative | 09/01/2026 | Charging Party |
| 438-2025-02440_Position Statement Cover Letter and Response Request | Position Statement Cover Letter | 08/18/2026 | arcapp user |
| 2026-08-01_Request_for_Respondent_Position_Statement_Charge_438-2025-02440_Gray | Correspondence To/From Charging Party | 08/01/2026 | Charging Party |
| Exhibits to Commonwealth Savers Position Statement | Position Statement Attachments-Non-Confidential | 07/06/2026 | Respondent user |
| Commonwealth Savers Position Statement (7.6.2026) | Position Statement | 07/06/2026 | Respondent user |
| 2026-07-02_Request_for_ADR_Mediation_Status_Charge_438-2025-02440_Gray | ADR-Correspondence from Charging Party/Representative | 07/02/2026 | Charging Party |
| 438-2025-02440_ConfidentialityAgreementSigned-CP | Charging Party Confidentiality Agreement | 06/05/2026 | publicportal user |
| 438-2025-02440_AgreementToMediateSigned-CP | Charging Party Agreement to Mediate | 06/05/2026 | publicportal user |
| 438-2025-02440_ChargeOfDiscrimination | Charge of Discrimination | 05/26/2026 | arcapp user |
| SUPPLEMENTAL STATEMENT final filed with EEOC | Other Charging Party Document | 04/27/2026 | Charging Party |
| 2026-04-11 Alexander Gray Form 5A | Charge of Discrimination-Form 5A | 04/14/2026 | LADONNA INGRAM |
| 2026-04-09 EEOC Inquiry 438-2025-02440.msg | Form 5A Provided to PCP | 04/09/2026 | LADONNA INGRAM |

## Additional Information

What you should KNOW after filing a charge

What you should DO after filing a charge

How to request Respondent's Position Statement

**If you have questions**
You may find answers in the Frequently Asked Questions (FAQ)

If you still have questions about charge or the status of your charge, please contact your investigator directly at **ERIC.PETERSON@EEOC.GOV**. Please use Charge Number **438-2025-02440** on all correspondence and communications.

Back to My Cases

Technical Support | Accessibility Statement | Privacy Statement

## C2 - Enlargement of charge information

Left portion of the charge-information block

# My Charge

**EEOC Number:** 438-2025-02440

EEOC is collecting evidence about your charge.

The charge of discrimination filed on **04/11/2026** with the U.S. Equal Employment Opportunity Commission (EEOC) by **Alexander C Gra**

The EEOC's **Richmond Local Office** is handling this charge. Your point of contact at the EEOC for this charge is **INVESTIGATOR,ERIC**

Right continuation of the same block (with overlap)

**Status:** Investigation

**nder C Gray** against **COMMONWEALTH SAVERS PLAN** is available for you to view online

**ATOR,ERIC PETERSON** and can be reached at **ERIC.PETERSON@EEOC.GOV**

# EXHIBIT AC | June 23, 2025 - RE: Draft Renewal

*Cropped photograph: complete visible Bishop email header, displayed date/time, body and signature. Surrounding notes and the incomplete quoted older thread are excluded. The uncropped original is preserved.*




The next page provides a reading aid. No words within the displayed Bishop message have been removed or changed.

Source photograph: 20250627_125746.jpg. Displayed email timezone is not stated.

SHA256: 24b5221247d10ce3cf49dc117444107a68139d867841dc68e56a51401ad3a716

## EXHIBIT AC | Reading aid - displayed Bishop message

*Transcription from the photographed display; not a native email export. Line wrapping is normalized. The photograph controls. This reproduces the complete visible Bishop message and signature, not the incomplete quoted thread below it. No timezone is inferred.*

Subject: RE: Draft Renewal
From displayed name: Carolyn Bishop
To displayed name: Zander Gray
Displayed date/time: Mon 6/23/2025 5:51 PM

Thank you for your comments. I was unaware you were unable to work on requests for the past few weeks as you were working at least on Monday and Friday last week and Friday the week prior. There were several emails which you received that were for you to ask questions and provide comments about the goals, too, as others have pointed out. Today was a good meeting and I received some good intel for future work on the goals. As I said in that discussion, I will keep you in the loop as we move forward.

Carolyn Bishop | Chief Operations Officer
Commonwealth Savers
Mobile: 804.652.8036

## EXHIBIT AD | Signed EEOC Form 5 - May 26, 2026

EEOC Charge No. 438-2025-02440. The following four pages reproduce the retained signed Form 5 without alteration.

This is the May 26 Form 5. The April 11 Form 5A and saved portal record are reproduced separately in the existing ECF No. 38-2 section.

The original digital signature and dual-agency filing request appear on original page 3; original page 4 contains the notices.

# CHARGE OF DISCRIMINATION

Form 5 (06/24)

This form is affected by the Privacy Act of 1974.
See attached Privacy Act Statement and other information before completing this form.

| **CHARGE PRESENTED TO:** | **AGENCY CHARGE NO.** |
|---|---|
| EEOC<br>Virginia Office of Civil Rights | 438-2025-02440 |

Name *(indicate Mr., Ms., Mrs., Miss, Dr., Hon., Rev.)*: Mr. Alexander C. Gray

Phone No.: 804-335-7579

Year of Birth: 1968

Mailing Address: 150 N SNOW CANYON DR UNIT 19
IVINS, UT 84738

Named below is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency that I believe discriminated against me or others.

Name: Commonwealth Savers
No. Employees, Members: Unknown Number Of Employees
Phone No.: (804) 652-8036
Mailing Address: 9001 ARBORETUM PKWY
RICHMOND, VA 23236, UNITED STATES OF AMERICA
Name:
No. Employees, Members:
Phone No.:
Mailing Address:

DISCRIMINATION BASED ON:

Disability, Retaliation

DATE(S) DISCRIMINATION TOOK PLACE

Earliest: 06/30/2025
Latest: 06/30/2025

THE PARTICULARS ARE:

I: I was hired by the above-named employer in March 2020 as the Director of Application Development. In February 2025, I notified my employer of my wife's disability. On March 19, 2025, approximately five (5) weeks after receiving a positive performance review, I was accused of being unreachable and my remote work arrangement was changed from going into the office two (2) days per month to three (3) days per week. On June 23, 2025, I submitted a written complaint opposing disability-based unequal treatment, shifting justifications, inconsistent policy applications, and failure to evaluate a workable arrangement after disclosing my spouse's disability. On June 27, 2025, I was given the option to resign or be terminated immediately. That same evening, my supervisor texted that my system access would be re-enabled Monday morning. On June 30, 2025, I notified my supervisor that I needed PTO for a family medical need and approximately three (3) hours later I was terminated.

II: The reason given to me by Human Resources for my termination was job abandonment. I had provided PTO notice that morning using the same text method previously accepted by the employer. No meeting was scheduled that day.

III: I was subjected to discriminatory terms and conditions of employment because of my association with a person with a disability and terminated in retaliation for opposing disability-based discrimination, in violation of the Americans with Disabilities Act of 1990, as amended.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct, and that I have read each page of this form.

Digitally Signed By: Mr. Alexander C. Gray

05/26/2026

Charging Party Signature & Date

If a state or local Fair Employment Practices Agency (FEPA) requires notarization, you may need to sign the charge in the presence of a notary. If so, please do so here.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information, and belief.

________________________________________

Notarized Signature of Charging Party

Subscribed and sworn to before me this date:

Signature of Notary__________________________________________________

Printed Name ____________________________________________________

## CP Enclosure with EEOC Form 5 (06/24)

### Privacy Act Statement

Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1. **Form Number/Title/Date.** EEOC Form 5, Charge of Discrimination (06/24).
2. **Authority.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.
3. **Principal Purposes.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.
4. **Routine Uses.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.
5. **Whether Disclosure is Mandatory; Effect of Not Giving Information.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

### Notice of Right to Request Substantial Weight Review

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so *within 15 days* of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### Notice of Non-Retaliation Requirements

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA, Section 207(f) of GINA, and 42 USC 2000gg-2(f)(1) of the PWFA it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

## EXHIBIT AE | DOJ Notice of Right to Sue - October 16, 2026

*Printout of the original notice email. Transport headers and email styling are omitted; notice wording, body CC line and contact information are retained.*

From: DOJ Civil Rights - Do Not Reply <civilrightsdonotreply@mail.civilrights.usdoj.gov>
To: zandergray1@gmail.com
Date: Fri, 16 Oct 2026 16:31:37 +0000
Subject: Response: Your Civil Rights Division Report - 851727-LRG from the Employment Litigation Section

U.S. Department of Justice

Civil Rights Division

civilrights.justice.gov [ https://civilrights.justice.gov ]

851727-LRG

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

Oct 16, 2026

Alexander Gray

zandergray1@gmail.com

Re: Alexander Gray v. COMMONWEALTH SAVERS PLAN, et al.,
EEOC Charge No. 438-2025-02440

Dear Alexander Gray,

You are receiving this notice because you filed the above charge(s) with the Equal Employment Opportunity Commission (EEOC), and you or your attorney specifically requested this notice.

Because either 180 days have passed since you filed the above charge(s), or because the EEOC has determined that it will not be able to conclude its administrative process within 180 days of the date it assumed jurisdiction of the charge(s), you are hereby notified that you have the right to file a lawsuit commencing a civil action based on the charge(s) under the following statute(s):

Title VII of the Civil Rights Act of 1964, 42 USC. 42 U.S.C. § 2000e, et seq.

Title I of the Americans with Disabilities Act, 42 U.S.C. § 12111, et seq.

If you decide to file a lawsuit under the statute(s) identified above, you must file it in the appropriate court within 90 days of receiving this Notice. This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether your charge is meritorious. If you haven't already, you may want to consult with a private attorney of your own choosing and expense.

If you have questions or wish to inspect the investigative file pertaining to this matter, please address your inquiry to the following EEOC office: Richmond Local Office. Contact information for this office can be located at https://www.eeoc.gov/field-office/richmond/location.

Sincerely,

Complaint Referral Unit
Employment Litigation Section
Civil Rights Division

CC: zandergray1@gmail.com, rsullivan@hunton.com, CATHERINE.GLOVER@EEOC.GOV

Contact
civilrights.justice.gov [ https://civilrights.justice.gov ]
mail U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

phone (202) 514-3847
1-855-856-1247 (toll-free)
Telephone Device for the Deaf
TTY/TDD: 711

## EXHIBIT AH | EEOC administrative correspondence

These printouts reproduce the identified messages and substantive quoted threads from preserved message data. They concern the existing charge chronology. The original saved messages remain preserved.

AH-1 - November 18, 2025 sent request

AH-2 - December 4, 2025 response and complete support thread

AH-3 - April 11, 2026 Form 5A submission and quoted April 9 instructions

AH-4 - April 14, 2026 receipt/processing reply and complete quoted thread

AH-5 - May 26, 2026 charge acknowledgment and conditional dual-filing statement

The November/December thread retains the agency warning that a charge cannot be filed by email. The April correspondence retains the intake/perfection instructions. The May acknowledgment retains its conditional dual-filing language. These documents do not by themselves establish actual referral to the Virginia agency.

Display-only transformations, including normalized line wrapping and visibly marked omission of a personalized support link, are identified on the applicable printout. Earlier quoted correspondence is retained; it is not presented as a separately received message on the later date.

# EXHIBIT AH-1 | November 18, 2025 sent request

*Reproduction of preserved email text and ordinary message headers. Transport headers are omitted. Complete relevant quoted thread is retained.*

From: Zander Gray <zandergray1@gmail.com>
To: richmond@eeoc.gov, info@eeoc.gov
Date: Tue, 18 Nov 2025 09:11:54 -0700
Subject: Immediate Action Required – Intake/Amendment Needed (Charge 438-2025-02440 – Imminent Deadlines)

To the Richmond EEOC Office,

I am contacting you because the EEOC Scheduler is still unavailable
following the shutdown, and
the notice on the scheduling page specifically instructs individuals who
are nearing their
180-day or 300-day deadlines to contact the EEOC via email.

That applies directly to me.

I have an existing EEOC matter:
• Inquiry/Charge Number: 438-2025-02440
• Respondent: Commonwealth Savers (Virginia College Savings Plan),
Richmond, VA
• Date of Adverse Action: June 30, 2025
• Issues: Disability, retaliation, family-medical-leave related
termination, discriminatory
statements, and post-termination publication of false reasons for
separation.

My deadlines are running, and I must amend and perfect my charge. The
online scheduler is not
allowing appointments, and the shutdown notice explicitly directs
individuals in my situation to
email your office.

Additional context:
• I notified my employer of family-medical leave needs on the morning of
June 30.
• I was terminated hours later the same day.
• The employer's stated reason ("job abandonment") is factually false.
• These events are part of ongoing federal litigation in the Eastern
District of Virginia
(Gray v. Commonwealth Savers, Case No. 3:25-cv-00742-RCY).
• My 180- and 300-day statutory deadlines are approaching rapidly.

I am requesting:

1. The earliest available intake or amendment appointment (telephone or
virtual), OR
2. Written instructions for immediately submitting amendments so they may
be processed without delay.

Please confirm the next steps so my statutory rights are not compromised due to the EEOC's
shutdown and scheduling system outage.

Name: Alexander C. Gray
Phone: 804-335-7579
Email: zandergray1@gmail.com
Current Location: Ivins, UT
Charge: 438-2025-02440
EEOC Office: Richmond Local Office (as listed in my EEOC notice)

Thank you. I look forward to your prompt response.

# EXHIBIT AH-2 | December 4, 2025 response and complete support thread

*Reproduction of preserved email text and ordinary message headers. Transport headers are omitted. Complete relevant quoted thread is retained. Character-encoding display has been repaired; the account-specific support link is visibly omitted.*

From: EEOC - I I G <info@eeoc.gov>
To: zandergray1@gmail.com
Date: Thu, 4 Dec 2025 17:49:42 -0600 (CST)
Subject: [External] Immediate Action Required – Intake/Amendment Needed (Charge 438-2025-02440 – Imminent Deadlines) [Incident: 251118-000310]

Recently you requested personal assistance from our on-line support
center. Below is a summary of your request and our response.

If this issue is not resolved to your satisfaction, you may reopen it within the next 2 days.

Thank you for allowing us to be of service to you.
To access your question from our support site, click [account-specific support link omitted from printout]

------------------------------------------------------------

Subject
------------------------------------------------------------
[External] Immediate Action Required – Intake/Amendment Needed (Charge 438-2025-02440 – Imminent Deadlines)

Discussion Thread
------------------------------------------------------------
Response By Email (Inquiry) (12/04/2025 05:49 PM)
Thank you for contacting us.

I am sorry that you were not able to schedule an appointment due to the choices being grayed out. Keep checking daily for new appointments as new ones become available each morning through our public portal at https://publicportal.eeoc.gov/Portal/Login.aspx .

You can also find more information about the laws we enforce and our charge-filing procedures when visiting our website.

Also, please note that there are time limits to file the charge, in many States that limit is 180 days from the date you knew about the harm or negative job action, but in other States it is 300 days.

This incident happened 157 days ago.
The last date a charge can be filed is April 26, 2026.
There are 143 days left to file a charge.

Alternatively, you may call us at 1-800-669-4000 (VideoPhone: 1-844-234-5122) to discuss your situation.

Sincerely,

U.S. Equal Employment Opportunity Commission

Auto-Response By (Administrator) (11/18/2025 10:15 AM)
Thank you for contacting the United States Equal Employment Opportunity Commission. This automated response confirms receipt of your inquiry and is not intended to address your specific questions. For those of you wishing to file a charge of employment discrimination, please note that there is a time limit of either 180 or 300 days to file a charge, depending on a number of factors. If you want to begin the process, you can use our online

assessment tool at https://publicportal.eeoc.gov/Portal/Login.aspx https://publicportal.eeoc.gov/Portal/Login.aspx . You cannot file a charge via email. We will respond to your specific questions as quickly as possible.

Customer By CSS Email (Zander Gray) (11/18/2025 10:15 AM)
To the Richmond EEOC Office,

I am contacting you because the EEOC Scheduler is still unavailable following the shutdown, and the notice on the scheduling page specifically instructs individuals who are nearing their 180-day or 300-day deadlines to contact the EEOC via email.

That applies directly to me.

I have an existing EEOC matter:
• Inquiry/Charge Number: 438-2025-02440
• Respondent: Commonwealth Savers (Virginia College Savings Plan), Richmond, VA
• Date of Adverse Action: June 30, 2025
• Issues: Disability, retaliation, family-medical-leave related termination, discriminatory statements, and post-termination publication of false reasons for separation.

My deadlines are running, and I must amend and perfect my charge. The online scheduler is not allowing appointments, and the shutdown notice explicitly directs individuals in my situation to email your office.

Additional context:
• I notified my employer of family-medical leave needs on the morning of June 30.
• I was terminated hours later the same day.
• The employer's stated reason ("job abandonment") is factually false.
• These events are part of ongoing federal litigation in the Eastern District of Virginia (Gray v. Commonwealth Savers, Case No. 3:25-cv-00742-RCY).
• My 180- and 300-day statutory deadlines are approaching rapidly.

I am requesting:

1. The earliest available intake or amendment appointment (telephone or virtual), OR
2. Written instructions for immediately submitting amendments so they may be processed without delay.

Please confirm the next steps so my statutory rights are not compromised due to the EEOC's shutdown and scheduling system outage.

Name: Alexander C. Gray
Phone: 804-335-7579

Email: zandergray1@gmail.com
Current Location: Ivins, UT
Charge: 438-2025-02440
EEOC Office: Richmond Local Office (as listed in my EEOC notice)

Thank you. I look forward to your prompt response.

Question Reference # 251118-000310
Date Created: 11/18/2025 10:15 AM
Date Last Updated: 12/04/2025 05:49 PM
Status: Closed

[---002:003900:49803---]

# EXHIBIT AH-3 | April 11, 2026 Form 5A submission and quoted April 9 instructions

*Reproduction of preserved email text and ordinary message headers. Transport headers are omitted. Complete relevant quoted thread is retained. The email identifies an attachment named Form 5A signed.pdf. The attachment is not reproduced from this email; the filed Form 5A is retained separately in ECF No. 38-2.*

From: Zander Gray <zandergray1@gmail.com>
To: LADONNA INGRAM <LADONNA.INGRAM@eeoc.gov>
Date: Sat, 11 Apr 2026 18:48:19 -0600
Subject: Re: EEOC Inquiry 438-2025-02440

Dear Ms. Ingram,

Please find attached my completed and signed Form 5A in response to your request.

Please confirm receipt. I am available for the intake interview at your convenience and will cooperate fully in the next steps of the process.

Thank you for your assistance.

Sincerely,
Alexander C. Gray

On Thu, Apr 9, 2026 at 9:28 AM LADONNA INGRAM <LADONNA.INGRAM@eeoc.gov> wrote:

Alexander C. Gray,

Good morning, we are contacting you to follow up on your claim you submitted to the U.S. Equal Employment Opportunity Commission (EEOC). In that claim, you reported that your employer or potential employer may have discriminated against you.

Except for the Equal Pay Act, the laws we enforce require you to file a charge of discrimination before you can file a lawsuit for unlawful discrimination.

An inquiry, like the one you submitted to us, is not a charge of discrimination.

There are strict time limits for filing a charge. For more information about the time limits, please see http://www.eeoc.gov/employees/timeliness.cfm. Based on the information you provided in your inquiry with a date of harm of June 30, 2025, your time to file a charge expires on or about April 27, 2026. Please be aware that if you file a charge, we will notify the employer you filed the charge against.

If you would like to file a charge, you may do so by completing and signing the attached form. Please do not use a typed electronic signature for the signing of these documents as we will need a handwritten signature or a digital signature. A typed electronic signature is not sufficient for legal documents processed by the Commission. The Form must be completed, properly signed, and returned to us by email at ladonna.ingram@eeoc.gov <ladonna.ingram@eeoc.gov> or fax at (804) 592-3799 no later than 11:59

pm Monday, April 27, 2026. (If you have already filed your charge with a state or local agency that handles charges of employment discrimination, you do not need to file another charge with us.)

Please keep in mind that you will still need to be interviewed by one of our staff members within the next few days in order for us to prepare a formal/perfected Form 5, Charge of Discrimination.

Your charge (Form 5A) should consist of a clear and concise statement of the facts constituting the alleged unlawful employment practice(s), including the date(s) of each negative employment action taken against you. For example: “I was denied an accommodation I needed to perform my job,” “I was fired because I was pregnant”, “I was laid off because of my age.”

We will administratively close your inquiry until we hear back from you and/or before your deadline to file. If you are still interested in filing a charge after your inquiry has been closed, and you have not missed the deadline to file your charge timely, please contact us as quickly as possible and we will reopen your inquiry.

[Email image placeholder omitted; signature text retained]

LaDonna Ingram| Office Automation Assistant

U.S. Equal Employment Opportunity Commission

Richmond Local Office

Phone: (804) 362-6910

Email: ladonna.ingram@eeoc.gov

## EXHIBIT AH-4 | April 14, 2026 receipt/processing reply and complete quoted thread

*Reproduction of preserved email text and ordinary message headers. Transport headers are omitted. Complete relevant quoted thread is retained.*

From: LADONNA INGRAM <LADONNA.INGRAM@eeoc.gov>
To: Zander Gray <zandergray1@gmail.com>
Date: Tue, 14 Apr 2026 16:21:30 +0000
Subject: RE: [External] Re: EEOC Inquiry 438-2025-02440

Good afternoon,

I have received and processed your information. The next step is to schedule you for an intake interview. Are you available for a phone interview on 4/30/2026 @ 2PM EST?
[Email image placeholder omitted; signature text retained]
LaDonna Ingram| Office Automation Assistant
U.S. Equal Employment Opportunity Commission
Richmond Local Office
Phone: (804) 362-6910
Email: ladonna.ingram@eeoc.gov

From: Zander Gray <zandergray1@gmail.com>
Sent: Saturday, April 11, 2026 8:48 PM
To: LADONNA INGRAM <LADONNA.INGRAM@EEOC.GOV>
Subject: [External] Re: EEOC Inquiry 438-2025-02440

CAUTION: The sender of this message is external to the EEOC network. Please use care when clicking on links and responding with sensitive information. Forward suspicious emails to phishing@eeoc.gov<mailto:phishing@eeoc.gov>.

Dear Ms. Ingram,

Please find attached my completed and signed Form 5A in response to your request.

Please confirm receipt. I am available for the intake interview at your convenience and will cooperate fully in the next steps of the process.

Thank you for your assistance.

Sincerely,
Alexander C. Gray

On Thu, Apr 9, 2026 at 9:28 AM LADONNA INGRAM <LADONNA.INGRAM@eeoc.gov<mailto:LADONNA.INGRAM@eeoc.gov>> wrote:
Alexander C. Gray,

Good morning, we are contacting you to follow up on your claim you submitted to the U.S. Equal Employment Opportunity Commission (EEOC). In that claim, you reported that your employer or potential employer may have discriminated against you.

Except for the Equal Pay Act, the laws we enforce require you to file a charge of discrimination before you can file a lawsuit for unlawful discrimination.
An inquiry, like the one you submitted to us, is not a charge of discrimination.

There are strict time limits for filing a charge. For more information about the time limits, please see http://www.eeoc.gov/employees/timeliness.cfm. Based on the information you provided in your inquiry with a

date of harm of June 30, 2025, your time to file a charge expires on or about April 27, 2026. Please be aware that if you file a charge, we will notify the employer you filed the charge against.

If you would like to file a charge, you may do so by completing and signing the attached form. Please do not use a typed electronic signature for the signing of these documents as we will need a handwritten signature or a digital signature. A typed electronic signature is not sufficient for legal documents processed by the Commission. The Form must be completed, properly signed, and returned to us by email at ladonna.ingram@eeoc.gov<mailto:ladonna.ingram@eeoc.gov> or fax at (804) 592-3799 no later than 11:59 pm Monday, April 27, 2026. (If you have already filed your charge with a state or local agency that handles charges of employment discrimination, you do not need to file another charge with us.)
Please keep in mind that you will still need to be interviewed by one of our staff members within the next few days in order for us to prepare a formal/perfected Form 5, Charge of Discrimination.

Your charge (Form 5A) should consist of a clear and concise statement of the facts constituting the alleged unlawful employment practice(s), including the date(s) of each negative employment action taken against you. For example: "I was denied an accommodation I needed to perform my job," "I was fired because I was pregnant", "I was laid off because of my age."

We will administratively close your inquiry until we hear back from you and/or before your deadline to file. If you are still interested in filing a charge after your inquiry has been closed, and you have not missed the deadline to file your charge timely, please contact us as quickly as possible and we will reopen your inquiry.
[Email image placeholder omitted; signature text retained]
LaDonna Ingram| Office Automation Assistant
U.S. Equal Employment Opportunity Commission
Richmond Local Office
Phone: (804) 362-6910
Email: ladonna.ingram@eeoc.gov<mailto:ladonna.ingram@eeoc.gov>

## EXHIBIT AH-5 | May 26, 2026 charge acknowledgment and conditional dual-filing statement

*Reproduction of preserved email text and ordinary message headers. Transport headers are omitted. Complete relevant quoted thread is retained. Both English and Spanish portions are retained.*

From: EEOC <no-reply@service.eeoc.gov>
To: "Mr. Alexander C. Gray" <zandergray1@gmail.com>
Date: Tue, 26 May 2026 21:14:44 +0000 (UTC)
Subject: Your Charge of Discrimination is Signed / El Cargo de Discriminación está Firmado

U.S. Equal Employment Opportunity Commission
Richmond Local Office
400 N. Eight Street Suite 350
Richmond, VA 23219
(804) 362-6910
Website: www.eeoc.gov

05/26/2026
Mr. Alexander C. Gray
150 N SNOW CANYON DR UNIT 19
IVINS, UT 84738

Re: Mr. Alexander C. Gray v. Commonwealth Savers
EEOC Charge Number: 438-2025-02440

Dear Mr. Alexander C. Gray,
This is to acknowledge receipt of your EEOC charge of discrimination, which has been filed under the following statute(s):
The Americans With Disabilities Act of 1990 (ADA).

We will contact you when we need more information. A notice of the charge will be sent to the organization you filed the charge against. Many states, counties, cities, and towns have their own laws prohibiting discrimination and are responsible for enforcing those laws. These agencies are referred to as Fair Employment Practices Agencies (FEPAs). Usually, the laws enforced by these agencies are similar to those enforced by the EEOC. If the charge is initially filed with the EEOC and the charge is also covered by state or local law, the EEOC dual files the charge with the state or local FEPA (meaning the FEPA will receive a copy of the charge).

Please use the EEOC charge number listed at the top of this email whenever you or your attorney (if you have one) contact us about this charge. Please notify the EEOC's Richmond Local Office of any change to you or your attorney's contact information or if either of you will ever be unavailable for a long time. Failure to cooperate may lead to dismissal of the charge.

The quickest and most convenient way for you or your attorney to obtain the status of your charge and to submit documents is to use the EEOC Public Portal. ( https://publicportal.eeoc.gov/Portal/Login.aspx )

Sincerely,

DEANDRE WHITEHURST
EQUAL OPPORTUNITY INVESTIGATOR
DEANDRE.WHITEHURST@EEOC.GOV
(804) 771-2190

Comisión para la Igualdad de Oportunidades en el Empleo de los Estados Unidos

Asunto: Mr. Alexander C. Gray v. Commonwealth Savers
Número de cargo de la EEOC: 438-2025-02440

Estimado(a): Mr. Alexander C. Gray,
Este documento sirve para confirmar que hemos recibido su cargo de discriminación de la EEOC, que ha sido presentado bajo la(s) siguiente(s) ley(es):
The Americans With Disabilities Act of 1990 (ADA).

Nos pondremos en contacto con usted cuando necesitemos más información. Se enviará una notificación del cargo a la organización contra la que presentó el mismo. Muchos estados, condados, ciudades y pueblos tienen sus propias leyes que prohíben la discriminación y son responsables de hacerlas cumplir. Estas agencias se denominan Agencias de Prácticas de Empleo Justas (FEPA, por sus siglas en inglés). Normalmente, las leyes que hacen cumplir estas agencias son similares a las que hace cumplir la EEOC. Si el cargo se presenta inicialmente ante la EEOC y también está cubierto por la legislación estatal o local, la EEOC presenta el cargo ante la FEPA estatal o local (lo que significa que la FEPA recibirá una copia del cargo).

Utilice el número de cargo de la EEOC que aparece en la parte superior de este correo electrónico siempre que usted o su abogado (si tiene uno) se pongan en contacto con nosotros en relación con este cargo. Por favor, notifique la Richmond Local Office de la EEOC de cualquier cambio en su información de contacto o en la de su abogado, o si alguno de los dos no va a estar disponible en algún momento durante mucho tiempo. La falta de cooperación puede dar lugar a la desestimación del cargo.

La forma más rápida y cómoda para que usted o su abogado obtengan el estado de su cargo y presenten documentos es utilizar el Portal público de la EEOC. ( https://publicportal.eeoc.gov/Portal/Login.aspx )

Atentamente,

Comisión de Igualdad de Oportunidades en el Empleo (EEOC)

DEANDRE WHITEHURST
EQUAL OPPORTUNITY INVESTIGATOR
DEANDRE.WHITEHURST@EEOC.GOV
(804) 771-2190

Cc:

# EXHIBIT AI | May 19, 2025 - Remote work this week




*Unchanged photograph, scaled to fit. The displayed message is dated May 19, 2025 at 5:28 p.m.; its timezone is not shown. The taskbar's June 27 display is distinct from the email date. The next page provides a reading aid.*

Source: 1-1000025690.jpg | SHA256: 8780ab8dcb6cc542de3f268864e881852aaebceb3c943d5f0b1e7d16683a6406

## EXHIBIT AI | Reading aid - displayed May 19 email

*Transcription of all visible email text from the preserved photographs; not a native email export. Line wrapping is normalized. The photographs control. Only one of the two views of the same message is reproduced in this packet. The source does not establish whether unseen attachments or later messages existed.*

Subject: Remote work this week
From displayed name: Carolyn Bishop
To displayed name: Zander Gray
Cc displayed names: Jessica Geis; Mike Henry
Displayed date/time: Mon 5/19/2025 5:28 PM

Zander,

I wanted to circle back regarding your request this weekend to work remotely from Utah this week. I approve it for this week but still need you working East Coast hours and being reliably available, especially to the team you manage. If you need to step away to attend to your familial obligations, please take PTO as it's provided for this reason. As noted in previous conversations, you may be eligible for Family Medical Leave under the Family Medical Leave Act and Jessica will be sending you that paperwork soon. Please note that you will only have about 15 days to return that paperwork, so timing is important.

Beyond this week, last minute remote work will not be approved unless we have agreed upon a long-term solution. However, I will consider PTO if a similar situation arises, and you have PTO to take (notwithstanding any FML that has been approved, and which can be taken unpaid). You have requested a long-term remote position verbally but have not yet submitted anything to us in writing with the details of what you are requesting. Absent that proposal, it is difficult to make these decisions last minute so please get that to us as soon as possible.

I would like to meet about this tomorrow but wanted to get the email out today so you could read it in advance of that meeting. I will schedule something for us.

I will be out of the office beginning Wednesday of this week so please also include Mike and Jessica on any associated communications and feel free to reach out to them if you have questions.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

Alexander C. Gray v. Commonwealth Savers Plan, et al.
Civil Action No. 3:25-cv-00742-RCY

# EXHIBIT AJ

## Namely Records Photographed June 27, 2025

The following pages reproduce four complete photographs taken by Alexander C. Gray on June 27, 2025, of records displayed in his Namely account.

The first three photographs display comments by Mike Henry dated February 8, 2024. The fourth displays the FY2025 Mid Year Progress Check overview, including a completed date of February 13, 2025 and a review-writer submission date of February 25, 2025. These displayed record dates are distinct from the photograph date.

| AJ page | Original photograph | Displayed record |
| --- | --- | --- |
| 2 | 20250627_130442.jpg | Henry comment concerning project communication and core competencies; displayed entry date February 8, 2024. |
| 3 | 20250627_130546.jpg | Henry comment concerning team leadership and collaboration; displayed entry date February 8, 2024. |
| 4 | 20250627_130645.jpg | Henry comment concerning goal tracking and demonstrations; displayed entry date February 8, 2024. |
| 5 | 20250627_131746.jpg | FY2025 review overview: displayed completed date February 13, 2025; review-writer submission date February 25, 2025. |

Each photograph is reproduced in full on its own page. The photographs have not been cropped, retouched, or transcribed; they are proportionally scaled to fit the page.


https://virginia529.namely.com/performance/goals/200843406?back_dest=%2Fpeople%2F5992035e-cce1-4034-9584-3df8ba7331a2%2...
OneLogin
Zander has demonstrated Core Competencies.
Mike Henry
Feb 8, 2024
Zander has been doing well communicating progress on his very critical projects to the leadership team. He has been giving status updates on our weekly project update meeting with the SIT group, COO and myself. He is prepared and is open and honest about progress, lack of progress and hurdles.
During the go live for Okta and right before the go live Zander was very busy keeping the team focused on the last items we needed to feel comfortable with such as performance testing. I appreciated his commitment to making sure those efforts happened and that they were communicated out so I could be confident we did everything we could to be successful.
Zander, please watch for and set reminders for critical HR or other non-IT related Agency needs. It is easy to miss these items, but they are critical to the Agency as well.
Zander Gray changed title from Demonstrate Core Competencies to Demonstrate Core Competencies -2024
Feb 7, 2024
Type here to search
3:04 PM
6/27/2025



Zander has demonstrated leadership up to this point.

Mike Henry Feb 8, 2024

Zander was very interactive with his team and provided good leadership for the especially during the push to implement Okta. He was team oriented and pushed them to succeed when needed. Zander has been working well with Security and IT Operations and has help bring the 3 groups come closer together.

I know each individual on a team has different needs and appreciates different management styles. Zander, please make sure that touch base with your silent self-directed power players frequently as well. I worry with a team your size that squeaky wheels may divert from others sometimes.

Please continue working closely with Marcomm and other business units to deliver changes to the product that are impactful to our customers and the Agency.

Zander Gray created **Development Leadership -2024** Feb 7, 2024

ype here to search

Mike Henry Feb 8, 2024

Zander is tracking our progress toward goal completion very closely. This tracking is done in conjunction with the SIT group and communicated to leadership frequently. As of the last readout on progress Zander is still on track with completing Agency goals on time.

Zander has been supportive of new ideas that may provide development performance improvements. He has also been realistic in not letting new ideas sidetrack the team from finishing goals on time. I like that he is balancing this throughout the team.

Zander is meeting metrics on providing demos of new functionality and changes directly related to the agency customer journey goals. This is critical to the success of the goals as it brings the stakeholders together to make sure we are not diverging from their business needs.

Zander Gray changed title from **Operational Excellence, Strategic Planning, and Process Improvements** to **Operational Excellence, Strategic Planning, and Process** Feb 7, 2024


OneLogin
(137) Review : Commonwealth
https://virginia529.namely.com/performance/reviews/07ab47ef-298b-4448-9946-6b7446a881af
OneLogin
All Bookmarks
Review: Zander Gray
Actions
Overview
STATUS Complete
REVIEW CYCLE FY2025 Mid Year Progress Check
COMPLETED 02/13/2025
Due Dates
OVERALL DUE 02/14/2025
Zander Gray
Development Director
Collapse All
Review Writers
Collapse Answers Mike Henry submitted February 25, 2025
Goals
FY2024 Mid-Year Goal Progress
Type here to search
3:17 PM
6/27/2025